**No. 26-769**

# In the United States Court of Appeals for the Ninth Circuit

BEAGLE LABS, INC., BEAGLE TECHNOLOGIES, INC., BIG BEAGLE, INC., RENTAL PROPERTY MANAGERS ASSOCIATION LLC, AND YRIG RISK RETENTION GROUP, INC.

*Plaintiffs-Appellants,*

v.

APPFOLIO, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the Central District of California, No. 2:25-cv-12248-JFW-SSC (Walter, J.)

## APPELLANTS' OPENING BRIEF

Michael Burshteyn
Marcelo Barros
GREENBERG TRAURIG, LLP
101 2nd Street, Suite 2200
San Francisco, CA 94105
Telephone: (415) 590-5141
Michael.Burshteyn@gtlaw.com
Marcelo.Barros@gtlaw.com

Jake Evans (*pro hac vice*)
Jordana R. Sternberg (*pro hac vice*)
GREENBERG TRAURIG, LLP
3333 Piedmont Road, NE
Suite 2500, Terminus 200
Atlanta, GA 30305
Telephone: (678) 553-2100
Jake.Evans@gtlaw.com
Jordana.Sternberg@gtlaw.com

*Counsel for Appellants*

ACTIVE 722172805v1

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellants Beagle Labs, Inc. and Beagle Technologies, Inc. disclose that there is no publicly held corporation that owns 10% or more of their stock, and their parent corporation is Corgi Insurance Services, Inc.

i

# TABLE OF CONTENTS

**Page(s)**

JURISDICTIONAL STATEMENT ................................................................1

ISSUES PRESENTED ...............................................................................4

STATEMENT OF THE CASE .....................................................................5

       i.    AppFolio Attempted to Block Beagle's Ability to Correct its False Smears through a Twice Failed TRO in Santa Barbara Superior ...................................... 16

       ii.   AppFolio in Parallel Promised that it Would Block Beagle's Ability to Service its Customers on December 16.............................................................. 17

  A.   Left With No Choice, Beagle Sued In Federal Court to Maintain the Status Quo ........................................................ 21

       i.    Northern District of California ...................................... 21

       ii.   The Case is Transferred to the Central District of California ................................................................ 22

  B.   The Challenged Order: January 7 TRO and OSC Denial....... 24

  C.   The Reconsideration Effort......................................................... 24

SUMMARY OF ARGUMENT .....................................................................27

STANDARD OF REVIEW .........................................................................30

ARGUMENT..............................................................................................33

I.   The Court's Central Finding that Substitutes can Provide Beagle's Integration with AppFolio Was Clearly Erroneous ........... 33

  A.   The Record Does Not Support a Finding that the Scheduled Reports Are an Adequate Substitute and Instead Renders Such a Finding Implausible ........................ 35

ii

ACTIVE 722172805v1

i. Beagle's Operations Require Write Access as Supported by AppFolio's Own TRO Brief and Engineer Declaration........................................ 36

ii. Beagle's Briefs Confirm Beagle's Services Require More Than Mere Read Functionality ............................ 37

iii. AppFolio's Admissions in the Reconsideration Filings Establish the District Court's January 7 Finding Lacked Evidentiary Foundation ....................... 39

B. The Record Does Not Support a Finding that the Database API Is An Adequate Substitute ............................... 40

i. AppFolio's Passing Observations About Database API Do Not Establish Substitutability for Beagle's Services ...................................................................... 41

ii. The District Court Did Not Adequately Engage With Beagle's Sworn Statements, Including Unrebutted Testimony ..................................................... 42

iii. AppFolio Never Represented that the Database API was Available to Beagle's Customer Base...................... 46

C. The District Court's "Moving Target" Finding Cannot be Reconciled with the Record .................................................... 47

II. The District Court Committed Legal and Factual Error In Concluding Beagle Failed to Show Irreparable Harm ..................... 47

A. The District Court Own Findings of Fact Establish Irreparable Harm Under Controlling Precedent..................... 48

B. The District Court Disregarded Concrete and Unrebutted Evidence of Reputational Harm............................................... 49

C. The District Cout Abused Its Discretion By Imputing the Statements of One Plaintiff Onto Others ............................... 52

iii

III.    The District Court Abused Its Discretion By Resolving a Technically Complex Dispute Without a Hearing ............................ 53

IV.    The Reconsideration Denial Was an Independent Abuse of Discretion ..................................................................................... 58

    A.    The District Court Overlooked New And Material Evidence, Satisfying The Reconsideration Standard .............. 58

    B.    The Court's Ruling Deprived Beagle of Any Opportunity to Be Heard or to Demonstrate the New Information. ........... 61

CONCLUSION ............................................................................................ 64

iv

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AK Futures LLC v. Boyd St. Distro, LLC,*
35 F.4th 682 (9th Cir. 2022) ............................................................ 43

*Allstate Ins. Co. v. Herron,*
634 F.3d 1101 (9th Cir. 2011) ......................................................... 59

*Amazon.com, Inc. v. Perplexity AI, Inc.,*
3:25-cv-09514-MMC (N.D. Cal. Mar. 9, 2026) ............................ 11, 13

*Anderson v. Bessemer City,*
470 U.S. 573 (1985) ..................................................................... 30, 39

*AppFolio, Inc. v. Beagle, Inc.,*
Case No. 25CV07670 ............................................................ 16, 17, 44

*Balla v. Idaho Bd. of Corrections,*
869 F.2d 461 (9th Cir. 1989) ........................................................... 58

*Bose Corp. v. Consumers Union of U.S., Inc.,*
466 U.S. 485 (1984) ..................................................................... 30, 31

*Charlton v. Estate of Charlton*
841 F.2d 988 (9th Cir. 1988) ........................................................... 55

*Coastal Transfer Co. v. Toyota Motor Sales,*
U.S.A., 833 F.2d 208 (9th Cir, 1987) ............................................... 58

*Com. Park at DFW Freeport v. Mardian Const. Co.,*
729 F.2d 334 (5th Cir. 1984) ........................................................... 56

*Cooper v. Harris,*
137 S. Ct. 1455 (2017) ..................................................................... 30

*Cooter & Gell v. Hartmarx Corp,*
496 U.S. 384 (1990) ......................................................................... 30

v

*Direct Israel, Ltd. v. Breakthrough Medical Corp.*,
  952 F.2d 802 (4th Cir. 1991) ...................................................... 31

*Doe v. Kelly*,
  878 F.3d 710 (9th Cir. 2017)...................................................... 32

*Envtl. Def. Fund, Inc. v. Andrus*,
  625 F.2d 861 (9th Cir. 1980)........................................................ 2

*Epic Games, Inc. v. Apple Inc.*,
  No. 4:20-cv-05640-YGR (N.D. Cal. Sept. 28, 2020) ........................... 10

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022) ................................................. *passim*

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  No. 17-03301-EMC (N.D. Cal. Aug. 14, 2017) ........................... *passim*

*Intl. Molders' & Allied Workers' Union v. Nelson*,
  799 F.2d 547 (9th Cir. 1986)...................................................... 55

*Kos Pharm. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004) ...................................................... 57

*McDonald's Corp. v. Robertson*,
  147 F.3d 1301 (11th Cir. 1998)................................................... 57

*Medeco Security Locks, Inc. v. Swiderek*,
  680 F.2d 37 (7th Cir. 1981)....................................................... 56

*Relig. Tech. Ctr., Church of Scientology Intern., Inc. v. Scott*,
  869 F.2d 1306 (9th Cir. 1989)................................................. 2, 30

*S.O.C., Inc. v. County of Clark*,
  152 F.3d 1136 (9th Cir. 1998).................................................. 3, 6

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001)...................................................... 50

*Swimmer v. IRS*,
  811 F.2d 1343 (9th Cir. 1987)..................................................... 58

vi

ACTIVE 722172805v1

*Thomas v. County of Los Angeles*,
   978 F.2d 504 (9th Cir. 1992)....................................................... 28, 53, 62

*U.S. for Use of Pippin v. J.R. Youngdale Constr. Co.*,
   923 F.2d 146 (9th Cir. 1991)................................................................ 3

*U.S. v. Mark*,
   795 F.3d 1102 (9th Cir. 2015)............................................ 32, 61, 62, 63

*Vyne Dental, Inc. v. Henry Schein One, LLC*,
   No. 1:25-cv-03246-MJM (D. Md. Feb. 10-12, 2026)........................... 10

*Williams v. S.F. Unified Sch. Dist.*,
   340 F. Supp. 438 (N.D. Cal. 1972)..................................................... 43

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)............................................................................... 24

**Statutes**

28 U.S.C. § 1292(a)(1)............................................................................ 1, 2

28 U.S.C. § 1404(a) ................................................................................... 22

**Other Authorities**

Challenged Order: January 7 TRO and OSC............................................. 24

Fed. R. App. P. 4(a)(1)(A) .......................................................................... 1

Fed. R. Civ. P. 59(e) ........................................................................... 58, 59

Local Rule 7-18 ......................................................................................... 58

Local Rule 7 18 and Rule 59(e) ................................................................ 60

vii

ACTIVE 722172805v1

## JURISDICTIONAL STATEMENT

The Ninth Circuit has jurisdiction under 28 U.S.C. § 1292(a)(1), which makes interlocutory orders "refusing injunctions" immediately appealable as of right. The orders at issue are the Order Denying Beagle's Motion for ex parte Temporary Restraining Order and Order to Show Cause re Preliminary Injunction (1-ER-005-010) and the Order Denying Beagle's Motion for Reconsideration of Order Denying Temporary Restraining Order and Order to Show Cause re Preliminary Injunction (1-ER-002-004). Both notices of appeal were timely. Beagle filed its initial Notice of Appeal on February 6, 2026 and the amended notice of appeal on March 31, 2026—both within 30 days of their respective orders. (4-ER-742-748; 1-ER-002-004; *see also* Fed. R. App. P. 4(a)(1)(A)).

This Court directed counsel to address this Court's jurisdiction over the appeal. (**Ninth Circuit Dkt. 3**.) The district court denied injunctive relief wholesale. Beagle's motion was for a TRO pending an OSC re PI. The district court denied the TRO and did not schedule a hearing on the PI. There was no opportunity for further injunctive relief. Beagle did everything it could to exhaust remedies at the district court level. It filed

1

a reconsideration motion requesting a hearing to resolve factual disputes and provided additional detail that it could not have known before the prior ruling.  This did not suffice.

The district court's two-time denial has foreclosed any possibility for a hearing and relief for injunctive requests.  After Beagle filed its reconsideration motion, the district court vacated the case management initial status conference hearing and issued a scheduling and case management order setting forth deadlines through jury trial.  That scheduling order provided no opportunity for a pathway to injunctive relief.  (2-ER-091-123.)  Thus, given the "futility of any further hearing [is] patent; there [is] nothing left to talk about." *Relig. Tech. Ctr., Church of Scientology Intern., Inc. v. Scott*, 869 F.2d 1306, 1309 (9th Cir. 1989).  That futility is dispositive and makes the nominal denial of a TRO and order to show cause the functional equivalent of a preliminary injunction denial for purposes of § 1292(a)(1).[1]  *Scott*, 869 F.2d at 1308–09; *Envtl. Def. Fund, Inc. v. Andrus*, 625 F.2d 861, 862 (9th Cir. 1980).

---

[1] The district court noted that the analysis for "[t]he standard for issuing a [TRO] . . . and preliminary injunction under [FRCP] 65 is the same."  (1-ER-009.)

2

Accordingly, this Court has jurisdiction to hear the appeal over the two challenged orders. *See U.S. for Use of Pippin v. J.R. Youngdale Constr. Co.*, 923 F.2d 146, 148-49 (9th Cir. 1991); *see also S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1140 (9th Cir. 1998) (court had jurisdiction of an appeal from a denial of preliminary injunctive relief and the denial of a motion for reconsideration).

ACTIVE 722172805v1

## ISSUES PRESENTED

1. Whether the district court's denial of a preliminary injunction, or even a temporary restraining order pending a hearing on whether a preliminary injunction should issue, was in error, where that decision was based on resolving a contested technical nuanced factual dispute (over whether AppFolio had alternative integration paths available after blocking Beagle's access) against the movant, and where the paper record showed that AppFolio's purported alternative integration paths were not viable;

2. Whether the district court's application of the irreparable harm standard as requiring only extinction level risk for a business and not reputational harm, and analyzing the irreparable harm prong of the TRO and PI standard without reference to the sliding scale of likelihood of success on the merits, equitable balance, or other elements, was in error; and

3. Whether the district court erred by declining to hold an evidentiary hearing on a preliminary injunction, even while denying a TRO in the interim, where the case involves complex technical issues and contested facts with competing engineer declarants.

4

ACTIVE 722172805v1

## STATEMENT OF THE CASE

Beagle has had no opportunity to be heard in this case. The Central District of California court below erred when it declined to issue a temporary restraining order pending an order to show cause regarding a preliminary injunction to stop AppFolio's unlawful targeting and platform blocking against Beagle. A second error compounded the first: The district court declined to hold a hearing on contested complex technical fact disputes material to its decision.

At first, prior to these errors, Beagle was on track to be heard. The same day Beagle filed its TRO, the district court in the Northern District of California set a status conference for the parties to discuss the pending request and whether the case should transfer to the Central District of California. From the jump, the district court acknowledged that the "tech" issues in the case were complex and nuanced.[2] AppFolio at that status conference made a "proposal to have the TRO heard by your Honor" (the Northern District court) "at the earliest possible time that

---

[2] *See* 4-ER-754 (analogizing AppFolio's access blocks to being "deplatformed" from an online platform).

5

your Honor available." ( 4-ER-752-762)  The Northern District court decided to consider venue first, and noted that "if I need to take up the substance of the TRO, I will pick it up at that point, but . . . I'm not picking up the substance of it if it's not supposed to be mine." (*Id.*)

The Northern District ultimately transferred the case to the Central District.  Along with the transfer, the Northern District ordered that AppFolio "shall maintain the status quo pending further order of the transferee court."  (4-ER-752-762 )  At that time, there was an issue of whether AppFolio "failed to maintain the status quo" already, "as it agreed on the record during the status conference[.]"  (*Id.*)  That issue the Northern District too observed that Beagle "may raise . . . to the transferee court."  (*Id.*)

Months after transfer, however, Beagle has never had an opportunity to be heard on its request.  There has been no hearing in the Central District of California on any issue.  The district court denied Beagle's request for TRO on the papers, and did the same as to Beagle's motion for reconsideration.  The initial case management conference was taken off calendar.  AppFolio, in the meantime, has taken advantage of

6

the situation to block Beagle unlawfully from its platform, causing Beagle mounting irreparable harm.

***

Beagle had no choice but to file this case when, out of nowhere, AppFolio embarked on a concerted campaign to unlawfully destroy Beagle's business and block Beagle from accessing the AppFolio platform. AppFolio based this attack on false pretexts. On December 9, 2025, AppFolio, without prior notice, mass-emailed joint customers of Beagle and AppFolio, telling them that Beagle posed "serious security risks." AppFolio told Beagle's customers that it planned to block Beagle's access to AppFolio, even though those customers contract with Beagle to work with and through their AppFolio accounts. (1-ER-006.)

Why did AppFolio do this? AppFolio knew about Beagle and the integration for over a year. It was a method of operation that many other third parties use with AppFolio. Indeed, AppFolio designed its platform to facilitate this. AppFolio took action because it wanted to enter Beagle's business. It offered its own in-house solutions and invested $75,000,000 in a Beagle competitor. Shortly after, AppFolio started spreading lies

7

about Beagle, making up excuses based on fabricated security issues to justify blocking Beagle from AppFolio.

At the same time, the same day as its mass-email to Beagle's customers, AppFolio sought a TRO in Santa Barbara Superior Court.

AppFolio sought to silence Beagle in the face of its false statements—preventing Beagle from communicating with AppFolio's customers who were also Beagle's customers. The superior court denied the TRO. Beagle then filed this case.

The case is technically complex. It has to do with artificial intelligence technology, cloud software, platform interoperability, and data flows. It is easy for any person—even a technical person—to confuse the issues. Even a technical engineer would benefit from a deeper dive into understanding the particular facts underlying this case. This is something the district court in the Northern District of California acknowledged right away at the first status conference held on the day Beagle filed.

AppFolio has taken advantage of the situation to give itself cover for unlawfully targeting Beagle. AppFolio claimed to the district court that it had alternative access methods for Beagle to pursue. The challenged

8

January 7 order rests on the erroneous factual premise that AppFolio's offer of "Scheduled Reports" and "the Database API" could provide viable substitutes for Beagle's integrated platform access. That premise is contradicted by AppFolio's own pre-January 7 submissions, by Beagle's sworn reply testimony, and even by the product description in the original TRO motion. To the extent the initial briefs permitted any doubt, the subsequent reconsideration papers cleared it.

The court below relied on AppFolio's promises of an alternative when it denied the TRO and then declined to hold a hearing on the requested PI. The denial, based on the clear record that already disproved the viability of AppFolio's proposed alternatives, was in error. The declination to hold a hearing given the factual disputes was in error too.

The district court's order is contrary to this Court's precedent in the *hiQ v. LinkedIn* case. What AppFolio is doing is worse than what the Court affirmed enjoining there. Here, Beagle works with customers who use AppFolio's platform as designed and as many use it. But when Beagle grows, AppFolio tries to compete, invests in a competitor, then makes up false statements that damage Beagle's reputation and risk its

9

business to justify pretextual blocking Beagle from its platform—that is unfair competition and tortious interference.

Apart from the clear error on the record that existed before the court below on the papers, not providing Beagle an opportunity to be heard and cross examine AppFolio's witnesses is an outlier circumstance as well. This independently requires reversal and remand for an evidentiary hearing.

Courts confronted with technically complex platform-access disputes typically hold live hearings rather than resolve the dispute on a cold record. *See hiQ Labs, Inc. v. LinkedIn Corp.*, No. 17-03301-EMC (N.D. Cal. Aug. 14, 2017) (docket entries Nos. 38 (June 29, 2017), 55 (July 27, 2017)) (1 hour and 24 minute hearing on an ex parte motion for a TRO, and a subsequent 2 hour and 30 minute evidentiary hearing on the PI); *Epic Games, Inc. v. Apple Inc.,* No. 4:20-cv-05640-YGR (N.D. Cal. Sept. 28, 2020) (docket entry No. 103) (2 hour and 31 minute evidentiary hearing on PI motion); *Vyne Dental, Inc. v. Henry Schein One, LLC*, No. 1:25-cv-03246-MJM (D. Md. Feb. 10-12, 2026) (docket entry Nos. 125-27) (after two TRO hearings, the court held a 3-day evidentiary hearing spanning seven witnesses, limited depositions of witnesses prior to the hearing, and

10

requested post-hearing briefing); *Amazon.com, Inc. v. Perplexity AI, Inc.*, 3:25-cv-09514-MMC (N.D. Cal. Mar. 9, 2026) (docket entry No. 77) (3 hour and 18 minute evidentiary hearing on PI motion).

Rather than hold a hearing here, the court below resolved the technically complex SaaS integration dispute on paper. It relied on representations that Beagle could not test in cross examination. That cross examination would delve into the details of how enterprise SaaS platforms work, what Scheduled Reports are, what the Database API at issue can and cannot do, and whether a periodic data export can replicate an automated, real-time compliance workflow. AppFolio presented its proposed alternatives—Scheduled Reports and Database API—in its opposition brief, filed December 29, two days before Beagle's reply was due. The court resolved the substitutability question on that record. No court—no matter how technical—could have meaningfully resolved a technical dispute of this nature without some form of a hearing. The Northern District acknowledged the technical complexity in its pre-transfer status conference.

11

After the court below's ruling, Beagle then filed a reconsideration motion and provided further texture and evidence corroborating its initial arguments as to the unfeasibility of these alternative integration workflows. The district court, however, imposed a Catch-22: it then denied the reconsideration motion on the basis that Beagle should have presented this evidence in its opening brief.

Because the district court effectively closed its doors to a hearing and injunctive relief, Beagle now appeals. Beagle is not asking this Court to grant the preliminary injunction outright—though there are grounds for that relief—but for what virtually every court facing a dispute of this complexity has provided: an evidentiary hearing. There, the parties' engineers can testify, be cross-examined, and the court can actually assess whether AppFolio's proposed alternatives can replicate Beagle's automated compliance platform. That is the remedy the record demands. The record also shows that a TRO pending that hearing is appropriate, consistent with the status quo order previously entered by the Northern District court.

12

Beagle respectfully requests that the Court reverse and remand with instructions to hold an evidentiary hearing where Beagle may cross-examine the witnesses.

## I.     Factual Background

### A. Beagle Has Worked with AppFolio Like Many Other Third Parties for Over a Year With AppFolio's Knowledge

Beagle provides insurance verification, compliance management, and resident-protection services to residential property managers across the United States, including tenant liability waiver programs, renters' insurance verification, deposit alternative services, and pet damage waiver offerings.  (1-ER-007.)  Beagle's platform serves over 40,000 properties in all fifty states.  (*Id.*)  To administer these programs, Beagle requires access to its customers' operational data—including tenant rosters, unit identifiers, lease and billing information, and insurance-compliance status—and for many of Beagle's customers, this operational data is held within AppFolio's property management software platform. (D'Angelo Decl. ¶. 4, 4-ER-685-686.)  AppFolio's own terms of service permit customers to grant such access to third-party vendors through designated user accounts. (*See* Ex. C to AppFolio's opposition, 3-ER-514 (Terms of Service § 15.1) ("You may choose to use your data in conjunction

13

with a third party provider.  If you decide to do so, you may permit that third party provider to access or use your data as required for the interoperation of their products and services with the Services."  A significant amount of Beagle's customer base operates on AppFolio's platform.  (¶¶ 4, 47, 4-ER-715, 4-ER-723; 1-ER-007; 2-ER-267.)  As a result, AppFolio is not merely a vendor relationship for Beagle; AppFolio's platform provides the foundational infrastructure for Beagle's services.

Beagle reached out to AppFolio back in November of 2024 to seek a more formal commercial partnership, including through AppFolio's Stack Marketplace, which is a program AppFolio offers for approved third-parties to integrate with AppFolio.  (4-ER-614; ¶ 5, 2-ER-166.)  AppFolio declined.  (2-ER-152.)  In December 2024, AppFolio told Beagle that it was "unable to move forward at this time as we currently do not support integrations in the insurance space."  (*Id*; *see also* 2-ER-246.)

Thus, AppFolio has known about Beagle and its operations for quite some time.  (¶ 5, 2-ER-166 (AppFolio's Answer admits it "has known about Beagle for over a year'); 4-ER-614.)  Beagle's operational practices have always been transparent and public: Beagle accessed customer accounts using email addresses registered under its own publicly

14

identifiable domain "beagleforpm.com," which meant AppFolio had complete visibility into Beagle's activities. Indeed, "Beagle's workflow is so transparent that it goes as far as publishing 'Beagle Reports' of accounts with Beagle email domains." (D'Angelo Decl. ¶ 5, 4-ER-686.) "Beagle Reports" are publicly available lists, published by Beagle itself, identifying the AppFolio accounts associated with Beagle's email domains. (D'Angelo Decl. ¶¶ 4-5, 4-ER-685-686; ¶ 25, 4-ER-719.) AppFolio does not dispute that it could see these accounts through its own administrative tools. (Delage Decl., ¶¶ 9-10, 3-ER-522-523 (describing AppFolio's ability to identify Beagle accounts by querying its own databases for Beagle email domains).)

## B. Without Notice, AppFolio in December 2025 Mass-Messaged False Statements to Beagle's Customers and Promised to Block Beagle from AppFolio's Platform Within a Week, Interfering with Beagle's Ability to Service Customers.

Suddenly on the evening of December 9, 2025, after having been aware of and permitting Beagle's operations for at least a year, AppFolio launched a coordinated two-pronged attack designed to eliminate Beagle: an ex parte TRO request in Santa Barbara and a seven-day fuse after which AppFolio would abruptly and unilaterally cut Beagle's access to its

15

ACTIVE 722172805v1

platform. Prior to this attack, AppFolio had sent Beagle no warning, no demand, no cease-and-desist, indeed no notice of any kind.

### i. AppFolio Attempted to Block Beagle's Ability to Correct its False Smears through a Twice Failed TRO in Santa Barbara Superior

On the evening of December 9, 2025, AppFolio filed a complaint and *ex parte* TRO application in the Superior Court of California, County of Santa Barbara, against Beagle, Inc. *AppFolio, Inc. v. Beagle, Inc.*, Case No. 25CV07670. (4-ER-614, n.3; 3-ER-328-399 (AppFolio's Santa Barbara TRO application).) The record further shows no meaningful attempt by AppFolio to reach Beagle before filing its *ex parte* TRO.

On the same day AppFolio mass-emailed Beagle's customers calling Beagle a "potential scam" and a "serious security risk," AppFolio raced to a California state court to muzzle Beagle's response. AppFolio's request for injunctive relief spanned 12 paragraphs—all of them targeting Beagle's speech. (3-ER-329-330 (AppFolio's Santa Barbara TRO application).) The Superior Court denied AppFolio's TRO a few days later. (4-ER-614.) A week later, AppFolio re-filed its TRO, and the court again denied this TRO application on December 17, 2025. (3-ER-561.)

16

Notably absent from AppFolio's twelve-point muzzle request was any request to enjoin Beagle's access to AppFolio's platform. (3-ER-329-330.)

### ii. AppFolio in Parallel Promised that it Would Block Beagle's Ability to Service its Customers on December 16

Simultaneously with filing its lawsuit and *ex parte* TRO, AppFolio mass-emailed Beagle's customers announcing that it would "remove Beagle's noncompliant access" to AppFolio's platform in five business days. (1-ER-008.) The email accused Beagle of posing "serious security risks" and breaching AppFolio's terms of service, and directed customers to purported alternative methods of access, including AppFolio's Scheduled Reports and Database API. (Id.) AppFolio also displayed a banner inside its application notifying its users, including Beagle's customers, of the impending December 16th cutoff. (Id.)

Beagle's customers, who had no independent means to evaluate AppFolio's accusation,immediately began canceling relationships with Beagle. (4-ER-620-621.)

Yet, AppFolio's claim that Beagle's operations posed a hidden compliance concern cannot be reconciled with the undisputed fact that

17

Beagle operated entirely in the open. Beagle accessed its customers' AppFolio accounts using user accounts registered under Beagle's own publicly identifiable domain names. (D'Angelo Decl. ¶¶ 4-5, 4-ER-685-686.) And as stated, Beagle went as far as publicly disclosing the Beagle Reports.

## C. One of the Beagle Entities Issued a Damage-Control Statement in the Fog of the Situation

AppFolio's sudden attack on December 9, 2025, placed Beagle's business and its customer relationships in peril, forcing Beagle to respond, both legally and commercially.

The response came from Mike Brown, who was CEO of Big Beagle, Inc. He later declared under oath that the email "was meant to be damage control to stop customer panic" and that Scheduled Reports (the alternative AppFolio claims is a sufficient substitute to Beagle's prior access methods) "are not workable." (Brown. Decl. ISO Reply ¶ 5, 2-ER-278.) The email did not purport to be a technical assessment. Nor could it have been a reliable technical assessment: That same evening, Mr. Brown sent an email to a concerned customer in an attempt to arrest the panic AppFolio had created. (Id.; 3-ER-519.) Brown wrote that "[t]he 'fix' is simple and already in motion" and that Beagle "can continue to run

18

your Beagle program using [S]cheduled [R]eports from AppFolio instead of direct logins if you prefer." (3-ER-519.) At this point in time, Beagle had not had the opportunity to make any meaningful evaluation of possible technical substitutions for the access AppFolio announced it would sever. Mr. Brown was speaking to confused and concerned clients in the midst of a business and technology crisis, and, even so, his statement was not absolute: he explicitly stated that Beagle would "need to confirm" the Scheduled Reports "stay active" through AppFolio's blocking measures. (3-ER-519.)

AppFolio would later make much of this email. It underpinned the district court's decision to deny injunctive relief and foreclose even the possibility of a hearing on whether a preliminary injunction would be appropriate. (1-ER-009-010.) The district court took Mr. Brown's statement as a binding technical concession, even though the court also recognized Mr. Brown sent the statement to "allay" confusion. (1-ER-008.) (The district court's characterization of this email is inconsistent, evincing the court's clearly erroneous fact finding.)

### D. AppFolio's Real Motivation Was Anticompetitive in Nature

19

Appfolio's timing of this attack on Beagle was not random. AppFolio's competing insurance products—FolioGuard and Smart Ensure—had struggled against Beagle's offerings in the market. (Brown Decl. ISO TRO ¶ 5, 4-ER-637.) Beagle's accelerating growth in 2025 threatened both AppFolio's in-house products and a brand new $75 million investment in a competitor to Beagle.

AppFolio had purchased an interest in a competing company, Second Nature Holdings, L.P, the indirect parent of Second Nature, on or around April 11, 2025, for $75M cash on hand. (2-ER-267, n.2.) On November 18, 2025—merely 21 days before the December 9 deplatforming announcement—AppFolio held its annual investor meeting in Santa Barbara and featured the Second Nature partnership prominently, including a dedicated slide promoting Second Nature's services as a new revenue-generating offering for AppFolio's property management customers. (AppFolio Investor Day Presentation, Nov. 18, 2025, 3-ER-410-501.)

Second Nature is a direct competitor of Beagle offering substantially similar residential property services. (1-ER-007.) Mr. Brown declared under oath that Second Nature "uses the exact same method of

20

authorized access" as Beagle—the identical permissioned user-account model AppFolio seeks to eliminate.  (Brown Decl. ISO TRO ¶ 8, 4-ER-637.)

Weeks after showcasing its new investment in November 2025, AppFolio launched its coordinated December 2025 attack on Beagle.

## II. Procedural Background

### A. Left With No Choice, Beagle Sued In Federal Court to Maintain the Status Quo

#### i. Northern District of California

Appfolio refused to halt its December 16th deplatforming efforts pending negotiations.  (4-ER-621.)  Left with no choice, Beagle filed its own federal complaint in the Northern District of California laying out AppFolio's anticompetitive conduct, seeking its own TRO to maintain the status quo, on December 15, 2025.  (4-ER-714-734; 4-ER-611-631.) Beagle's complaint against AppFolio sets forth nine claims for relief including tortious interference, unfair competition, false advertising, monopolization, defamation, unjust enrichment, and declaratory relief. (4-ER-714-734.)

The Northern District set a status conference for that very same day.  (4-ER-609-610.)

21

At this December 15 status conference, AppFolio proposed that the court hear the TRO. The court acknowledged that the issues were technical and nuanced and contemplated that there would be an opportunity to address them at a subsequent time. Instead of hearing the substance, however, the court raised *sua sponte* whether the case should be transferred to the Central District under 28 U.S.C. § 1404(a), and directed the parties to submit 5 pages of briefing on that question by December 19 (Friday). (Id.)

Importantly, AppFolio agreed at the conference to maintain the status quo through December 22, 2025. (3-ER-553, n.1.) On the same day the parties submitted blind briefs, the Northern District transferred the case to the Central District, carrying forward the status quo order. (3-ER-559.) The TRO was never heard in the Northern District.

### ii. The Case is Transferred to the Central District of California

The case was then assigned to Judge John F. Walter in the Central District of California. The Northern District of California ordered AppFolio to maintain the status quo after transfer. AppFolio had previously consented, although its commitment was nominal only. Despite consenting to maintain the status quo, AppFolio continued

22

displaying a banner inside its application falsely suggesting that Beagle had already been removed as of December 16. (3-ER-561; 2-ER-268.) This banner—which AppFolio did not correct until at least December 18, 2025 (3-ER-312 at n.7; Saxena Decl. ¶ 27, 3-ER-407)—caused Beagle to lose more than $500,000 in annual recurring revenue and over 6,000 "doors" before the TRO was ever decided, forcing, again, Beagle to respond. (3-ER-561 (referencing Brown Decl. ¶ 11, 3-ER-569); 2-ER-268.) After Beagle brought this to the Northern District of California's attention, it ordered the maintenance rather than continuing to rely on AppFolio's consent and observed that the issue of AppFolio violating its consent made on the record could be raised to the Central District of California.

The Central District court then issued a briefing schedule: AppFolio was to file its opposition to the TRO on December 29, 2025 (3-ER-294-324) and Beagle its reply 48 hours later, on December 31, 2025 (2-ER-266-275.) Substantively, AppFolio's opposition introduced the notion that AppFolio's Scheduled Reports and Database API were adequate substitutes for Beagle's integrated access. (3-ER-299, 3-ER-303-304.) Under this compressed schedule, Beagle had no meaningful opportunity

23

to conduct engineering validation and a fully fleshed rebuttal to AppFolio's technical representations.

### B. The Challenged Order: January 7 TRO and OSC Denial

On January 7, 2026, the court below denied Beagle's TRO and order to show cause re preliminary injunction. (1-ER-005-010.) The court expressly recognized that "[t]he standard for issuing a [TRO] and preliminary injunction . . . is the same," applying the full four-factor *Winter* framework, but did not address the factors holistically. (1-ER-006 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).)

The denial rested primarily on the finding of lack of irreparable harm. The Court first credited AppFolio's statements that the Scheduled Reports and Database API were viable substitutes. Next, the court held that Beagle's supplemented write-access arguments and evidence, adduced in its Reply, had appeared there only "for the first time." (1-ER-010; *see also* 1-ER-003 at 2 (characterizing Beagle's position as a "moving target" in the reconsideration denial).) The order set no further injunctive proceedings.

### C. The Reconsideration Effort

Beagle timely moved for reconsideration on January 21, 2026. (2-ER-063 (AppFolio Opp., confirming January 21 deadline).) On February

24

4, the court struck that motion. (4-ER-188; 1-ER-067; ER-017.) Beagle filed its Notice of Appeal on February 6, 2026. (4-ER-742-748.)

On February 11, Beagle filed a second motion for reconsideration, presenting new engineering testimony from Ayanga Okpokowuruk establishing the operational non-viability of AppFolio's proposed alternatives through post-order testing, as well as evidence of post-order customer attrition caused by AppFolio's January 9, 2026 disparagement communications. (2-ER-129-130; Okpokowuruk Decl., 2-ER-153-155.)

The next day—February 12, 2026, with the reconsideration motion pending and unresolved—the court issued two orders. First, it vacated the previously scheduled February 23 scheduling conference and referred the case to private mediation. (2-ER-124.) It simultaneously issued a scheduling and case management order setting this case for jury trial. (2-ER-123.) The scheduling order contains no preliminary injunction hearing, order to show cause, and no injunctive relief track of any kind. (Id.) With Beagle's AppFolio integration severed and an eighteen-month merits timeline in place, there was no remaining avenue for interim relief.

On March 12, 2026, the court denied Beagle's motion for reconsideration and simultaneously vacated the March 23 hearing that

25

had been scheduled on that motion.  (1-ER-002-004.)  Beagle timely filed its amended Notice of Appeal within 30 days of that order.  (4-ER-735-737.)  This appeal followed.

26

ACTIVE 722172805v1

## SUMMARY OF ARGUMENT

The district court denied Beagle injunctive relief based on a factual premise the record contravened: that AppFolio's Scheduled Reports and Database API provide Beagle with viable alternative routes to AppFolio's platform. That premise is clearly erroneous, and its collapse impacts all of the district court's rulings below.

I.    The record establishes that Scheduled Reports are read-only—as admitted by AppFolio—and that Database API is restricted to AppFolio's enterprise-tier customers, rendering it commercially not viable—a fact unrebutted by AppFolio. Neither route currently can perform the write-capable workflow Beagle customers require. The court resolved this contested technical question against Beagle on a paper record, crediting AppFolio's representations without scrutinizing the evidence. That is clear error.

II.    Once the substitutability finding falls, irreparable harm is compelled by *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022). The district court's own factual findings, under controlling *hiQ*, lead to the legal conclusion that Beagle

ACTIVE 722172805v1

established a sufficient threat of irreparable harm. The court also ignored unrebutted evidence that AppFolio's false security-risk accusations caused immediate, documented, reputational harm to Beagle. This is evidence *hiQ* recognizes as independently sufficient. Both failures were an abuse of discretion.

III. Once the district court issued its erroneous January 7 order denying Beagle's injunctive relief, the court further erred by failing to hold a hearing when the court was confronted with two irreconcilable sworn declarations by engineers on opposite sides. The district court should not have resolved the dispute on the papers under these circumstances. *Thomas v. County of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1992). No hearing was held; that is an abuse of discretion.

IV. Beagle and AppFolio's own briefing and attendant declarations presented new facts and new evidence that warranted reconsideration of the TRO denial or, at least, an evidentiary hearing given the technical complexity at issue. The district court denied the reconsideration motion on the ground that there was no new evidence presented. But AppFolio itself presented

28

29

new evidence.  The court's denial of the reconsideration motion

presents an independent ground for reversal.

ACTIVE 722172805v1

## STANDARD OF REVIEW

The denial of a preliminary injunction is reversible if the "district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Religious Tech. Ctr. v. Scott*, 869 F.2d 1306, 1309 (9th Cir. 1989) (citing *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 849 (9th Cir. 1985). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp,*, 496 U.S. 384, 405 (1990).

The Supreme Court has articulated that a finding is "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 573, 573 (1985). The finding of the trial court will govern so long as it is "plausible," even if a contrary finding is "equally or more" plausible. *Cooper v. Harris*, 137 S. Ct. 1455, 1465 (2017) (quoting *Bessemer City*, 470 U.S. at 573). But this presumption of correctness is not absolute, indeed it is "stronger in some cases than in others." *Bose Corp. v. Consumers Union of U.S., Inc.*,

30

466 U.S. 485 at 500 (1984).  The "conclusiveness of a finding of fact depends on the nature of the materials on which the finding is based," (*Bose*, at 500 n.16) with "lesser force" in the context of documentary evidence versus "oral testimony" (*Bose*, at 466 U.S. at 500).  This is so because the "likelihood that the appellate court will rely on the presumption tends to increase when trial judges have lived with the controversy for weeks or months instead of just a few hours."  *Bose* at 500.

Although the hallmark of an abuse of discretion inquiry by the appellate court is deference, given the wide variety of matters committed to the discretion of district judges, this standard is inherently variable and contextual.  The Fourth Circuit has aptly held that "abuse of discretion is a legal term of art," not a "wooden term but one of flexibility, dependent on the type of case in which it is to be applied and the posture of the case when it arises."  *Direct Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 814 (4th Cir. 1991).  The review of the grant or denial of a preliminary injunction cannot be "a rule of perfunctory appellate review but one of careful scrutiny."  *Id.*, 814-15.

A district court's irreparable harm determination is also reviewed for abuse of discretion, with underlying factual findings reviewed for clear

31

error.  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022).  A finding is clearly erroneous when it is "illogical, implausible, or without support in the record." *Doe v. Kelly*, 878 F.3d 710, 713 (9th Cir. 2017).

The district court's denial of the reconsideration motion is also reviewed under the abuse of discretion standard.  *U.S. v. Mark*, 795 F.3d 1102, 1105–06 (9th Cir. 2015) (failure to meaningfully consider newly presented evidence that calls into question the factual foundation of a prior ruling is abuse of discretion).

ACTIVE 722172805v1

## ARGUMENT

### I. The Court's Central Finding that Substitutes can Provide Beagle's Integration with AppFolio Was Clearly Erroneous

The district court credited AppFolio's assertion that after it blocked Beagle's access to the platform, Beagle's customers could still work with Beagle using AppFolio's Scheduled Reports and API functionality. Relying on AppFolio's untested assertions, the district court decided that Beagle had not established a likelihood of irreparable harm, looking only at extinction risk and not reputation. The record does not support the result.

First, the question of adequate substitute access is a highly technical one. The motion at issue did not concern contract terms or the contents of a customer list. The questions before the court below had to do with whether Beagle faced irreparable harm as a result of AppFolio's abrupt severance of Beagle's longtime access and AppFolio's vilification of Beagle to Beagle's own customers. In making this determination, the district court adopted the assertions made by AppFolio without an opportunity for Beagle to test those assertions.

The district court found that the Scheduled Reports "provide the exact information that Beagle claimed it needed" and that Beagle had

33

failed to identify with specificity which data fields are missing from the Database API, leaving the court "unable to determine the materiality of the data." (1-ER-010.)

At the core of the district court's error in making these factual findings and the resulting legal conclusion is the confusion between two different types of data access: 'reading' data and 'writing' data. Reading data is passive: it permits review of static information that already exists. Writing data, in contrast, is active. Writing data permits the user to input new information, update existing information, or make changes to a system of record. 'Read' and 'write' are fundamentally different functions in any software platform.

After accepting AppFolio's representation that it was offering Beagle adequate alternative access when, in fact, AppFolio was offering only read access, the district court did not reconsider the error. Presented with evidence that AppFolio's proffered solutions did not work, the district court ruled that Beagle had not articulated a need for 'write' access. (1-ER-010; 1-ER-003.)

But the record shows that Beagle had articulated a need for 'write' access. An evidentiary hearing at the initial TRO stage or at the

34

reconsideration stage would have confirmed this. Moreover, even AppFolio admits to understanding that Beagle needs 'write' level access. (3-ER-300 ("AppFolio's user logs show Beagle is not just accessing data, it is using AppFolio's platform to issue charges to residents for its products"); 3-ER-528 (Delage Decl. ¶ 26, explaining that after deplatforming, Beagle will no longer "be able to log in to the property manager's AppFolio account and set up [] billing").) Both of these statements are AppFolio's own account and words confirming it understood Beagle required write functionality.

The decision's confusion of this basic but important technical difference—reading and writing data—underscores how complex and specialized the dispute is. Any observer, even a technical engineer, would need to carefully consider the technology at issue in this case. An evidentiary hearing was warranted to sort out these issues.

## A. The Record Does Not Support a Finding that the Scheduled Reports Are an Adequate Substitute and Instead Renders Such a Finding Implausible

The district court held that AppFolio's Scheduled "provide the exact information that Beagle claimed it needed in its moving papers" (1-ER-010.) That finding is contradicted by AppFolio's own pre-January 7

35

submissions, by Beagle's sworn Reply testimony, and by the original product description attached to the declaration the court itself cited. This issue was not a close call and amounts to clear error.

### i. Beagle's Operations Require Write Access as Supported by AppFolio's Own TRO Brief and Engineer Declaration.

AppFolio's December 29 opposition described Scheduled Reports in a single sentence: it "allows Beagle to *receive* exactly the same data it *receives* through its unauthorized user accounts." (3-ER-299 (emphasis added) (referring to sample report 3-ER-403-404).) That was the sum of AppFolio's evidentiary showing on Scheduled Reports. AppFolio made no representation that Scheduled Reports supported interactive workflows, enabled write operations, or could substitute for any function requiring Beagle to act within a customer's database. (*Id.*) In short, AppFolio merely stated Scheduled Reports provide read functionality.[3]

Importantly, AppFolio *knew* Beagle required more than mere read functionality and explicitly said so in its TRO opposition brief: "AppFolio's user logs show *Beagle is not just accessing data,* it is using AppFolio's

---

[3] AppFolio's own reconsideration opposition confirm the Scheduled Reports' 'read-only' nature. (2-ER-064.)

ACTIVE 722172805v1

platform to issue charges to residents for its products. This functionality is offered only to AppFolio's paying customers." (3-ER-300 (emphasis added).) AppFolio's own engineering director, Mr. Delage, in a sworn statement, also confirmed it: "After Beagle's accounts on AppFolio's platform are closed . . . Beagle [] will not be able to log in to the property manager's AppFolio account and set up [] billing." (3-ER-528.) AppFolio knew Beagle's services required more than mere read capabilities.

### ii. Beagle's Briefs Confirm Beagle's Services Require More Than Mere Read Functionality

Exhibit A to the original D'Angelo declaration, filed on December 15, describes how Beagle works. (4-ER-687-690.) It describes Beagle as: "Autopilot for Renters Insurance Compliance"; with a service that is "100% hands-off," and "fully managed and automated," allowing the customer to "[s]ave hours of manual work by automating verification of third party insurance policies." (4-ER-689.) A customer quoted in the exhibit called it "the easiest program ever to launch." (*Id.*) The exhibit states that "Beagle integrates . . . enabling seamless setup and automating insurance verification within minutes." (4-ER-690.)

A system that is "100% hands-off" and operates on "autopilot" for the property manager cannot work by being a passive receiver of data.

37

Automation requires more than reading data: it requires action, i.e., write operations. This is not a legal inference: it is confirmed by AppFolio's own engineer's statement that deplatforming will eliminate Beagle's ability to "set up [] billing." (3-ER-528.) This exhibit was attached in the original filing on December 15.

The district court's holding that the Scheduled Reports provide the "exact information" Beagle needs cannot be reconciled with an exhibit in the record describing Beagle's service as automated, hands-off, on "autopilot" (4-ER-688-689), or with AppFolio's own engineer's admission that deplatforming would eliminate Beagle's ability to "set up [] billing" (3-ER-528).

Further, Beagle's December 31 reply in support of its initial request for TRO adds to the record: Mr. D'Angelo declared that Scheduled Reports "will not work" as it limits Beagle to an unworkable binary yes-or-no, lacking policy visibility, and that it fails to show coverage amounts, expiration dates, or interested-party listings. (D'Angelo Decl. ¶ 3, 2-ER-290.) The Scheduled Reports are also incapable of adding or removing insurance charges. This is because Scheduled Reports merely provide passive data export functionality.

38

As stated in the Reply brief, reliance on Scheduled Reports would in effect negate "the whole point of Beagle's value proposition." (2-ER-271-272.) The district court's finding that Scheduled Reports as sufficient is an implausible (indeed impossible) conclusion in the face of the evidence. A finding that ignores contrary sworn testimony is clearly erroneous. *Anderson*, 470 U.S. at 574.[4]

### iii. AppFolio's Admissions in the Reconsideration Filings Establish the District Court's January 7 Finding Lacked Evidentiary Foundation

The reconsideration briefing highlights the error below. In opposing reconsideration, AppFolio admitted the Scheduled Reports are "read-only." (2-ER-064.) Or as AppFolio put it: "As the name suggests, scheduled reports provide a report—not write access to the functionality of AppFolio's system." (2-ER-064-065.) AppFolio also admits that it:

> "[N]ever claimed that any of its features would allow Beagle to service its customers' contracts. To the contrary, AppFolio expressly stated that because Beagle had not attached a contract or identified any term thereof, AppFolio 'does not know what Beagle has actually

---

[4] The district court sidesteps the Reply brief by alleging Beagle raised new arguments at the reply stage. This point is addressed on Argument § I.C.

39

promised its customers.'" (2-ER-075 (quoting 3-ER-315).)

That was AppFolio's contorted defense for its claim that it did not mislead the district court: it was merely "focused on the data Beagle told the Court it needed [sic]." (2-ER-075.) In any event, AppFolio recognized that "Beagle itself told the [district] [c]ourt [the] scheduled reports did not have the write access it claims to require." (2-ER-076 (referring to 2-ER-272).)

## B. The Record Does Not Support a Finding that the Database API Is An Adequate Substitute

With respect to the Database API, the district court faulted Beagle for "fail[ing] to identify what data fields" it needed and failing to explain how many "months" it would take to engineer new integrations. (1-ER-010.) The court reasoned that "[w]ithout knowing what data fields Beagle claims are missing, the Court is unable to determine the materiality of that data and the likelihood of irreparable harm." (1-ER-010.)

But AppFolio offered no rebutting testimony challenging Beagle's statements. The error here is problematic because it rests not solely on a misreading of the record, but a finding based on the court's own inference and speculation that Beagle's motion needed more specificity. The district court's reference to speculation is shown its use of the phrase:

40

"*[p]resumably*, as soon as Beagle became aware that AppFolio intended to enforce its Terms of Service"—five business days before Beagle filed its own complaint and TRO—"Beagle began working on developing or engineering such integrations." (1-ER-010.)

In short, the district court held, contrary to the evidence before it, and without permitting Beagle to test the evidence, that the Database API was adequate as-is, or that because Beagle would be developing integrations—an assumption without support in the record—the court could not find irreparable harm. This too was clear error.

> **i. AppFolio's Passing Observations About Database API Do Not Establish Substitutability for Beagle's Services**

AppFolio mentioned Database API three times in total in its opposition to Beagle's TRO. Two of these mentions simply describe what an API is. (3-ER-303; 3-ER-403.) In a footnote, AppFolio describes an API as an "application programming interface, is an automated means for two computer programs to communicate." (3-ER-303, n.3.) AppFolio then noted that "customers are free to use Database API to share their data with direct competitors of AppFolio." (3-ER-303 (citing to Saxena Decl. ¶ 10, 3-ER-403.) This statement does not imply that Database API can

41

ACTIVE 722172805v1

provide 'write' access.  Yet, the district court extrapolated from these statements as if the Database API route was adequate.

AppFolio's reconsideration statements admit that Database API does not have the needed write functionality (2-ER-075) and—critically—also admit that AppFolio "made no representation as to [capability of the] database API."  (2-ER-077.)  AppFolio's own admission that it "made no representations" regarding the API capabilities should have foreclosed a ruling that the API was a technically feasible substitute.  (2-ER-077.)

> ### ii. The District Court Did Not Adequately Engage With Beagle's Sworn Statements, Including Unrebutted Testimony

Beagle's December 31 reply D'Angelo Declaration identified three specific reasons the API is not an adequate substitute.  (D'Angelo Decl. ¶ 2-7, 2-ER-290-291.) The court dismissed each without properly engaging with the evidence.

*First Beagle objection: missing data fields.*  D'Angelo declared that AppFolio "designed its API so that it would not expose all the data fields that Beagle customers contract with Beagle to manage."  (D'Angelo Decl. ¶ 4, 2-ER-290.)  Yet the district court found that Beagle failed to "identify what data fields are missing."  (1-ER-010.)  Because AppFolio put no

42

technical evidence about the API before the district court, D'Angelo's sworn statement was uncontradicted. It is error to disregard uncontradicted sworn testimony by ruling that the testimony lacks greater needed granular specificity. *See AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 691 (9th Cir. 2022) (affirming an injunction where "at the preliminary injunction stage . . . the only probative record evidence [was] AK Futures' statement[.]"); *see also Williams v. S.F. Unified Sch. Dist.*, 340 F. Supp. 438, 442 (N.D. Cal. 1972) (the district explained it was "required to take as true the statements of fact contained in the [unrebutted] affidavits").

*Second Beagle objection: AppFolio will ban Beagle from the API.* D'Angelo declared that "AppFolio will simply ban Beagle from use of the API, just as it wishes to ban Beagle from use of its platform." (D'Angelo Decl. ¶ 42-ER-290.) The district court concluded that "AppFolio has made no such statement to its customers, and in fact advised its customers in connection with its plans to disable Beagle's user names that it supports 'multiple safe methods for you to work with [third party providers], including AppFolio Stack, Database API, and scheduled reports.'" (1-ER-010 (brackets in original).)

43

The district court's conclusion is erroneous on several levels. *First*, the messaging the court is referencing says nothing about whether AppFolio will permit *Beagle* to use the Database API. Those were generic statements to customers. The court also ignored that AppFolio had consistently refused to work with Beagle as far back as 2024 (4-ER-614).

*Second*, and more importantly, the district court ignored AppFolio's own produced record, which contradicts the court's finding. AppFolio's own exhibit showing customer support chats—provided by AppFolio in its Santa Barbara TRO filings—show that AppFolio's live agents told its customers that AppFolio had "no plans to integrate" with Beagle because Beagle was "a direct competitor"—at least at four separate instances. (3-ER-360, 3-ER-365, 3-ER-367-368.) Though AppFolio's Answer was not before the court made its January 7 denial order, AppFolio categorically admits that "Beagle does not and will not integrate with AppFolio—**not now, and not ever**." (2-ER-179 (emphasis added).)

It was not plausible to assume that the same company that launched a lawsuit seeking an *ex parte* TRO without notice, declared publicly that Beagle is a security risk, and repeatedly told its customers it will not be doing business with Beagle would allow for API access.

44

*Third Beagle objection: number of months of development required.*
D'Angelo declared that "implementing a new API would require AppFolio itself to engineer new API endpoints and Beagle to spend months engineering new integrations." (D'Angelo Decl. ¶ 4, 2-ER-290.) The court again faulted Beagle's supposed lack of specificity, noting that "[i]t is unclear whether 'months' means 2 months, 3 months, 4 months, or more" and concluded that "presumably" Beagle "began working on developing or engineering such integrations" on December 9. (1-ER-010.)

This conclusion is erroneous for at least two reasons.

First, in reaching this conclusion, the district court did not credit D'Angelo's sworn statement that new endpoints require AppFolio's engineering cooperation. AppFolio offered no response to D'Angelo's statement. The court dismissed a sworn, specific statement as insufficiently explained while ignoring the fact that the party opposing the relief acquiesced to D'Angelo's statements.

Second, the district court's conclusion that Beagle was "presumably working on integrations" is a factual assumption contradicted by the evidence on the record. A more plausible inference is that a business would not undertake months of engineering development (and the

45

accompanying massive expense) on an integration doomed for failure from the outset.

### iii. AppFolio Never Represented that the Database API was Available to Beagle's Customer Base

In reply, D'Angelo's declaration stated that API access "is not universally granted by AppFolio" and that *AppFolio "is likely to throttle and restrict Beagle's access."* (D'Angelo Decl. ¶ 4, 2-ER-290 (emphasis added).) In concluding that Beagle had not shown irreparable harm, the district court did not address either of these points. (1-ER-009-010.) Then, after the district court denied relief, Beagle's engineer confirmed it: the API is restricted to enterprise-tier AppFolio accounts, therefore rendering it unavailable to most of Beagle's relevant customer base. (Okpokowuruk Decl. ¶ 4, 2-ER-154 (.) The issue is not merely that the API is less preferable or not optimal: it is that API access is not a viable option for Beagle at all.

Moreover, AppFolio's reconsideration papers did not rebut this, and the district courts' orders are entirely silent on the issue. (*See* 1-ER-005-010; 1-ER-002-ER-004.)

46

### C. The District Court's "Moving Target" Finding Cannot be Reconciled with the Record

The district court's January 7 order found that Beagle's need for write-capable access appeared "for the first time" (1-ER-009) in the Reply whereas the court's reconsideration decision called it a "moving target." (1-ER-003.) Both characterizations rest on one premise: that Beagle's original papers described only a passive data-access need. That premise cannot be reconciled with the record.

The court's confusion stems from confusion about the meaning of the word 'access.' The court concluded that Beagle could service its customers with the read-only 'access' AppFolio was offering, without recognizing that Beagle needed both write and read access.

Because the court below based its denial of the TRO pending a hearing on the preliminary injunction, as well as its declination of having a hearing, on a reading of the facts unsupported by the record, reversal is merited for this reason alone.

## II. The District Court Committed Legal and Factual Error In Concluding Beagle Failed to Show Irreparable Harm

A district court's denial of injunctive relief is reviewed for abuse of discretion, with underlying factual findings reviewed for clear error and legal conclusions premised on clearly erroneous findings cannot stand.

47

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022). The district court recognized *hiQ* controls (1-ER-008) but did not rule consistent with that decision.

### A. The District Court Own Findings of Fact Establish Irreparable Harm Under Controlling Precedent

The district court's own preceding findings of fact compel a finding of irreparable harm. Beagle's entire business hinges on its ability to serve its customers, and AppFolio's blocking measures pose an existential threat.

The district court recognized that Beagle's business is driven from revenue derived from customers who use AppFolio's platform, and that deplatforming Beagle would cause the potential destruction of that revenue base. (1-ER-006.) *hiQ* held that the "threat of being driven out of business is sufficient to establish irreparable harm." *hiQ*, 31 F.4th at 1188 (quoting *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985). There, the Ninth Circuit affirmed a preliminary injunction where "hiQ's entire business depends on being able to access" the defendant's platform and there was "no current viable alternative." *hiQ Labs*, 31 F.4th at 1189. The record before the court was clear on that front. That should have been enough.

48

Like hiQ, Beagle faces a threat to the survival of its business as a result of AppFolio's position and conduct. But Beagle's position is more precarious. Beagle is not a data analytics company scraping publicly available profiles, but a compliance services company with existing customer contracts that require write-capable, interactive platform access. (D'Angelo Decl. ¶¶ 4-7, 4-ER-685-686; Okpokowuruk Decl. ¶¶ 2-5, 2-ER-154.) In short, Beagle faces even more irreparable consequences as a result of AppFolio's blocking: hiQ's loss of access to LinkedIn would deprive hiQ of data, but AppFolio's blocking threatens Beagle's ability to service its clients.

Further, the district court's conclusion was based on a clearly erroneous foundation: that the Scheduled Reports and the Database API were adequate substitutes for Beagle's access. (1-ER-009-010.) As already explained in Argument §§ I.AI.AI.B, that was clearly erroneous. It is error for the court to conclude irreparable harm based on a clearly erroneous factual foundation. *hiQ Labs*, 31 F.4th at 1188.

## B. The District Court Disregarded Concrete and Unrebutted Evidence of Reputational Harm

It is settled law that reputational injury constitutes irreparable harm: *hiQ* itself recognizes reputational injury and disruption of customer

49

ACTIVE 722172805v1

relationships as components of irreparable harm. *hiQ Labs*, 31 F.4th at 1188-89, 1192.[5] Loss of goodwill and reputational harm to a business constitute irreparable harm where, as here, the harm cannot be quantified or remedied through damages. The record before the court on January 7 more than sufficiently established reputational damage.

First, AppFolio's December 9 mass email falsely accused Beagle of posing "serious security risks." (1-ER-008.) Beagle customers immediately forwarded this email to tenants, revoked Beagle's access, and terminated contracts. (*Id.*) One customer called Beagle a "scam"—citing AppFolio's messaging. (4-ER-679.) AppFolio also kept a banner active inside its platform falsely stating Beagle had already been removed, even while AppFolio had agreed before the original federal district court to maintain the status quo. (3-ER-568-569.)

AppFolio issued no correction. (2-ER-268.) Immediately, Beagle's customers, unable to independently verify the situation, believed the ban had already been executed and canceled contracts with Beagle accordingly. (Brown Decl. ¶ 11, 3-ER-569.) That conduct alone cost

---

[5] *See also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").

50

Beagle more than $500,000 in annual recurring revenue and over 6,000 customer "doors." (*Id.*) None of the above is speculative. It is documented evidence of reputational harm flowing directly from AppFolio's conduct.

Though the court recognized Mr. Brown's December 9 email was an attempt to "allay" customer "confusion and concern," the court never grappled with the evidence. It never reached the reputational harm theory. (1-ER-005-010.) Instead of contending with Beagle's allegations and concerns about reputational harm, the district court disposed of irreparable harm entirely on the grounds that Scheduled Reports and API Database were adequate substitutes. The court's dismissiveness was an abuse of discretion and an independent reversible error.

There can be no doubt that the harm is irreparable. Beagle operates in a compliance-sensitive, insurance-adjacent industry where accusations of security concerns are existential. Property managers entrust Beagle with access to their resident data and lease information. A vendor accused of being a "security risk" or "scam" by the dominant platform cannot simply issue a press release and recover its reputation. AppFolio did not merely threaten to terminate Beagle's access—it affirmatively told

51

tens of thousands of property managers, in writing, that Beagle was a security threat and that AppFolio was going to deplatform it.

Monetary damages cannot restore the trust lost when a dominant platform brands a compliance vendor as a risk to its customers' data. *See hiQ Labs*, 31 F.4th at 1188 ("[t]he loss of . . . an ongoing business representing many years of effort and the livelihood of its owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages") (citation modified).

After the district court denied injunctive relief, the harm continued. AppFolio's January 9, 2026 communications, sent to additional Beagle customers AppFolio *had not reached* earlier in December, caused at least one active customer to decline to restore Beagle's access after receiving AppFolio's false accusations. (D'Angelo Decl. ISO Reconsideration ¶ 2, 2-ER-141.) The district court denied reconsideration without addressing this evidence. (1-ER-002-ER-004.) That too was error.

## C. The District Cout Abused Its Discretion By Imputing the Statements of One Plaintiff Onto Others

Mr. Brown is CEO of Big Beagle, Inc., only of *five* legally distinct plaintiff entities. (¶ 1, 2-ER-277.) The five plaintiffs are separate legal entities with distinct customer relationships, contractual exposures, and

52

independent harm profiles. Distinct corporate entities are presumed separate here, where there is no finding or question raised about potential alter egos. Accordingly, a preliminary injunction analysis requires examining irreparable harm as to each plaintiff. Extending an officer's statement beyond the entity for which the officer speaks requires, at minimum, a legal and factual predicate. Where five plaintiffs are separate and distinct entities, the district court cannot collapse them into one for purposes of irreparable harm without explaining the legal or factual basis for treating Mr. Brown's statement as probative of each entity's threatened injury.

The court performed no such examination. Instead, the district court applied Brown's December 9 email against all five plaintiffs without an explanation as to why the statement could be imputed to others.

## III. The District Court Abused Its Discretion By Resolving a Technically Complex Dispute Without a Hearing

The Ninth Circuit has recognized that when material facts underlying injunctive relief are genuinely disputed, a district court may not resolve those disputes on a paper record alone. *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1992). This case presents precisely that circumstance. AppFolio's Software Engineering Director

53

claimed—for the first time, and only in the reconsideration opposition—that the Database API offers "robust write capability." (Delage Decl. ¶ 5, 2-ER-089-090.) Beagle's engineer, by contrast, attested that the API lacks the write functionality required by Beagle's workflows, and that Beagle cannot support API development unilaterally. These positions directly and materially contradict each other. Resolving such a head-on technical conflict requires testimony and cross-examination.

The procedural posture underscores the impropriety of resolving this dispute on affidavits alone. Beagle filed its opening TRO brief in the span of a week: *after* defending itself against AppFolio's TRO in Santa Barbara and having only five business days to thwart AppFolio's ban. Then, pursuant to the district court's order, Beagle had only two days to reply to AppFolio's December 29 opposition: the reply was due December 31, on New Year's Eve.

The district court's requirement for technical validation and granularity was impossible within five business days before filing the opening brief or 48 hours after AppFolio's opposition. This is the reason the engineering analysis exposing the API's limits could only be

54

completed in January—after the district court had ruled on the injunctive request.

But because AppFolio's "write capability" assertion was absent from the TRO record entirely, the district court never had before it the very evidence AppFolio claims justifies its order. A court cannot meaningfully resolve a technical dispute when the key technical assertion surfaces only after the ruling.

Ninth Circuit precedent warrants a hearing. In *Charlton v. Estate of Charlton*, the Court reversed the district court's injunction without a hearing where facts were disputed and no party had waived the right to one. *Charlton v. Estate of Charlton* 841 F.2d 988, 989 (9th Cir. 1988). Neither exception applies here: Beagle did not waive a hearing—rather, it has repeatedly requested one—and the facts are sharply, materially contested.

The case of *Intl. Molders* likewise teaches that although evidentiary hearings are not automatic, they are required when factual disputes are "sharply drawn," straightforward, material, and where credibility matters. *Intl. Molders' & Allied Workers' Union v. Nelson*, 799 F.2d 547, 555–56 (9th Cir. 1986) ("Where sharply disputed facts are simple and

55

little time would be required for an evidentiary hearing, proceeding on affidavits alone might be inappropriate.") That is exactly the case here. Two engineers offered irreconcilable accounts of the API's capabilities— an issue that goes to the core of whether Beagle has any viable substitute for the terminated integration. Nothing in the record allowed the district court to credit one declarant over the other without evaluating credibility or probing the competing technical claims in an evidentiary hearing.

In short, the district court confronted sworn, directly conflicting evidence on a dispositive technical issue, under circumstances where no exception to the hearing requirement applies, and where Beagle expressly requested the opportunity to present testimony. Deciding such a dispute on a cold record was not an exercise of discretion, it was reversible error.

Other circuits have noted that "where factual disputes *are* presented, the parties must be given a fair opportunity and a meaningful hearing to present their differing versions of those facts before a preliminary injunction may be granted" or denied. *Com. Park at DFW Freeport v. Mardian Const. Co.*, 729 F.2d 334, 341 (5th Cir. 1984) (emphasis added); *see, also, e.g.*, *Medeco Security Locks, Inc. v. Swiderek,* 680 F.2d 37, 38 (7th Cir. 1981) (differences on the facts "must be resolved

56

by oral testimony" before deciding preliminary injunction); *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1313 (11th Cir. 1998) ("Where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held."); *cf. also, e.g., Kos Pharm. v. Andrx Corp.,* 369 F.3d 700, 719 n.16 (3d Cir. 2004) ("[I]t may be improper to resolve a preliminary injunction motion on a paper record alone.").

This case implicates technically complex issues involving data interoperability and software. In other similar cases in the district courts of this circuit, judges have held significant evidentiary hearings to determine factual disputes. Here the factual issues were hotly contested in the papers. The court below erred in declining to hold a hearing because Beagle was given no opportunity to pressure test and cross-examine AppFolio about its contradictory and inconsistent statements. Even if this Court does not agree that the court below should have granted a TRO—continuing the status quo freeze ordered by the Northern District of California—pending a hearing on a preliminary injunction, Beagle respectfully submits that the law entitles it to an opportunity to

57

present evidence and cross-examine AppFolio's witnesses before the court below issues a preliminary injunction order.

## IV. The Reconsideration Denial Was an Independent Abuse of Discretion.

Appellate Courts "review a denial of a proper motion for reconsideration under Fed. R. Civ. P. 59(e) for abuse of discretion." *Balla v. Idaho Bd. of Corrections*, 869 F.2d 461, 464 (9th Cir. 1989); *see also Coastal Transfer Co. v. Toyota Motor Sales*, U.S.A., 833 F.2d 208, 211 (9th Cir, 1987); *Swimmer v. IRS*, 811 F.2d 1343, 1345 (9th Cir. 1987).

### A. The District Court Overlooked New And Material Evidence, Satisfying The Reconsideration Standard

The United States District Court for the Central District of California's Local Rule 7-18 provides for reconsideration "on the grounds of (a) a material difference in fact or law from that presented to the Court that, in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered, or (b) the emergence of new material facts or a change of law occurring after the Order was entered, or (c) a manifest showing of a failure to consider material facts presented to the Court before the Order was entered."

58

Similarly, Fed. R. Civ. P. 59(e) allows for reconsideration "(1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011).

Beagle's motion satisfied these standards. The Okpokowuruk declaration contained engineering testing results that did not exist—and could not have existed—before the order. (Okpokowuruk Decl. ¶¶ 2-5, 2-ER-154.) Beagle had only two days to file its reply in support of its Motion for TRO and lacked AppFolio's technical cooperation, making pre-order engineering confirmation untenable. The district court's conclusion that these results were not new because Scheduled Reports themselves were known at the time Beagle filed its motion for TRO misapplies the rule. (1-ER-004 ("The information, data, and functionality that Beagle requires to service its customer base were well-known to Beagle at the time it filed its Motion for TRO")). The relevant question is not whether Beagle knew of the *concept* of Scheduled Reports, but

59

whether Beagle could, with engineering certainty, verify that AppFolio's proposed alternatives were operationally incapable of performing the write-enabled workflows Beagle's customers require.  It could not do so.

The court further erred by equating abstract awareness that Scheduled Reports generate static outputs with actual knowledge that they cannot substitute for Beagle's interactive, write capable processes. *After* the district court denied injunctive relief, Beagle performed the engineering evaluation that revealed AppFolio's purported alternatives are technologically nonfunctional for Beagle's required operations. (Okpokowuruk Decl. ¶¶ 2-5, 2-ER-154.)  Those results constitute "new material facts" under both Local Rule 7 18 and Rule 59(e).

The reconsideration motion therefore introduced evidence that was unavailable before the order: 1) sworn testimony confirming that the court-credited alternatives did not provide sufficient access for Beagle to service its customers (Okpokowuruk Decl. ¶¶ 2-5, 2-ER-154) documented instances of customer attrition tied directly to AppFolio's January 9, 2026 disparaging communications (D'Angelo Decl. ¶ 2, 2-ER-141; 2-ER-136-137).  These facts went to the heart of the district court's irreparable

60

harm analysis and were not a rehash of prior arguments. This was new evidence that the district court was required, but failed, to consider.

### B. The Court's Ruling Deprived Beagle of Any Opportunity to Be Heard or to Demonstrate the New Information.

*U.S. v. Mark* establishes that when newly presented evidence calls into question the factual foundation of a prior ruling, the district court should meaningfully consider that evidence, or, at a minimum, hold an evidentiary hearing, and that failure to do so constitutes an abuse of discretion. 795 F.3d 1102, 1105–06 (9th Cir. 2015).

In *Mark*, the government's assertion that the defendant became uncooperative during a July 2011 phone call was central to the district court's ruling. *U.S. v. Mark*, 795 F.3d 1102, 1104 (9th Cir. 2015). After the denial of dismissal, newly produced phone records revealed that no such call occurred. This evidence directly contradicted the basis for the district court's decision. *U.S. v. Mark*, 795 F.3d 1102, 1104 (9th Cir. 2015). The Ninth Circuit held that, in "light of the gaps and the contradictions in the record, the district court's failure to either grant Mark's motion for reconsideration or order an additional evidentiary hearing was an abuse of discretion." *U.S. v. Mark*, 795 F.3d 1102, 1106 (9th Cir. 2015).

61

Similar error occurred here. The parties submitted conflicting technical declarations concerning whether the AppFolio alternatives upon which the district court relied provide the write-access Beagle's customer contracts require. Specifically, Mr. Okpokowuruk attested that the existing endpoints cannot support Beagle's required workflows and that creating them would require AppFolio's cooperation—cooperation AppFolio has refused to provide. (Okpokowuruk Decl. ¶ 4, 2-ER-154.) AppFolio's Software Engineering Director, by contrast, claims that customers can use the API's supposed write capability "without the need for AppFolio to engineer new endpoints." (¶ 5, 2-ER-089-090.) These statements directly contradict each other, further underscoring the need for an evidentiary hearing. *See Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1992) (holding that where parties submit "diametrically opposing declarations" on material issues, the district court errs by resolving the matter without addressing those disputes).

The stark evidentiary conflicts on write capability, necessary endpoints, and basic API availability are precisely the kind of material disputes *Mark* requires district courts to confront, not overlook. Yet the district court here ignored these contradictions and disputes entirely.

62

63

Ignoring sworn, head-on contradictions does not fall within the court's

discretion, but rather constitutes reversible error under *Mark*.

ACTIVE 722172805v1

## CONCLUSION

Beagle respectfully requests that this Court remand with instructions that the district court conduct a full evidentiary hearing on the disputed technical issues, and reinstate the status quo maintenance order issued by the Northern District of California pending the outcome of a preliminary injunction hearing.

Dated: April 6, 2026        Respectfully submitted,

/s/ Michael Burshteyn
Michael Burshteyn
Marcelo Barros
GREENBERG TRAURIG, LLP
101 2nd Street, Suite 2200
San Francisco, CA 94105
Telephone: (415) 590-5141
Michael.Burshteyn@gtlaw.com
Marcelo.Barros@gtlaw.com

Jake Evans (*pro hac vice*)
Jordana R. Sternberg (*pro hac vice*)
GREENBERG TRAURIG, LLP
3333 Piedmont Road, NE
Suite 2500, Terminus 200
Atlanta, GA 30305
Telephone: (678) 553-2100
Jake.Evans@gtlaw.com
Jordana.Sternberg@gtlaw.com

*Counsel for Appellant*

64

ACTIVE 722172805v1

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of 9th Cir. R. 32-1(a) because this brief contains 12297 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century type.

/s/ Michael Burshteyn
Michael Burshteyn

65

ACTIVE 722172805v1

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 6, 2026.  All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Michael Burshteyn
Michael Burshteyn

66