**Case No. 26-769**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

BEAGLE LABS, INC.; BEAGLE TECHNOLOGIES, INC.; BIG BEAGLE, INC.; RENTAL PROPERTY MANAGERS ASSOCIATION LLC; and YRIG RISK RETENTION GROUP, INC.,
Plaintiffs-Appellants,

v.

APPFOLIO, INC.,
Defendant-Appellee.

---

Appeal from the United States District Court for the Central District of California
Case No. 2:25-cv-12248-JFW-SSC
Honorable John F. Walter

---

**APPELLANTS' EXCERPTS OF**
**RECORD VOLUME 1 OF 4**

---

Michael Burshteyn
Marcelo Barros
GREENBERG TRAURIG, LLP
101 2nd Street, Suite 2200
San Francisco, CA 94105
Telephone: (415) 590-5141

Jake Evans (pro hac vice)
Jordana R. Sternberg (pro hac vice)
GREENBERG TRAURIG, LLP
3333 Piedmont Road, NE, Suite 2500, Terminus 200
Atlanta, GA 30305
Telephone: (678) 553-2100

*Counsel for Plaintiffs-Appellants*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

Case No. **CV 25-12248-JFW(SSCx)** Date: March 12, 2026

Title: Beagle Labs, Inc., et al. -*v*- AppFolio, Inc.

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| **Shannon Reilly** | **None Present** |
| **Courtroom Deputy** | **Court Reporter** |

| **ATTORNEYS PRESENT FOR PLAINTIFFS:** | **ATTORNEYS PRESENT FOR DEFENDANTS:** |
|---|---|
| None | None |

**PROCEEDINGS (IN CHAMBERS): ORDER DENYING PLAINTIFFS' MOTION FOR RECONSIDERATION OF ORDER DENYING TRO AND OSC PRELIMINARY INJUNCTION RE ECF NO. 39 [filed 2/11/2026; Docket No. 64]**

On February 11, 2026, Plaintiffs Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc (collectively, "Plaintiffs" or "Beagle") filed a Motion for Reconsideration of Order Denying TRO and OSC Preliminary Injunction Re ECF No. 39 . On March 2, 2026, Defendant AppFolio, Inc. ("Defendant" or "AppFolio") filed its Opposition. On March 9, 2026, Plaintiffs filed a Reply. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument. The hearing calendared for March 23, 2026 is hereby vacated and the matter taken off calendar. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

Plaintiffs move for reconsideration of the Court's Order Denying Plaintiffs' Motion for Ex Parte Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction pursuant to Federal Rules of Civil Procedure 59(e) and Local Rule 7-18.

In general, there are four grounds upon which a Rule 59(e) motion may be granted: "(1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011). Rule 59(e) "offers an extraordinary remedy, to be used sparingly in the interest of finality and conservation of judicial resources." *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (internal quotation marks and citation omitted). "A Rule 59(e) motion may *not*

be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Id.*

Pursuant to Local Rule 7-18, "[a] motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of failure to consider material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion." Local Rule 7-18; *see also Orange Street Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999) ("[A] motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law."). Motions for reconsideration "are disfavored and are rarely granted." *Trust Corp. v. Aetna Casualty and Surety Co.*, 873 F. Supp. 1386, 1393 (D. Ariz. 1994). "Reargument should not be used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." *Ernest Paper Products, Inc. v. Mobil Chemical Co.*, Inc., 1997 WL 33483520, at * 1 (C.D. Cal. Dec. 2, 1997) (quoting *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1231 (3d Cir. 1995)). Additionally, motions for reconsideration "are not to be used to test new legal theories that could have been presented when the original motion was pending." *FDIC v. Jackson-Shaw Partners No. 46, Ltd.*, 850 F. Supp. 839, 845 (N.D. Cal. 1994).

The Court concludes that Beagle has failed to demonstrate that reconsideration of the Court's Order Denying Plaintiffs' Motion for Ex Parte Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction is warranted. In particular, Beagle has failed to demonstrate that there has been "a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision."

Indeed, Beagle's various justifications for a TRO have been a moving target. Specifically, in its motion for a TRO, Beagle argued that it only needed access to four categories of data to continue servicing its customers: "tenant rosters, unit identifiers, lease and billing information, and insurance compliance." D'Angelo Decl. (Docket No. 4-7) ¶ 4. When AppFolio demonstrated that a Scheduled Report could provide the exact information that Beagle claimed it needed in its moving papers, Beagle contended, for the first time in the Reply, that it needed to view existing insurance policies relating to specific tenants, and that it needed to be able to "add or remove charges." D'Angelo Decl. (Docket No. 36-2) ¶ 3. In its Reply, Beagle also contended that, after extensively studying AppFolio's API as a potential alternative, it was not a viable alternative merely because it "would not expose all the data fields that Beagle customers contract with Beagle to manage" (without specifying what data fields Beagle required or stating that it needed more than access to static data). D'Angelo Decl. (Docket No. 36-2) ¶ 4. In its motion for reconsideration, Beagle now contends that it requires the ability to "write operations" within AppFolio's systems, including to "remediate compliance issues, validate or correct records, execute workflows, or perform other active functions required by Plaintiffs' customer contracts." Motion for Reconsideration (Docket No. 64-1) at 5. Thus, Beagle contends that Scheduled Reports and Database API are insufficient because they only permit passive receipt of static data snapshots.

The information, data, and functionality that Beagle requires to service its customer base were well-known to Beagle at the time it filed its Motion for TRO, and could have been presented to the Court before it issued its decision on Beagle's Motion for TRO. Instead, Beagle made vague and unspecific assertions regarding the data it needed, which failed to demonstrate a likelihood that it would suffer irreparable harm.

Accordingly, Beagle's Motion for Reconsideration is **DENIED.**

IT IS SO ORDERED.



Initials of Deputy Clerk sr

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

Case No. **CV 25-12248-JFW(SSCx)** Date: January 7, 2026

Title: Beagle Labs, Inc., et al. *-v-* AppFolio, Inc.

---

**PRESENT: HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| **Shannon Reilly** | **None Present** |
| **Courtroom Deputy** | **Court Reporter** |

| **ATTORNEYS PRESENT FOR PLAINTIFFS:** | **ATTORNEYS PRESENT FOR DEFENDANTS:** |
|---|---|
| None | None |

**PROCEEDINGS (IN CHAMBERS): ORDER DENYING PLAINTIFFS' MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION [filed 12/15/2025; Docket No. 4]**

On December 15, 2025, Plaintiffs Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc (collectively, "Plaintiffs" or "Beagle") filed a Motion for *Ex Parte* Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction. On December 29, 2025, Defendant AppFolio, Inc. ("Defendant" or "AppFolio") filed its Opposition. On December 31, 2025, Plaintiffs filed a Reply. The Court finds that this matter is appropriate for decision without oral argument. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. AppFolio's Property Management Software

AppFolio is one of the principal providers of property management software in the United States. Its software platform "AppFolio Property Manager" assists property managers to operate their businesses. To access AppFolio Property Manager, property managers must pay a monthly subscription fee. The software is not available to non-customers.

When a property manager subscribes to AppFolio Property Manager, the property manager receives a database, which provides it with a wide range of functionality, including accounting, payments, tenant screening, insurance-related services, maintenance management, and more. By design, a property manager can create multiple user accounts to provide its employees' access to its database. For example, an employee tasked with monitoring rent payments can use his or her user account to perform that function. For security and audit purposes, the actions of each employee's user account are logged in the system. When an employee leaves the company, the user account is deleted.

The property manager's database will contain a large amount of data, which comes from a

number of sources, including the property manager, the property manager's tenants, and vendors of both AppFolio and the property manager. Property managers and their residents store and use data for a wide variety of purposes through AppFolio's platform. AppFolio does not own or create this data, but merely hosts this data on its software platform. Indeed, the Terms of Service for AppFolio Property Manager (available on AppFolio's website) specifically provide: "You represent and warrant that you are the rightful owner of your data and have the requisite authority to perform the migration of such data. You will retain all right, title and interest in and to your data." Brown Decl., Ex. A (Docket No. 4-3) § 1.4; Saxena Decl., Exh. C (Docket No. 33-6), § 1.4.

AppFolio offers its customers the ability to work with third parties that offer a particular service to the property manager, including internet listing sites, tenant screening companies, debt collection agencies, and maintenance management services. While these third parties (known as "Point Solutions") sometimes compete with AppFolio's own offerings, AppFolio does not prohibit or penalize its customers for working with whatever Point Solutions they choose. Specifically, there are four authorized methods by which its customers can work with these third parties or "Point Solutions":[1]

(1) **AppFolio Stack Marketplace:** The AppFolio Stack Marketplace offers its customers Point Solutions that AppFolio has vetted for security and performance and with whom AppFolio has built dedicated integrations into its platform. Some of these Point Solutions compete directly with AppFolio.

(2) **Database API**: If a customer wishes to integrate with a Point Solution that is not available in the AppFolio Stack Marketplace, the customer can use AppFolio's Database Application Programming Interface ("API"), which is an automated means for two computer programs to communicate.

(3) **Scheduled Reports**: A customer can also use Scheduled Reports to share data with any Point Solution of their choice. Scheduled Reports allow the property manager to automate the data sharing process and share almost any data in the property manager's database. A customer can set up automated Scheduled Reports in a matter of five minutes.

(4) **Outside of AppFolio**: A customer may share any data they input into AppFolio (such as tenant rosters) with Point Solutions or other platforms.

While AppFolio permits (and even encourages) its customers to work with third parties through these four authorized means, AppFolio's Terms of Service prohibit its customers from allowing third parties' direct access to the customer's respective database: "Third parties are not permitted to access or use the Services or any application programming interface we make available to you without [AppFolio's] prior consent." Brown Decl., Ex. A (Docket No. 4-3) § 5.2; Saxena Decl., Exh. C (Docket No. 33-6), § 5.2. This provision prohibiting third party access has been part of AppFolio's Terms of Service since 2019. In the event a property manager violates

[1]Apart from these four methods, it appears that AppFolio offers a "Vendor Portal," which gives vendors access to view work order details, upload invoices, add notes and photos, and mark their work as complete. It is unclear from the current record how a customer sets up a vendor in the "vendor portal" and whether vendors differ from "Point Solutions."


Initials of Deputy Clerk sr

this provision, AppFolio reserves the right to "disable or delete access to the Services and any application programming interface for any of your authorized users to enforce these Terms of Service or to otherwise protect our interests." *Id.*

**B. Beagle's Services**

Beagle provides insurance-related compliance services to property managers nationwide, including tenant liability waiver programs, renters' insurance verification, deposit alternative services, and pet damage waiver offerings. These services help property managers satisfy lease requirements, manage risk, and provide cost-effective protection to renters. Beagle's platform serves over 40,000 properties in all 50 dates.

To administer these programs, Beagle requires access to limited categories of the property managers' operational data, including "tenant rosters, unit identifiers, lease and billing information, and insurance-compliance status." D'Angelo Decl. (Docket No. 4-7) ¶ 4. Beagle, however, is not an AppFolio integration partner and its services are not available in AppFolio Stack Marketplace. Pursuant to Beagle's request, in order to give Beagle the access to the data it needs, its customers create user accounts giving Beagle direct access to their respective AppFolio Property Manager databases.[2] The property manager is able to fully control the permissions that Beagle is granted in its accounts and can limit those permissions to facilitate the sharing of data that is needed by Beagle. However, depending on the permissions granted by the property manager, Beagle could conceivably access the personally identifiable information of the property manger's residents, issue payments through the AppFolio payments platform, access and alter the customer's bank information, and view and take action across the property manager's entire account database.

When Beagle obtains user accounts, it allows Beagle to use the functionality that AppFolio provides only to its paying customers. For example, Beagle uses AppFolio to charge residents for its offerings and products. Notably, Beagle has never asked AppFolio for permission to access AppFolio's application programming interface and has never paid or provided any consideration for access to AppFolio's software.

**C. AppFolio's Partnership with Second Nature**

On April 11, 2025, AppFolio entered into a strategic partnership with Second Nature Brands, Inc. ("Second Nature") that enables AppFolio's property management customers to offer Second Nature's suite of residential property services within the AppFolio Stack Marketplace. Second Nature is a competitor of, and offers similar services as, Beagle. In connection with its strategic partnership, AppFolio purchased a minority, non-controlling equity interest in Second Nature Holdings, L.P., the indirect parent of Second Nature.

Beagle contends that Second Nature uses the same method of access to AppFolio Property Manager as Beagle. *See* Brown Decl. (Docket No. 4-2) ¶ 8. However, in light of Second Nature's partnership with AppFolio, it appears that Second Nature is operating in this manner with AppFolio's permission in accordance with AppFolio's Terms of Service (and after a vetting

---

[2]It is unclear how long Beagle has been operating in this manner, although it appears to be "over a year." *See* Reply (Docket No. 36) 2 ("Customers have for over a year contracted with Beagle to provide vital services . . . .").

process), whereas Beagle has never asked AppFolio for permission to access AppFolio's application programming interface.

**D. AppFolio's Actions to Disable Beagle's User Accounts**

On December 9, 2025, AppFolio emailed its customers who use Beagle's services notifying them they would remove Beagle's "noncompliant access" to the customers' accounts in five business days (on December 16, 2025). AppFolio explained: "In addition to the serious security risks the noncompliant access poses for you, your residents, and your customers, [Beagle's noncompliant access] also constitutes a breach of AppFolio's terms of service, which are in place both to protect your account and to safeguard AppFolio's intellectual property." Brown Decl. Ex. C. (Docket No. 4-5). AppFolio also noted that there are multiple safe and secure methods for property managers to work with third-party providers, such as Beagle, including through AppFolio Stack Marketplace, Database API, and Scheduled Reports. *Id.* In addition, AppFolio notified its customers through a banner inside its application that it would disable all Beagle-related user accounts on December 16, 2025.

Beagle's customers immediately began emailing Beagle, expressing confusion and concern. In order to allay one of its customer's concerns, Beagle's CEO advised its customer that the "fix" was "simple and already in motion" and that it could "continue to run your Beagle program using scheduled reports from AppFolio instead of direct logins." Brown Decl., Ex. C (Docket No. 4-5); Saxena Decl., Ex. D (Docket No. 33-7).

On December 15, 2025, Beagle filed a Complaint against AppFolio in the United States District Court for the Northern District of California alleging the following claims for relief: (1) tortious interference with contractual relations; (2) tortious interference with prospective economic relations; (3) violation of the Lanham Act § 43(a), false advertising; (4) violations of Cal. Bus. & Prof. Code § 17500, false advertising; (5) violations of Cal. Bus. & Prof. Code § 17200, unfair competition; (6) violation of Sherman Act § 2, monopolization; (7) defamation and trade libel; (8) unjust enrichment; and (9) declaratory judgment. On that same day, Beagle filed its Motion for *Ex Parte* Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction ("Motion for TRO"). On December 15, 2025, AppFolio agreed not to disable Beagle's accounts until December 22, 2025. On December 19, 2025, the district judge in the Northern District of California transferred the action to this Court, and ordered AppFolio to maintain the status quo pending further order of this Court.

Beagle has taken advantage of AppFolio's agreement and the transferor court's order to maintain the status quo. Since December 15, 2025, Beagle has changed fifty-seven of its user accounts in AppFolio's customers' databases to prevent AppFolio from locating those accounts and disabling them.

**E. Beagle's Motion for TRO**

In its Motion for TRO, Beagle asks the Court to enjoin AppFolio from disabling all of Beagle's customer-authorized accounts on the AppFolio Property Manager Platform or from otherwise interfering with Beagle's ability to access data through AppFolio's Property Manager Platform until the Court determines whether a preliminary injunction should be issued. Beagle contends that it faces "extinction" if AppFolio disables its user accounts and cuts off its access to



Initials of Deputy Clerk sr

data, which it relies on to serve more than eighty percent of its customers. According to Beagle, it has already suffered harm, as property managers have forwarded AppFolio's messages to tenants, revoked Beagle's access, and terminated their relationships with Beagle.

## II. LEGAL STANDARD

The standard for issuing a temporary restraining order ("TRO") and preliminary injunction under Federal Rule of Civil Procedure 65 is the same. *Six v. Newsom*, 462 F. Supp. 3d 1060, 1067 (C.D. Cal. 2020) (citation omitted); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that a TRO and preliminary injunction involve "substantially identical" analysis). And, like a preliminary injunction, a TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008).

A plaintiff seeking a TRO must establish four elements: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tip in its favor, and (4) that the public interest favors an injunction." *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.,* 758 F.3d 1069, 1071 (9th Cir. 2014) (*citing Winter*, 555 U.S. at 20). Courts in this circuit also employ "an alternative 'serious questions' standard, also known as the 'sliding scale' variant of the *Winter* standard" (*Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021)), in which the four *Winter* elements are "balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, a TRO may be warranted where there are "'serious questions going to the merits' and a hardship balance . . . tips sharply toward the plaintiff," and so long as the other *Winter* factors are also met. *Id.* at 1132.

## III. DISCUSSION

On this record, the Court concludes that Beagle has failed to demonstrate that it is entitled to the requested TRO.

Specifically, the Court concludes that Beagle has failed to demonstrate a likelihood that it will suffer irreparable harm. "[M]onetary injury is not normally considered irreparable." hiQ Labs, Inc. v. LinkedIn Corp., 31 F.4th 1180, 1188 (9th Cir. 2022) (quoting *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)). "Nonetheless, the threat of being driven out of business is sufficient to establish irreparable harm." *Id.* (cleaned up). Beagle contends that it will face the threat of "extinction" if AppFolio disables its user accounts and cuts off its access to data, which it relies on to serve more than eighty percent of its customers.

In its moving papers, Beagle only identified four categories of data that is necessary for it to continue servicing its customers: "tenant rosters, unit identifiers, lease and billing information, and insurance compliance." However, that data is available through alternative authorized means, such as through the use of Scheduled Reports. Indeed, AppFolio has attached a sample Scheduled Report showing the data Beagle claims to require. *See* Saxena Decl., Ex. B (Docket No. 33-5). Moreover, in an email to a customer, Beagle's CEO expressly stated that the solution was "simple" and that Beagle could "continue to run your Beagle program using scheduled reports from AppFolio instead of direct logins." Saxena Decl., Ex. D (Docket No. 33-7)

In its Reply, contrary to its CEO's representation to its customer, Beagle now contends that Scheduled Reports are not a viable alternative because "[t]he whole point of Beagle's value proposition to customers is that they don't have to go through the onerous process of setting up Scheduled Reports in AppFolio. All they have to do is create an account for Beagle and then Beagle handles the rest." Plaintiff's Reply (Docket No. 36) at 6. However, Beagle has failed to demonstrate that the setting up of Scheduled Reports is particularly onerous (and, according to AppFolio, only takes five minutes), or that it is any more time consuming then a property manager setting up a user account with the appropriate permissions.

Beagle also contends that the Scheduled Reports do not provide the necessary information required by Beagle. However, AppFolio tailored the sample report filed in conjunction with its Opposition to provide the exact information that Beagle claimed it needed in its moving papers. For the first time in its Reply, and without any opportunity for AppFolio to respond, Beagle now contends that it needs to view existing insurance policies, and that Scheduled Reports do not give it access to that needed data. However, customers can share that data with Beagle through other authorized means, including by using AppFolio's Database API.

Beagle contends that AppFolio's Database API is also insufficient, asserting that "AppFolio designed its API so that it would not expose all the data fields that Beagle customers contract with Beagle to manage." D'Angelo Decl. (Docket No. 36-2) ¶ 4. Beagle, however, fails to identify what data fields are missing. Without knowing what data fields Beagle claims are missing, the Court is unable to determine the materiality of that data and the likelihood of irreparable harm. Perhaps recognizing that Database API is a workable solution, Beagle also speculates that AppFolio will simply "ban Beagle from use of the API." *Id.* However, AppFolio has made no such statement to its customers, and in fact advised its customers in connection with its plans to disable Beagle's user names that it supports "multiple safe methods for you to work with [third party providers], including AppFolio Stack, Database API, and scheduled reports." Brown Decl., Ex. C (Docket No. 4-5). Finally, Beagle also states that it would take them "months" to engineer new integrations using the Database API, without any meaningful explanation of what would be entailed. *See id.* It is unclear whether "months" means 2 months, 3 months, 4 months, or more. Presumably, as soon as Beagle became aware that AppFolio intended to enforce its Terms of Service, Beagle began working on developing or engineering such integrations. On this record, the Court cannot conclude that Beagle is likely to suffer irreparable harm.

Accordingly, the Court concludes that Beagle has failed to demonstrate that it is entitled to the extraordinary remedy of a temporary restraining order.

## IV. CONCLUSION

For the foregoing reasons, Beagle's Motion for *Ex Parte* Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction is **DENIED**.

IT IS SO ORDERED.



Initials of Deputy Clerk sr