**Case No. 26-769**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

BEAGLE LABS, INC.; BEAGLE TECHNOLOGIES, INC.; BIG BEAGLE, INC.; RENTAL PROPERTY MANAGERS ASSOCIATION LLC; and YRIG RISK RETENTION GROUP, INC.,
Plaintiffs-Appellants,

v.

APPFOLIO, INC.,
Defendant-Appellee.

---

Appeal from the United States District Court for the Central District of California
Case No. 2:25-cv-12248-JFW-SSC
Honorable John F. Walter

---

**APPELLANTS' EXCERPTS OF RECORD VOLUME 3 OF 4**

---

Michael Burshteyn
Marcelo Barros
GREENBERG TRAURIG, LLP
101 2nd Street, Suite 2200
San Francisco, CA 94105
Telephone: (415) 590-5141

Jake Evans (pro hac vice)
Jordana R. Sternberg (pro hac vice)
GREENBERG TRAURIG, LLP
3333 Piedmont Road, NE, Suite 2500, Terminus 200
Atlanta, GA 30305
Telephone: (678) 553-2100

*Counsel for Plaintiffs-Appellants*

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**Notice of Electronic Filing**

The following transaction was entered on 12/30/2025 at 8:47 AM PST and filed on 12/30/2025

| | |
|---|---|
| **Case Name:** | Beagle Labs, Inc. et al v. AppFolio, Inc. |
| **Case Number:** | 2:25-cv-12248-JFW-SSC |
| **Filer:** | |
| **Document Number:** | 34 |

**Docket Text:**
**Text Entry Order: On or before December 31, 2025, Plaintiffs shall file their Reply brief. On or before January 5, 2026, the parties shall file their proposed Statements of Decision in accordance with paragraph 5(f) of the Courts Standing Order. The Court will set a hearing, if necessary, after the Court reviews the additional pleadings filed by the parties. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sr) TEXT ONLY ENTRY**

**2:25-cv-12248-JFW-SSC Notice has been electronically mailed to:**

Marcelo Leao de Barros marcelo.barros@gtlaw.com

Martin H Pritikin marty@procel-law.com

Jake Evans jake.evans@gtlaw.com

Michael Burshteyn knightj@gtlaw.com, michael--burshteyn-5563@ecf.pacerpro.com, michael.burshteyn@gtlaw.com

Brian Procel brian@procel-law.com

Jeremiah Michael Levine jeremiah@procellevine.com

**2:25-cv-12248-JFW-SSC Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

Brian Procel (Cal. Bar No. 218657)
Brian@Procel-Law.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@Procel-Law.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for Defendant*
*AppFolio, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,<br><br>Plaintiffs,<br><br>v.<br><br>APPFOLIO, INC., a California corporation,<br><br>Defendant. | Case No. 2:25-cv-12248-JFW-SSC<br><br>**APPFOLIO'S OPPOSITION TO PLAINTIFFS' MOTION FOR AN EX PARTE TEMPORARY RESTRAINING ORDER**<br><br>**[Declarations of Sean Saxena, Nate Delage, and Jeremiah Levine Filed Concurrently Herewith]** |

## TABLE OF CONTENTS

INTRODUCTION .......... 4
STATEMENT OF FACTS .......... 7
A. AppFolio. .......... 7
B. AppFolio's Terms of Service. .......... 7
C. Point Solutions. .......... 8
D. Beagle's Campaign of False Advertising .......... 10
E. Beagle's Unauthorized Use of AppFolio's Platform. .......... 11
F. AppFolio's Action to Protect its Customers. .......... 12
G. Beagle's Forum Shopping and Abuse of a Court Order. .......... 13
LEGAL STANDARDS .......... 13
ARGUMENT .......... 14
**I. Beagle Admits There Is No Need for "Emergency" Relief.** .......... 14
**II. The Balance of Equities Favors Denial of the TRO.** .......... 14
**A. Beagle Has Not Established That It Will Sustain Any Harm.** .......... 15
**B. This TRO Should Be Denied Because Beagle Has Acted Inequitably.** .......... 16
**III. Beagle Cannot Establish a Likelihood of Success on the Merits.** .......... 18
**A. Beagle's Tortious Interference Claims Fail As A Matter of Law.** .......... 19
**B. AppFolio Is Not Violating Any Antitrust Laws.** .......... 22
**IV. It Is Not In The Public Interest To Reward Beagle's Devious Conduct.** .......... 28
CONCLUSION .......... 29

# TABLE OF AUTHORITIES

## Cases

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016)..........22

*Apache Stronghold v. United States*, 38 F.4th 742 (9th Cir. 2022).....................12

*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.,* 47 Cal. App. 4th 464 (1996) ....................20

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585(1985)...........22

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) ...........12

*Damabeh v. 7-Eleven, Inc*., 2013 WL 1915867. *9 (N.D. Cal. May 8, 2013)....20

*Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020 (8th Cir. 1992) ....................16, 27

*Herrejon v. Ocwen Loan Servicing, LLC*, 980 F. Supp. 2d 1186 (E.D. Cal. 2013) ....................14, 27

*hiQ Labs v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022)...............................24

*Ixchel Pharma, LLC v. Biogen, Inc.,* 9 Cal. 5th 1130 (2020)........................17, 19

*MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004).............22

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ............21, 23

*Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26 (1998) ......................19

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F. 4th 205 (4th Cir. 2025) ....................25

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995).......................21

*Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020) ....................14

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ..................................16

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)21

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008)..................................13

*WPEngine,* 2024 WL 5077610, at *2 (N.D. Cal. Dec. 10, 2024)........................23

*Xport Forwarding LLC v. Mesitis DWC LLC*, 694 F. Supp. 3d 1258 (C.D. Cal. 2023) ........................................................................................................26

## INTRODUCTION

Beagle seeks an emergency Court order entitling it to free access to AppFolio's proprietary, customer-only software. With this access, Beagle would continue to use functionality available only to AppFolio's paying customers to run its own business and recruit AppFolio's customers.

Beagle gets access to AppFolio's functionality by improperly convincing AppFolio customers to provide it with user accounts[1] in their AppFolio databases. This violates AppFolio's Terms of Service and creates significant security risks for both AppFolio and its customers. When AppFolio announced its intent to disable these unauthorized user accounts, Beagle sued and filed the present TRO motion (the "Motion").

From these facts, Beagle cannot establish a single element required for a TRO, let alone *all* of them. Beagle instead, relies on a multitude of demonstrably false claims. Three in particular tell the story.

***First***, Beagle claims that if it loses access to AppFolio's customers' databases, it will have "catastrophic consequences for Beagle" and "will destroy Beagle's business." Not so. As Beagle's own CEO wrote to customer(s) *the week before* filing this Motion: "The fix is simple and already in motion. We can continue to run your Beagle program using scheduled reports from AppFolio instead of direct logins if you prefer." Indeed, Beagle is *already* running its

[1] "User accounts" refers log-in credentials that allow Beagle to access the customer's AppFolio database under the customer's subscription.

program this way for at least one AppFolio customer. ***Beagle's claim of "irreparable harm" is fabricated.***[2]

***Second,*** Beagle claims that, by disabling user accounts that violate the Terms of Service, AppFolio is "data blocking." This is also false. AppFolio's platform is specifically designed to provide customers with *secure* methods of sharing their data with third parties, such as Beagle. The method referenced by Beagle's CEO—scheduled reports—allows Beagle to receive exactly the same data it receives through its unauthorized user accounts. And Beagle knows this method works because it has *already implemented it* with at least one AppFolio customer. ***Because disabling the unauthorized Beagle user accounts will not block any data, Beagle cannot show a likelihood of success on its unfair competition claim.*** Beagle can get the data it needs without placing AppFolio and its customers at risk.

***Third,*** Beagle claims that AppFolio is disabling the unauthorized user accounts for the sole purpose of harming Beagle. This is, again, false. AppFolio is merely asking its customers to share data with Beagle via one of the multiple *secure* methods designed for this exact purpose. The unauthorized user accounts, by contrast, allow Beagle to take action across the entire database, including accessing the personally identifiable information of the customer's residents and issuing payments from the customer's bank account. When AppFolio notified its customers of these security risks, Beagle's CEO confirmed they are "things a user *could* technically do in your account" (emphasis in original). In other words,

---

[2] And without a showing of harm, the balance of the equities preclude an injunction that would perpetuate Beagle's unauthorized access and the risk it presents to AppFolio and its customers.

Beagle admits that it has the ability to engage in security violations. Security risk is not a pretense for disabling the unauthorized user accounts, it is the reason such accounts are prohibited in the first place. Because AppFolio is rightfully enforcing its Terms of Service (and even offering Beagle alternative methods of working with its customers), Beagle cannot show a likelihood of success on its interference claims.

In addition to these false claims, Beagle has and continues to prove itself untrustworthy, heightening the need for AppFolio's prompt action. As detailed in AppFolio's first-filed complaint in Santa Barbara Superior Court, Beagle has falsely advertised itself as a partner of AppFolio, inducing customers to provide the unauthorized user accounts that AppFolio now seeks to disable. And rather than abide by the status quo during the transfer of this case, Beagle attempted to hide those user accounts by systematically changing their usernames from the identifiable reports@beagleforpm.com (which it touts as a sign of its honesty) to a host of generic, untraceable names such as support@portfoliopm.cc. A Beagle affiliate even went so far as to create a fictional property management company to pose as a prospective customer and gain information about AppFolio's platform.

So why has Beagle expended such effort to gain and maintain unauthorized access to AppFolio's customers' databases when scheduled reports can provide the data it needs? Functionality. AppFolio's user logs show Beagle is not just accessing data, it is *using AppFolio's platform* to issue charges to residents for its products. This functionality is offered only to AppFolio's paying customers; and Beagle is using it, for free, to run its competing business. Beagle's conduct is neither permitted by the Terms of Service nor protected by the law. Beagle's motion should be denied.

## STATEMENT OF FACTS

### A. AppFolio.

AppFolio Property Manager is a software platform that helps property management companies run their businesses. (Saxena Decl., ¶ 3.) To access AppFolio Property Manager, property managers must pay a monthly subscription fee. (*Id.* ¶ 5.) The software is not available to non-customers. (*Id.*)

When a property manager subscribes to AppFolio Property Manager, they receive a database, which provides them with a wide range of functionality, including accounting, payments, tenant screening, insurance-related services, maintenance management, and more. (*Id.*)

In connection with these services, a property manager's database will contain a large amount of data. (*Id.* ¶ 4.) This data comes from a number of sources, including the property manager, their tenants, and vendors of both AppFolio and the property manager. (*Id.*)

AppFolio's customers manage approximately nine million units on its software platform. (*Id.* ¶ 6.) These nine million units (not all of which are residential rental) account for less than 17% of the estimated 52 million residential rental units in the United States. (*Id.* ¶ 6.) AppFolio believes at least two property management software platforms have a bigger market share: Real Page, Inc. and Yardi Systems, Inc. (*Id.* ¶ 7.)

### B. AppFolio's Terms of Service.

The Terms of Service for AppFolio Property Manager are available on AppFolio's website. (*Id.* ¶ 17.) Two sections of those terms, in particular, are relevant to this case: Sections 1.4 (Migration of Data) and Section 5.2 (Authorized Users).

Section 1.4 provides that customers "retain all right, title and interest in

and to [their] data." (Saxena Decl., Exh. C, ¶ 1.4.) AppFolio strongly believes in its customers' right to use and share their data with whomever they see fit, and so identifies their retention of this right in the Terms of Service. (*Id.*)

Section 5.2, entitled Authorized Users, provides that "[t]hird parties are not permitted to access or use the Services or any application programming interface we may make available to you without [AppFolio's] prior consent." (*Id.*, Exh. C, ¶ 5.2 "Authorized Users"). While customers have the right to share their data with others by exporting it from the database, customers do not have the right to share AppFolio's services. (*See* Saxena Decl. Exh. C ¶¶ 1.4, 5.2.) Under this section, customers are not permitted to give third parties, like Beagle, user accounts that access the database. (*Id.*) AppFolio's services are available only to AppFolio's paying customers. (*Id.*)

In the event a customer violates Section 5.2, for example by giving a third party a user account in its database, Section 5.2 provides AppFolio the right "to disable or delete [that] access to the Services and any application programming interface for any of your authorized users." (*Id.*, ¶ 5.2).

In sum, customers may freely share their data with Beagle, but may not give Beagle user accounts in their database. (*See* Saxena Decl., Exh. C ¶¶ 1.4, 5.2.) AppFolio has the right to disable that access if they do. (Saxena Decl., Exh. C ¶ 5.2.) These provisions have been in place, as written, since at least 2019. (Saxena Decl., ¶ 21.) That is before AppFolio knew Beagle existed. (*Id.*)

### C. Point Solutions.

AppFolio offers its customers the ability to work with "**Point Solutions**". (*Id.* ¶ 8.) Point Solutions are companies that offer a particular service to the property

manager. (*Id.*) These include internet listing sites, tenant screening companies, debt collection agencies, and maintenance management services. (*Id.*)

While these Point Solutions sometimes compete with AppFolio's own offerings, AppFolio does not prohibit or penalize its customers for working with whatever Point Solutions they choose. (Saxena Decl., ¶ 9.) Thus, any Point Solution is free to work with AppFolio's customers. (*Id.*) AppFolio has, in fact, created multiple *secure* methods by which Point Solutions can work with its customers. (*Id.* ¶¶ 10-13.)

First, customers can work with Point Solutions in the AppFolio Stack Marketplace. (*Id.* ¶ 10.) The Stack Marketplace includes Point Solutions that AppFolio has vetted for security and performance, and with whom it has built dedicated integrations into its platform. (*Id.*) The Stack Marketplaces includes Point Solutions that compete directly with AppFolio. (*Id.*)

Second, customers can use AppFolio's Database API[3] offering to build an automated data link between their database and any Point Solution they like. (*Id.* ¶ 11.) Again, customers are free to use Database API to share their data with direct competitors of AppFolio. (*See id.*).

Third, customers can use scheduled reports to automate data sharing with Point Solutions. (*Id.* ¶ 12.) Scheduled reports allow the customer to create a report of almost any data in their database and automatically send that report on the schedule of their choosing. (*Id.*) Scheduled reports can include the data Beagle says its needs to operate: tenant rosters, unit identifiers, lease and billing

---

[3] An API, or application programming interface, is an automated means for two computer programs to communicate.

data, and insurance compliance status. (Dkt. 4 at 5; Saxena Decl., ¶ 12, Exh. B (showing example scheduled report conveying this data.)

Customers can also work with Point Solutions outside the AppFolio platform, exchanging data through other means. (Saxena Decl., ¶ 13.)

AppFolio provides these secure methods of sharing data precisely so customers do not have to give third parties user accounts in their database, which, as explained below, creates considerable risk. (*Id.* ¶ 14.)

### D. **<u>Beagle's Campaign of False Advertising.</u>**

Beagle is a Point Solution that offers an insurance program that competes with AppFolio's insurance offering. (Levine Decl., Ex. A; Saxena Decl. ¶ 11.) To promote their program, Beagle has engaged in a campaign of misrepresentations about AppFolio. (Levine Decl., Ex. A; Saxena Decl. ¶¶ 12-16, Hohler Decl. ¶¶ 3-5.)

Specifically, Beagle tells AppFolio's customers that it has "partnered with" or "integrated with" AppFolio; and, in some cases, Beagle has gone so far as to claim that AppFolio "failed an audit" and so was no longer offering insurance products (which is why customers should ostensibly switch to Beagle's insurance offering).[4] (*Id.*)

---

[4] Beagle also misappropriated AppFolio's name and logo on its own website to falsely imply affiliation or endorsement. (Levine Decl. Ex. A Saxena Decl. ¶ 31.) Beagle only took it down once AppFolio filed suit. (Levine Decl. ¶ 3.) A Beagle affiliate also posed as a property manager interested in a demo to gain information about AppFolio's platform, and even went so far as to generate fake company information to bolster this fake identity. (Levine Decl. Ex. A Saxena Decl. ¶¶ 31-35.)

**E. Beagle's Unauthorized Use of AppFolio's Platform.**

Rather than use the secure methods of working with AppFolio's customers, Beagle uses these misrepresentations to induce AppFolio's customers to provide it with user accounts. (Saxena Decl. ¶ 24.) User accounts are intended for the customers' employees, not third parties. (*Id.*)

By design, a customer can create user accounts to give their employees access to their database. (Delage Declaration., ¶ 6.) For example, an employee tasked with monitoring rent payments can use their user account to perform that function. (*Id.*) For security and audit purposes, the actions of each employee's user account are logged in the system. (*Id.*) And when an employee leaves the company, the user account is deleted. (*Id.*)

Beagle, in part through the false advertising described above, induces customers to create user accounts for it. (Levine Decl., Ex. A; Saxena Decl. ¶¶ 23.) These user accounts also create considerable security risk for the customer. Unlike employee user accounts, which are tied to a specific individual, Beagle shares one user account across its company, with everyone using the same username and password. (Delage Dec. ¶¶ 20-22.) Because Beagle shares the user account (including username and password), actions within the database are not traceable to any individual (*Id.*) This provides bad actors with anonymity within the database. (*Id.*) In addition, because the username and password are shared, former Beagle's employees can retain their ability to access the database even after leaving Beagle. (*Id.*) Any Beagle employee (current or former) with the password could take any number of nefarious actions in the database, such as stealing residents' personal identifying information or accessing the customers' bank accounts. (*Id.* ¶ 23.) Beagle's CEO has admitted that Beagle's access to a

customer's AppFolio database enables Beagle to harm the customer. (Saxena Decl., Exh. D) (responding to AppFolio's email listing security risks from Beagle and admitting that "AppFolio's message listed things a user *could* technically do in your account.") (original emphasis).

When Beagle obtains user accounts, it allows Beagle to use the functionality AppFolio provides only to its customers. (Saxena Decl. ¶ 25.) For example, Beagle uses AppFolio to create charges to residents for its offerings. (Delage Decl. ¶ 25.) Beagle has never asked for permission to access AppFolio's application programming interface. (Saxena Decl. ¶ 29.) And Beagle has never paid or provided any consideration to access AppFolio's software. (*Id.*)

**F. <u>AppFolio's Action to Protect its Customers.</u>**

The Terms of Service allow AppFolio to disable unauthorized user accounts without prior notice. (Saxena Decl., Exh. C, ¶ 5.2). But to minimize disruption and provide its customers the opportunity to transition to the *secure* methods of working with Beagle, AppFolio gave a week of advanced notice before disabling Beagle's unauthorized user accounts. (Brown Decl. iso Motion, Exh. C (Dkt. 4-5).) In that notice (sent only to customers who use Beagle), AppFolio explained that Beagle can access customer data in a way that does not violate the Terms of Service or create security risk (i.e., Beagle cannot continue using unauthorized accounts). (*Id.*) As AppFolio explained:

> We have notified Beagle we are removing their access and outlined a path to provide you continued service that is compliant with our terms of service and does not create security risk. To facilitate any transition for your business, we will allow them [to] maintain access to your database (should you so choose) for 5 business days, until December 16, 2025, before removing those users.

(Brown Decl. iso Motion, Exh. C (Dkt. 4-5).)

In response, Beagle's CEO sent an email in which he conceded that Beagle would suffer no harm from AppFolio disabling Beagle's unauthorized accounts. He explained: "**The fix is simple and already in motion. <u>We can continue to run your Beagle program using scheduled reports</u>** from AppFolio instead of direct logins if you prefer." (Saxena Dec. Exh. D) (original emphasis). In the same email, he conceded that Beagle is a security risk, writing that AppFolio's security concerns were "listed things a user *could* technically do in your account." (*Id.*) (original emphasis). In sum, the security concerns arising from Beagle are grave and unnecessary. Beagle admitted that it has the *ability* to cause substantial harm to customers; and could avoid this risk by using scheduled reports. (*Id.*)

### G. <u>Beagle's Forum Shopping and Abuse of a Court Order.</u>

Prior to transferring this case to the Central District, which was based in part on her holding that "the apparent forum shopping by Beagle strongly favors transfer," Judge Martinez-Olguin held a status conference on December 19, 2025. (Dkt. 24.) At that status conference, AppFolio agreed to delay disabling its customers' unauthorized Beagle user accounts until December 22. (Dkt. 15.) Beagle has taken advantage of that delay to change the usernames on its user accounts in AppFolio's customers' databases to prevent AppFolio from finding and disabling them. (Delage Decl., ¶ 16.)

## <u>LEGAL STANDARDS</u>

"A party seeking a preliminary injunction must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in [its] favor; and (4) an injunction is in the public interest." *Apache Stronghold v. United States*, 38 F.4th 742, 751 (9th Cir. 2022).

## ARGUMENT

### I. Beagle Admits There Is No Need for "Emergency" Relief.

"A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (original emphasis).

Here, Beagle's own CEO admitted, in writing, that there is no need for emergency relief. (Saxena Decl., Exh D.) Shortly after AppFolio's notice that the unauthorized user accounts would be disabled, Beagle CEO, Michael Brown, sent an email to some or all of Beagle's AppFolio-based customers. (Saxena Decl. ¶ 31, Exh. D.) In that email, Brown emphasized that "**The fix is simple and already in motion. We can continue to run your Beagle program using scheduled reports** from AppFolio instead of direct logins if you prefer." (Saxena Decl. Exh. D.) (original emphasis).) In other words, ***Beagle admits that it has an effective alternative in the event AppFolio disables the unathorized user accounts.***

Beagle is now telling this Court precisely the *opposite* of what it told its own customers. The truth is that Beagle faces no "extinction event" or impending "catastrophe" that will destroy its business. In Beagle's own words, the solution is "simple." (Saxena Decl. Exh. D.) Beagle can use AppFolio's scheduled reports. (Saxena Decl. ¶ 12, Exh. D.) There is no need for a TRO.

### II. The Balance of Equities Favors Denial of the TRO.

Before issuing preliminary injunctive relief, courts "must balance the competing claims of injury and must consider the effect on each party of the

granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008) (quotation omitted).

**A. <u>Beagle Has Not Established That It Will Sustain Any Harm.</u>**

Beagle claims that if AppFolio enforces its Terms of Service and disables the unauthorized user accounts in its customers' databases, it "will end Beagle's business overnight." (Dkt. 4-2, ¶ 10.) As detailed above, its own CEO says otherwise. But as importantly, Beagle offers no actual evidence of its impending "extinction."

Beagle contends that the "cutoff would prevent Beagle from verifying coverage, administering tenant-liability programs, processing compliance data, and performing other essential functions." (Dkt. 4 at 9-10.) But Beagle does not explain how or why. Beagle does not explain how it uses user accounts to perform these functions, or why they cannot be performed without them. The only indication in Beagle's papers is that it uses the user accounts to obtain certain data from customers' databases. But Beagle can obtain that data without user accounts. (Saxena Decl., ¶ 12.) It is available, *securely,* through other means, including scheduled reports (as its CEO recognizes). (Saxena Decl. ¶ 12, Exh. D.)

To make the point plainly: Beagle's alleged harm cannot be based on lost access to data because *Beagle has access to the data*. The four categories of data Beagle says it needs, "tenant rosters, unit identifiers, lease and billing information, and insurance compliance," can be included in a scheduled report. (Dkt. 4 at 5; Saxena Decl. ¶ 13, Exh. D.) AppFolio has even attached a sample scheduled report showing the data Beagle claims to require. (Saxena Decl., Exh. A.) When Beagle's CEO says the solution is "simple," he is right. Customers could automate these scheduled reports in about 5 minutes. (Saxena Decl. ¶ 12.)

Beagle's arguments amount to nothing more than the conclusory claim that it "faces extinction if AppFolio abruptly cuts its access"[5] (Dkt. 4 at 18); a claim directly refuted by its CEO and by its ability to obtain the required data by other means. Its motion should be denied.

### B. **<u>This TRO Should Be Denied Because Beagle Has Acted Inequitably.</u>**

When a party tries to use a TRO to facilitate wrongful conduct, the balance of equities necessarily tips against it. *See Herrejon v. Ocwen Loan Servicing, LLC*, 980 F. Supp. 2d 1186, 1210 (E.D. Cal. 2013) ("[T]he balance of equities weighs in defendants' favor as the record suggests that plaintiffs may have unauthorized access to the property without payment of outstanding amounts owed and seek to delay foreclosure to extend their possession of the property.").

Through its false advertising and disregard for AppFolio's Terms of Service, Beagle has placed AppFolio in a position where, if the TRO is granted, AppFolio will be forced to permit ongoing breaches of its Terms of Service and provide software functionality (which it reserves for its paying customers) to a competing company for free.

In addition, Beagle has already demonstrated it will use the time afforded by a TRO to prevent AppFolio from ever enforcing its rights. Beagle has already used the standstill intended for the Court to address Beagle's "apparent forum shopping" to begin hiding its access to AppFolio's platform. (Delage Decl. ¶ 16.)

---

[5] It is well-settled that such conclusory allegations of competitive harm are insufficient to sustain a lawsuit, much less justify injunctive relief. *See Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1002 (N.D. Cal. 2020) (granting motion to dismiss Sherman Act claim on ground that allegations of harm were conclusory).

Specifically, Beagle entered customers' AppFolio databases and began taking Beagle's identifiable reports@beagleforpm.com email domains and changing them to generic email domains without the word "Beagle", such as support@portfoliopm.cc. (*Id.* ¶¶ 9-10.) As detailed in the declaration of AppFolio engineer Nathanial Delage, Beagle systematically created at least seven new generic domain names — pmportfolio.cc, portfolioanalysis.cc, portfolioreview.cc, portfoliopm.cc, fortwaynegroup.cc, scheduledreports.info, and residentliability.com — to hide its unauthorized user accounts from AppFolio. (*Id.* ¶¶ 15-16.) ***As of December 24, 2025, Beagle had hidden at least 60 user accounts in this manner.*** (*Id.* ¶ 15.)

Beagle's subterfuge undermines its representation to this Court that its access to AppFolio's platform is "transparent." (Dkt. 1 ¶ 25). Beagle told this Court it does not hide, but uses "accounts with Beagle email domains," so that "AppFolio has full visibility into this through its own administration of the AppFolio platform." (*Id.*) Those representations, if they were ever true, are no longer.[6] Given this conduct, there is every reason to expect that Beagle will attempt to use further delay to find new ways to hide its accounts and activities within customers' databases.

A TRO would allow Beagle to continue to wrongly advertise its access to AppFolio's platform, force AppFolio into permitting ongoing violations of its Terms of Service, and require AppFolio to continue spending time and resources to combat Beagle's efforts to hide its presence in AppFolio's propriety software platform. Meanwhile, Beagle has failed to establish any harm of its own. The

[6] AppFolio has no reason to believe that Beagle's attorneys are intentionally making misrepresentations. They may be unaware of Beagle's subterfuge.

balance of equities therefore favors denying the injunction. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir. 1992) ("[A]n illusory harm to the movant will not outweigh any actual harm to the non-movant.").[7]

### III. <u>Beagle Cannot Establish a Likelihood of Success on the Merits.</u>

Although Beagle's Complaint contains nine causes of action, the Motion focuses on the claims for interference with contract and prospective economic relations, and unfair competition.[8] Beagle cannot show a likelihood of success on any of these claims.

Beagle's interference claims fail because AppFolio is merely enforcing its preexisting contractual right to prohibit third parties from accessing its platform; and because it engaged in no "independently wrongful" conduct when enforcing these rights. AppFolio merely seeks to protect the security of its platform and its customers' databases.

---

[7] In the opening of its venue brief, Beagle claimed that AppFolio breached the status quo when it "continued" to display its in-app message regarding its intent to disable Beagle user accounts. (Dkt. 22.) "Continu[ing]" to display the message *maintained* the status quo; it did not change it. In any event, AppFolio removed the banner on December 18, prior to and independent of Beagle's allegations first raised on December 19. (Saxena Decl. ¶ 27.)

[8] To the extent that Beagle's interference or unfair competition claims are premised on allegedly false statements, that would not support the preliminary injunction Beagle seeks. "Injunctive relief . . . must be tailored to remedy the specific harm alleged. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009). An overbroad injunction is an abuse of discretion." *Id*. Even if AppFolio defamed Beagle (it hasn't), that wouldn't entitle Beagle to prevent AppFolio from disabling its accounts. At most, it would entitle Beagle to an injunction against making further false statements (which Beagle hasn't sought)—or, more likely, a claim for damages after trial.

Beagle's unfair competition claim[9] also fails because it cannot establish that AppFolio has monopoly power (AppFolio has less than 17% of the market) and because AppFolio has not and will not block Beagle's access to data; rather AppFolio has deliberately created multiple *secure* methods for Beagle to access the data it needs.

**A. <u>Beagle's Tortious Interference Claims Fail As A Matter of Law.</u>**

Tortious interference with contractual relations requires "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Ixchel Pharma, LLC v. Biogen, Inc.,* 9 Cal. 5th 1130, 1141 (2020). For at-will contracts such as those at issue here, a showing of "independent wrongfulness" is required. *Ixchel Pharma, LLC*, 9 Cal. 5th at 1141.

Interference with prospective economic relations is similar, but "a plaintiff asserting this tort must show that the defendant knowingly interfered with an economic relationship between the plaintiff and some third party, [which carries] the probability of future economic benefit to the plaintiff." (*Id.*) (citations omitted). Beagle cannot carry its burden as to *any* of these elements, let alone all of them.

***Beagle cannot establish the existence of a valid contract*** because it has not even identified the contracts at issue. Beagle has not included with the Motion a single customer contract, a template of a customer contract, or cited even one term of such a contract. It is entirely unclear what promises Beagle has made or what

[9] Beagle's unfair competition claim also incorporates the interference claims, which, as explained, are non-viable.

promises its customers have made in return, if any. Beagle is not entitled to injunctive relief based on some vague assertion that it has "contracts."

***Beagle cannot establish AppFolio's knowledge of these contracts.*** At most, Beagle alleges that AppFolio is aware that Beagle has a relationship with its customers. But there is no evidence that AppFolio has knowledge of any contract or the terms thereof. Indeed, AppFolio still does not know what Beagle has actually promised its customers, or what the customers have promised in return. The most AppFolio can glean is that, in the words of Beagle's own website,[10] Beagle has "no long-term contracts or commitments. Property managers can adjust or cancel their participation at any time. We earn your business every day." Beagle's motion includes no evidence to the contrary.

***Beagle cannot establish that AppFolio intended to disrupt Beagle's contracts.*** Obviously, if AppFolio does not know the terms of Beagle's contracts (if any), it cannot have intended to disrupt them. And Beagle cannot show intent to interfere because the evidence attached to Beagle's motion shows that AppFolio deliberately sought to *preserve* its customers' ability to work with Beagle. Specifically, as Beagle's CEO said, AppFolio's notice to customers "outlined a path" for Beagle to "provide [its customers] continued service that is compliant with our terms of service and does not create security risk." (Brown Decl. iso Motion, Exh. C (Dkt. 4-5).) Far from interfering, AppFolio has actively sought to help Beagle and its customers transition to scheduled reports—a feature AppFolio created specifically to allow its customers to work *securely* with third parties. (*Id.*, Saxena Decl. ¶ 12.) Conversely, Beagle offers no evidence that AppFolio did

[10] (https://www.joinbeagle.com/faq.)

anything other than enforce its pre-existing contractual rights to secure its platform and its customers' databases.

***Beagle cannot establish that AppFolio engaged in "independently wrongful" conduct.*** Beagle claims that interference with a contract alone is sufficient, without the need to show independently wrongful conduct (as is required for a prospective advantage claim). (Dkt. 4, at 12-13, citing *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 32 (1998).) The law Beagle cites does not apply to these facts.

As Beagle's website says, Beagle has "no long-term contracts or commitments," but allows its customers to "cancel their participation at any time." In other words, Beagle's contracts (if any) are at-will. The Supreme Court of California has held that, because there is no guarantee of future performance in an at-will contract, such a contract is treated as a prospective economic advantage, and a showing of "independent wrongfulness" *is* required. *Ixchel Pharma, LLC*, 9 Cal. 5th at 1148. Thus, Beagle must show independently wrongful conduct on *both* of its interference claims.

Beagle cannot make this showing. California law is clear that enforcement of one's contractual rights is *not* "independently wrongful" conduct. *See Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.,* 47 Cal. App. 4th 464, 480 (1996) ("[T]he exercise of contractual rights . . . is not wrongful conduct actionable as intentional interference with prospective economic relations"); *see also Damabeh v. 7-Eleven, Inc.*, 2013 WL 1915867. *9 (N.D. Cal. May 8, 2013) (relying on *Arntz* to dismiss tortious interference claim without leave to amend on ground that "Plaintiff has failed to establish that, in reclaiming the Merchandise, Defendant was doing anything more than exercising its contractual rights.'") Thus,

AppFolio's enforcement of its preexisting contractual rights does not support Beagle's interference claims.

***Beagle cannot establish that AppFolio actually disrupted a contractual relationship or caused harm.*** All Beagle offers to show disruption is the conclusory statement that the "cutoff would prevent Beagle from verifying coverage, administering tenant-liability programs, processing compliance data, and performing other essential functions." (Dkt. 4 at 9-10.) Beagle does not explain whether these functions are required by the contracts; and Beagle does not explain why user accounts are required to perform these functions. At most, Beagle claims it needs access to data. But that cannot support Beagle's claim because, as shown above (and as admitted by its CEO), Beagle can obtain all the data it claims it needs through scheduled reports. (Saxena Decl. ¶ 12, Exh. D.) There is no evidence of disruption.

**B. AppFolio Is Not Violating Any Antitrust Laws.**

**1. AppFolio Lacks Sufficient Market Power.**

Beagle claims that "AppFolio possesses monopoly power in the Property Management Software Platform Market for residential property managers in the United States." (Dkt. 1 at ¶ 82.) But "a market share of less than 50 percent is presumptively insufficient to establish market power" to monopolize, and "[w]hen the claim involves attempted monopolization," even "30 percent is presumptively insufficient." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (finding 44% market share raised a triable issue).

AppFolio has about nine million units on its platform, and there are approximately 52 million residential rental units in the United States.[11] (Saxena Decl. ¶ 6.) That means AppFolio has less than 17% of the residential rental units in the United States.[12] (*Id.*) Not only does that place AppFolio well below the "presumptively insufficient" 30% mark, but AppFolio is not even the market leader. (*Id.* ¶ 7.) AppFolio believes two other companies, Real Page, Inc. and Yardi System, Inc., have larger market share. (*Id.*) At third place and with less than 17% of the market, AppFolio is far from a monopoly power. *Rebel Oil Co.*, 51 F.3d at 1438.

**2. <u>Beagle Has Not Alleged Anticompetitive Conduct.</u>**

The United States Supreme Court has long held that the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).

---

[11] Beagle alleges AppFolio has eight million units, but AppFolio has chosen to present the Court with the largest possible number of units. Indeed, not all of the nine million units are rentals, and thus not candidates for Beagle's services. Should it become necessary, AppFolio reserves the right to demonstrate that applicable number of rental units for evaluation of its market power is lower than nine million.

[12] That 80% of Beagle's customers are purportedly on AppFolio's platform shows only the degree to which Beagle has targeted AppFolio and taken advantage of its functionality.

The lone established exception to this rule arises when "the only conceivable rationale or purpose is 'to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition.'" *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016). To use this exception, a plaintiff must show (1) "the unilateral termination of a voluntary and profitable course of dealing"; (2) "the defendant's refusal to sell [ ] to the plaintiff 'even if compensated at retail price,' thus 'suggesting a calculation that its future monopoly retail price would be higher'"; and (3) the defendant's refusal "to provide to their competitors products that were already sold in a retail market to other customers." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601(1985) (establishing the exception). None of these elements are met here.

AppFolio did not terminate a "voluntary and profitable course of dealing" with Beagle; AppFolio has never had a business relationship with Beagle. (Saxena Decl., ¶¶ 28-29.) Nor is AppFolio sacrificing profits; AppFolio never received any money from Beagle for its use of AppFolio's platform. (*Id.*) Nor has AppFolio refused to sell its services to Beagle "at a retail price;" Beagle is not a property manager and has never openly[13] attempted to purchase AppFolio's services. (Id. ¶ 29.)

AppFolio merely seeks to enforce its Terms of Service that have been in place since 2019 (well before AppFolio was aware of Beagle) and prevent non-secure third-party access. (*Id.* ¶ 29.) Beagle has failed to articulate any legally

[13] At one point, a Beagle affiliate apparently created a fake property management company to defraud AppFolio into providing a demonstration of AppFolio's product. (Levine Decl. Exh. A; Saxena Decl. ¶¶ 32-34.)

cognizable reason that AppFolio should not be allowed to enforce its contracts, and should instead be forced to provide its platform and functionality to Beagle. The law is expressly to the contrary: "[b]usinesses are free to choose the parties with whom they will deal." *Pac. Bell Tel. Co.*, 555 U.S. at 448.

### 3. Beagle Cannot Rely On Narrow Exceptions for Public Data or Health Records.

Unable to overcome "the long recognized right of" a company to choose "parties with whom [it] will deal," Beagle attempts to portray AppFolio's actions as unlawful "data blocking." (Motion at 2.) To support this argument, Beagle cites two decisions in which companies blocked competitors' access to platforms or data that were otherwise publicly available. (Dkt. 4 at 2.) These decisions, if anything, show why Beagle's motion is unsupported.

In *WPEngine*, the defendant, WordPress, offered a "free and open-source software program that allow[ed] users to build and maintain websites" and was used by more that 40% of all websites on the internet. *WPEngine,* 2024 WL 5077610, at *2 (N.D. Cal. Dec. 10, 2024). The plaintiff, WPEngine, offered additional tools for WordPress users to improve their websites. *Id.* After a decade, and despite ***offering its software for free to the general public***, WordPress began charging WPEngine a substantial fee for the previously free software (which was still free to others). *Id*.

On these facts, the Court found WordPress had enticed WPEngine to use its software to build a customer base, and then used that customer base as leverage to charge WPEngine for software it made free to others. *Id*. at *13-14. Based on this enticement, the lack of a viable alternative, and the pending loss of customers, the

District Court entered a preliminary injunction enjoining the defendant from charging WPEngine for its free software. *Id*. at *13-14.

In *hiQ Labs*, the plaintiff was a data analytics company that scraped publicly available LinkedIn data, analyzed it, and sold it to clients. *hiQ Labs v. LinkedIn Corp.*, 31 F.4th 1180, 1187 (9th Cir. 2022). It's "entire business depend[ed] on being able to access public LinkedIn member profiles . . ." *hiQ Labs*, 31 F.4th at 1189. There was "no current viable alternative to LinkedIn's member database to obtain data for hiQ's Keeper and Skill Mapper services." *Id.* Despite LinkedIn profiles being accessible to the general public, LinkedIn prevented hiQ from accessing them. *Id.* at 1185, 1189.

The Ninth Circuit affirmed the grant of a preliminary injunction, holding that it was at least probable that LinkedIn, "whose servers hold vast amounts of ***public data***," should not be permitted to selectively ban "only potential competitors from accessing and using that otherwise ***public data*** . . ." *Id.* at 1193–94 (emphasis added.)

This case has nothing in common with *hiQ* or *WPEngine*. AppFolio does not make software or data available to the public. (Saxena Decl. ¶ 5.) Nor is Beagle using publicly available data; to the contrary, the data is protected by password within customers' databases on AppFolio's platform. (*Id.* ¶¶ 5, 25; Delage Decl. ¶ 5.) And, AppFolio is not blocking access to this data. Rather, AppFolio has designed multiple methods for its customers to share data with third parties like Beagle. (*Id.* ¶¶ 10-13.) These include (1) using AppFolio's Scheduled Reports; (2) applying to become a recognized partner of AppFolio; and (3) using Database API functionality. (*Id.*) Beagle is not blocked at all.

Beagle's reliance on the blocking of health record data is similarly unpersuasive. (Motion (Dkt. 4) at 3 n. 2, 14, 16.) Beagle cites to *Real Time* for the proposition that data blocking is unlawful when it would cause harm to a business. *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F. 4th 205 (4th Cir. 2025). That is not the law.

*Real Time* involved an attempt by a health records company to withhold medical files from a health analytics company that serviced skilled nursing facilities. *Id.* at 205. The decision rested on the 21st Century Cures Act, which, among other things, "seeks to prevent companies from engaging in 'information blocking' of electronic ***health information***." *Id*. at 230. The public policy rationale of the statutory scheme was "designed to advance interoperability" and "support the access, exchange, and use of electronic health information." *Id*. at 231. Thus, in *Real Time*, there was an entire statutory scheme that prohibits companies in possession of medical records from refusing to share them with legitimate third-parties. *See id*. The court issued a preliminary injunction based on the 21st Century Cures Act that obligated the defendant to turn over its medical files. *Id.* at 241.

There is no statutory scheme here that governs data sharing among property managers. There is no body of law that regulates the exchange of data among property managers. There is no public policy reason that a privately-held company should be required to share its property management data with third-parties. AppFolio, like virtually all companies in the United States, is free to determine with whom it wants to do business. Beagle's decision to rely on *hiQ*, *WPEngine*., and *Real Time* is misguided.

### 4. AppFolio is Justified in Enforcing its Terms of Service Against Beagle.

Beagle argues that AppFolio is only enforcing its Terms of Service because Beagle is a competitor. (Dkt. 4 at 1.) In fact, AppFolio is enforcing its Terms of Service to protect its customers and itself from the risks imposed by the unauthorized user accounts in its customers' databases. These accounts impose substantial security risks: Beagle, or any former Beagle employee with the password, can use the AppFolio services in the customer's database, such as charging a property manager's residents, sending other payments, or running background checks. (Saxena Decl. ¶ 25.) Beagle personnel (current or former) could also steal residents' personal and financial information, access and alter the customer's bank information, and more, depending on the permission level. (*Id.*) These risks are particularly concerning given Beagle's track record of dishonest behavior, including falsely advertising to AppFolio's customers that Beagle and AppFolio are partners; falsely telling customers that AppFolio failed an audit and brought Beagle in to offer insurance services (Levine Decl. Exh. A; Saxena Decl. ¶ 14); pretending to be a property manager to get a demonstration of AppFolio's product (*Id.* ¶¶ 32-35); and exploiting a stand-still order to hide Beagle's identifiers in AppFolio's customer databases. (Delage Decl. ¶ 16.)

## IV. It Is Not In The Public Interest To Reward Beagle's Devious Conduct.

The public interest will rarely favor an injunction when the dispute is between private companies. *See Xport Forwarding LLC v. Mesitis DWC LLC*, 694 F. Supp. 3d 1258, 1271 (C.D. Cal. 2023) ("[T]his is a private dispute between two companies. When the reach of an injunction is narrow, limited only to the parties,

and has no impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one that favors granting or denying the preliminary injunction.") (quotation omitted). And as discussed above, Beagle's claim that countless renters will be affected is specious, since Beagle admits that the "fix" to disabling the unauthorized user accounts is "simple and already in motion." (Saxena Decl. Exh. D.)

The public interest is also in no way served by an injunction enabling a party to continue inequitable conduct. *See, e.g., Herrejon*, 980 F. Supp. 2d at 1211 ("Granting injunctive relief would be a disservice to public interest by allowing plaintiffs to preclude foreclosure after their default and without legitimate tender of outstanding amounts owed.").

Nor would the public interest be served by forcing AppFolio to tolerate an ongoing breach of its terms of service. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025-26 (8th Cir. 1992) ("[T]he public interest does not favor forcing parties to an agreement to conduct themselves in a manner directly contrary to the express terms of the agreement.").

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety.

DATED this 29th day of December, 2025.

*/s/*
Brian Procel
Jeremiah Levine
Marty Pritikin
**PROCEL LEVINE, LLP**

Attorneys for Defendant
AppFolio, Inc.

Brian Procel (Cal. Bar No. 218657)
Brian@Procel-Law.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@Procel-Law.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for Defendant AppFolio, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,

Plaintiffs,

v.

APPFOLIO, INC., a California corporation,

Defendants.

Case No. 2:25-cv-12248-JFW-SSC

**DECLARATION OF JEREMIAH LEVINE IN SUPPORT OF APPFOLIO, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR AN EX PARTE TEMPORARY RESTRAINING ORDER, EXHIBIT A**

**DECLARATION OF JEREMIAH LEVINE**

I, Jeremiah Levine, declare:

1. I am a principal of Procel Levine LLP, counsel for AppFolio, Inc. ("AppFolio"). I make this declaration in support of AppFolio's Opposition to Plaintiffs' Motion for an Ex Parte Temporary Restraining Order based on personal knowledge. If called as a witness, I could and would testify competently hereto.

2. Attached hereto as Exhibit A is a true and correct copy of AppFolio's Application for a Temporary Restraining Order filed in Santa Barbara Superior Court.

3. After AppFolio filed its Application for a Temporary Restraining Order, Beagle removed AppFolio's name and logo from its website. I know this from reviewing Beagle's website on December 9, 2025, before AppFolio's filing; and December 22, 2025, after AppFolio's filing.

4. On December 15, 2025, AppFolio agreed not to disable Beagle's access to AppFolio's client accounts until December 23, 2025.

I declare under penalty of perjury according to the laws of the State of California that the foregoing is true and correct and that this declaration was signed by me on December 26, 2025 in Los Angeles, California.

_/s/ Jeremiah Levine_____________
Jeremiah Levine

Exhibit A

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
12/16/2025 2:43 PM
By: Terri Chavez , Deputy

Brian Procel (Cal. Bar No. 218657)
Brian@Procel-Law.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@Procel-Law.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for AppFolio, Inc.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA BARBARA

| | |
|---|---|
| APPFOLIO, INC., a California corporation<br><br>Plaintiff,<br><br>v.<br><br>BEAGLE, INC., a Delaware corporation, and DOES 1-20;<br><br>Defendants. | Case No. 25-CV-07670<br><br>Ex parte hearing date: Dec. 16, 2025<br>Ex parte hearing time: 8:30 AM<br><br>Court: Hon. Donna Geck<br><br>Action filed: Dec. 9, 2025<br><br>**NOTICE OF EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**[(Declarations of Sean Saxena, Melanie Hohler, and Jeremiah Levine, and (Proposed) Order to Show Cause and Temporary Restraining Order Filed Concurrently Herewith]** |

Plaintiff AppFolio, Inc. ("Plaintiff" or ("AppFolio") hereby applies[1] for (1) a temporary restraining order and (2) for an order requiring Defendant Beagle, Inc. ("Defendant" or "Beagle")[2] to show cause why a preliminary injunction should not issue pending trial in this action, enjoining Defendant and Defendant's employees, agents, and persons acting with Defendant or on its behalf, from doing or attempting to do any of the following:

(a) falsely misrepresenting to AppFolio's actual or potential customers or clients, or to any other third party, that Beagle or its products or services are, or soon will be, affiliated with, partnered with, endorsed by, approved by, or otherwise associated with AppFolio or any of AppFolio's products or services;

(b) falsely misrepresenting to AppFolio's actual or potential customers or clients, or to any other third party, that AppFolio, or any of its products or services, has failed any audits or has been deemed to be out of compliance with any applicable laws, statutes, ordinances, rules, or regulations;

(c) falsely misrepresenting to AppFolio's actual or potential customers or clients, or to any other third party, that AppFolio is no longer offering or is no longer permitted by law to offer any of its existing products or services;

(d) falsely misrepresenting to AppFolio's actual or potential customers or clients, or to any other third party, that AppFolio's customers or clients are, or are at risk for, being out of compliance with or violating any applicable laws, statutes, ordinances, rules or regulations by utilizing or continuing to utilize AppFolio or any of its products or services;

(e) falsely misrepresenting to, suggesting to, encouraging, or advising AppFolio's customers or clients that they need to or should utilize Beagle or its products or services as a result of AppFolio's supposed compliance violations or supposed discontinuation of any of its products or services;

(f) falsely misrepresenting to AppFolio's actual or potential customers or clients that Beagle or its agents or representatives have already been in contact with AppFolio or its agents or representatives and obtained consent from AppFolio to contact them;

(g) inducing AppFolio customers or clients to give Beagle or Beagle's representatives or agents access to their log-in credentials to their AppFolio customer account, or inducing them to otherwise violate their AppFolio terms of service;

---

[1] Plaintiff is resubmitting this application after obtaining a hearing date for its motion. Plaintiff's initial application was denied.

[2] Counsel for Beagle is Michael Burshteyn, Greenberg Traurig, LLP

Case: 26-769, 04/07/2026, DktEntry: 11.4, Page 39 of 299

(h) training, encouraging, or incentivizing current or prospective sales representatives or other agents to make false or misleading representations about AppFolio or its products or services, or about any current or expected affiliation between AppFolio or its products or services and Beagle or its products or services;

(i) making any other false misleading claims about AppFolio or its products and services, or about Beagle or its products or services, during any communications with actual or potential AppFolio customers or clients;

(j) contacting AppFolio customers or clients for the purposes of making false or misleading statements about AppFolio or its products and services, or about Beagle or its products or services, or about any current or expected affiliation between AppFolio or its products or services and Beagle or its products or services;

(k) making any other false or misleading statements about AppFolio or its products or services, or about any affiliation between AppFolio or its products or services and Beagle or its products or services, in Beagle's marketing, advertising, social media, or any other communications, including but not limited to utilizing AppFolio's name or logo on Beagle's website or any other promotional materials;

(l) taking any other steps to intentionally create confusion or uncertainty in the marketplace about any current or expected affiliation between AppFolio or its products or services and Beagle or its products or services.

This application is made pursuant to the provisions of California Code of Civil Procedure Section 527 on the grounds that Plaintiff has a substantial likelihood of establishing that Defendant has engaged in prohibited false advertising and unfair competition; induced breaches of contract; and interfered with AppFolio's contractual or prospective economic relations; and will continue to do so absent relief from the Court. Plaintiff will suffer great irreparable injury if Defendant is not enjoined from the aforementioned wrongful conduct before the matter can be heard on notice. Plaintiff has already lost a substantial number of customers as a result of Defendant's wrongful conduct in just the last few months, and will continue to lose even more if Defendant is not enjoined. Moreover, the confusion that Defendant continues to sow about the affiliation between AppFolio and Beagle, and the lies that Beagle is spreading about AppFolio's regulatory non-compliance, is causing untold harm to AppFolio's reputation.

This application is based upon the memorandum in support and declaration set forth below, the complaint in this action, and the accompanying declaration of notice.

There have been no previous applications for similar relief.

DATED this 15th day of December, 2025.

*/s/ Jeremiah Levine*
Brian Procel
Jeremiah Levine
Marty Pritikin
**PROCEL LEVINE, LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

Attorneys for Plaintiff
AppFolio, Inc.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. Introduction

Plaintiff AppFolio, Inc. ("AppFolio"), one of the leading providers of software for property managers, seeks to enjoin a predatory competitor, Beagle, Inc. ("Beagle"), from continuing its brazen campaign of deceit designed to wrongfully sign up AppFolio's customers. This campaign is not only causing AppFolio to lose more and more customers with each passing day, but is also seriously tarnishing AppFolio's reputation.

Beagle representatives contact AppFolio customers and tell them a variety of blatant lies. They claim that AppFolio has failed audits (it hasn't) and so is no longer offering insurance-related products (it very much still is). They claim that Beagle is "partnered with" AppFolio (it isn't), and that AppFolio asked Beagle to provide insurance to those clients (it didn't). They claim that Beagle is integrated with AppFolio (it isn't, and never will be).

When Beagle convinces an AppFolio customer to switch, Beagle logs in to the AppFolio ***as the customer***. That is, Beagle persuades the customer to give them log-in credentials to the customer's account. Beagle then turns off the customer's AppFolio's insurance program and turns on its own. Beagle thus deceives the customers into violating AppFolio's terms of service. And Beagle knows full well that it is inducing violations of the terms of service.

Beagle's wrongdoing is not confined to lying to customers. Beagle uses AppFolio's name and logo on its own website, falsely suggesting an affiliation or endorsement that does not exist.

AppFolio is substantially likely to prevail on its claims against Beagle for false advertising, unfair competition, interference with contract, and inducing breach of contract. AppFolio has business records that reflect numerous customers calling to complain about Beagle or expressing confusion about the affiliation between AppFolio and Beagle. This is not a case

where reasonable minds can differ about whether sales tactics cross the line into puffery. Beagle's *standard* sales pitch to AppFolio customers is predicated on outright lies.

AppFolio has suffered and will continue to suffer irreparable harm unless Beagle is enjoined from continuing to engage in its false, misleading, and confusing marketing and sales practices. Unfortunately, Beagle's false advertising campaign has proved to be effective. In just a recent two-month period, Beagle signed up more than 170 AppFolio customers, representing approximately 70,000 rental units, costing AppFolio $125,000 in revenue. These lost customers alone will cost AppFolio more than $7 million in additional future revenue. Unless Beagle is enjoined, there is every reason to believe AppFolio will lose more and more customers and many millions more in lost revenue.

Lost sales aside, Beagle's false claims of affiliation with AppFolio are causing untold damage to AppFolio in the marketplace. Customers who contact AppFolio's customer service department to complain about Beagle's products or service are doing so precisely because they believe Beagle's lie that it is partnered with AppFolio. The tarnishing of AppFolio's name through false association with a inferior product is precisely the sort of harm that the false advertising laws are meant to protect against.

Given how brazen Beagle has been to date, nothing short of an immediate court order will stop it from continuing its unlawful practice. The Court should issue a temporary restraining order to immediately put a halt to these practices, until such time as a hearing can be held on the propriety of entering a preliminary injunction pending trial.

## II. <u>Facts</u>

**AppFolio.** For nearly 20 years, AppFolio has been an industry leader in software for property managers. (Saxena Decl., ¶ 7.) It provides a property management software platform, on which property managers can run nearly all aspects of their business — including leasing,

maintenance, and payments. (*Id.*) The platform serves as the system of record for all aspects of the property manager's business. (*Id.*) AppFolio provides services to more than 20,000 property managers, who in turn have more than eight million units. (*Id.*.)

One of AppFolio's most important services is called Smart Ensure. (*Id.* ¶ 8.) When a property manager uses Smart Ensure, they place a requirement in their leases that renters must carry liability insurance on their unit. (*Id.*) The renter then has a choice of purchasing renters insurance (either through AppFolio Insurance Services or another provider); if the renter does not purchase renters insurance, the property manager will enroll the renter's unit in the property manager's Liability to Landlord Insurance policy ("LLI policy"). (*Id.*) Smart Ensure manages this process, tracking whether the renter has renter's insurance and, where they do not, automatically adding the unit to the property manager's LLI policy. Smart Ensure generates revenue for AppFolio. (*Id.*)

In addition to offering its own services, AppFolio offers its customers the ability to work with "point solutions." (*Id.* ¶ 9.) Point solutions are companies that offer a particular service to the property manager. (*Id.*) These services include vacancy listings, inspection services, and debt collection. (*Id.*) While these services sometimes compete with AppFolio's own, AppFolio values its customer's ability to choose. (*Id.*)

AppFolio works with point solutions in different ways. (*Id.*) One way is by partnering with a point solution so that the point solution is seamlessly integrated into the customer's experience of AppFolio. (*Id.*) It is very valuable for a point solution to be partnered with AppFolio because AppFolio is widely used by property managers, and because partnership makes it easy for AppFolio's customers to use the point solution. (*Id.*) Beagle claims to be a partner. (*Id.*) It is not. (*Id.*)

**Beagle Uses False Advertising to Promote its Insurance Program**

Beagle offers an insurance service that competes with AppFolio's offering. (*Id.* ¶ 11.) And Beagle has launched a campaign to deceive AppFolio's customers into adopting Beagle's competing service. (*Id.* ¶ 12.)

AppFolio became aware of Beagle's lies when it began receiving a stream of customer questions and complaints regarding Beagle's advertising and services. (*Id.* ¶ 13.) As examples, between September 24, 2025 and November 24, 2025 alone (the "Time Period"), AppFolio received the following customer complaints:

On or about October 8, 2025, AppFolio customer MH reported that Beagle made a sales call to her, during which Beagle claimed that AppFolio had failed audits and, as a result, asked Beagle to work with its customers to bring it back into compliance. (*Id.* ¶ 13, Exh. A at 1; Hohler Decl. ¶ 3.) None of that is true. (Saxena Decl. ¶ 14.) No such affiliation has ever or will ever exist. (*Id.*) Beagle lied to MH. (*Id.*)

On or about September 24, 2025, AppFolio Customer SP reported that Beagle made a sales call to her and claimed to be partnered with AppFolio. (*Id.* ¶ 15, Exh. A at 7.) Beagle lied. (*Id.* ¶ 15.)

On or about October 16, 2025, AppFolio Customer LS reported that Beagle made a sales call to her and claimed that Beagle had already spoken with specialists at AppFolio who were ready to help her get set up using Beagle. (*Id.* ¶ 16, Exh. A at 5.) That too was a lie. (*Id.*)

**Beagle's False Advertising Causes Customer Confusion**

During the Time Period, AppFolio received additional inquiries from customers confused about AppFolio's non-existent partnership with Beagle. For example, Customer MV contacted AppFolio asking for a list of authorized partners in order to learn more about Beagle. (Saxena Decl. ¶ 17, Exh. A at 11.) This confusion is the direct result of Beagle's false advertising.

**Beagle's False Advertising Induces Customers to Switch Under False Pretenses**

Beagle's false advertising works.

During the Time Period, customer LC switched to Beagle. (*Id.* ¶ 19, Exh. A at 3.) Based on LC's statements to AppFolio, it appears that LC was under the mistaken belief that Beagle was a vendor offered through AppFolio. (*Id.* ¶ 19, Exh. A at 3.)

During the Time Period, customer SI switched to Beagle based on the mistaken belief that Beagle was soon to be offered through AppFolio. (*Id.* ¶ 20, Exh. A at 10.)

**Beagle's False Advertising Harms AppFolio's Relationship with its Customers**

Since Beagle pretends to be affiliated with AppFolio, bad reviews of Beagle's product reflect badly on AppFolio.

Customer RG reported to AppFolio that Beagle is "not very organized" and left him "unsure if anything was done [by Beagle] other than create[] the monthly charges" [sic]. (*Id.* ¶ 22, Exh. A at 8.) Customer LS similarly reported to AppFolio, after switching to Beagle, that Beagle had been a "nightmare" and "ridiculous," and that Beagle had done "nothing but waste my time and cause me issues with my tenants." (*Id.* ¶ 22, Exh. A at 5-6.) Still confused by Beagle's false association with AppFolio, LS admonished AppFolio stating "you should not be promoting this company." (*Id.* ¶ 22, Exh. A at 5-6.)

These actions by Beagle have made AppFolio's performance of its agreements with customers more costly and difficult. (*Id.* ¶ 18.) Beagle's recent efforts to sign up AppFolio's customers through a series of lies has resulted in a surge of customers contacting AppFolio's customer service department to air complaints or raise questions based on the confusion Beagle has intentionally sowed. (*Id.*) This has taxed AppFolio's customer service function. (*Id.*)

**What Beagle Does to AppFolio Customers' Accounts**

When Beagle convinces an AppFolio customer to switch, Beagle logs in to the customer's AppFolio account. (Saxena Decl. ¶ 23.) This gives Beagle the ability to change the customer's system settings. (*Id.*) And with that power, Beagle turns off Smart Ensure and replaces it with their own offering. (*Id.*)

In summary, Beagle lies to AppFolio's customers, pretends to be AppFolio's partner to gain access to the customer's AppFolio account, and then uses AppFolio's own platform to turn off AppFolio's service and run its own competing business.

**Beagle's False Advertising Tricks Customers Into Violating the Terms of Service**

Beagle's subterfuge tricks the customers into violating AppFolio's terms of service (the "Terms of Service"), to which all customers have agreed.

AppFolio's terms of service state: "Third parties are not permitted to access or use the Services or any application programming interface we may make available to you without our prior consent." (*Id.* ¶ 26, Exh. B at 3.) The "Services" refers to AppFolio's platform and all services offered therein. (*Id.* ¶ 26, Exh. B at 1.)

AppFolio's terms of service also address direct competitors, stating: "You may not . . . make available or otherwise provide all or any portion of the Services . . . or any application programming interface . . . to any of our direct or indirect competitors." (*Id.* ¶ 27, Exh. B at 5.)

Allowing Beagle access AppFolio's customer-facing platform violates the Terms of Service. (*Id.* ¶ 28.) Stated differently, by deceiving customers into believing they are an approved AppFolio partner, Beagle falsely leads customers to believe that the customers have AppFolio's permission to provide Beagle access to the platform and that Beagle is not a direct competitor.

Beagle knows it is not allowed to access AppFolio's platform and that it is deceiving customers into violating the terms of service. Beagle knows this because it is standard practice for companies that provide software as a service ("SaaS") to forbid, in their terms of service, third-party access without permission, particularly by direct competitors. (*Id.* ¶ 29.) These prohibitions are necessary to prevent third parties (and competitors) from using the service for free, copying the service, or misusing the service (as is happening here). (*Id.*) As a SaaS company, Beagle knows that AppFolio's terms of service forbid third party access. (*Id.*)

Moreover, Beagle's own terms of service state that its customers are "responsible for keeping any login credentials (e.g., username, password) private and for restricting access to your computer or device." (*Id.* ¶ 30, Exh. D at 2.)

Also, AppFolio's Terms of Service are publicly accessible on its website. (*Id.* ¶ 31.) And Beagle has visited that website to steal AppFolio's trademarked logo and place it on Beagle's website to create the false impression of partnership. (*Id.*)

**Beagle's Deception Extends Beyond False Advertising**

Recently, an individual named Vincenzo Passariello contacted AppFolio's sales team. (Saxena Decl. ¶ 32.) Passariello said that he worked for a property management company called Akita, and that he wanted a demonstration of AppFolio's platform. (*Id.*)

It appears that Passariello is associated with Beagle and was lying. (*Id.* ¶ 33.) And it appears that Akita is a made-up company. (*Id.*) This is apparent because (1) Passariello provided inconsistent information about the purported business and was unable to answer basic questions about it; (2) Akita's online presence appears to be fictional, created by artificial intelligence; (3) Akita is a dog breed, just like Beagle and Beagle's parent company. (*Id.*)

Nonetheless, Passariello got the demonstration—and with him on the video call was a senior figure in Beagle's parent company, Corgi. (*Id.* ¶ 34.)

In sum, it appears that Passariello was attempting to purchase an AppFolio database to covertly provide Beagle with its own AppFolio account, which Beagle could in turn use to provide fake demonstrations of its non-existent integration.

**Harm Caused by Beagle's Wrongful Conduct.** Since the first false advertising that AppFolio learned of on or about September 24, 2025, Beagle has signed up at least 172 AppFolio customers. (*Id.* ¶ 36.) Each of those customers is a property manager operating numerous residential units. (*Id.*) Altogether, the 172 customers that Beagle signed up represent approximately 70,000 units. (*Id.*)

Based on AppFolio's historical revenue associated with Smart Ensure, the absence of these customers has *already* cost AppFolio approximately $125,000 in just the two-month Time Period. (*Id.* ¶ 37.) Over the course of the customer lifecycle, Beagle's lies could cost AppFolio in excess of $7,000,000. (*Id.*)

Moreover, because Beagle is falsely representing an affiliation with or endorsement by AppFolio, when customers are dissatisfied with Beagle's products or level of service, they hold it against AppFolio. (*Id.* ¶ 38.) Thus, Beagle is also causing untold harm to AppFolio's reputation. (*Id.*)

## III. Legal Standards

"The law is well settled that the decision to grant [a restraining order] rests in the sound discretion of the trial court. A trial court will be found to have abused its discretion only when it has exceeded the bounds of reason or contravened the uncontradicted evidence." *Church of Christ in Hollywood v. Superior Ct.*, 99 Cal. App. 4th 1244, 1251 (2002) (quotations and citations omitted).

"[T]rial courts should evaluate two interrelated factors when deciding whether or not to issue [a restraining order]. The first is the likelihood that the plaintiff will prevail on the merits

at trial. The second is the interim harm that the plaintiff is likely to sustain if the [restraining order] were denied as compared to the harm that the defendant is likely to suffer if the [order] were issued." *Id.* (quotations omitted).

California courts of appeals have upheld interim injunctive relief in connection with each of the causes of action raised in AppFolio's complaint. *See, e.g., People ex rel. Brown v. iMergent, Inc.,* 170 Cal. App. 4th 333, 341 (2009) (affirming granting of preliminary injunction in light on trial court's "'very broad' discretion under the UCL and the FAL"); *People v. Columbia Rsch. Corp.,* 71 Cal. App. 3d 607 (Ct. App. 1977) (affirming grant of preliminary injunction in FAL case); *People ex rel. Brown v. Black Hawk Tobacco, Inc.,* 197 Cal. App. 4th 1561, 1568 (2011) (affirming grant of preliminary injunction in UCL case); *Fed. Auto. Servs. v. Lane Buick Co.*, 204 Cal. App. 2d 689, 691 (Ct. App. 1962) ("[O]rder granting a preliminary injunction which enjoins defendant from . . . persuading and inducing plaintiff's customers to breach and cancel their contracts with plaintiff by making false and malicious representations . . . is proper in the situation thus presented."); *California Auto Ct. Ass'n v. Cohn*, 98 Cal. App. 2d 145, 150 (1950) (referencing "various California cases wherein . . . injunctive relief [was] granted for unjustifiable interference with contractual relations").

## IV. Argument

### A. AppFolio Is Likely to Succeed on the Merits of Its Claims

#### 1. False Advertising

Section 17500 makes it unlawful for any "corporation . . . or employee thereof," in connection with the promotion of any goods or services, "to make or disseminate . . . any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Bus. & Prof. Code § 17500.

"[T]to state a claim under . . . the false advertising law, based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002) (quotation omitted).

Here, even without the benefit of discovery, AppFolio already has ample evidence that its customers are not only *likely* to be deceived, but in fact *have* been deceived, by Beagle's false claims of association, partnership, or integration with AppFolio.

Beagle has made false claims that AppFolio has failed audits and can no longer offer insurance products, and that AppFolio has consented to Beagle reaching out to its customers to offer them insurance products in AppFolio's stead. Beagle has also repeatedly made false claims that it is "partnered with" AppFolio.

AppFolio customers have called with complaints or questions that reflect obvious confusion about the relationship or affiliation between AppFolio and Beagle. Many others have actually switched to Beagle as their provider of insurance products.

### 2. <u>Inducement of Breach of Contract and Interference with Contractual Relations</u>

The elements of a cause of action for intentional interference with contractual relations are "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148, (2004). The plaintiff "need not prove that a defendant acted with the primary purpose of disrupting the contract, but must show the defendant's knowledge that the interference was certain or substantially certain to occur as a result of his or her action." *Id.*

Inducement of breach of contract is "a species of intentional interference with contractual relations." *1-800 Contacts, Inc. v. Steinberg*, 107 Cal. App. 4th 568, 585 (2003). Whereas inducement of breach of contract requires an actual breach, interference with contract "is slightly broader in that it protects against intentional acts not necessarily resulting in a breach" but which nevertheless cause a disruption to the contractual relationship or make performance more difficult or expensive. *Shamblin v. Berge*, 166 Cal. App. 3d 118, 122 (Ct. App. 1985); *see Pac. Gas & Elec. Co. v. Bear Stearns & Co.,* 50 Cal. 3d 1118, 1129 (1990) ("[I]nterference with the plaintiff's performance may give rise to a claim for interference with contractual relations if plaintiff's performance is made more costly or more burdensome.").

Here, through false representations about AppFolio and Beagle's relationship to AppFolio, Beagle has induced numerous AppFolio customers to provide Beagle with their AppFolio log-in credentials. This constitutes a breach of AppFolio's terms of service, which provide: "Third parties are not permitted to access or use the Services or any application programming interface we may make available to you without our prior consent." (Saxena Decl. ¶ 25.) (The "Services" refers to AppFolio's platform and all services offered therein. (*Id.*)) The terms of service also state: "You may not . . . make available or otherwise provide all or any portion of the Services . . . or any application programming interface . . . to any of our direct or indirect competitors." (*Id.*)

Beagle knows about AppFolio's terms of service, and knows that it is inducing AppFolio's customers to breach those terms of service. First, Beagle, like anyone in the software as a service ("SaaS") industry, knows that the ability to exclude unauthorized third-party access is an essential component of any SaaS platform. Second, Beagle's own terms of service provide just such an exclusion on unauthorized third-party access. Third, Beagle has

visited AppFolio's website, which contains AppFolio's terms of service, to wrongfully take AppFolio's logo.

Beagle has also made AppFolio's performance of its agreements with customers more costly and difficult. Beagle's recent efforts to sign up AppFolio's customers through a series of lies has resulted in a surge of customers contacting AppFolio's customer service department to air complaints or raise questions based on the confusion Beagle has intentionally sowed. This has taxed AppFolio's customer service function.

### 3. Unfair Competition Law (Bus. & Prof. Code § 17200)

Section 17200 defines "unfair competition" to include "any unlawful, unfair *or* fraudulent business act." Bus. & Prof. Code § 17200 (emphasis added). "Because section 17200's definition is disjunctive, a 'business act or practice' is prohibited if it is 'unfair' *or* 'unlawful' *or* 'fraudulent.'" *State Farm Fire & Casualty Co. v. Superior Court*, 45 Cal.App.4th 1093, 1102 (1996) (original emphasis).

"The 'unlawful' practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made. . . . As our Supreme Court put it, section 17200 'borrows' violations of other laws and treats them as unlawful practices independently actionable under section 17200 et seq." *Saunders v. Superior Court*, 27 Cal. App.4th 832, 838-839 (1994) (citing *Farmers Ins. Exch. v. Superior Ct.*, 2 Cal. 4th 377, 383 (1992).)

Interference with AppFolio's contracts constitutes a violation of the Unfair Competition Law under Section 17200. *See Angelica Textile Servs., Inc. v. Park*, 220 Cal. App. 4th 495, (2013) ("[T]he conduct needed to maintain a statutory or common law unfair competition cause of action may consist of a tortious interference with business relations."); *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099 (9th Cir. 2007) ("CRST adequately alleged a

violation by Werner of the UCL by alleging Werner engaged in an 'unlawful' business practice, to wit, intentional interference with existing contracts . . . .").

Section 17200 also defines "unfair competition" to include "unfair, deceptive, untrue or misleading advertising." Bus. & Prof. Code § 17200. Thus, "[a]ny violation of the false advertising law . . . necessarily violates the unfair competition law." *Committee On Children's Television, Inc. v. General Foods Corp.,* 35 Cal.3d 197, 210 (1983)).

Because AppFolio is likely to prevail on its contractual interference and false advertising claims, it necessarily will likely prevail on its unfair competition claim as well.

Furthermore, Beagle's practice of making false claims of affiliation with or endorsement by AppFolio violates California's Consumer Legal Remedies Act (CLRA) and thus violates Section 17200 as well. *See, e.g., Brockey v. Moore*, 107 Cal. App. 4th 86, 98 (2003) (affirming Section 17200 injunction based on violation of CLRA).; *Klein v. Chevron U.S.A., Inc.,* 202 Cal. App. 4th 1342, 1384 (2012) ("[P]laintiffs' complaint adequately states a claim for violation of the CLRA. As a result, they have also properly stated a claim under the "unlawful" prong of section 17200.").

The CLRA's prohibitions include: "[m]isrepresenting the affiliation, connection, or association with . . . another," "[r]epresenting that goods or services have sponsorship, approval, . . . uses, [or] benefits . . . that they do not have," and "[d]isparaging the goods, services, or business of another by false or misleading representation of fact." Civil. Code § 1770(a)(3), (5), (8). Beagle is doing all of these things.

As noted above, Beagle has repeatedly made false claims that it is "partnered with" AppFolio. Beagle includes AppFolio's name and logo on its website without authorization, further amplifying its false claims of affiliation or endorsement. And Beagle has disparaged and lied about AppFolio by claiming that AppFolio failed an audit and can no longer provide

insurance products. This misconduct clearly violates the CLRA, and so is a predicate "unlawful" act for liability under Section 17200.

Because AppFolio has suffered an "injury in fact" and lost money as a result of Beagle's unfair competition, AppFolio has standing to bring a claim under Section 17200 predicated on violations of the CLRA, regardless of whether it would have standing to sue under the CLRA itself. Bus. & Prof. Code § 17204; *see, e.g., L. Offs. of Mathew Higbee v. Expungement Assistance Servs.,* 214 Cal. App. 4th 544, 555-56, 563 (2013)*; Smith v. Wells Fargo Bank, N.A.*, 135 Cal. App. 4th 1463, 1480 (2005).

**B. AppFolio Will Suffer Great and Irreparable Injury if Beagle Is Not Enjoined**

In just a two-month period, from September 24, 2025 to November 24, 2025, Beagle has induced over 170 AppFolio property managers customers to switch to Beagle for insurance products. These customers represent approximately 70,000 rental units. This lost business has cost AppFolio $125,000 in just the last few months. And these customers represent in excess of $7,000,000 million in lost future revenue.

There is no reason to think that Beagle has any intention of voluntarily stopping or slowing down its campaign of lies. If this is the damage Beagle can wreak in just two months, the harm it could cause going forward if its predatory and deceptive practices are not enjoined is staggering.

Beagle is also causing untold harm to AppFolio's reputation. Many of the customers who have contacted AppFolio with Beagle-related complaints believe Beagle's lies that it is partnered or affiliated with AppFolio. Customers complain about Beagle's product, and they (mistakenly) hold that against AppFolio for supposedly associating with such a company. And by using AppFolio's name and logo on its website without authorization, which falsely suggests affiliation

or endorsement, Beagle is tarnishing AppFolio's reputation in the eyes of anyone else who has had a negative experience with Beagle.

### C. The Balance of Equities Strongly Favors Granting Interim Injunctive Relief

To the extent the balancing of hardships is relevant to the issue of whether to grant a temporary restraining order, this factor also strongly favors AppFolio. AppFolio has the right not to lose customers as a result of the outright lies Beagle is routinely spreading. And while Beagle has the right to compete for customers fair and square, it has no right to obtain those customers by lying about a competitor or improperly capitalizing on the competitor's goodwill. Beagle has no right to falsely claiming an affiliation or endorsement that does not exist.

AppFolio will continue to suffer further harm every day that Beagle's false and improper sales tactics continue. Conversely, Beagle will suffer no cognizable harm whatsoever if it is enjoined from committing unlawful acts.

## V. Conclusion

For the foregoing reasons, AppFolio respectfully requests that the Court enter a temporary restraining order against Beagle and enter an order to show cause why a preliminary injunction should not issue.

DATED this 15th day of December, 2025.

*/s/ Jeremiah Levine*

Brian Procel
Jeremiah Levine
Marty Pritikin
**PROCEL LEVINE, LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

Attorneys for Plaintiff
AppFolio, Inc.

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
12/16/2025 2:43 PM
By: Terri Chavez , Deputy

Brian Procel (Cal. Bar No. 218657)
Brian@Procel-Law.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@Procel-Law.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for AppFolio, Inc.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA BARBARA

APPFOLIO, INC., a California corporation

Plaintiff,

v.

BEAGLE, INC., a Delaware corporation, and DOES 1-20;

Defendants.

Case No. 25-CV-07670

Ex parte hearing date: Dec. 16, 2025

Ex parte hearing time: 8:30 AM

Court: Hon. Donna Geck

Action filed: Dec. 9, 2025

**DECLARATION OF SEAN SAXENA IN SUPPORT OF APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER; EXHIBITS A-D**

**DECLARATION OF SEAN SAXENA**

I, Sean Saxena, declare:

1. I make this declaration in support of Plaintiffs' Application for an Order to Show Cause and Temporary Restraining Order (the "Application"), based on personal knowledge. If called as a witness, I could and would testify competently hereto.

2. I am a Senior Director, Insurance, for AppFolio, Inc. ("AppFolio"). I have been employed by AppFolio for approximately 13 years.

3. I am a duly authorized custodian of records for AppFolio. I have authority to testify as to the authenticity of Exhibit A.

4. The items attached as Exhibit A are true and correct copies of records maintained by AppFolio. The records were prepared by AppFolio personnel in the ordinary course of business at or near the time that the recorded events took place. Specifically, the records memorialize online customer service interactions, and were automatically recorded at the time of those interactions.

5. Exhibit B is a true and correct copy of AppFolio's Terms of Service (the "Terms of Service").

6. Exhibit C is a true and correct copy of the homepage of Beagle's website, taken December 8, 2025. Exhibit D is a true and correct copy of Beagle's terms of service.

7. For nearly 20 years, AppFolio has been an industry leader in software for property managers. It provides a property management software platform, on which property managers can run nearly all aspects of their business, including leasing, maintenance, and payments. The platform serves as the system of record for all aspects of the property manager's business. AppFolio provides services to more than 20,000 property managers, who in turn have more than eight million units.

Case: 26-769, 04/07/2026, DktEntry: 11.4, Page 58 of 299

8. One of AppFolio's most important services is called Smart Ensure. When a property manager uses Smart Ensure, they place a requirement in their leases that renters must carry liability insurance on their unit. The renter then has a choice of purchasing renters insurance (either through AppFolio Insurance Services or another provider); if the renter does not purchase renters insurance, the property manager will enroll the renter's unit in the property manager's Liability to Landlord Insurance policy ("LLI policy"). Smart Ensure manages this process, tracking whether the renter has renters insurance and, where they do not, automatically adding the unit to the property manager's LLI policy. Smart Ensure generates revenue for AppFolio.

9. In addition to offering its own services, AppFolio offers its customers the ability to work with "point solutions." Point solutions are companies that offer a particular service to the property manager. These services include vacancy listings, inspection services, and debt collection. While these services sometimes compete with AppFolio's own, AppFolio values its customer's ability to choose.

10. AppFolio works with point solutions in different ways. One way is by partnering with a point solution so that the point solution is seamlessly integrated into the customer's experience of AppFolio. It is very valuable for a point solution to be partnered with AppFolio because AppFolio is widely used by property managers, and because partnership makes it easy for AppFolio's customers to use the point solution. Based on my review of AppFolio's customers' reports, Beagle claims to be a partner. (Exh. A.) It is not.

**Beagle Uses False Advertising to Promote its Insurance Program**

11. Beagle offers an insurance service that competes with AppFolio's offering.

12. Beagle appears to have launched a campaign to deceive AppFolio's customers into adopting Beagle's competing service.

13. As reflected, among other things, on Exhibit A, AppFolio has received a stream of customer questions and complaints regarding Beagle's advertising and services. As examples, between September 24, 2025 and November 24, 2025 alone (the "Time Period"), AppFolio received the following customer complaints, as shown on Exhibit A at 1.

14. On or about October 8, 2025, AppFolio customer MH reported that Beagle made a sales call to her, during which Beagle claimed that AppFolio had failed audits and, as a result, asked Beagle to work with its customers to bring it back into compliance. (*See* Exh. A.) None of that is true. No such affiliation has ever or will ever exist. Beagle lied to MH.

15. On or about September 24, 2025, AppFolio Customer SP reported that Beagle made a sales call to her and claimed to be partnered with AppFolio. (*See* Exh. A at 7.) This was a lie.

16. On or about October 16, 2025, AppFolio Customer LS reported that Beagle made a sales call to her and claimed that Beagle had already spoken with specialists at AppFolio who were ready to help her get set up using Beagle. (*See* Exh. A at 5.) That too was a lie.

17. During the Time Period, AppFolio received additional inquiries from customers confused about AppFolio's non-existent partnership with Beagle. For example, Customer MV contacted AppFolio asking for a list of authorized partners in order to learn more about Beagle. (Exh. A at 11.)

18. These actions by Beagle have made AppFolio's performance of its agreements with customers more costly and difficult. Beagle's recent efforts to sign up AppFolio's customers through a series of lies has resulted in a surge of customers contacting AppFolio's customer service department to air complaints or raise questions based on the confusion Beagle has intentionally sowed. This has taxed AppFolio's customer service function.

**Beagle's False Advertising Induces Customers to Switch Under False Pretenses**

19. Based on reviewing AppFolio's customer departure records, I know that during the Time Period, customer LC switched to Beagle. Based on what LC reported to the AppFolio customer service representative, it appeared that LC was under the mistaken belief that Beagle was a vendor offered through AppFolio. (*Id.*) This is apparent because LC told AppFolio that she found Beagle through Stack. Stack refers to the Stack marketplace. The Stack marketplace is limited to AppFolio-vetted applications. Beagle is not one.

20. Based on reviewing AppFolio's customer departure records, I know that during the Time Period, customer SI switched to Beagle. In an interaction with AppFolio, it appeared that SI was under the mistaken belief that Beagle was soon to be offered through AppFolio. (*Id.*)

**Beagle's False Advertising Harms AppFolio's Relationship with its Customers**

21. Since Beagle pretends to be affiliated with AppFolio, bad reviews of Beagle's product reflect badly on AppFolio.

22. Customer RG reported to AppFolio that Beagle is "not very organized" and left him "unsure if anything was done [by Beagle] other than create[] the monthly charges" [sic]. (*Id.*) Customer LS similarly reported to AppFolio, after switching to Beagle, that Beagle had been a "nightmare" and "ridiculous," and that Beagle had done "nothing but waste my time and cause me issues with my tenants." (*Id.*) Still apparently confused by Beagle's false association with AppFolio, LS admonished AppFolio stating "you should not be promoting this company." (*Id.*)

**What Beagle Does to AppFolio Customers' Accounts**

23. When Beagle convinces an AppFolio customer to switch, Beagle logs in to the customer's AppFolio account. This is clear for reasons including that AppFolio's database shows credentials in customer accounts that are set up using Beagle email domains. This gives Beagle

the ability to change the customer's system settings. And with that power, Beagle turns off Smart Ensure and replaces it with their own offering.

24. In summary, Beagle lies to AppFolio's customers, pretends to be AppFolio's partner to gain access to the customer's AppFolio account, and then uses AppFolio's own platform to turn off AppFolio's service and run its own competing business.

**Beagle's False Advertising Tricks Customers Into Violating the Terms of Service**

25. Beagle's subterfuge tricks AppFolio customers into violating AppFolio's terms of service (the "Terms of Service"), to which all customers have agreed.

26. AppFolio's terms of service state: "Third parties are not permitted to access or use the Services or any application programming interface we may make available to you without our prior consent." (Exh. B.) The "Services" refers to AppFolio's platform and all services offered therein.

27. AppFolio's terms of service also address direct competitors, stating: "You may not . . . make available or otherwise provide all or any portion of the Services . . . or any application programming interface . . . to any of our direct or indirect competitors." (*Id.*)

28. Allowing Beagle access AppFolio's customer-facing platform violates the Terms of Service.

29. Based on my years of working for AppFolio, I know that it is standard practice for companies that provide software as a service ("SaaS") to forbid, in their terms of service, third-party access without permission, particularly by direct competitors. These prohibitions are necessary to prevent third parties (and competitors) from using the service for free, copying the service, or misusing the service (as is happening here). As a SaaS company, Beagle would have known AppFolio's terms of service forbid third party access.

30. Moreover, I have visited Beagle's website. Beagle's own terms of service state that its customers are "responsible for keeping any login credentials (e.g., username, password) private and for restricting access to your computer or device." (Exh. D at 2.)

31. Also, AppFolio's Terms of Service are publicly accessible on its website. I believe that Beagle has visited AppFolio's website. I believe that because AppFolio's trademarked logo appears on Beagle's website, as shown on Exhibit C.

**Beagle's Deception Extends Beyond False Advertising**

32. Based on reviewing AppFolio's business records consisting of a recorded sales call made and kept in the regular course of business, I know the following. Recently, an individual named Vincenzo Passariello contacted AppFolio's sales team. Passariello said that he worked for a property management company called Akita, and that he wanted a demonstration of AppFolio's platform.

33. It appears that Passariello is associated with Beagle and was lying. And it appears that Akita is a made-up company. This is apparent because Passariello provided inconsistent information about the purported business and was unable to answer basic questions about it. In addition, Akita's online presence appears to be fictional, created by artificial intelligence. The fact that Akita is a dog breed, just like Beagle and Beagle's parent company, Corgi, also contributes to my belief that Akita was fabricated for use by Beagle.

34. Nonetheless, Passariello got the demonstration—and with him on the video call was a person who, based on LinkedIn posts, appears to be a senior figure in Beagle's parent company, Corgi.

35. Based on Beagle's pattern of behavior, I believe that Passariello was attempting to purchase an AppFolio database to covertly provide Beagle with its own AppFolio account, which Beagle could in turn use to provide fake demonstrations of its non-existent integration.

**Harm Caused by Beagle's Wrongful Conduct.**

36. I have reviewed records of customer departures from AppFolio. Since the first false advertising that AppFolio learned of on or about September 24, 2025, Beagle has signed up at least 172 AppFolio customers. Each of those customers is a property manager operating numerous residential units. Altogether, the 172 customers that Beagle signed up represent approximately 70,000 units.

37. Based on AppFolio's historical revenue associated with Smart Ensure, the absence of these customers has *already* cost AppFolio approximately $125,000 in just the two-month Time Period. Over the course of the customer lifecycle, Beagle's lies could cost AppFolio in excess of $7,000,000.

38. Moreover, because Beagle is falsely representing an affiliation with or endorsement by AppFolio, when customers are dissatisfied with Beagle's products or level of service, they hold it against AppFolio. Thus, Beagle is also causing untold harm to AppFolio's reputation.

I declare under penalty of perjury according to the laws of the State of California that the foregoing is true and correct and that this declaration was signed by me on December 8, 2025 in Goleta, California.

Sean Saxena

Exhibit A

Intercom Case

Description

2025-10-07T15:42:13Z - AppFolio AI Assistant: This is your Support AI here to help! If I cannot answer your question you can always ask me to connect you to a person.Can you please provide a detailed description of the issue you are having?
2025-10-07T15:43:00Z - M[redacted] would like to know why a company called BEAGLE keeps reaching out to us according to them for your company.
2025-10-07T15:43:14Z - AppFolio AI Assistant: I don't see any specific information about a company called "BEAGLE" in our knowledge base. However, I can see that we work with various third-party partners and vendors through our AppFolio Stack™ Marketplace.
Could you provide more details about how BEAGLE is contacting you? For example:

What type of communication are you receiving (emails, calls, texts)?
What are they saying they need from you?
Do they mention any specific AppFolio services or features?

This will help me better understand the situation and provide you with the most accurate information about whether this is a legitimate partner or if there might be something else going on.
Source:AppFolio Stack™ Marketplace
2025-10-07T15:44:13Z - M[redacted] Phone calls, They are saying that they work with Appfolio and that they are reaching out to keep Appfolio compliant
2025-10-07T15:44:33Z - AppFolio AI Assistant: I don't see "BEAGLE" listed as one of our official partners in the AppFolio Stack™ Marketplace. This is concerning since they're claiming to work with us on compliance matters.
This sounds like a potential scam. Here's what you should know:

We require all partners to pass readiness certification and quality compliance criteria

Legitimate partners are listed in our AppFolio Stack™ Marketplace
We never ask for passwords or sensitive information via unsolicited calls

What you should do:

Don't provide any information to BEAGLE

Verify their identity - ask for specific details about your AppFolio account that only legitimate partners would know

Contact us directly if they persist

Would you like me to connect you with one of our human agents who can help verify whether BEAGLE has any legitimateconnection to AppFolio and provide guidance on handling these calls?
Sources:AppFolio Stack™ MarketplaceAppFolio Stack™ FAQsHow to Keep Your Account SafeVendor Portal Two-Factor Authentication
2025-10-07T15:44:52Z - M[redacted] Yes
2025-10-07T15:45:19Z - AppFolio AI Assistant: You can contact our support team by scheduling a call, or submitting a support request.
2025-10-07T15:45:20Z - AppFolio AI Assistant: Please note that calls can be scheduled between 1 - 5 business days in the future.
2025-10-07T15:45:32Z - M[redacted] Request a Call
2025-10-07T15:45:33Z - AppFolio AI Assistant: Please note that more complex issues may take more than one call to resolve. To make efficient use of your time, please be as detailed as possible about your request and provide relevant links and names so that our team can research your questions in advance or your scheduled call!
2025-10-07T15:45:36Z - AppFolio AI Assistant: [App: biz-sys-calendly]
2025-10-07T15:45:36Z - AppFolio AI Assistant: In order to receive a call, you must select a time to receive a callback. If you do not, your request will be closed without response from a Customer Care Specialist. You will receive a confirmation email once your call has been scheduled.
2025-10-07T15:45:37Z - AppFolio AI Assistant: If you would prefer to contact our team on another channel please select "Choose another contact" method below.
If there are any additional details you wish to provide, please add them to this conversation thread.
2025-10-07T15:48:48Z - M[redacted] Choose another contact method
2025-10-07T15:48:51Z - AppFolio AI Assistant: You can contact our support team by scheduling a call, or submitting a support request.
2025-10-07T15:48:51Z - AppFolio AI Assistant: Please note that calls can be scheduled between 1 - 5 business days in the future.
2025-10-07T15:48:56Z - M[redacted] Submit a Request
2025-10-07T15:49:00Z - AppFolio AI Assistant: Your request has been successfully submitted to our Customer Care team. The team will reply as soon as they can. Expected wait time is within the business day.
2025-10-07T15:49:01Z - AppFolio AI Assistant: Please provide any additional detail that may help our agents in resolving your issue. Links/names help our agents research your issue quicker.Additionally, please refrain from submitting duplicate support requests, as this will result in your message being sent to the back of the queue.
2025-10-07T15:52:21Z - M[redacted] Please contact me ASAP regarding the company called BEAGLE that keeps calling me, trying to get me to give them our company information stating that they Appfolio has failed their audits and that they are coming in to work with your customers and do all of the work for them so that your company will be in compliance with the audits. And they brought up the fact that I wouldn't be able to verify this information with your company because there is no easy way to contact you.
2025-10-07T15:52:52Z - M[redacted]
2025-10-07T16:06:19Z - Shania Zoe Jarabejo: Hello M[redacted] We received your request about you receiving calls from Beagle to keep AppFolio compliant.Thank you so much for the details of your concern. I'm going to take some time to investigate further and I'll be sure to reach out when I have any updates. In the meantime, feel free to check the messenger for updates or keep an eye out for an email notification. I'm looking forward to getting to the bottom of this!Regards,Shania J
2025-10-08T12:01:27Z - Shania Zoe Jarabejo: Hello M[redacted] We have Specialists trained on this topic so I will transfer you to the Specialist team to get you the help you need.This team generally responds within a few hours, but on occasion, responses may take longer depending on the volume of requests we are fielding. You'll continue to receive replies on this Message thread, but you do not need to stay at your computer - if you don't see their message right away, it will also be sent to the email address on file!
Thank you so much for your patience!Regards,Shania J
2025-10-08T12:04:27Z - M[redacted] Thank you. For the record I did not give them any information. I told them I would be speaking with your company regarding this issue. I just wanted to bring it to Appfolio's attention so that they could send a warning out if it is a scam.
2025-10-08T13:01:47Z - Lance Panariello: Hello M[redacted]
Thanks for reaching out, I hope you're doing well! My name is Lance and I am a Customer Care Specialist with AppFolio's Value Added Services team. Thank you for bringing this matter to our attention.I am going to look things over and escalate this internally. I will be sure to circle back when I have more information. Best,Lance
2025-10-08T13:19:09Z - Lance Panariello: Thank you for your patience, M[redacted]
We are not planning to integrate with Beagle as they are a direct competitor of our FolioGuard Insurance product line. We have no intention to affiliate with Beagle and cannot assist with Beagle-related support. It is at your company's discretion if you would like to use Beagle for their services or by giving them access as a user in your database.Thanks again for bringing this matter to our attention.Lance
2025-10-08T14:03:07Z - M[redacted] I have not given them any access to our company, they are telling people that they are affiliated with Appfolio and that Appfolio has given them the information. You may want to put put an email to your clients so they know that you are not. Hopefully before someone falls for this scam.
2025-10-08T14:23:11Z - Lance Panariello: Thank you, M[redacted] The communications you received from Beagle have been escalated to the appropriate teams internally to determine next steps. In the meantime, are there any other questions or concerns I can assist with?Best,Lance
2025-10-08T14:24:48Z - M[redacted] Thank you for getting back to me regarding Beagle. I have not given them any information regarding our company. I am trying to make Appfolio aware of the issue. Beagle is calling your customers stating that you have failed your audit and that they have merged with your company to take over. Again, I did not give them any information and in fact I did tell them that I would be contacting Appfolio regarding this issue. Beagle said that I could do that but that I wouldn't be able to contact anyone because it is very difficult to speak to anyone at Appfolio. They are correct about that I am trying to warn you that they are using the name of Appfolio and banking on the fact that your customers cannot confirm or deny that fact that Beagle is taking over on the account. And while I have stated this more than once you are telling me about support for Beagle. Please take the time to really look at what I am saying or if you do not understand call me at [redacted] but please put out an email to your clients letting them know that Beagle is not part of your company before some of your clients get suckered into giving out their innformation.Thank you and have a Wonderful Day! [redacted]
2025-10-08T16:23:22Z - Savanna Manzo: Hello Melanie,
Thank you for your response! My name is Savanna and I am Senior support specialist here at AppFolio. I just tried giving you a call back at the phone number that you supplied and I believe the line dropped during our automated message. Are you still available to connect?Thank you

1

so much for your time,
Savanna
2025-10-08T16:29:57Z - M[redacted] H[redacted] Yes I am available you can also call me a[redacted]hat is my direct line
2025-10-08T16:31:27Z - Savanna Manzo: Perfect thank you so much, Melanie! There will be a call recording message that plays first, but you should be able to hear me after the conclusion of that message. I appreciate you getting back to me so quickly! Giving you a call at [redacted] now.
2025-10-08T17:08:19Z - Savanna Manzo: Hi M[redacted]
Thank you so much for taking the time to speak with me today and for sharing the details of your experience with Beagle. I really appreciate you bringing this to our attention and helping us better understand how they're reaching out to customers.
I want to reassure you that Beagle is not affiliated with AppFolio in any way. Your report has been escalated to the appropriate internal teams, so that we can further investigate and determine next steps. We take this type of activity very seriously and are working to gather more information to ensure our customers are protected and informed. Your awareness and communication are extremely helpful in that effort.
Thank you again for your time and for your partnership. Please know that we take this matter seriously and are actively working to address it.
Warm regards,Savanna Manzo
2025-10-09T08:53:57Z - AppFolio AI Assistant: Help your support agent understand how they are doing:
2025-10-09T08:53:58Z - AppFolio AI Assistant: [Conversation Rating Request]
2025-10-09T09:34:01Z - M[redacted] It is just difficult to get through the chat options.
2025-10-14T10:32:53Z - Virtual Assistant: This is an automated message about your scheduled call with AppFolio Customer Care: your upcoming call has been cancelled through Calendly. Please submit a new support request if you need additional support.

Applicant Name

For this question, please contact me via

Internal Comments

Steps to Reproduce

| | |
|---|---|
| Date/Time Opened<br>10/7/2025 11:30 PM | Date/Time Closed<br>10/9/2025 8:54 AM |
| Web Email | Original Closed Date/Time<br>10/9/2025 8:53 AM |
| Webform Contact Email | Web Company |
| Web Name | Web Phone |
| | Webform Contact Phone |
| Parent Case | Owner Role<br>Care - FolioGuard & Screening |

› Data Migration Case

› Case Notification

› HTML Email Status

Subject

Intercom Case

Description

2025-10-29T12:49:41Z - AppFolio AI Assistant: This is your Support AI here to help! If I cannot answer your question you can always ask me to connect you to a person.Can you please provide a detailed description of the issue you are having?
2025-10-29T12:49:56Z - L[redacted] [redacted] I need to cancel the liability insurance
2025-10-29T12:50:07Z - AppFolio AI Assistant: I can help you with canceling liability insurance! Based on what I found, it looks like you're referring to Liability to Landlord Insurance (LLI) coverage.
To cancel LLI coverage, you'll need to un-enroll the specific occupancies that are covered before hiding any units or properties. This is important because simply hiding a unit won't automatically remove the LLI coverage, and charges are non-refundable.
For help with un-enrolling units from LLI coverage, especially if you need to do this in bulk, you'll want to submit a support request to our team.
Would you like me to connect you with someone who can help you with the specific units you need to un-enroll?
Sources:Delete or Hide a UnitHide a Property
2025-10-29T12:50:36Z - L[redacted] C[redacted] yes
2025-10-29T12:51:00Z - AppFolio AI Assistant: You can contact our support team by beginning a chat, or submitting a support request.For issues which may require additional research, we recommend submitting a support request.
2025-10-29T12:51:26Z - L[redacted] C[redacted] Submit a Request
2025-10-29T12:51:27Z - AppFolio AI Assistant: Your request has been successfully submitted to our Customer Care team. The team will reply as soon as they can. You can expect a within the business day.
2025-10-29T13:40:03Z - [redacted] Hello L[redacted]

I have received your support request regarding disabling FolioGuard Smart Ensure in your database.

I want to reach out before we proceed to gather the following details about your request to disable this feature and the associated Liability to Landlord insurance policy.

Reason you wish to disable FolioGuard Smart Ensure and the associated LLI policy:
Preferred disablement date:

Please reply to this thread with the above details and your written authorization to move forward with this request.

Thank you for your time!
[redacted]
2025-10-29T13:41:33Z - L[redacted] C[redacted] Hi [redacted] we got a different vendor through Stack. Beagle I think it is called. They instructed us to cancel the smart ensure and have you all route GL code 4260 to us across all properties
2025-10-29T14:01:44Z - [redacted] Hello, L[redacted]

Thank you for providing this information.

AppFolio does not partner with Beagle and has no plans to integrate with their solution. Any claims regarding a partnership are not true.
All of our integration partners undergo a rigorous security and compliance vetting process. We evaluate every partner to ensure your technology ecosystem is not only secure but also optimized for your business and the customer experience.
Recognizing that the resident experience and resident benefits packages are important to your business, I'd love to introduce you to Resident Onboarding Lift, our newest integrated product offering in partnership with Second Nature.
If you are interested in learning more, please let us know, and we will get you in touch with your account executive.If you would still like to proceed with your initial request, please respond with your written authorization to proceed with the disablement of FolioGuard Smart Ensure and the date you prefer to disable the feature.

Thank you,
[redacted]
2025-10-30T07:03:15Z - [redacted] Hi L[redacted]

I hope you're having a great day so far! I wanted to follow up on my last message to see if you had any questions or needed further assistance. It's all good if you need more time to review!

I'll check in again tomorrow if I don't hear back, but feel free to reply whenever it's convenient for you.

Looking forward to your response!

Best [redacted]
2025-10-30T11:12:11Z - L[redacted] C[redacted] Hi [redacted] we would still like to proceed with the disablement of FolioGuard Smart Ensure effective 10/31/25
2025-10-30T11:26:06Z - [redacted] Great! Thank you for your authorization L[redacted] I've got the disablement of FolioGuard Smart Ensure scheduled for tomorrow 10/31/2025. I will circle back with you once this is complete.Best [redacted]
2025-10-31T08:01:15Z - [redacted] Hello L[redacted] Thank you for taking the time to speak with me regarding your request to disable FolioGuard™ Smart Ensure within your database.Per your request, this service has been disabled in your AppFolio database, effective today 10/31/2025.Should you have any further questions or wish to re-enable this service in the future, please do not hesitate to contact us. We are happy to assist.Best,
[redacted]
2025-10-31T08:01:37Z - AppFolio AI Assistant: Help your support agent understand how they are doing:
2025-10-31T08:01:36Z - AppFolio AI Assistant: [Conversation Rating Request]

Parent Case

Owner Role
Care - FolioGuard & Screening

> Data Migration Case

> Case Notification

> HTML Email Status

More in the Help Center
2025-10-16T13:53:16Z - [redacted] Hi L[redacted] This is [redacted] from AppFolio Customer Care.
2025-10-16T13:54:10Z - [redacted] Thank you for reaching out to us! I would be more than happy to assist you. Just give me a moment to carefully review the information you have provided.
2025-10-16T14:00:01Z - [redacted] I would like to clarify the matter concerning the Beagle Company you mentioned. Are you referring to the insurance issue or the syndication issue? I need this information to better assist you. Thank you, [redacted]
2025-10-16T14:05:29Z - L[redacted] S[redacted] I'm not really sure what you mean by syndication but I've had three different video calls all with different people than multiple phone calls From others saying no no that person got fired that you talk to now I'm the person who's gonna make sure everything happens. It's been ridiculous. They've done nothing but waste my time and caused me issues with my tenants. Noone could seem to answer my questions or get us set up properly. They started charging people when they hadn't even set everything up yet
[redacted]

2025-10-16T14:10:15Z - [redacted] We have Specialists trained on this topic, so I will transfer you to the appropriate team to get you the help you need. This team generally responds within a few hours, but on occasion, responses may take longer depending on the volume of requests we are fielding. Thank you so much for your patience! 😊
2025-10-16T14:11:38Z - L[redacted] S[redacted] Honestly, I just want to know that they don't have any more access to my App Folio, and then I am done with them. I would assume that if you had a specialist working with them on the implementation, it might've gone better? Instead of saving me time it's cost me time and aggravation
[redacted]

2025-10-16T14:37:17Z - S[redacted] Hello L[redacted],
Thanks for reaching out, I hope you're doing well! My name is [redacted] and I am a Customer Care Specialist with AppFolio's Value Added Services team. I am following up on a support request you submitted regarding Beagle.
When you say, "You should not be promoting this company" can you pleasure clarify what you mean? Do you have any example of this that you could provide to us?
AppFolio does not have any affiliation with Beagle. Any claims regarding a partnership or other details are not accurate. We encourage all our customers to carefully evaluate the companies you choose to work with. We do not have any current plans to integrate with their solutions. They offer competitive solutions to AppFolio. You can find all of our partner and solution apps here.If you'd like to connect over a call, I'm more than happy to do so as well.
2025-10-16T14:39:02Z - L[redacted] S[redacted] I found Beagle on App Folio if that's not you promoting this company then why did I find it there?
[redacted]

2025-10-16T14:41:04Z - [redacted] Thank you for your quick response, L[redacted] Would you be able to provide me a screenshot or further explanation of what you mean when you say you found them "On" AppFolio?
2025-10-16T14:42:17Z - [redacted] To reiterate, AppFolio does not partner with Beagle and has no plans to integrate with their solutions. Any claims regarding a partnership are not true.

All of our integration partners undergo a rigorous security and compliance vetting process. We evaluate every partner to ensure your technology ecosystem is not only secure but also optimized for your business and the customer experience
2025-10-16T14:52:32Z - L[redacted] S[redacted] Well I can't imagine how else I found them. Who do you partner with for insurance compliance?
[redacted]

2025-10-16T15:03:52Z - [redacted] Thank you, L[redacted] I can assure you AppFolio is not affiliated in anyway, with Beagle and that they are a direct competitor of ours. AppFolio did not share your information with Beagle nor promote them. AppFolio does not share customer information with anyone except as necessary to provide our services. Some examples include sharing information with third-party service providers and legally required disclosures to courts or law enforcement. For more information on how we collect, use and share your information please refer to our Terms of Service and Privacy Notice.We partner with Second Nature for a resident benefits packages and have our own internal insurance solution through FolioGuard Smart Ensure and the coinciding Liability to Landlord insurance policy.
2025-10-16T15:05:22Z - L[redacted] S[redacted] I guess they reached out to me.
[redacted]

5

2025-10-16T15:10:11Z - [redacted] I am sorry to hear that you had a poor experience with them, [redacted] I can assure you we are not affiliated with their company. Would you by chance be able to share any information with us on your experience with their company? Did they specifically state they were a partner of AppFolio or mention AppFolio during your relationship with their company?
2025-10-16T15:13:42Z - [redacted] They did say that they had worked with clients using App Folio and stated they had spoken with specialists at App Folio to get me set up. I am now trying to make sure they have no more access to my App Folio.
2025-10-16T15:18:31Z - [redacted] I appreciate your feedback, [redacted] If they were added as a user to your database, they would have been granted accesses to reach out to support. We have taken the stance to not communicate with their support representatives, regardless of them being a user in am AppFolio client's database. In accordance with AppFolio's policy regarding customer support and account communication and our terms of service, all account-related support communications must be conducted directly with an authorized user on the account. Under our Terms of Service and in order to protect the integrity of customer and user data and our systems, direct competitors such as Beagle are not permitted to access any portion of our services or application programming interface.I checked your user settings and I do not see them as a user in your database currently.
2025-10-16T15:19:12Z - [redacted] I removed them today
2025-10-16T15:19:28Z - [redacted] Awesome, I am glad to hear that!
2025-10-16T15:19:49Z - [redacted] Again, I am so sorry to hear you had a poor experience with their team and product and that they were positioning themselves as a partner of ours.
2025-10-16T15:20:24Z - [redacted] Do you have plans to offer commercial liability insurance?
2025-10-16T15:23:28Z - [redacted] To my knowledge, not at this time through FolioGuard. I am not well affiliated with Second Nature's product parameters to know if they offer commercial, but if you are interested in learning more, please let us know, and we will get you in touch with your account executive.
2025-10-16T15:27:46Z - [redacted] Yes, I would be interested.
2025-10-16T15:44:36Z - [redacted] Noted, thank you [redacted] I have created a task request with the Growth Team and someone will reach out as soon as possible

I am going to close this case out, but should you have anymore questions please feel free to respond and I will be ready to assist you.
A survey on my support throughout this inquiry will populate for you if you feel inclined to leave any feedback for me specifically!
Have a great rest of your day!

Description

2025-09-24T11:24:01Z - AppFolio AI Assistant: This is your Support AI here to help! If I cannot answer your question you can always ask me to connect you to a person.Can you please provide a detailed description of the issue you are having?
2025-09-24T11:24:25Z - S[redacted]P: Hi, I need to speak with someone about tenant insurance
2025-09-24T11:24:32Z - AppFolio AI Assistant:
The Risk Mitigation line item on your AppFolio billing invoice is associated with Liability to Landlord Insurance enrollments for that billing period. You may cross-reference these charges against the Insurance Usage report.

Risk Mitigation is also referenced in your database under 'General Settings', which houses the FolioGuard feature settings.

2025-09-24T11:24:33Z - AppFolio AI Assistant: Was that helpful?
2025-09-24T11:25:07Z - S[redacted]P: where can I see the insurance company that provide that?
2025-09-24T11:25:12Z - AppFolio AI Assistant: Thanks for your question.
2025-09-24T11:25:15Z - AppFolio AI Assistant: You can contact our support team by beginning a chat, or submitting a support request.For issues which may require additional research, we recommend submitting a support request.
2025-09-24T11:25:22Z - S[redacted]P: Chat Now
2025-09-24T11:25:24Z - AppFolio AI Assistant: The team will reply as soon as they can. Expected wait time is a few minutes.
2025-09-24T11:26:14Z - [redacted] Hello S[redacted]

I hope you are doing well! My name is [redacted] and I am a Customer Care Specialist with AppFolio's Value Added Services team.
2025-09-24T11:26:25Z - [redacted] Are you looking for your company's LLI policy?
2025-09-24T11:30:07Z - S[redacted]P: Hi [redacted] well the thing is that someone from Beagle contact us saying that they are Appfolio partners, and that they are trying to contact us to do an audit on our tenants coverage, the compliance of all tenants for rent
2025-09-24T11:30:18Z - S[redacted]P: but we are not sure what is going on about this
2025-09-24T11:32:48Z - [redacted] Ah, I understand. I cannot speak to Beagle's practices however, I can confirm that we are not in partnership with Beagle.
2025-09-24T11:33:21Z - [redacted] We do not have any integrations with Beagle.
2025-09-24T11:38:55Z - [redacted] Can I help any further regarding this? I am here.
2025-09-24T11:39:09Z - S[redacted]P: No thank you this has been very helpful :)
2025-09-24T11:40:07Z - [redacted] My pleasure! We appreciate your response.

If no further assistance is needed. I am going to close this case out.

You will also see a quick survey that is purely based on my performance during our interaction.

Please don't hesitate to contact our team or myself if you need any more product assistance or if you have any additional questions on this specific issue. It was great to work with you, thank you for continuing to be an AppFolio Client.

Have a great rest of your day!
Kindly
[redacted]
2025-09-24T11:40:20Z - AppFolio AI Assistant: Help your support agent understand how they are doing:
2025-09-24T11:40:20Z - AppFolio AI Assistant: [Conversation Rating Request]

Subject

Intercom Case

Description

2025-08-08T10:51:13Z - AppFolio AI Agent: Heads up! The old "connect to an agent" support button no longer appears after AI answers. If you need to connect to a person you can simply ask the AI using plain language. The button's gone, but support is always here!
2025-08-08T10:51:13Z - AppFolio AI Agent: This is your Support AI here to help! If I cannot answer your question, I will get you to the best team to assist you.Can you please provide a detailed description of the issue you are having?
2025-08-08T10:51:47Z - R[redacted]G[redacted] remove beagle insurance script
2025-08-08T10:51:57Z - AppFolio AI Agent: You can disable the renters insurance option from appearing in tenants' Online Portals by submitting a support request.
To submit a support request, you can ask me to connect you with a human agent using plain language, and they'll help you remove the insurance script from your tenant portals.
Source:Renters Insurance
2025-08-08T10:51:57Z - AppFolio AI Agent: Was that helpful?
2025-08-08T10:52:26Z - R[redacted]G[redacted] connect me to a human agent
2025-08-08T10:52:47Z - AppFolio AI Agent: Your request is not yet submitted - we just need a bit more information to connect you with the right team.
What is your issue related to?
2025-08-08T10:53:18Z - R[redacted]G[redacted] Maintenance
2025-08-08T10:53:21Z - AppFolio AI Agent: Our agents are available now to chat or you can submit a request and our team will reach out at a later time.We recommend chatting now for simpler issues. For issues which may require additional research, we recommend submitting request.
2025-08-08T10:53:34Z - R[redacted]G[redacted] Chat Now
2025-08-08T10:53:35Z - AppFolio AI Agent: The team will reply as soon as they can. Expected wait time is a few minutes.
2025-08-08T10:54:05Z - [redacted] Hi R[redacted] Thank you for reaching out! One moment, please, while I look over the information you provided!
2025-08-08T10:55:05Z - R[redacted]G[redacted] I previously gave access to a company called Beagle Insurance. The installed a script or made changes to direct tenants to their renter insurance.
2025-08-08T10:55:25Z - R[redacted]S[redacted] I need help removing that and setting appfolio back to using folio guard
2025-08-08T10:58:43Z - [redacted] Upon checking, we have a team of specialists who are dedicated to this topic. I will be happy to transfer you to them so they can provide you with the assistance you need. Please do not worry, I have tagged this ticket as a priority, so rest assured that your issue will [redacted] out to us and we look forward to resolving this for you.
2025-08-08T11:00:19Z - R[redacted]G[redacted] Thank you
2025-08-08T11:15:14Z - [redacted] Hello R[redacted] Thank you for reaching out, I hope you are doing well!

To confirm, are you looking to re-enable the Smart Ensure Liability to Landlord Insurance? I see this was previous enabled in your database and was removed.

Best,
[redacted]
2025-08-08T11:16:09Z - R[redacted]G[redacted] I believe that is correct. When was it removed?
2025-08-08T11:16:30Z - R[redacted]G[redacted] Have you heard of "Beagle" insurance
2025-08-08T11:34:49Z - R[redacted]G[redacted] are you there?
2025-08-08T11:38:42Z - R[redacted]G[redacted] I need a support ticket
2025-08-08T13:26:57Z - R[redacted]G[redacted] hello anyone there
2025-08-08T15:17:47Z - [redacted] Hi R[redacted]

I have had a bit of experience with Beagle.

I do see that FolioGuard Renters Insurance is enabled in your database however, the Smart Ensure Liability to Landlord Insurance is not.

Upon further looking into your account, I do see that Liability to Landlord Insurance was has not historically been enabled.

Is there a specific tenant that is still being directed to Beagle?

Best,
[redacted]
2025-08-11T06:17:42Z - R[redacted]G[redacted] I made the mistake of working with them very briefly. So I have many charges in the accounts and they may or may not have installed a script? I am not for sure
2025-08-11T15:37:45Z - [redacted] Hi R[redacted]

Let me run it through my product team to see if they happen to see any script that would interfere with the insurance services. I will circle back once I have any information.

Best,
[redacted]
2025-08-13T13:06:51Z - [redacted] Hi R[redacted]

I wanted to circle back with you to see if there is anything you or a renter is seeing on your end that would still reflect Beagle being in your database?

Thank you,
[redacted]
2025-08-13T14:32:33Z - R[redacted]G[redacted] No not that I know of. I went through a deleted all of the recurring charges manually.
2025-08-13T14:33:11Z - R[redacted]G[redacted] The Beagle team is not very organized, so really unsure if anything was done other than created the monthly charges that I removed
2025-08-13T14:36:38Z - [redacted] hank you for that information. I have sent this back to my product team for further review. As soon as I have an update, I will let you know.
2025-08-14T12:58:04Z - [redacted] Hello R[redacted]

I hope you are doing well! My name is [redacted] and I am a Customer Care Specialist with AppFolio's Value Added Services team. [redacted] s out of office, however, I am happy to take over here!

We are still awaiting an update from our product team but I have requested a follow up on your behalf.
Please let me know if you need anything. I am here and happy to help.

Kindly, [redacted]
2025-08-14T15:01:06Z - R[redacted]G[redacted] Thank you
2025-08-18T05:11:29Z - [redacted] You're more than welcome. I am still awaiting a response, but will keep you updated. I hope you had a great weekend.
2025-08-22T13:43:36Z - [redacted] Hello R[redacted]

2025-08-28T14:26:51Z - [redacted] Hello R[redacted]

I wanted to follow up and let you know my product team is still looking into this. I have sent several follow-ups to them for an update. As soon as I have additional information, I will let you know.

Best,
[redacted]
2025-09-04T09:36:38Z - [redacted] Helly R[redacted]

I wanted to reach out and let you know that our product manager, [redacted] should be reaching out to you if he has not already. He was going to connect with you personally.

Was there anything additional that I could help answer?

Best,
[redacted]
2025-09-04T13:53:08Z - [redacted] Hi R[redacted] I wanted to check in to make sure the information I shared earlier answered your question. If there's anything additional you need or if new questions have come up, I'm more than happy to help! If I don't hear from you today, I'll go ahead and close this conversation at the end of the day. But no worries, if you ever need more help, you can simply reply to this thread or start a new conversation, and you'll be directed right back to my team.

2025-09-04T14:23:20Z - R[redacted] G[redacted] Yes, I understand [redacted] will reach out. I think it is all in order and working fine
2025-09-04T17:05:03Z - [redacted] Hi R[redacted]

Thank you for your confirmation. I will go ahead and close out this conversation but if additional questions come up, feel free to reach back out!I will let [redacted] ake over from here with communication.

Regards,
[redacted]
2025-09-04T17:05:37Z - AppFolio AI Agent: Help your support agent understand how they are doing:
2025-09-04T17:05:37Z - AppFolio AI Agent: [Conversation Rating Request]

Description

2025-10-21T07:19:15Z - AppFolio AI Assistant: This is your Support AI here to help! If I cannot answer your question you can always ask me to connect you to a person.Can you please provide a detailed description of the issue you are having?
2025-10-21T07:19:24Z - S[redacted] what happened to beagle integration
2025-10-21T07:19:39Z - AppFolio AI Assistant: We don't have specific information about a Beagle integration in our available resources. However, we do have details about other integration transitions that have occurred recently, such as our mailing service transitioning from AppFolio's internal service to a partnership with Page Per Page via AppFolio Stack™.
Could you provide more details about what the Beagle integration was used for in your workflow?
2025-10-21T07:19:52Z - S[redacted] beagle was an integration that was listed as coming soon. now it does not appear
2025-10-21T07:20:03Z - AppFolio AI Assistant: Features that are "coming soon" or in development can sometimes change or be removed from our roadmap as we evaluate business needs and priorities.
Some features are released through AppFolio Labs for early testing before becoming permanent, while others like Resident Onboarding Lift are in limited release and may not be available in all accounts yet.
If Beagle was previously listed as coming soon but no longer appears, it's likely that our development priorities have shifted. You can check AppFolio Labs in your General Settings to see what new features are currently available for testing.
Sources:Turn on New Features with AppFolio LabsResident Onboarding Lift
2025-10-21T07:20:03Z - AppFolio AI Assistant: Was that helpful?
2025-10-21T07:20:24Z - S[redacted] no, we connected with them
2025-10-21T07:20:32Z - AppFolio AI Assistant: I understand you've already connected with Beagle directly. If you need assistance with integrating their services with your AppFolio workflow or have questions about how this might work with your current setup, I'm here to help with any AppFolio-related questions you might have.
Is there anything specific about your AppFolio account or workflow that you'd like assistance with?
2025-10-21T07:20:42Z - S[redacted] connect with human
2025-10-21T07:20:56Z - AppFolio AI Assistant: Your request has been successfully submitted to our Customer Care team. The team will reply as soon as they can. Expected wait time is a few business hours.
2025-10-21T08:19:26Z - [redacted] Hello S[redacted]
Thanks for reaching out, I hope you're doing well! My name is [redacted] and I am a Customer Care Specialist with AppFolio's Value Added Services team. I am following up on a support request you submitted regarding Beagle integration.AppFolio does not have any affiliation with Beagle. Any claims regarding a partnership or other details are not accurate. We encourage all our customers to carefully evaluate the companies you choose to work with. We do not have any current plans to integrate with their solutions. They offer competitive solutions to AppFolio. You can find all of our partner and solution apps here.Please let me know if you have additional questions:) [redacted]
2025-10-21T08:42:50Z - S[redacted] Hi [redacted] I understand this but the only reason we reached out to Beagle was as they were listed as "coming soon" in appfolio to my understanding
2025-10-21T08:42:54Z - S[redacted] and now they are not showing
2025-10-21T09:09:47Z - [redacted] can assure you AppFolio is not affiliated in any way, with Beagle. They are a direct competitor of ours. AppFolio did not promote them. We partner with Second Nature for a resident benefits package and have our own internal insurance solution through FolioGuard Smart Ensure and the coinciding Liability to Landlord Insurance policy.I hope that helps[redacted]
2025-10-21T09:15:31Z - S[redacted] Okay, thanks
2025-10-21T09:21:11Z - [redacted] You're welcome! I'm working with you in another thread to disable FolioGuard Smart Ensure. With this in mind, would you still like to proceed with disabling the feature? Best[redacted]
2025-10-21T09:38:41Z - S[redacted] yes, please disable
2025-10-21T10:06:30Z - [redacted] Thank you for confirming! I will close this case out and circle back with you in our other thread once the disablement of FolioGuard Smart Ensure is complete!Thank you[redacted]
2025-10-21T10:07:24Z - AppFolio AI Assistant: Help your support agent understand how they are doing:
2025-10-21T10:07:24Z - AppFolio AI Assistant: [Conversation Rating Request]

Subject

Intercom Case

Description

2025-09-02T12:58:58Z - AppFolio AI Agent: What is your issue regarding Stack™ Integrations and our partners?
2025-09-02T12:59:49Z - [redacted] I received a call from "Beagle" wanting to replace Folioguard insurance compliance. Does Appfolio have a list of authorized partners where I might find more information on these people?
2025-09-02T13:00:03Z - AppFolio AI Agent: Your request has been successfully submitted to our Customer Care team. The team will reply as soon as they can. Expected wait time is a few business hours.
2025-09-02T13:00:09Z - AppFolio AI Agent: In the meantime, these articles might help:
2025-09-02T13:00:10Z - AppFolio AI Agent:
AppFolio Stack™ Marketplace

2025-09-02T13:00:10Z - AppFolio AI Agent:
AppFolio Stack™ Marketplace

Jeff Wood

Self Service Billing Page

Joshua Figueroa

Hunter Warfield Integration

Jeff Wood

More in the Help Center
2025-09-02T13:07:06Z - [redacted] Hi [redacted]

This is [redacted] with the AppFolio Integrations Support Team. Thank you for reaching out. 😊

Beagle is not a registered integration partner or working with AppFolio at this time. Any reference to AppFolio is done so without prior authorization and without any warranties from AppFolio.

We encourage you to have this prospective partner submit a partner request form by sharing the following link with them:

https://www.appfolio.com/stack/become-a-partner

The best source for a list of all our current partners can be found:

Website: https://www.appfolio.com/stack

Marketplace: In your AppFolio account >> General Settings >> Integration Marketplace

Please let me know if you have any other questions on this!
2025-09-02T13:33:06Z - [redacted] Hi [redacted]

Upon further review, we have a dedicated team that handles questions related to Beagle and AppFolio.

Someone should be in contact with you soon. 😊

Thank you for your patience!

Best regards,
[redacted]
2025-09-02T14:18:01Z - [redacted] Hi [redacted]
I hope you are doing well!

My name is [redacted] and I am an Associate Customer Care Specialist with AppFolio's Value Added Team!

Thank you for reaching out!

Happy to provide clarification on your request! At this time, we do not have any plans to integrate with Beagle, as they are a direct competitor to our Smart Ensure product

Please let me know if you have any additional questions.

I'm happy to help!
2025-09-03T08:13:29Z - [redacted] Hi [redacted]

I hope you're having a great day so far! I wanted to follow up on my last message to see if you had any questions or needed further assistance. It's all good if you need more time to review!

I'll check in again tomorrow if I don't hear back, but feel free to reply whenever it's convenient for you.

Looking forward to your response!

Best [redacted]
2025-09-03T08:41:52Z - [redacted] I'm not sure what Smart Ensure is, but does Beagle being a direct competitor mean you're going to shut them out?
2025-09-03T08:43:11Z - [redacted] They're making some pretty fantastic claims over there about revenue sharing on the insurance side, though.
2025-09-03T11:39:18Z - [redacted] Hi [redacted]

We offer Smart Ensure LLI, which is a comparable product to the insurance integration offered by Beagle.

At this time, we do not have any partnership with Beagle, as they are a direct competitor. Any claims suggesting a partnership between our companies are inaccurate.

Please let me know if you have any additional questions or if you'd like more information about Smart Ensure LLI.
2025-09-04T08:19:28Z - [redacted] Hi M[redacted]

I wanted to check in once more regarding your case. Since I haven't heard back, I'll plan to close this case at the end of the day today.

If the case closes and you still need assistance, please feel free to reply within 24 hours. This will reopen the case so we can continue working together.

Thanks, and have a great day! [redacted]
2025-09-04T15:32:13Z - AppFolio AI Agent: Help your support agent understand how they are doing:
2025-09-04T15:32:13Z - AppFolio AI Agent: [Conversation Rating Request]

Exhibit B

# AppFolio Property Manager Core

Last updated: August 5, 2025

Welcome to AppFolio Property Manager Core! Please carefully review these AppFolio Property Manager Core Terms of Service (these "Terms of Service"), as they contain important information about your legal rights, remedies and obligations. By subscribing to or using any of our Services (as defined below), you are entering into a legally binding agreement with AppFolio, Inc. (also referred to as "AppFolio," "we," and "our") that gover your access to and use of the Services.

The agreement consists of (i) your order form and (ii) these Terms of Service, which incorporate by reference (a) the Add-On Service Terms for any Service to which you subscribe or use, including the AppFolio Value+ Terms, the AppFolio Tenant Screening Terms, the AppFolio Payments Terms, the AppFolio Sites Terms, the AppFolio Beta Terms and (b) any other terms or policies applicable to your use of the Services that we make available, such as through an online signup flow. Any terms contained in your order form will supersede these Terms of Service.

In addition, our Privacy Notice contains information on how we collect, use and share your personal informati for our own purposes. The Privacy Notice is not a part of these Terms of Service and may be changed from ti to time, but by agreeing to these Terms of Service, you acknowledge and consent to the collection, use, shar and disclosure of your personal information and data as described in our Privacy Notice, as may be modified from time to time.

## 1. Scope of services

We offer a hosted suite of property management software services, which include our property management software solution, AppFolio Property Manager Core, and Add-On services to which you may subscribe or use addition to your base subscription (collectively the "Services" and each a "Service").

Some Services are offered on a subscription basis, while others are made available per-use. To subscribe to c use a Service, you must sign an order form or complete the online sign-up flow, which identifies the Service, additional terms, and the fees payable for such Service. You may access and use the Service to manage and account for the real property units (collectively, the "Units" and each a "Unit"). If the Service is billed on a per unit basis, we will assess your Unit count at regular intervals and invoice you appropriately.

We reserve the right to modify the Services (or any part thereof) from time to time, and we are not liable to yc or to any third party for any modification of the Services.

**1.1 Intended Use**

The Services are designed and intended to be used for property management purposes in the United States. Your use of the Services for any other purpose or in any other manner is at your own risk and may be grounds for termination.

**1.2 No Legal Advice**

The Services contain features and tools designed to assist you in the operation of your business and are capable of being used to comply with certain of your regulatory or other legal obligations. Notwithstanding th foregoing, we do not make any representations or warranties that your use of the Services will satisfy or ensu compliance with any legal obligations or laws, rules, or regulations. AppFolio does not provide legal advice ar is not engaged in the practice of law. We encourage you to consult with your legal counsel before utilizing an of the Services that may have legal ramifications.

**1.3 Expanding the Services**

You may subscribe to or use additional Services and add additional databases. These additions may be subje to eligibility and your execution of an order form or completion of an additional online sign-up flow. All new Services are subject to these Terms of Service.

**1.4 Migration of Data**

Promptly following your initial subscription to the Services, we will coordinate and work with you to migrate certain of your data into the Services (referred to as "Onboarding"). You will be responsible for providing data a format deemed acceptable to us and will provide materials and reasonable assistance for the migration of your data. You represent and warrant that you are the rightful owner of your data and have the requisite authority to perform the migration of such data. You will retain all right, title and interest in and to your data.

Together, we will mutually agree upon a date by which Onboarding will be completed and your access to the Services will go live (the "Go-Live Date"). If it becomes necessary to move back your Go-Live Date, we will mutually agree on a new date. But if the Go-Live Date is moved more than once due to your failure to provide us with the requested data, information, or assistance required to complete such onboarding, we reserve the right to charge you an additional Onboarding Fee (as defined below). You must complete migration of your da before receiving access to the Services.

In some instances, changes to your business may require setting up a new database and/or migrating the da within the existing database; for example, a change of your business name, tax identification number, or business structure. If Such a "Re-Migration" is necessary we will charge an additional one-time non-refundab Onboarding Fee for setting up a new database and/or migrating the data within the existing database. We wi help determine the optimal plan for Re-Migration based upon the individual situation. Additional Onboarding Fees are non-refundable and due and payable by you on the date of invoice.

**1.5 Set-Up and Configuration**

You are solely responsible for determining the appropriate set-up and configuration of the Services. In the event you request our assistance in the set-up or configuration of the Services, without in any way limiting Section 8.2, we make no representations or warranties with respect to any changes we may make or work we may perform on your behalf and at your request.

## 2. Modification of These Terms of Service

We work constantly to improve our Services with updates, new features, and new services. And we may need change these Terms of Service from time to time to accurately reflect our Services and practices. If we do, those revised Terms of Service will supersede prior versions. Unless we say otherwise, changes will be effecti upon the "Last Updated" date located at the top of this page. We agree that changes cannot be retroactive. W will provide you advance notice of any material changes to these Terms of Service. For any other changes, we will publish the revised Terms of Service and update the "Last Updated" date above. We hope that you will continue to use our Services, but if any change has a negative material impact on your business and you obje to such changes, you may terminate your subscription to the Services without penalty and in accordance wit the terms herein. Your continued use of the Services after we modify these Terms of Service constitutes your acceptance of any revisions.

# 3. Customer Support

We will use commercially reasonable efforts to provide complimentary technical support services to you and your authorized users of the Services. Our standard support is available Monday through Friday from 8:00 a.m - 8:00 p.m. Eastern Time, excluding major holidays, which include Memorial Day, Independence Day, Labor D Thanksgiving, Christmas, and New Year's Day.

# 4. Training

We will make training materials and sessions available to you and your authorized users. These include tutorials, which are accessible via the Help Articles and Training Sessions sections of our website at no additional charge. If you purchase custom training, the hours must be used within 90-days of contract signin or 90-days of your Go-Live date, whichever comes second. Custom training fees are considered Service Fee and are non-refundable.

# 5. Your Rights and Restrictions

**5.1 Authorization to Use the Services**

Subject to (i) your timely payment of all fees set forth in the order form or online sign-up flow and (ii) your compliance with these Terms of Service, we authorize you to use (and permit your authorized users to use) th Services to which you have subscribed.

**5.2 Authorized Users**

You (i) are responsible for your authorized users' compliance with these Terms of Service, and (ii) will use commercially reasonable efforts to prevent unauthorized access to or use of the Services. If the authorized status of a user changes, it is your responsibility to promptly remove such user's access to the Services. Thir parties are not permitted to access or use the Services or any application programming interface we may ma available to you without our prior consent. Even if we provide prior consent for a third party to access or use Services, we disclaim all liability for any actions taken by that third party with respect to the Services, and yo assume all risk for any actions taken by that third party. We reserve the right to disable or delete access to th Services and any application programming interface for any of your authorized users to enforce these Terms Service or otherwise protect our interests.

**5.3 Your Responsibilities; Use of the Services In Compliance With Laws**

The Services contain various features, tools and workflows that assist you in the conduct of your business. W do not make any representations or warranties that your use of the Service will satisfy or ensure compliance with any legal obligations or applicable laws, rules, or regulations. For example, you may be able to use the Services to, among other things, text, email, and accept and make payments. Such activities can be highly regulated, and while we assist you in carrying out such activities, you are solely responsible for ensuring compliance with all applicable laws and regulations including, without limitation, the Fair Credit Reporting Ac Equal Credit Opportunity Act, the Fair Housing Act, Title VII of the Civil Rights Act of 1964, the Telephone Consumer Protection Act of 1991, and utility billing practices. You are responsible for all activities that occur under your account or by your authorized users. Without limiting the foregoing, you will (i) have sole responsibility for the accuracy, quality, integrity, legality, reliability, and appropriateness of all data that you submit to the Services; (ii) use commercially reasonable efforts to prevent unauthorized control or tampering any other unauthorized access to, or use of, the Services and notify us immediately of any unauthorized use security breach; (iii) comply with all applicable local, state, federal, and foreign laws (including laws regardin privacy and protection of personal or consumer information) in using the Services; and (iv) obtain and mainta

all computer hardware, software and communications equipment needed to access the Services in connectio with your use of the Services.

**5.4 Your Restrictions**

You may not, and you will ensure your authorized users do not, (i) disassemble, reverse engineer, decompile o otherwise attempt to decipher any code in connection with the Services, or modify, adapt, create derivative works based upon, or translate the Services; (ii) license, sublicense, sell, rent, assign, distribute, time share transfer, lease, loan, resell for profit, distribute, or otherwise commercially exploit, grant rights in or make the Services or any content offered therein available to any third party; (iii) use the Services except as expressly authorized under these Terms of Service or in violation of any applicable laws; (iv) engage in any illegal or deceptive trade practices with respect to the Services; (v) circumvent or disable any security or other technic features or measures of the Services or any other aspect of the software or, in any manner, attempt to gain unauthorized access to the Services or its related computer systems or networks; (vi) use the Services to transmit infringing, obscene, threatening, libelous, or otherwise unlawful, unsafe, malicious, abusive or tortio material, or to store or transmit material in violation of third-party privacy rights; (vii) use the Services to store or transmit any viruses, worms, time bombs, Trojan horses and other harmful or malicious code, files, scripts, agents or programs or to send spam or otherwise duplicative or unsolicited messages in violation of applicab laws; (viii) interfere with or disrupt the integrity or performance of the Services or third-party data contained therein; (ix) use any robot, spider, or other automated device, process or means to access, retrieve, scrape o index any portion of the Services; (x) reformat or frame any portion of the Services; or (xi) make available or otherwise provide all or any portion of the Services, our Confidential Information (as defined below), or any application programming interface we make available to you to any of our direct or indirect competitors.

Although we have no obligation to monitor your use of the Services, we may do so at our discretion and may prohibit any use of the Services we believe may be in violation of these Terms of Service or applicable laws a regulations.

**5.5 Reservation of Rights**

No other rights are granted except as expressly stated in these Terms of Service, and nothing herein conveys

Introducing Real Estate Performance Management. **Learn More.**



# 6. Term and Termination



**6.1 Term**

If a Service is subject to a term, the term will be set forth on the order form or in the online sign-up flow. Unle either party provides written notice of non-renewal at least thirty (30) days prior to the expiration of the curre term of a Service, the Service will automatically renew. Your base Service subscription will automatically rene for the same period as your initial term; and add-on services will automatically renew to become coterminous with your base subscription.

At least sixty (60) days prior to the expiration of your base Service Subscription, we will provide you with an updated order form reflecting the Services, rates, unit counts, and terms applicable to your next term. Any active addenda to your order form will remain incorporated and unchanged, unless replaced by a new addendum.

WRITTEN NOTICE OF NON-RENEWAL MUST BE SUBMITTED:

via email to: billing@appfolio.com

or via USPS or courier to: AppFolio, Inc.

70 Castilian Drive Santa Barbara, CA 93117

)verview
. Scope of services
. Modification of These Terms of ervice
. Customer Support
. Training
. Your Rights and Restrictions
**. Term and Termination**
. Fees
. Representations and Warranties; isclaimer
. Confidential Information and usiness Data
0. Indemnification
1. Limitation on Liability
2. Data Protection

Attn.: Billing Department

**6.2 Termination**

Either party may terminate any subscription to Services (i) if the other party breaches any of its obligations under these Terms of Service and such breach is not cured within thirty (30) days of receipt of notice from th non-breaching party, or (ii) if the other party becomes insolvent or bankrupt, liquidated or is dissolved, or ceases substantially all of its business. Notwithstanding the foregoing, we may immediately terminate your subscription to the Services if: (a) you materially breach of these Terms of Service, as determined by us in ou sole and absolute discretion; (b) we reasonably believe that you are associated with conduct that is illegal, fraudulent, or that could otherwise cause a real risk of harm to us or others (whether financial, legal, busines or reputational harm); or (c) upon the request of any of our financial service providers. Upon termination of yo subscription, you will immediately discontinue all use of the Services, cease to represent that you are a user the Services, and destroy all our Confidential Information (as defined in Section 9 below) in your possession.

**6.3 Handling of Your Data in the Event of Termination**

You agree that following expiration or termination of any of your subscriptions to the Services, we may immediately deactivate the affected Services and that, following a reasonable period, we may delete your account and data. In the event you terminate your subscriptions, or allow them to expire, you are expected to retrieve your data prior to the termination or expiration. However, in the event that the Services are terminate by us, we will grant you temporary, limited access to the Services, not to exceed thirty (30) days, for the sole purpose of permitting you to retrieve your proprietary data, provided that you have paid in full all undisputed amounts owed to us. You further agree that we will not be liable to you or to any third party for any terminatic of your access to the Services or deletion of your data, provided that we are in compliance with the terms of this Section 6.3.

**6.4. Termination for Convenience; Early Termination Fee**

You have and may invoke an option terminate your subscription to the Services for convenience at any time b providing thirty (30) days' prior written notice and paying to us (a) any outstanding fees and (b) an early termination fee equal to fifty percent (50%) of the Service Fees (as defined below) payable for the remaining period of your subscription, calculated on a pro rata basis (the "Early Termination Fee"). You hereby expressly acknowledge and agree that we shall have the right to charge the Early Termination Fee to the payment meth associated with your AppFolio account. You will not be entitled to a refund of any pre-paid amounts under an circumstances.

# 7. Fees

**7.1 Service Fees**

You will pay certain non-refundable fees for the Services in the amount set forth on the order form or in the online sign-up flow (the "Service Fees") and according to the billing frequency stated therein. Service Fees ar due and payable on the date of invoice and are non-refundable. Service Fees may be based on usage; the minimum amounts set forth in your order form; or the minimums for each Service. Unless set forth on your or form, we may increase the minimum amounts for a Service from time to time by providing you with no less th thirty (30) days advance notice.

For Services offered on a subscription basis, the rate of the Service Fees is fixed for the term of the subscription and may only be increased at renewal. For Services offered on a per-use basis, we may increase Service Fees from time to time by providing you with no less than thirty (30) days advance notice.

**7.2 Onboarding Fees**

You will pay certain non-refundable fees for onboarding and data migration in the amount set forth on the orc form,online sign-up flow, or as otherwise set forth in Section 1.4 (the "Onboarding Fees"). The Onboarding Fe are due and payable by you on the date of invoice. Onboarding Fees are non-refundable unless we fail to

complete the onboarding for reasons other than your failure to provide us with the requested data, informatio or assistance required to complete such onboarding.

**7.3 Additional Fees**

You may incur certain other non-refundable fees or charges based on your use of the Services in addition to those fees set forth on the order form or in the online sign-up flow (the "Additional Fees"). We will provide you with notice of any Additional Fees before they are incurred.

**7.4 Late Payments**

You acknowledge that your failure to pay any fees when due may result in suspension or termination of your subscription to the Service. If you fail to pay any of the fees or charges due hereunder, AppFolio reserves the right to, among other things, engage an attorney or a collections agency to collect the delinquent fees and charges. You agree to pay all fees and costs incurred by AppFolio in connection with the collection of such delinquent amounts, including without limitation, any and all court and related costs, attorneys' and/or collections agencies' fees plus interest in an amount equal to the lesser of 1.0% per month or the maximum rate permitted by applicable law.

**7.5 Taxes**

You are responsible for all sales tax, use tax, value added taxes, withholding taxes and any other similar taxes and charges of any kind imposed by federal, state or local governmental entities on the transactions contemplated by these Terms of Service. When we have the legal obligation to pay or collect taxes for which you are responsible pursuant to this Section, the appropriate amount will be invoiced to and paid by you unle you provide us with a valid tax exemption certificate authorized by the appropriate taxing authority.

# 8. Representations and Warranties; Disclaimer

**8.1 Representations and Warranties**

You represent and warrant that (i) you have all necessary authority to enter into and perform your obligations under these Terms of Service without the consent of any third party or breach of any contract or agreement with any third party; and (ii) you will use the Services only for lawful purposes in accordance with these Terms of Service.

**8.2 Disclaimer of Warranties**

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, WE MAKE NO REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, IN LAW OR FROM A COURSE OF DEALIN OR USE OF TRADE, AS TO ANY MATTER, INCLUDING THOSE OF MERCHANTABILITY, SATISFACTORY QUALITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. WE DO NOT WARRAN THAT THE SOFTWARE OR THE SERVICES WILL MEET ALL OF YOUR REQUIREMENTS OR THAT THE USE THE SOFTWARE OR THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE. THE SOFTWARE AND SERVICES ARE PROVIDED TO YOU ON AN "AS IS" BASIS AND YOUR USE OF SOFTWARE AND SERVICES I AT YOUR OWN RISK. WE HEREBY EXPRESSLY DISCLAIM ANY REPRESENTATIONS OR WARRANTIES THA YOUR USE OF THE SERVICES WILL SATISFY OR ENSURE COMPLIANCE WITH ANY LEGAL OBLIGATIONS OR LAWS, RULES OR REGULATIONS. THIS DISCLAIMER APPLIES TO BUT IS NOT LIMITED TO ANY FEDERAL OR STATE STATUTES OR REGULATIONS THAT MAY BE APPLICABLE TO YOU. YOU ARE SOLELY RESPONSIBLE FOR ENSURING THAT YOUR USE OF THE SERVICES IS IN ACCORDANCE WITH APPLICABL LAW.

IF YOU ARE DISSATISFIED WITH THE SERVICES OR THESE TERMS OF SERVICE, YOUR SOLE AND EXCLUSIVE REMEDY IS TO STOP USING THE SERVICES. NOTWITHSTANDING THE FORGOING, NOTHING THIS SECTION (SECTION 8.2) SHALL BE CONSTRUED TO LIMIT OR DEPRIVE EITHER PARTY OF A REMED THAT IS OTHERWISE EXPRESSLY PROVIDED FOR UNDER THESE TERMS OF SERVICE.

THE PARTIES EXPRESSLY ACKNOWLEDGE THAT THE DISCLAIMER OF WARRANTY CONSTITUTES AN

ESSENTIAL PART OF THE AGREEMENT BETWEEN THE PARTIES CONTAINED IN THESE TERMS OF SERVICE.

## 9. Confidential Information and Business Data

**9.1 Confidential Information**

Neither party shall disclose to any third party any information or materials provided by the other party hereunder and reasonably understood to be confidential ("Confidential Information") without the other party's prior written consent, except as otherwise expressly permitted under these Terms of Service; provided, however, AppFolio may use and disclose your Confidential Information (in accordance with our Privacy Notice as necessary to provide the Services. The foregoing restrictions do not apply to (i) any information that is in t public domain or already in the receiving party's possession, (ii) was known to the receiving party prior to the date of disclosure, (iii) becomes known to the receiving party thereafter from a third party having an apparen bona fide right to disclose the information, or (iv) Confidential Information that the receiving party is obligate to produce pursuant to a court order or a valid administrative subpoena, providing receiving party provides disclosing party of timely notice of such court order or subpoena (unless receiving party is legally precluded from providing such notice).

You agree to ensure that your authorized users keep all passwords and other access information to the Services in strict confidence.

Each party agrees that its violation of this Section 9.1 may cause irreparable injury to the other party, entitlin the other party to seek injunctive relief in addition to all legal remedies.

**9.2 Your Business Data**

While it may not constitute personal information (use of personal information is addressed in our Privacy Notice), if you use the Services, we may access and use data you provide us related to your business and obtain other information related to your business, such as your bank account balance and transaction histor ("Business Data") to provide, improve, develop, and market the Services. Some examples include providing customer service, data analytics, and sending you advertising materials. We do not share your Business Data with anyone except as necessary to provide our Services. Some examples include sharing Business Data wit third-party service providers, legally required disclosures to courts or law enforcement, and sharing Busines Data with our wholly owned subsidiaries. We aggregate and anonymize your Business Data to create industr reports, which may be made available or provided to the public. We do not and will not sell your Business Dat

This Section 9 will survive termination or expiration of your subscription to the Services.

## 10. Indemnification

**10.1 Our Indemnification**

We agree to defend, indemnify, and hold you harmless from and against all claims brought or threatened against you by a third party alleging that a provision of the Services as permitted hereunder infringes or misappropriates a third party copyright, trade secret, trademark or patent ("Infringement Claim"). If your use the Services has become, or in our opinion is likely to become, the subject of any Infringement Claim, we ma at our option and expense: (i) procure for you the right to continue using the Services as set forth herein; (ii) modify the Services to make them non-infringing; or (iii) if the foregoing options are not reasonably practicab terminate your subscription to the Services and refund you any unused prepaid Service Fees. This Section 1C states your exclusive remedy for any claim by a third party alleging that the use of the Services as permitted hereunder infringes or misappropriates a third party copyright, trade secret, trademark or patent. The indemnification obligations in this Section will survive termination or expiration of your subscription to the Services.

**10.2 Limitations**

We have no liability or obligation with respect to any costs or damages claimed under Section 10.1 if the Infringement Claim arises out of or is in any manner attributable to (i) any modification of any Services by you (or any of your authorized users), or (ii) use of Services in combination with services and products not provide by AppFolio if such infringement would have been avoided without such modification or combination, or (iii) c compliance with your designs or instructions (each an "Excluded Claim").

**10.3 Your Indemnification**

You agree to defend, indemnify, and hold us and all our affiliates, employees, officers, directors, contractors, agents, licensors, successors and assigns (collectively, the "AppFolio Parties") harmless from any and all clair judgments, awards, demands, suits, proceedings, investigations, damages, costs, expenses, losses, and any other liabilities (including reasonable attorneys' fees, court costs and expenses) (collectively, "Costs") arising out of or relating to (i) your use of the Services in violation of these Terms of Service, (ii) an Excluded Claim, ( any actual or alleged breach by you of any representation, warranty, covenant or obligation under these Term of Service, or (iv) your gross negligence or willful misconduct. Your indemnification obligations under this Section 10.3 will survive any termination or expiration of your subscription to the Services.

**10.4 Conditions of Indemnification**

The indemnification obligations under this Section 10 above are conditioned upon (i) the indemnified party notifying the indemnifying party promptly in writing upon knowledge of any claim for which it may be entitled indemnification hereunder; (ii) to the extent applicable, the indemnified party ceasing use of the claimed infringing Services upon receipt of notice of an Infringement Claim; (iii) the indemnified party permitting indemnifying party to have the sole right to control the defense and settlement of any such claim (provided tl the indemnifying party may not settle any claim without the indemnified party's consent unless the settlemer unconditionally releases the indemnified party from all liability); (iv) the indemnified party providing reasonab assistance to the indemnifying party, at the indemnifying party's expense, in the defense of such claim; (v) th indemnified party not entering into any settlement agreement or otherwise settling any such claim without indemnifying party's express prior written consent or request (except as set forth in (iii) above); and (vi) the indemnified party complying with any settlement or court order made in connection with the claim (e.g., relat to the future use of any infringing materials). For clarity, the indemnified party may participate in the defense settlement of a claim with counsel of its own choice and at its own expense.

# 11. Limitation on Liability

EXCEPT IN CONNECTION WITH (I) EITHER PARTY'S INDEMNIFICATION OBLIGATIONS PURSUANT TO THIS AGREEMENT, (II) YOUR PAYMENT OBLIGATIONS PURSUANT TO SECTION 7 (FEES), (III) BREACH OF SECTION 5.3 (YOUR RESPONSIBILITIES), (IV) BREACH OF SECTION 5.4 (YOUR RESTRICTIONS), (V) BREACH OF SECTION 12 (DATA PROTECTION), OR (VI) AS OTHERWISE PROVIDED FOR IN THE TERMS OF ANY ADD-ON SERVICE TO WHICH YOU SUBSCRIBE OR USE, EACH OF OUR LIABILITY UNDER THESE TERMS OF SERVICE WILL BE LIMITED AS FOLLOWS:

TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY'S TOTAL LIABILITY ARISING OUT OF OR IN CONNECTION WITH THESE TERMS OF SERVICE IS LIMITED TO THE SUM OF THE AMOUNTS PAID BY YOU FOR THE SERVICES DURING THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE DATE THE CAUS OF ACTION AROSE.

TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER PARTY WILL BE RESPONSIBLE FOR LOST PROFITS, REVENUES, DATA, FINANCIAL LOSSES,OR INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY PUNITIVE OR INCIDENTAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE SERVICES OR THESE TERMS OF SERVICE. IN ALL CASES NEITHER PARTY WILL BE LIABLE FOR ANY LOSS OR DAMAGI THAT IS NOT REASONABLY FORESEEABLE.

BECAUSE SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATION MAY NOT APPLY TO YOU, IN WHIC

CASE OUR LIABILITY SHALL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY LAW.

# 12. Data Protection

**12.1 Your Obligations**

You will comply with all applicable privacy, data protection, anti-spam and other laws, rules, regulations and guidelines relating to protection, collection, use and distribution of Personal Information (as defined below). I required by applicable data protection legislation or other law or regulation, you will inform third parties that you are providing their Personal Information to us for processing and will ensure that any required third partie have given their consent to such disclosure and processing. "Personal Information" means any information th identifies, relates to, describes, or can be reasonably associated with or traced to, directly or indirectly, an individual or household, including an individual's name, address, telephone number, e-mail address, credit ca information, social security number or other similar specific factual information, regardless of the media on which such information is stored (e.g., on paper or electronically).

**12.2 Service Provider Certification**

This Section 12.2 applies only where, and to the extent that, AppFolio processes Personal Information that is subject to the California Consumer Privacy Act ("CCPA") on your behalf as a service provider (as defined in th CCPA) in the course of providing the Services. AppFolio shall not (i) sell (as defined in the CCPA) any Person Information; (ii) retain, use, or disclose any Personal Information for any purpose other than for the specific purpose of performing the Services, including retaining, using, or disclosing any Personal Information for a commercial purpose (as defined in the CCPA) other than for such specific purpose; or (iii) retain, use, or disclose any Personal Information outside of the direct business relationship between AppFolio and you. AppFolio certifies that it understands and will comply with the restrictions set out in this Section 12.2.

# 13. Ownership Disputes

Ownership of a database associated with the Services is sometimes disputed between one or more parties. While we will have no obligation to do so, we reserve the right, at any time and in our sole discretion, with or without notice to you, to determine rightful database ownership and to transfer a database to the rightful owner. If we can't reasonably determine the rightful owner, we reserve the right to suspend access to a database until the disputing parties reach a resolution. We also may request joint instructions or certain documentation from the disputing parties, such as a government-issued photo ID, a credit card invoice or a business license, to help determine the rightful owner.

# 14. Customer Interactions

**14.1 Customer Research**

We frequently engage with our customers, and may engage with our customers' customers or other third parties related to our customers, to understand how they interact with our Services and how to better develo our Services to meet their collective and ever-evolving needs. While transparency and candor are key to that process, you acknowledge and agree that you will not improperly use or disclose to us any confidential information or trade secrets of any third parties, and will not breach any obligation of confidentiality that you may have to any third party. You further acknowledge and agree that no jointly owned intellectual property sh be created as a consequence of our customer or third party engagement process or practices, and that AppFolio owns all right, title and interest in and to its intellectual property.

**14.2 Ownership of Feedback**

You and your authorized users may from time to time provide suggestions, comments, ideas or other feedbac ("Feedback") to us with respect to the Services. You agree that we are free to use, disclose, reproduce, licens or otherwise distribute and exploit the Feedback, entirely without obligation or restriction of any kind on account of intellectual property rights or otherwise.

**14.3 Services to Your Customers**

You acknowledge and agree that we may make certain services available directly to your tenants, homeowne or other customers; and may communicate with them regarding these services. These services, such as our Online Portal, payments offerings, and renters insurance,may be provided by us, through our licensed subsidiaries, and/or partners. Furthermore, any information that we make available to you about renters insurance is for informational purposes only and is not a solicitation or offer. You acknowledge and agree tha renters insurance is offered by AppFolio Insurance Services, Inc. ("AIS"), a licensed insurance producer, and r through AppFolio, Inc. Any questions regarding and requests to purchase renters insurance should be directe only to AIS.

# 15. Third Party Products and Services

**15.1 Third Party Products and Services**

The Services and our website may contain links to or integrations with products, services, and websites provided by third parties, which may include our affiliates or subsidiaries. You may choose to use such third party products or services in connection with the Services, including Third Party Applications (see Section 15 (AppFolio Stack Marketplace)), however, your receipt or use of any third party products, services or Third Par Applications, and the third parties' use or access to any of your data, is subject to a separate agreement between you and the third party provider. Once you enable or use third party products, services, or Third Par Applications in connection with the Services, you consent to us allowing that third party provider to access o use your data as required for the interoperation of their products and services with the Services. Such access and use by third party providers may include transmitting, transferring, deleting, or modifying your data, or storing your data on systems belonging to that third party provider and their vendors. You acknowledge and agree that this access and use of your data by a third party provider is subject to the applicable agreement between you and that third party provider. AppFolio makes no guarantee that any third party products, servic or Third Party Applications will work properly with the Services or that third party products, services, or Third Party Applications will continue to work with the Services as they change over time.

**15.2 AppFolio Stack Marketplace**

We provide a variety of integrations with third party products and services and the Services through our AppFolio Stack Marketplace ("Third Party Applications"). Third Party Applications are not AppFolio Services and remain subject to their own applicable third party providers' terms. We may enable interoperation of the Services with Third Party Applications as set forth in Section 15.1 above (Third Party Products and Services). We may, at any time, remove any Third Party Applications from the AppFolio Stack Marketplace and the third party providers may also update, modify, or remove their own applications at any time.

**15.3 Disclaimer of Liability**

AppFolio has no liability or responsibility whatsoever for any third party provider's websites, products, service or Third Party Applications, including their accuracy, reliability, availability, security, data handling, data processing, completeness, usefulness, or quality, even if AppFolio has reviewed, certified, or approved the product, service, or Third Party Application for use in connection with the Services. Use of third party websit products, services, or Third Party Applications is at your sole discretion and risk and you are solely responsib for your decision to permit any third party provider to use or access your data. The third party provider is sole responsible for ensuring that any information submitted through their websites, products, services, or Third Party Applications to the Services is accurate, complete, and correct. AppFolio is not responsible for the standards or business practices of any third party provider and WE DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR ANY THIRD PARTY WEBSITES, PRODUCTS, SERVICES, AND THIRD PARTY

APPLICATIONS (WHETHER SUPPORT, AVAILABILITY, SECURITY OR OTHERWISE) OR FOR THE ACTS OR OMISSIONS OF ANY THIRD PARTY PROVIDERS OR VENDORS.

# 16. General Provisions

**16.1 Independent Parties**

No joint venture, partnership, agency or employment relationship exists between you and AppFolio. You are solely responsible for managing your employees and for any and all compensation, taxes, benefits and liabilit to your employees and any of your other representatives or service providers.

**16.2 Assignment**

You will not assign or transfer the Services or any of your rights and/or obligations under these Terms of Service without our prior written consent. We may without restriction assign or transfer our rights and/or obligation hereunder, at our sole discretion. Subject to the foregoing, these Terms of Service will bind to the parties' respective successors and assigns.

**16.3 Force Majeure**

No failure, delay or default in performance of any obligation of a party will constitute an event of default or breach of these Terms of Service to the extent that such failure to perform, delay or default arises out of a cause that is beyond the control and without negligence of such party, including (but not limited to) natural disasters (e.g. lightning, earthquakes, hurricanes, floods); wars, riots, terrorist activities, and civil commotion a local exchange carrier's activities, and other acts of third parties; explosions and fires; embargoes, strikes, and labor disputes; governmental decrees; failures of telecommunications providers or internet service providers; and failures of third party suppliers, service providers or vendors. The party affected by such caus shall take all reasonable actions to minimize the consequences of any such cause.

**16.4 Applicable Law**

These Terms of Service and any dispute arising out of or relating to the Services and/or these Terms of Servi will be interpreted in accordance with the laws of the State of California, without regard to conflict-of-law provisions. All disputes arising out of or related to these Terms of Service shall be subject to the exclusive jurisdiction and venue of the California state courts located in Santa Barbara, California and federal courts of the Central District of California (unless we both agree to some other location). We each hereby expressly consent to the personal and exclusive jurisdiction of such courts.

**16.5 Notices**

You agree that we will provide notices, statements and other messages to you in the following ways: (i) withir the Service, or (ii) to the contact information you last provided us (e.g., e-mail, mobile number, physical address, etc.). You agree to keep your contact information up to date.

**16.6 No Waiver; Cumulative Remedies**

Either party's failure to enforce any right or provision under these Terms of Service will not constitute a waive of that right or provision. Except as expressly set forth in these Terms of Service, the exercise by either party any of its remedies under these Terms of Service are in addition to (and not exclusive of) any other remedies permitted at law or in equity.

**16.7 Severability**

If any provision of these Terms of Service is deemed invalid, then that provision will be limited or eliminated b the court to the minimum extent necessary, and the remaining provisions of these Terms of Service will remai in full force and effect.

**16.8 Entire Agreement**

The sole and entire agreement between you and us consists of (i) your order form and (ii) these Terms of Service, which incorporate by reference (a) the Add-On Service Terms for any Service to which you subscrib or use, including the AppFolio Value+ Terms, the AppFolio Tenant Screening Terms, the AppFolio Payments Terms, the AppFolio Sites Terms, the AppFolio Beta Terms and (b) any other terms or policies applicable to yo use of the Services that we make available, such as through an online signup flow. This agreement supersede all prior and contemporaneous oral or written understandings or agreements with AppFolio with respect to th Services. You acknowledge and agree that your agreement is not contingent upon the delivery of any future functionality or features not specified herein or in an order form or in the online sign-up flow, as applicable, o dependent upon any oral or written, public or private comments made by us with respect to future functionali or features for the Services.

**16.9 Export**

You understand and acknowledge that the Services may be subject to United States export control laws and regulations. You and your authorized users agree that: (i) you will comply with all applicable United States export control laws and regulations; (ii) you are not located within, or a resident of, any country or territory fo which the United States maintains export control laws and regulations, and trade and economic sanctions or embargoes; (iii) you will not use the Services from or in any territory that is subject to export and import laws and regulations, and trade and economic sanctions (currently including, but not limited to, Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, the Luhansk People's Republic region of Ukraine, and the Donets People's Republic of Ukraine); (iv) you are not a person on the List of Specially Designated Nationals and Blocked Persons, or any other list of sanctioned persons administered by the Office of Foreign Assets Contro or any other governmental entity; and (v) you will not use the Services for any purpose prohibited by applicab export control laws and regulations.

**16.10 Copyright Policy**

AppFolio respects the intellectual property rights of others, and asks that everyone utilizing the Services do t same. Anyone who believes that their work has been reproduced on the Services in a way that constitutes copyright infringement may notify us here.

**oduct**

OPERTY MANAGEMENT

erview

orkflow Automation

sident Experience

counting & Reporting

arketing & Leasing

aintenance

mmunication & Service

egrations & Partnerships

ORE FROM APPFOLIO

estment Management

alm-X AI

hat's New

**Solutions**

Single-Family

Multifamily

Student Housing

Affordable Housing

Community Associations

Commercial

Investment Management

**Pricing**

Property Management

Investment Management

Book a Free Demo

Contact Us

**r Company**

ho We Are

reers

versity & Inclusion

estor Relations ↗

**Resources**

Blog

Events

Newsroom

Contact Us

**Why AppFolio**

Performance Method

Customer Experience

Customer Stories

Customer Trust

**Login**

Property Manager Login

Investment Manager Login

Resident Portal Login

Owner Portal Login

Vendor Portal Login

Investor Portal Login

025 AppFolio, Inc Privacy Notice ↗ Do Not Sell or Share My Personal Information ↗

Exhibit C


beagle
Home
Waiver Programs
Resident Kit
AI Tools
Company
Login
Connect with any PMS
Beagle integrates with all property management softwares, enabling seamless setup and automating insurance verification within minutes.
entrata
appfolio
rentvine
Buildium
Rent Manager
doorloop
Get Started Now

Exhibit D

beagle Home Waiver Programs Resident Kit AI Tools Company Login Book a Demo

# Beagle Terms of Service

Last updated February 14, 2025

Last Updated: February 14, 2025

Welcome to the websites and online services (collectively, the "Site") operated by **Beagle, Inc.**, doing business as Beagle, Beagle by YRIG, Beagle Agency, Beagle Insurance Agency, Big Beagle Inc, or any other division, affiliate, or subsidiary (collectively, "Beagle," "Company," "we," "us," or "our").

By accessing or using our Site, you acknowledge that you have read and agree to be bound by these Terms of Service (the "Terms of Service"), along with any other agreements or terms incorporated by reference. If you do not agree to these Terms of Service, you must not access or use the Site.

Through our Site, you may learn about our products, apply for services, or access educational content and resources (collectively, "Online Activities"). Our services are intended for individuals who have reached the age of majority in their jurisdiction and are seeking services within the United States of America.

**Note:** This Policy is subject to our Terms & Conditions. In the event of any conflict between this Policy and the Terms & Conditions, the Terms & Conditions will control.

## Need to get in touch?

Contact us and we'll get backto you as soon as possible.

Contact us

1. Acceptance of These Terms and Changes

2. Privacy & Security

3. Prohibited Uses

4. Intellectual Property

5. Submissions, Reviews & Feedback

6. Site Access & System Requirements

7. Legal/Regulatory Notices & Communications

8. Disclaimer of Warranties

9. Limitation of Liability

10. Indemnification ("Your Liabilities")

11. Insurance Products (No Offer)

12. General Provisions

# 1. Acceptance of These Terms and Changes

1. **Acceptance**
   By using the Site, you agree to these Terms of Service as well as any additional terms or guidelines posted within specific areas of the Site. If you do not agree, discontinue use immediately.
2. **Modifications**
   We reserve the right to modify these Terms of Service at our sole discretion. Any changes are effective immediately upon posting. Your continued use of the Site after updates are posted constitutes acceptance of those changes. We encourage you to review this page periodically for the latest version.

# 2. Privacy & Security

Your use of the Site is subject to our Privacy Policy, which explains how we collect, use, and share your personal information. By using the Site, you consent to the practices outlined in the Privacy Policy.

Additionally, you are responsible for keeping any login credentials (e.g., username, password) private and for restricting access to your computer or device. You agree to notify us immediately of any unauthorized use of your credentials or account.

## 3. Prohibited Uses

You may use the Site **only** for lawful purposes and in accordance with these Terms of Service. You agree not to:

1. Violate any applicable federal, state, local, or international law or regulation.
2. Exploit or harm minors, including seeking or collecting personally identifiable information from them without proper authorization.
3. Upload or transmit any content that is unlawful, defamatory, obscene, harassing, invasive of privacy, or otherwise objectionable.
4. Send unsolicited or unauthorized advertising, promotional materials, or spam.
5. Impersonate the Company, a Company employee, or any other individual or entity.
6. Engage in any conduct that restricts or inhibits anyone's use of the Site or that may harm the Company or users.

In addition, you agree **not** to:

- Use any automated systems such as robots, spiders, or scrapers to access the Site for unauthorized purposes.
- Interfere with the proper operation of the Site or introduce any malicious code (e.g., viruses, worms, or Trojan horses).
- Attempt to gain unauthorized access to any server, database, or system connected to the Site.
- Attack the Site via denial-of-service (DoS) or distributed denial-of-service (DDoS) attack.

## 4. Intellectual Property

1. **Ownership of Content**
Unless otherwise stated, all content on the Site (including text, graphics, images, logos, designs, videos, software, and other materials) is the property of Beagle or its licensors and is protected by U.S. and international intellectual property laws.
2. **Limited License**
We grant you a limited, non-exclusive, revocable license to access and use the Site for your personal, non-commercial purposes. You may not reproduce, distribute, modify, publicly display, or create derivative works from the content without our express written permission.
3. **Trademarks**
The trademarks, service marks, slogans, logos, and trade dress ("Marks") displayed on the Site belong to Beagle or third-party licensors. Use of any Marks without written permission from Beagle or its licensors is strictly prohibited.

4. **Prohibited Framing and Linking**
You may not co-brand or frame the Site without express written consent. "Co-branding" means displaying a name, logo, or other means of attribution that may give a user the impression that another entity has the right to display the Site or its content.

5. **DMCA Compliance**
If you believe any material on the Site infringes your copyright, please send a notice to our Designated Copyright Agent at:

   - **Email:** contact@yourrenterskit.com
   - **Address:** 473 Pine St, San Francisco, CA 94104
   - **Phone:** 301-693-2267

6. We may remove or disable access to allegedly infringing material and take other appropriate actions under the Digital Millennium Copyright Act (DMCA).

## 5. Submissions, Reviews & Feedback

1. **Unsolicited Ideas**
We appreciate feedback but ask that you do not submit unsolicited creative ideas, proposals, or materials. If you do, such submissions automatically become Company property, and we assume no obligation to keep them confidential or compensate you.

2. **Testimonials and Reviews**

   - By posting a review or testimonial about Beagle on any public platform, you grant us permission to use it (including your name or username) for marketing or promotional purposes.
   - We may edit or shorten reviews for clarity and brevity. If you would like to remove a review or testimonial, please contact us at **contact@yourrenterskit.com**.

3. **Visitor Submissions**
If you upload or post content (e.g., comments, questions, or other information) ("Visitor Submissions"), you must ensure it does not contain unlawful or infringing material. You grant us a non-exclusive, worldwide, perpetual, royalty-free license to use, reproduce, and distribute your Visitor Submissions in any media. We reserve the right to remove such submissions without notice.

## 6. Site Access & System Requirements

1. **Geographic Restrictions**
The Site is operated from the United States. We do not guarantee that the Site's content or features are available or appropriate outside the U.S. If you access the Site from another

jurisdiction, you do so at your own initiative and risk.

2. **Withdrawal of Services**
We may modify, suspend, or discontinue any part of the Site at any time without notice, subject to applicable law. We are not liable for any unavailability of the Site.

3. **System Requirements**
To access and retain electronic documents, you may need:

   - A computer or mobile device with internet access.
   - A web browser capable of 128-bit SSL encryption.
   - Software to open PDF documents.
   - The ability to download or print these Terms and other disclosures.

# 7. Legal/Regulatory Notices & Communications

1. **Legal/Regulatory Notices**
We may provide notices about electronic signatures, insurance notices, Fair Credit Reporting Act details, or external data and AI usage. Please review all posted legal notices carefully, as they contain important information.

2. **Telephone and Text Communications**
By providing your phone number, you consent to receiving calls or text messages from us or our service providers in accordance with the law. For more details, please review our Telephone and Text Communications Terms & Conditions if provided on the Site.

# 8. Disclaimer of Warranties

1. **As-Is Basis**
The Site, including all content, products, and services, is provided on an "AS IS" and "AS AVAILABLE" basis, without warranties of any kind, whether express or implied.

2. **No Warranty**
BEAGLE EXPRESSLY DISCLAIMS ALL WARRANTIES, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT. We do not warrant that the Site will be uninterrupted or secure, or that it will be free of errors, viruses, or other harmful components.

3. **Third-Party Websites**
The Site may include links to third-party websites. We make no representations about the content, products, or services of any

linked websites and disclaim liability for your use of them.

## 9. Limitation of Liability

**TO THE FULLEST EXTENT PERMITTED BY LAW, BEAGLE AND ITS OFFICERS, DIRECTORS, EMPLOYEES, SHAREHOLDERS, AGENTS, LICENSORS, AND SERVICE PROVIDERS SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES, INCLUDING LOSS OF PROFITS, DATA, OR BUSINESS, ARISING OUT OF OR RELATED TO YOUR USE (OR INABILITY TO USE) THE SITE, EVEN IF FORESEEABLE OR ADVISED OF THE POSSIBILITY.**

Some jurisdictions do not allow certain limitations of liability. In such jurisdictions, some of these limitations may not apply to you.

## 10. Indemnification (“Your Liabilities”)

You agree to defend, indemnify, and hold harmless Beagle, its affiliates, and their respective officers, directors, employees, and agents from and against any claims, liabilities, damages, judgments, awards, losses, costs, expenses, or fees (including attorneys’ fees) arising out of or relating to your:

1. Violation of these Terms and Conditions;
2. Use of the Site other than as expressly authorized;
3. Violation of any applicable law or regulation; or
4. Infringement or violation of any third party’s rights.

## 11. Insurance Products (No Offer)

Any insurance, financial, or similar products referenced on the Site are provided solely for informational purposes and may not be available in all jurisdictions. Product descriptions and pricing may be subject to change and certain terms, conditions, and limitations will apply.

- Nothing on the Site constitutes an offer or solicitation where prohibited by law.
- Policy contracts and other official documentation govern the specifics of coverage, not the descriptions on the Site.

- Certain products and discounts may vary by state and are subject to underwriting requirements.

## 12. General Provisions

1. **Limitation on Time to File Claims**
   Unless prohibited by law, any claim or cause of action arising out of or related to these Terms of Service must be initiated within **one (1) year** after such claim accrues; otherwise, it is permanently barred.
2. **Waiver and Severability**
   No waiver of any provision shall be deemed a further or continuing waiver. If any term is held invalid or unenforceable, the remaining terms remain in full force and effect.
3. **Governing Law and Jurisdiction**
   These Terms of Service are governed by the laws of the State of Delaware, without regard to conflict-of-law principles. You consent to the exclusive jurisdiction of the state and federal courts located in Delaware.
4. **Entire Agreement**
   These Terms of Service, along with any policies or notices referenced, constitute the entire agreement between you and Beagle regarding use of the Site. They supersede all prior and contemporaneous agreements regarding the same subject matter.

If you have questions regarding these Terms & Conditions, please contact us at:

**Email:** contact@yourrenterskit.com

**Address:** 473 Pine St, San Francisco, CA 94104

**Phone:** 301-693-2267

Thank you for reviewing these Terms & Conditions. Your continued use of our Site indicates you understand and agree to abide by them. If you do not agree, you must discontinue use immediately.

Case: 26-769, 04/07/2026, DktEntry: 11.4, Page 102 of 299
Case 2:25-cv-12248-JFW-SSC Document 33-2 Filed 12/29/25 Page 67 of 73 Page ID #:136

beagle

Autopilot for Renters Insurance Compliance

473 Pine St Floor 5
San Francisco, CA 94104

support@beagleforpm.com

**Product**

Features

Resident Kit

Waiver Programs

FAQ

**Company**

Careers

**Resources**

Blog

Book a Demo

Beagle vs. Second Nature

Support

Nothing on this website is intended to act as a solicitation or offer for the purchase or sale of insurance in any state where it is forbidden.

These benefits to Association members should not be construed as an offer to provide insurance or construed as an insurance product in any state where where it would be prohibited by law.

Member benefits are not available to residents; they can only be accessed by landlord Association members.

© 2025 Beagle. All rights reserved.

Privacy Policy

Terms of Service

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
12/16/2025 2:43 PM
By: Terri Chavez , Deputy

Brian Procel (Cal. Bar No. 218657)
Brian@Procel-Law.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@Procel-Law.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for AppFolio, Inc.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA BARBARA

| | |
|---|---|
| APPFOLIO, INC., a California corporation<br><br>Plaintiff,<br><br>v.<br><br>BEAGLE, INC., a Delaware corporation, and DOES 1-20;<br><br>Defendants. | Case No. 25-CV-07670<br><br>Ex parte hearing date: Dec. 16, 2025<br>Ex parte hearing time: 8:30 AM<br><br>Court: Hon. Donna Geck<br><br>Action filed: Dec. 9, 2025<br><br>**DECLARATION OF JEREMIAH LEVINE REGARDING NOTICE IN SUPPORT OF APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER** |

**DECLARATION OF JEREMIAH LEVINE**

I, Jeremiah Levine, declare:

1. I am a principal of Procel Levine LLP, counsel for Plaintiff AppFolio, Inc. ("AppFolio" or "Plaintiff"). I make this declaration in support of Plaintiffs' Application for Order to Show Cause and Temporary Restraining Order (the "Application"), based on personal knowledge. If called as a witness, I could and would testify competently hereto.

2. Michael Burshteyn is counsel in this matter for Defendant Beagle, Inc., ("Defendant") and has agreed to accept service in this matter on Beagle's behalf.

3. On December 12, 2025, at 4:21 PM, I emailed Mr. Burshteyn as follows: Plaintiff has reserved a hearing for 8:30 AM on Wednesday, December 17, before Judge Geck of Santa Barbara County Superior Court regarding a TRO application that Plaintiff will file." Shortly afterwards, I spoke with Mr. Burshteyn by phone and provided the same notice. Mr. Burshteyn informed me that Defendant opposes the application, intends to file an opposition, and intends to attend the hearing.

4. On December 15, 2025, I emailed Mr. Burshteyn to specify that the order Plaintiffs seeks would prohibit:

a. falsely misrepresenting to AppFolio's actual or potential customers or clients, or to any other third party, that Beagle or its products or services are, or soon will be, affiliated with, partnered with, endorsed by, approved by, or otherwise associated with AppFolio or any of AppFolio's products or services;

b. falsely misrepresenting to AppFolio's actual or potential customers or clients, or to any other third party, that AppFolio, or any of its products or services, has failed any audits or has been deemed to be out of compliance with any applicable laws, statutes, ordinances, rules, or regulations;

c. falsely misrepresenting to AppFolio's actual or potential customers or clients, or to any other third party, that AppFolio is no longer offering or is no longer permitted by law to offer any of its existing products or services;

d. falsely misrepresenting to AppFolio's actual or potential customers or clients, or to any other third party, that AppFolio's customers or clients are, or are at risk

for, being out of compliance with or violating any applicable laws, statutes, ordinances, rules or regulations by utilizing or continuing to utilize AppFolio or any of its products or services;

e. falsely misrepresenting to, suggesting to, encouraging, or advising AppFolio's customers or clients that they need to or should utilize Beagle or its products or services as a result of AppFolio's supposed compliance violations or supposed discontinuation of any of its products or services;

f. falsely misrepresenting to AppFolio's actual or potential customers or clients that Beagle or its agents or representatives have already been in contact with AppFolio or its agents or representatives and obtained consent from AppFolio to contact them;

g. inducing AppFolio customers or clients to give Beagle or Beagle's representatives or agents access to their log-in credentials to their AppFolio customer account, or inducing them to otherwise violate their AppFolio terms of service;

h. training, encouraging, or incentivizing current or prospective sales representatives or other agents to make false or misleading representations about AppFolio or its products or services, or about any current or expected affiliation between AppFolio or its products or services and Beagle or its products or services;

i. making any other false misleading claims about AppFolio or its products and services, or about Beagle or its products or services, during any communications with actual or potential AppFolio customers or clients;

j. contacting AppFolio customers or clients for the purposes of making false or misleading statements about AppFolio or its products and services, or about Beagle or its products or services, or about any current or expected affiliation between AppFolio or its products or services and Beagle or its products or services;

k. making any other false or misleading statements about AppFolio or its products or services, or about any affiliation between AppFolio or its products or services and Beagle or its products or services, in Beagle's marketing, advertising, social media, or any other communications, including but not limited to utilizing AppFolio's name or logo on Beagle's website or any other promotional materials;

l. taking any other steps to intentionally create confusion or uncertainty in the marketplace about any current or expected affiliation between AppFolio or its products or services and Beagle or its products or services.

I declare under penalty of perjury according to the laws of the State of California that the foregoing is true and correct and that this declaration was signed by me on December 15, 2025 in Los Angeles, California.

_/s/ Jeremiah Levine_________________
Jeremiah Levine

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
12/16/2025 2:43 PM
By: Terri Chavez , Deputy

Brian Procel (Cal. Bar No. 218657)
Brian@Procel-Law.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@Procel-Law.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for AppFolio, Inc.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA BARBARA

APPFOLIO, INC., a California corporation

Plaintiff,

v.

BEAGLE, INC., a Delaware corporation, and DOES 1-20;

Defendants.

Case No. 25-CV-07670

Ex parte hearing date: Dec. 16, 2025

Ex parte hearing time: 8: 30 AM

Court: Hon. Donna Geck

Action filed: Dec. 9, 2025

**DECLARATION OF MELANIE HOHLER IN SUPPORT OF APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

## DECLARATION OF MELANIE HOHLER

I, Melanie Hohler, declare:

1. I make this declaration in support of Plaintiffs' Application for Order to Show Cause and Temporary Restraining Order (the "Application"), based on personal knowledge. If called as a witness, I could and would testify competently hereto.

2. I am a property manager with Frank St Clair DBA St. Clair Property Management. My firm has been a customer of AppFolio, Inc. for several years.

3. In October 2025, I was contacted by phone by someone who claimed to be a representative of Beagle, Inc. ("Beagle"). They claimed that AppFolio had failed an audit, and that AppFolio had partnered with Beagle to provide insurance to AppFolio customers and bring AppFolio back into compliance.

4. When the Beagle representative made these representations, I was confused or uncertain as to the relationship or affiliation between AppFolio and Beagle.

5. The representative tried to dissuade me from talking to AppFolio about this.

6. Beagle then made repeated follow-up calls to me.

I declare under penalty of perjury according to the laws of the State of California that the foregoing is true and correct and that this declaration was signed by me on December 5, 2025 in Bakersfield, California.

Melanie Hohler
F60D404D497E595E8D009F290DA01173 contractworks

Melanie Hohler

Brian Procel (Cal. Bar No. 218657)
Brian@Procel-Law.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@Procel-Law.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for Defendant AppFolio, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,

Plaintiffs,

v.

APPFOLIO, INC., a California corporation,

Defendants.

Case No. 2:25-cv-12248-JFW-SSC

**DECLARATION OF SEAN SAXENA IN SUPPORT OF APPFOLIO, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR AN EX PARTE TEMPORARY RESTRAINING ORDER; EXHIBITS A-D**

**DECLARATION OF SEAN SAXENA**

I, Sean Saxena, declare:

1. I make this declaration in support of AppFolio, Inc.'s ("AppFolio's") Opposition To Plaintiffs' Motion For An Ex Parte Temporary Restraining Order, based on personal knowledge. If called as a witness, I could and would testify competently hereto.

**Background**

2. My job title is Senior Director, Insurance, for AppFolio. I have been employed by AppFolio for approximately 13 years.

3. AppFolio Property Manager is a software platform that helps property management companies run their businesses. When a property manager subscribes to AppFolio Property Manager, they receive a database, which provides them with a wide range of services and functionality, including accounting, payments, tenant screening, insurance-related services, maintenance management, and more.

4. In connection with these services, a property manager's database will contain a large amount of data. This data comes from a number of sources, including the property manager, their tenants, and service providers of both AppFolio and the property manager.

5. To access AppFolio Property Manager, property managers must pay a monthly subscription fee. The software is not available to non-customers. To

emphasize that point, AppFolio does not permit the general public to access its platform or the data in any of its customers databases.

**Market Share**

6. As reflected in AppFolio's Investor Day presentation, attached hereto as **Exhibit A**, there are an estimated 52 million residential rental units in the United States. (Exh. A at 25.)[1] There are approximately nine million units AppFolio's platform. (Exh. A at 67.) While not all of those units are residential rentals, AppFolio's market share is no greater than 17% of the United States' 52 million residential rental units.

7. We believe at least two competitors have a greater market share than AppFolio: RealPage, Inc. and Yardi Systems, Inc.

**Point Solutions**

8. AppFolio values its customers' ability to work with "Point Solutions" and offers them multiple methods of doing so. Point Solutions are companies that offer a particular service to property managers. Examples of Point Solutions include internet listing sites, tenant screening companies, debt

[1] I am a duly authorized custodian of records for AppFolio. I have authority to testify as to the authenticity of Exhibit A. Exhibit A, AppFolio's Investor Day presentation, is a record of regularly conducted activity, made and kept in the ordinary course of business, prepared by AppFolio employees with a business duty to record and report information accurately, and made near the time of the facts reflected therein.

collection agencies, maintenance management services, and more. These point solutions often compete with AppFolio's own offerings.

9. Any Point Solution is free to work with AppFolio's customers. And AppFolio's platform is structured to allow its customers to work with any Point Solution. There is no prohibition or penalty for doing so. And we have, in fact, worked hard to make working with Point Solutions easier.

10. AppFolio customers have four ways to work with Point Solutions. First, they can work with Point Solutions in our AppFolio Stack Marketplace. These are Point Solutions that we have vetted for security and performance, and with whom we have built dedicated integrations into our platform. Some of these Point Solutions compete directly with AppFolio.

11. Second, if a customer wishes to have an integration with a Point Solution that is not in our marketplace, they can use our Database API[2] offering to build a direct, secure link between the Solution Partner and their database. There are no restrictions on the Point Solutions property managers can connect to using this functionality.

12. Third, a customer can also use Scheduled Reports to share data with any Point Solution of their choice. This takes the customer approximately five minutes. Scheduled Reports allow the property manager to automate the data

[2] An API, or application programming interface, is an automated means for two computer programs to communicate.

sharing process and share almost any data in their database. This includes tenant rosters, unit identifiers, lease and billing information, and insurance compliance status (assuming this information is in their database). Attached as **Exhibit B**[3] is a true and correct copy of an example of a Scheduled Report from AppFolio's platform containing exactly this kind of information. Based on reviewing AppFolio's software, I know that Beagle already receives Scheduled Reports from at least one of its clients.

13. Fourth, a customer can work with a Point Solution outside of AppFolio entirely. There is nothing that prohibits a customer from sharing the data they input into AppFolio (such as tenant rosters) with Point Solutions or other platforms. As expressly stated in our Terms and Conditions, our customers retain all right, title and interest in and to their data.

14. AppFolio has an interest in determining the third parties who access its platform. The one thing all four methods have in common is that they are secure methods of sharing data and working with Point Solutions. None of these methods give the Point Solution direct access to the customers' database or the myriad of sensitive data and functionality contained therein.

---

[3] To avoid disclosing customer data, Exhibit A is a demonstrative example that shows how a scheduled report looks, not a scheduled report created by a real customer. Exhibit A is provided not for the substance of the data reflected therein, but rather only to illustrate the functionality of Scheduled Reports and the type of information they can contain, including tenant rosters, unit identifiers, lease and billing information, and insurance compliance status.

**AppFolio's Partners Impact Its Reputation**

15. AppFolio is selective about the Point Solutions with whom it partners because their products, services, and overall conduct have a significant impact on AppFolio's reputation and operations. Because AppFolio's customers believe AppFolio should carefully vet its partners, bad experiences would lead to increased customer service volume and complaints and a negative impact to our brand reputation – all at substantial cost to AppFolio.

16. As detailed in AppFolio's TRO Application from the Santa Barbara action, attached to this Opposition, Beagle is falsely telling AppFolio customers that it is a partner of AppFolio.

**AppFolio's Terms of Service**

17. Attached as **Exhibit C** is a true and correct copy of the Terms of Service for AppFolio Property Manager that are available on our website. AppFolio offers three tiers of AppFolio Property Manager (Core, Plus, and Max) depending on the customers' needs. The Terms of Service are the same for each.

18. These Terms of Service state that the user/customer "will retain all right, title and interest in and to your data." (Terms of Service, ¶ 1.4.)

19. They state that "Third parties are not permitted to access or use the Services or any application programming interface we may make available to you without [AppFolio's] prior consent." (Terms of Service, ¶ 5.2).

20. And they further provide that AppFolio reserves the right "to disable or delete access to the Services and any application programming interface for any of your authorized users to enforce these Terms of Service or otherwise protect our interests." (Terms of Service, ¶ 5.2).

21. Each of these specific terms has been in effect since at least 2019. That is before AppFolio knew Beagle existed.

22. AppFolio does not permit the general public to access the data AppFolio aggregates.

23. There is nothing in AppFolio's Terms of Service that authorizes companies like Beagle to access AppFolio's platform without obtaining permission. In fact, it is prohibited.

**Beagle's Unauthorized Use of AppFolio's Platform.**

24. Despite having multiple secure methods of working with AppFolio's customers, and despite third-party account access being prohibited by the Terms of Service, Beagle convinces its AppFolio customers to give it user access to the customers' database. Such accounts are intended for the customers' employees.

25. As detailed above, the Terms of Service have (for approximately the last six years) prohibited third parties from having this type of access. With it, any Beagle employee (or ex-employee) with the password to the user account could use the AppFolio services in the customer's database. For example, Beagle personnel could charge residents for Beagle's services, send other payments, or

run background reports on people. The Beagle employee accessing the customer's account would also have direct access to all of the information that AppFolio has aggregated for its customer. Beagle personnel could steal residents' personal and financial information, access and alter the customer's bank information, and more, depending on the permission level. Needless to say, this presents substantial risk to the customer.

26. In other words, rather than pursue one of the secure (and permitted) methods of working with AppFolio customers, such as Scheduled Reports, Beagle convinces AppFolio users to give them *direct* access to their AppFolio database in violation of the Terms of Service and at considerable risk to the customer.

27. On December 9, 2025, AppFolio posted an in-app banner to its customers who use Beagle. It notified them that AppFolio would close Beagle's access to the customers' AppFolio databases. The banner stayed up until a user closed it. AppFolio also removed the banner on December 18, 2025.

**Beagle and AppFolio Do Not Have a Relationship**

28. AppFolio has chosen to enforce its Terms of Service and remove the Beagle user-accounts from its customers' databases because:[4] (1) Beagle's access creates the substantial security risk detailed above; (2) Beagle's conduct in

[4] AppFolio is enforcing its Terms of Service against its customers, not Beagle. As detailed below, AppFolio has no relationship with Beagle of any kind.

falsely claiming it partners with AppFolio has raised considerable concern over its credibility and practices; (3) AppFolio has received numerous complaints from its customers about Beagle's services and sales tactics; (4) Beagle has tried to directly use AppFolio's customer support resources to perform its work for it; and (5) Beagle's actions and access create substantial reputational risk for AppFolio, particularly among those customers who wrongly believe Beagle is a parter of AppFolio's.

29. To be clear: AppFolio has never partnered with Beagle. It has never entered into a contract with Beagle of any kind. And it has no intention to partner with Beagle in the future. It has never asked for permission to access AppFolio's application programming interface.[5] And Beagle has never paid or provided any consideration to access AppFolio's software.

30. AppFolio has previously enforced its Terms of Service against other companies. AppFolio is not selectively enforcing them only against Beagle.

31. Attached hereto as **Exhibit D** is a true and correct copy of an email received by AppFolio that purports to have been sent by Beagle CEO Michael Brown. The email bears Mr. Brown's name, title, and signature block and is from the domain @joinBeagle.com. The email was forwarded by an AppFolio

[5] To my knowledge, AppFolio had only introductory conversations with Beagle. Beagle shared no proprietary information. AppFolio declined to sign the NDA Beagle requested.

customer and the content responds to the content of AppFolio's email sent to Beagle about disabling Beagle's accounts.

I declare under penalty of perjury according to the laws of the State of California that the foregoing is true and correct and that this declaration was signed by me on December 26, 2025 in Goleta, California.

Sean Saxena

Exhibit A


appfolio
2025 Investor Meeting
Santa Barbara, CA
November 18, 2025

# Agenda

| | | |
|---|---|---|
| **Welcome** |  | **Bill Schroeder**<br>Vice President, Finance |
| Powering the Future of Real Estate: **AppFolio Vision & Strategy** |  | **Shane Trigg**<br>President & Chief Executive Officer |
| Differentiate to Win: **AppFolio Solutions** |  | **Kyle Triplett**<br>Sr. Vice President, Product |
| Deliver Performance Efficiently: **Go-to-Market Strategy** |  | **Lisa Horner**<br>Chief Marketing Officer |
| **Break** | | |
| **Customer Panel** |  | **Stacy Holden**<br>Vice President & Industry Principal |
| **Financial Overview** |  | **Tim Eaton**<br>Chief Financial Officer |
| **Q&A** | | All |


2025 © AppFolio


appfolio

# Safe Harbor Statement and Other Information

This presentation contains forward-looking statements within the meaning of federal securities laws, which statements involve substantial risks and uncertainties. Forward-looking statements made in this presentation are based primarily on our current expectations and projections about future events and trends that we believe may affect our business, financial condition, operating results, and prospects. In some cases, you can identify forward-looking statements by the use of words such as “may,” “will,” “should,” “might,” “expect,” “plan,” “anticipate,” “could,” “intend,” “target,” “project,” “contemplate,” “believe,” “estimate,” “predict,” “potential,” or “continue,” or the negative of these words or other similar terms or expressions that concern our expectations, strategy, plans, or intentions. Examples of forward-looking statements include, among others, statements made regarding product development plans, future product functionality or availability, future market conditions and size, growth in the size of our business and number of customers, strategic plans and objectives, business forecasts and plans, our future or assumed financial condition, ARPU potential, results of operations and liquidity, trends affecting our business and industry, the competitive environment, responding to customer needs, and capital resource allocation plans.

Further information on the above and other risks that could cause our actual results to differ materially from our current expectations and projections can be found in our Annual Report on Form 10-K filed for the year ended December 31, 2024 and in our other Securities and Exchange Commission (“SEC”) filings, including our most recent Quarterly Report on Form 10-Q, which are available on our website at https://ir.appfolioinc.com/ or the SEC’s website at www.sec.gov. We cannot guarantee that we will achieve the plans, intentions, or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Forward-looking statements represent our management’s beliefs and assumptions only as of the date of this presentation. Our forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures, or investments we may make. We undertake no obligation, and do not intend, to update these forward-looking statements, to review or confirm analysts’ expectations, or to provide interim reports or updates on the progress of the current financial quarter.

The information in this presentation on new products, features, or functionality is intended solely to outline our general product direction. It is not a commitment to deliver any product, feature, or functionality; and our product direction may change at any time without notice. As such, the information may not be incorporated into any contract and purchases should not be contingent upon it.

Numbers in this presentation may be rounded for presentation purposes.

# Statement Regarding Use of Non-GAAP Financial Measures

This presentation includes information about non-GAAP operating margin (collectively the “non-GAAP financial measures”). Our non-GAAP financial measures may not provide information that is directly comparable to that provided by other companies in our industry, as other companies may calculate non-GAAP financial results differently. In addition, there are limitations in using non-GAAP financial measures because non-GAAP financial measures are not prepared in accordance with GAAP and can exclude expenses that may have a material impact on our reported financial results. As such, non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information prepared in accordance with GAAP. A reconciliation of the historical non-GAAP financial measures to their most directly comparable GAAP measures has been provided in the tables above. We encourage investors to review the reconciliation of these historical non-GAAP financial measures to their most directly comparable GAAP financial measures.

We use non-GAAP financial measures internally to assess and compare operating results across reporting periods, for internal budgeting and forecasting purposes, and to evaluate our financial performance. We believe these adjustments also provide useful supplemental information to investors and facilitate the analysis of our operating results and comparison of operating results across reporting periods.

Non-GAAP operating margin is defined as income (loss) from operations, less stock-based compensation, amortization of stock-based compensation capitalized in software development, and other non-recurring items.


2025 © AppFolio

Powering the Future of Real Estate:

# AppFolio Vision & Strategy

**Shane Trigg** President & Chief Executive Officer

5

appfolio

# AppFolio: Two Decades of Growth & Innovation



# Transforming Our Performance: *Financial*




* 2025 represents the mid-point of 2025 annual guidance as reported on October 30, 2025. Non-GAAP operating margin is a non-GAAP financial measure. Refer to the Appendix for an explanation of non-GAAP financial measures, and why we believe these measures can be useful, as well as a reconciliation of non-GAAP financial measures to the most comparable GAAP measures, where applicable.
** YTD 2025 results

# *Innovation* Over the Years

## 2022

- AppFolio Stack
- FolioGuard Security Deposit Alternative
- Report Builder
- Bank Feed
- Flexible Screening
- AppFolio Alpha

## 2023

- AppFolio Realm
- Leasing Signals
- Leasing CRM
- AppFolio Stack Solution Partners
- Progressive Maintenance Intake
- Auto-generated Marketing Descriptions
- Instant Pay for Vendors
- Bulk actions move-outs, renewals, & pricing
- Affordable Housing

## 2024

- AppFolio Realm-X Assistant
- AppFolio Realm-X Messages
- AppFolio Realm-X Flows
- AppFolio Max (Tier)
- Database API
- Custom Fields
- Modern Reporting Interface
- AppFolio Stack Webhooks
- FolioScreen ID & Document Verification
- Affordable Housing Waitlist
- Student Pre-Leasing
- Resident Concierge (LiveEasy)

## 2025

- Realm-X Leasing Performer
- Realm-X Maintenance Performer
- Resident Onboarding
- Resident Onboarding Lift (Second Nature)
- Resident Messages
- Zillow Listing Spotlight
- AvidXChange Payables
- Centralized CRM
- Smart Budgeting
- Credit Card Accounting
- Bill Approval Flow & Bulk Bills
- Affordable Certification & HUD Move-In
- Student Pre-Leasing Placement Board
- Flexible Rental Applications

 2025 © AppFolio 

appfolio

# Transforming Our Performance:
## *Industry-Leading Innovation to Customer Value*




* YTD 2025 results
** Internal data on percentage of customers that used AppFolio Realm AI features and capabilities in 2025

# AppFolio Powers Winning Businesses

ATLAS REAL ESTATE
DREAM LIVE PROSPER Communities
FAIRGROVE
FOCUS
BREEDEN
AMC ADVANCEDMANAGEMENTCOMPANY
Fuller APARTMENT HOMES
GRANITE
VandenBerghe Properties
EUCALYPTUS REAL ESTATE
HARMONIQ RESIDENTIAL

"Moving to AppFolio was a seamless experience, which speaks volumes about the partnership. AppFolio's significant and ongoing investment in product development, along with their client-first support team, reinforces our confidence that Northpoint's residents and owners will continue to have the best experiences and outcomes."



NORTHPOINT
Adam Haleck
CEO
8,000 Units
Customer since 2024

# Awards & Accolades

## INNOVATION

inman AI AWARDS
appfolio

FORTUNE FUTURE FIFTY 2025

Forbes America's BEST COMPANIES 2025

## CUSTOMER IMPACT

BEST SOFTWARE 2025 Top 100 BEST SOFTWARE PRODUCTS

BEST SOFTWARE 2025 Top 50 REAL ESTATE PRODUCTS

Overall Leader, G2 Grid® for Property Management*

## TEAM

FORTUNE BEST WORKPLACES

Forbes America's BEST MIDSIZE EMPLOYERS 2025

appfolio

VALUES

Great *people* make a great company.

Listening to *customers* is in our DNA.

Simpler is *better*.

Do the *right thing*; it’s good for business.

*Innovation* powers success.

Build *trust* every day.


The AppFolian Way
PADDLE AS ONE
CUSTOMER OBSESSED
RAISE THE BAR
SET THE PACE
DELIVER RESULTS

# AppFolio Leadership Team



**Shane Trigg**
President and Chief Executive Officer
AppFolian Since 2020



**Tim Eaton**
Chief Financial Officer
AppFolian Since 2020



**Matthew Baird**
Chief Technology Officer
AppFolian Since 2022



**Elizabeth Barat**
Chief People Officer
AppFolian Since 2016



**Marcy Campbell**
Chief Revenue Officer
AppFolian Since 2024



**Lisa Horner**
Chief Marketing Officer
AppFolian Since 2014



**Kyle Triplett**
Sr. Vice President, Product
AppFolian Since 2019



**Evan Pickering**
Sr. Vice President, General Counsel
AppFolian Since 2018

 2025 © AppFolio 

appfolio


Outdated Systems
Fragmented Data
AI Noise
Compliance
Regulatory Challenges

CURRENT STATE

**Task-Based Management**



# The Performance Gap

EXTERNAL FORCES

- High Interest Rates
- Limited Rent Growth
- Increasing Vacancy Rates
- Growing Resident Expectations
- Inflation

INDUSTRY CHALLENGES

- Data Silos
- Fragmented Tech
- Bolt-on AI
- Efficiency Trap
- Change Resistance

FUTURE STATE

**Real Performance**



appfolio

# Legacy Systems Are Holding the Industry's Performance Back



The future of real estate has a name

# Real Estate Performance Management


appfolio
Performance
Platform
System of Growth
System of Action
System of Record
AI-Native Architecture

Vision

# To *power* the future of real estate.

Mission

# To build the *platform* where real estate comes to do business.

 2025 © AppFolio


appfolio

# Property Manager is Our *Core* Industry Segment




Property management is the **central function** that integrates and activates the real estate industry.

It **transforms** scattered assets into a thriving system of homes, businesses, and communities.

Its **collective actions** link residents, investors, vendors, and brokers, ensuring that value is consistently created and sustained.

# Investing to Win Across Key Industry Control Points

Investments across systems will independently grow revenue and margin while influencing customer acquisition and unit expansion



Property Manager

# Where We Play & How We Win

*10-Year Vision*




 2025 © AppFolio 

appfolio

Property Manager

# Where We Play & How We Win

*10-Year Vision TAM*




*BUILD* THE PLATFORM → *STORE* THE DATA → *DO* THE WORK → *CREATE* THE VALUE → *UNIFY* THE EXPERIENCE → *DRIVE* THE ECONOMICS → *POWER* THE FUTURE

* Estimates based on AppFolio analysis of data from Census.gov, BLS.gov, McKinsey, Cotality, and other third-party sources

 2025 © AppFolio 

appfolio


appfolio
A future of winning.
docs.google.com – To exit full screen, press esc
Investor Meeting - November 18, 2025
2025 © AppFolio
26

# Strategic Pillars

**Vision**

To *power* the future of real estate.

**Mission**

To build the *platform* where real estate comes to do business.

**Differentiate to Win**

**Deliver Performance Efficiently**

**Great People & Culture**


2025 © AppFolio

appfolio

Differentiate to Win:

# AppFolio Solutions

**Kyle Triplett** Sr. Vice President, Product

28

appfolio

# appfolio

Performance
Platform






appfolio

 2025 © AppFolio

# Winning the System of Record



## Accounting

Advance our accounting capabilities to support upmarket portfolios.



## Mixed Portfolios

Broaden our coverage with expanded Affordable and Student Housing functionality.



## Permissions

Empower large customers through more granular controls and permissions.



## Reporting

Enhance reporting with increased flexibility and customization.


2025 © AppFolio

appfolio

# Unified Data

The heart of every successful platform is data

Our ambition is to be the **system of record**, **action**, and **growth** for real estate, turning the data within our platform into structured intelligence that drives customer performance and strengthens our competitive advantage.

- Standardized
- Scalable
- Reliable

**Powered Initiatives**

AppFolio Stack | AppFolio Realm-X | Data & API Products



Property Manager

# AppFolio Stack

Our customers' space to connect their data to the outside world

**4M+** Units Connected

**84** Partners

**8** Product Categories



# AppFolio Stack in Realm-X Flows

Realm-X Flows will *trigger actions* in AppFolio Stack Apps to extend our System of Action




New Templates




Existing

 2025 © AppFolio 

appfolio


BUILD THE PLATFORM
STORE THE DATA
DO THE WORK
CREATE THE VALUE
UNIFY THE EXPERIENCE
DRIVE THE ECONOMICS
POWER THE FUTURE
System of Action
35
2025 © AppFolio
appfolio


The AppFolio Difference: AI-Powered Innovation
realm
Realm-X Assistant
Realm-X Messages
Realm-X Flows
Realm-X Performers
Bank Feed
Smart Bill Entry
Smart Budgeting
Generate Description
Leasing Descriptions
FolioGuard Smart Ensure
Leasing Signals
appfoliorealm
36
2025 © AppFolio
Investor Meeting - November 18, 2025
appfolio

# Real Performance with Realm-X




*10.3 Hours* **Saved Completing Tasks per User Each Week*** 




*26 Seconds* **Saved for Every Message Created****




*15+ Million* **Actions Automated in 2025**

* Average from 2024 survey of 343 AppFolio Realm-X users
** Estimated average from customer-usage data


2025 © AppFolio

appfolio

# realm·X Performers

- Leasing
- Maintenance
- Resident

AppFolio Realm-X Resident Messenger Performer is currently being piloted with select customers

*BUILD* THE PLATFORM → *STORE* THE DATA → *DO* THE WORK → ***CREATE* THE VALUE** → *UNIFY* THE EXPERIENCE → *DRIVE* THE ECONOMICS → *POWER* THE FUTURE




 2025 © AppFolio

appfolio


foliospace Unifying the Resident Experience
PM JOURNEY
RESIDENT JOURNEY
ATTRACT
We're marketing & generating quality/trusted leads
I'm looking for a place to call "home"
DISCOVER
Zillow
QUALIFY
We're processing and screening applicants
ID Verification
I'm applying for this rental
APPLY
ONBOARD
We're closing the lease and securing a commitment
We're welcoming new residents & ensuring a seamless move-in experience
foliospace
Let's Get You Moved In!
I'm signing my lease and paying deposits
I'm moving in and setting my space up the way I like it
SIGN & MOVE-IN
second nature
LiveEasy
MANAGE
We're providing services, collecting rent, & maintaining retention
Your work order number is: #823-1. Someone from 'A+ Plumbing' will contact you soon to schedule a time to resolve the issue.
I'm living in a hassle-free and comfortable space & I feel supported
LIVE
RETAIN
We're driving renewals and managing turnover
I'm deciding whether to stay or move out
RENEW
40
2025 © AppFolio
Investor Meeting - November 18, 2025
appfolio


Delivering Value During Resident Onboarding
PM JOURNEY
RESIDENT JOURNEY
ATTRACT
We're marketing & generating quality/trusted leads
I'm looking for a place to call "home"
DISCOVER
QUALIFY
We're processing and screening applicants
ID Verification
I'm applying for this rental
APPLY
ONBOARD
We're closing the lease and securing a commitment
We're welcoming new residents & ensuring a seamless move-in experience
foliospace
Let's Get You Moved In!
I'm signing my lease and paying deposits
I'm moving in and setting my space up the way I like it
SIGN & MOVE-IN
MANAGE
We're providing services, collecting rent, & maintaining retention
I'm living in a hassle-free and comfortable space & I feel supported
LIVE
RETAIN
We're driving renewals and managing turnover
I'm deciding whether to stay or move out
RENEW
Millions
of residents move in every year
41
2025 © AppFolio
Investor Meeting - November 18, 2025
appfolio


2:21
Let's get you moved in
Complete these tasks to get you set up smoothly to move in
Sign your lease
Review move-in charges
Confirm insurance coverage
Confirm utilities
Resident Onboarding




+ folioguard

appfolio + second nature®

**Helping customers improve the resident experience and create new revenue streams with Resident Onboarding Lift, powered by Second Nature.**

| RESIDENT | PROPERTY MANAGER | INVESTOR |
|---|---|---|
| Receive convenient benefits, cost savings, and an improved quality of life. | Generate ancillary revenue & deliver value to residents without adding more work. | Reduce maintenance costs, increase retention, & stand out from their competition. |

# Resident Messenger Performer

### RESIDENT TO PM

Can my late fee be waived?

PM Just now

Hi Jordan, we're happy to grant you a one-time waiver. The charge has been removed.

### PERFORMER ESCALATIONS

AI Concierge 12 mins ago

Hey there 👋 how can I help you?

Can my late fee be waived?

I can check with your Property Manager on that. Are there any other details you'd like to include before I send the request?

Carol has entered the chat

PM Carol Just now

Hi Jordan, we're happy to grant you a one-time waiver. The charge has been removed.

### AUTOMATED DECISIONS

AI Concierge Just now

Hey there 👋 how can I help you?

Can my late fee be waived?

Good news, you're eligible for a one-time late fee removal, and it's all taken care of.

### PROACTIVE

AI Concierge 3 mins ago

Hi Jordan, just a quick reminder that your June rent of **$1320 is past due**.

Pay Now

Can I setup a payment plan?

No problem, I can split that into two payments:

📅 Payment Plan

- Today: $660
- Aug 15: $660

Want me to set that up?

AppFolio Realm-X Resident Messenger Performer is currently being piloted with select customers


Value Added Services
GROW VALUE FOR RESIDENTS AND PROPERTY MANAGERS
Review Your Services
Resident Onboarding Lift
FolioGuard
GROW OCCUPANCY
Leasing Signals
ID Verification
FolioScreen
Premium Listings
Zillow Listing Spotlight
Sites
GROW PAYMENTS IMPACT
Receivables
This bill from Eastside Electricity for $2,100.00 has been recorded.
Payables
AvidPay
ACTION THE WORK
Realm-X Performers
Leasing CRM
45
2025 © AppFolio
Investor Meeting - November 18, 2025
appfolio


5 days
Vacancy Time Reduced*
20%
Increased Renewal Rates*
2.8%
Increased Net Operating Income*
Unified Experience
System of Growth
System of Action
System of Record
AI-Native Architecture
appfolio
Performance Platform
* Averages from 2025 survey of 120 AppFolio Realm-X Flows users
appfolio
46
2025 © AppFolio

Deliver Performance Efficiently:

# Go-to-Market Strategy

**Lisa Horner** Chief Marketing Officer

47

appfolio

# Our Brand Is a *Differentiator* for AppFolio



# *Differentiated* Brand & Customer Experiences Delivers Efficient Growth for AppFolio

ACQUIRE




ADOPT



GROW




RETAIN



ADVOCATE



# GTM Alignment & Insights Create *Efficient* Customer Acquisition

ACQUIRE | ADOPT | GROW | RETAIN | ADVOCATE

## Acquisition Market Segmentation




GTM Acquisition Playbooks by Segment + Common Goals Across GTM Functions

+40% Upmarket Acquisition Sales Capacity Since 2023

## Ideal Customer Profile Alignment




GTM Investments Prioritized By Highest Fit + Propensity to Buy Prospect Accounts

S&M Expense 13% of Revenue*

## Buyer Group Engagement




Personalized Value Plays by Buyer Group Stakeholder

80% Buyer Group Engagement With Top 500 Prospect Accounts

* 2025 represents YTD Q3-2025 as reported on October 30, 2025. Non-GAAP operating margin is a non-GAAP financial measure. Refer to the Appendix for an explanation of non-GAAP financial measures, and why we believe these measures can be useful, as well as a reconciliation of non-GAAP financial measures to the most comparable GAAP measures, where applicable.

 2025 © AppFolio 

appfolio

# *Ease of Use* Drives High Adoption & Customer Outcomes

ACQUIRE | **ADOPT** | GROW | RETAIN | ADVOCATE

### Product-Led Onboarding



Automating Onboarding Reduces Barrier to Switch + Decreases Time To Value

93% Onboarding Customer Satisfaction*

### AI & Agentic Product Experiences



Easy to Use Native Agentic Collaboration So Customers Build Thriving Communities

96% Use of AppFolio Realm AI Suite**

### Extended Value with Stack




Adoption & Customer Performance By Integrating Technology Customers Need

4M+ Units Connected | 84 Partners

* Represents the percentage of Upmarket new customers who rated their AppFolio migration experience a 9 or 10 via automated post-migration surveys since 1/1/25
** Internal data on percentage of customers that used AppFolio Realm AI features and capabilities in 2025

# We Win When Our *Customers Win*

ACQUIRE | ADOPT | **GROW** | RETAIN | ADVOCATE

## Revenue Potential Segmentation




GTM Growth Playbooks by Segment + Common Goals Across GTM Functions

+11% ARPU Growth from Prior Year*

## AI-Led Growth



Transforming Unstructured Customer Data Into Proactive Growth Outcomes

47% Customers Engaged Via Automation

## Value Added Services & Upsell




Driving Customer Outcomes Underpins Monetization Strategy

+50% Growth Sales Capacity Since 2023

*YTD 2025 ARPU is an approximate based YTD annualized actual results through September 30, 2025

# Service Excellence at *Every* Touchpoint

ACQUIRE | ADOPT | GROW | **RETAIN** | ADVOCATE

## AI In-App Assistance



Our Customers Get Agentic Assistance within our Platform

59% Support Interactions Handled by AI

## Real Customer Performance



As we *Do The Work* in Real Estate AppFolio Customers Perform

Realm-X Users Save 10.3 Hours Per Week*

## Customer Differentiation



When Customers Create Performance for Their Customers, We Are True Partners

Realm-X Flows Users See +20% Renewal Rates**

* Average from 2024 survey of 343 AppFolio Realm-X users
** Average from 2025 survey of 120 AppFolio Realm-X Flows users


2025 © AppFolio


appfolio

# Stories of Customer Performance Fuel Our *Efficient Growth*

ACQUIRE | ADOPT | GROW | RETAIN | **ADVOCATE**

## Real Stories of Success



We Break Through The AI Hype with Stories of Real Performance

56% of Managed Accounts Are Active Prospect References

## Community Multipliers




Users Connect to Share Best Practices Driving Community Led Growth

+28% YoY Community Engagements

## Our Reputation Is Built on Customer Success




Buyers Trust Authentic Customer Reviews & Ratings

Overall Leader, G2 Grid® for Property Management*

* G2 Grid for Property Management Software, AppFolio overall leader ranking as of 11/17/2025. Rankings are dynamic.

# We Deliver AppFolio & Real Estate *Performance* Efficiently

ACQUIRE




ADOPT



GROW




RETAIN



ADVOCATE



# AppFolio Customer Panel

**Stacy Holden** Vice President & Industry Principal

appfolio

# Hello to our Customers!



**Rob Gayle**
**President**
Dream. Live. Prosper Communities



**Tony Julianelle**
**CEO, Partner**
Atlas Real Estate



**Josh Winch**
**President**
Focus Property Management



**Stacy Winship**
**Executive Vice President**
Fairgrove Property Management

DREAM. LIVE. PROSPER. Communities



# Rob Gayle

**President**

St. Augustine, FL

9,900 Units
Multifamily, Single Family, Commercial

+

**Customer Since 2017**

Max

**Investment Manager**
folioscreen
**Sites**
stack
**Payments**
folioguard
**Realm-X Flows, Assistant, Messages**
**Realm-X Maintenance Performer** Beta
**Collections**
**Premium Leads**
**Leasing Signals, Leasing CRM**

 2025 © AppFolio 

appfolio

ATLAS REAL ESTATE



# Tony Julianelle

**CEO, Partner**

Denver, CO

5,475 Units
Single-Family, Multifamily,
Build-to-Rent, Commercial

\+

**Customer Since 2015**

Max IM

folioscreen

**Sites**

**Payments**

folioguard

**Realm-X Flows, Assistant, Messages**

**Collections**

**Premium Leads**

**Automated AP**

 2025 © AppFolio 

appfolio

FOCUS



# Josh Winch
**President**

Kaukauna, WI

6,161 Units
Multifamily, Single Family, Commercial

+

**Customer Since 2019**

Plus

folioscreen
**Sites**
**Payments**
folioguard
**Realm-X Flows, Assistant, Messages**
**Procurement**
**Collections**
**Premium Leads**

FAIRGROVE



# Stacy Winship

**Executive Vice President**

Irvine, CA

9,080 Units
Multifamily, Single Family

\+

**Customer Since 2018**

**Max**

folioscreen

**Sites**

**Payments**

**Realm-X Flows, Assistant, Messages**

**Realm-X Maintenance Performer** Beta

**Collections**

**Premium Leads**

**Leasing Signals, Leasing CRM**

 2025 © AppFolio  appfolio

AppFolio Customer Panel

# Thank You,
# AppFolio Customers!

appfolio

# Financial Overview

**Tim Eaton**
Chief Financial Officer

63

# Delivering *Shareholder* Value

## Financial Priorities

### REVENUE GROWTH

- Drive **unit growth** through new business and customer expansion
- Accelerate **premium tier** and **value added services** adoption
- Scale **resident** industry segment

### MARGIN EXPANSION

- Prioritize **profitable** revenue growth
- Continued **operational discipline** across S&M, R&D, and G&A
- Invest in **highest-ROI** opportunities

### CAPITAL ALLOCATION

- Prioritize **organic growth** while thoughtfully considering **inorganic opportunities**
- Maintain **financial flexibility** with appropriate liquidity
- Execute opportunistic **share repurchases** to drive long-term shareholder value

**Growing Operating Cash Flow Per Share**

* Operating Cash Flow is a GAAP metric. Operating cash flow per share defined as operating cash flow divided by diluted weighted average common shares outstanding.

 2025 © AppFolio 

appfolio

# Delivering *Shareholder* Value

## Financial Priorities

**REVENUE GROWTH**

- Drive **unit growth** through new business and customer expansion
- Accelerate **premium tier** and **value added services** adoption
- Scale **resident** industry segment

**MARGIN EXPANSION**

- Prioritize **profitable** revenue growth
- Continued **operational discipline** across S&M, R&D, and G&A
- Invest in **highest-ROI** opportunities

**CAPITAL ALLOCATION**

- Prioritize **organic growth** while thoughtfully considering **inorganic opportunities**
- Maintain **financial flexibility** with appropriate liquidity
- Execute opportunistic **share repurchases** to drive long-term shareholder value

**Growing Operating Cash Flow Per Share**

* Operating Cash Flow is a GAAP metric. Operating cash flow per share defined as operating cash flow divided by diluted weighted average common shares outstanding.


Consistent
Revenue
Growth
CAGR
26%
$472M
$620M
$794M
$948M
2022
2023
2024
2025*
* 2025 revenue of $948M is the full-year midpoint guidance provided on October 30, 2025.
appfolio
66
2025 © AppFolio
Investor Meeting - November 18, 2025

# *Growing* Units

Prioritizing Residential Unit Acquisition




* 2025 represents units under management as of September 30, 2025.

 2025 © AppFolio 

appfolio


Growing
ARPU
Through value added services adoption
Value Added Services ARPU
Core ARPU
Value Added CAGR 21%
$66
$78
$93
$103
2022
2023
2024
YTD 2025*
* YTD 2025 ARPU is an approximate based YTD annualized actual results through September 30, 2025.
68
2025 © AppFolio
Investor Meeting - November 18, 2025
appfolio

# *Growing* ARPU

Through premium tier adoption

Max Tier Units
Plus Tier Units
Core Tier Units





2025 © AppFolio


appfolio

# Long Runway for Future ARPU *Growth*




* ARPU is based on 2025 YTD annualized actual results through September 30. 2025.


2025 © AppFolio

appfolio

# Innovating for Future ARPU *Growth*




**Significant**
Long-term
ARPU
Potential

*Resident*
*Investor*
*Realm-X*
*Realm-X Performers*
*Residential Mixed Portfolio*
*Premium Tiers*
*AppFolio Stack*
*Other Value Added Services*
*…*

# Delivering *Shareholder* Value

## Financial Priorities

**REVENUE GROWTH**

- Drive **unit growth** through new business and customer expansion
- Accelerate **premium tier** and **value added services** adoption
- Scale **resident** industry segment

**MARGIN EXPANSION**

- Prioritize **profitable** revenue growth
- Invest in **highest-ROI** opportunities
- Continued **operational discipline** across S&M, R&D, and G&A

**CAPITAL ALLOCATION**

- Prioritize **organic growth** while thoughtfully considering **inorganic opportunities**
- Maintain **financial flexibility** with appropriate liquidity
- Execute opportunistic **share repurchases** to drive long-term shareholder value

**Growing Operating Cash Flow Per Share**

* Operating Cash Flow is a GAAP metric. Operating cash flow per share defined as operating cash flow divided by diluted weighted average common shares outstanding.

# *Prioritizing* Profitability

Investing in profitable revenue growth while delivering operational efficiencies




* 2025 represents the mid-point of 2025 annual guidance as reported on October 30, 2025. Non-GAAP operating margin is a non-GAAP financial measure. Refer to the Appendix for an explanation of non-GAAP financial measures, and why we believe these measures can be useful, as well as a reconciliation of non-GAAP financial measures to the most comparable GAAP measures, where applicable.

 2025 © AppFolio 

appfolio

# *Optimizing*
# Cost of Revenue

Balancing product mix, COR operational efficiencies, and early scaling of profitable revenue growth




* 2025 represents YTD Q3-2025 as reported on October 30, 2025. Non-GAAP operating margin is a non-GAAP financial measure. Refer to the Appendix for an explanation of non-GAAP financial measures, and why we believe these measures can be useful, as well as a reconciliation of non-GAAP financial measures to the most comparable GAAP measures, where applicable.

 2025 © AppFolio 

appfolio

# *Continued* Operational Discipline

Across G&A, R&D, and S&M




* 2025 represents YTD Q3-2025 as reported on October 30, 2025. Non-GAAP operating margin is a non-GAAP financial measure. Refer to the Appendix for an explanation of non-GAAP financial measures, and why we believe these measures can be useful, as well as a reconciliation of non-GAAP financial measures to the most comparable GAAP measures, where applicable.

 2025 © AppFolio 

appfolio

# *Improving* Revenue Per Employee

Through operational leverage




* 2025 represents ending employee count as of September 30, 2025 and trailing 12 months of revenue.


2025 © AppFolio

appfolio

# Delivering *Shareholder* Value

## Financial Priorities

**REVENUE GROWTH**

- Drive **unit growth** through new business and customer expansion
- Accelerate **premium tier** and **value added services** adoption
- Scale **resident** industry segment

**MARGIN EXPANSION**

- Prioritize **profitable** revenue growth
- Invest in **highest-ROI** opportunities
- Continued **operational discipline** across S&M, R&D, and G&A

**CAPITAL ALLOCATION**

- Prioritize **organic growth** while thoughtfully considering **inorganic opportunities**
- Maintain **financial flexibility** with appropriate liquidity
- Execute opportunistic **share repurchases** to drive long-term shareholder value

**Growing Operating Cash Flow Per Share**

* Operating Cash Flow is a GAAP metric. Operating cash flow per share defined as operating cash flow divided by diluted weighted average common shares outstanding.

# Capital Allocation *Priorities*

## ORGANIC REVENUE GROWTH

### Research & Development

R&D investment in capabilities to deliver value to customers, win new units, and expand ARPU

- System of Growth
- System of Action
- System of Record
- AI-Native Architecture

realm stack foliospace

Accounting | Mixed Portfolios | Reporting & Permissions

### Sales & Marketing

Sales and Marketing investment to drive new customer acquisition and customer growth

ACQUIRE · ADOPT · GROW · RETAIN · ADVOCATE

FUTURE · NARPM · NAA

Ad & Promo | Sales Capacity

### General & Administrative

Functional investment to deliver performance efficiently, enhance security, and ensure compliance

Information Security | Compliance & Governance | Internal Systems & Processes

## INORGANIC GROWTH

### M&A and Minority Investments

Accelerating our vision to own moments that matter and be the platform where real estate comes to do business

LiveEasy · second nature

## CAPITAL RETURN & SHAREHOLDER VALUE

### Share Repurchases

Opportunistically repurchase shares to drive long-term shareholder value and manage dilution

**689K**
Shares repurchased 2025 YTD

# Delivering *Shareholder* Value

## Financial Priorities

### REVENUE GROWTH

- Drive **unit growth** through new business and customer expansion
- Accelerate **premium tier** and **value added services** adoption
- Scale **resident** industry segment

### MARGIN EXPANSION

- Prioritize **profitable** revenue growth
- Continued **operational discipline** across S&M, R&D, and G&A
- Invest in **highest-ROI** opportunities

### CAPITAL ALLOCATION

- Prioritize **organic growth** while thoughtfully considering **inorganic opportunities**
- Maintain **financial flexibility** with appropriate liquidity
- Execute opportunistic **share repurchases** to drive long-term shareholder value

**Growing Operating Cash Flow Per Share**

* Operating Cash Flow is a GAAP metric. Operating cash flow per share defined as operating cash flow divided by diluted weighted average common shares outstanding.

# *Growing* Operating Cash Flow Per Share




* 2025 represents three quarters of results through September 30, 2025. Prior years represent full year results.

# Strategic Pillars



Differentiate to Win



Deliver Performance Efficiently



Great People & Culture

 2025 © AppFolio 

appfolio

Vision

# To *power* the future of real estate.

 2025 © AppFolio 

appfolio

# Appendix

appfolio

# Definitions of Measures and Metrics and Why They Matter

| METRIC NAME | DEFINITION | WHY IT MATTERS |
|---|---|---|
| ARPU | Annualized average revenue per unit. Recurring revenue (Core revenue + Value added services revenue) divided by average ending units under management for the specified period. | Provides insight into how much revenue recognized, on average, from each unit in a given period. |
| Customers | Customers which have an entitlement to an APM Core, Plus, or Max subscription at the end of the specified period. | Indicates our market penetration, the growth of our business, and our potential future business opportunities. |
| Non-GAAP Operating Margin | Operating margin is defined as income (loss) from operations, less stock-based compensation, amortization of stock-based compensation capitalized in software development, amortization of intangibles and other non-recurring items. | Serves as a non-GAAP financial measure of profitability. |
| Operating Cash Flow per Share | Operating cash flow per share is defined as operating cash flow divided by diluted weighted average common shares outstanding | Reflects the underlying economic engine of our business, encompassing our efforts to drive revenue growth and deliver non-GAAP operating margin improvement, while managing dilution. |
| Residential Units | Includes single-family, multi-family, student, and affordable rental units. | Demonstrates our market for AppFolio Property Management Solution products. |
| Community Associations Units | Includes condominium owners' associations who manage common structures with multiple units, such as apartments and townhomes and homeowner associations who oversee single-family homes in planned developments, usually made up of individual lots and homes. | Demonstrates our market for AppFolio Property Management Solution products. |
| Units | Number of ending units under management which have an entitlement to an APM Core, Plus or Max subscription at the end of the specified period. | Indicates our our market penetration, the growth of our business, and our potential future business opportunities. |
| Revenue Per Employee | Annualized average revenue per employee. Total revenue divided by ending full time equivalents for the specified period. Expressed in thousands. | Measures workforce efficiency and demonstrates our ability to convert our people and their capital into revenue. |

# GAAP to Non-GAAP *Reconciliation*

| OPERATING MARGIN | 2022 | 2023 | 2024 | YTD 2025 |
|---|---|---|---|---|
| GAAP income (loss) from operations as a percentage of revenue | (15.3%) | 0.2% | 17.1% | 15.6% |
| Stock-based compensation expense as a percentage of revenue | 8.7% | 8.4% | 7.6% | 7.9% |
| Amortization of stock-based compensation capitalized in software development costs as a percentage of revenue | 0.5% | 0.4% | 0.2% | 0.1% |
| Impairment, net as a percentage of revenue | 4.7% | — % | — % | — % |
| Amortization of purchased intangibles as a percentage of revenue | 0.9% | 0.4% | 0.3% | 1.1% |
| CEO separation costs payment as a percentage of revenue | — % | 1.9% | — % | — % |
| Gain on lease modification as a percentage of revenue | — % | (0.7%) | — % | — % |
| Severance payments for workforce reduction as a percentage of revenue | — % | 1.8% | — % | — % |
| **Non-GAAP operating margin as a percentage of revenue** | **(0.6%)** | **12.2%** | **25.2%** | **24.7%** |

 2025 © AppFolio 

appfolio

# GAAP to Non-GAAP *Reconciliation*

## *COR*

| EXPENSES | 2022 | 2023 | 2024 | YTD 2025 |
|---|---|---|---|---|
| GAAP COR expense as a percentage of revenue | 40.7% | 38.4% | 35.5% | 36.3% |
| Stock-based compensation expense as a percentage of revenue | (0.6%) | (0.6%) | (0.6%) | (0.6%) |
| Severance payments for workforce reduction as a percentage of revenue | — % | (0.3%) | — % | — % |
| **Non-GAAP COR expense as a percentage of revenue** | **40.1%** | **37.4%** | **34.9%** | **35.7%** |


2025 © AppFolio

appfolio

# GAAP to Non-GAAP *Reconciliation*

## *S&M*

| OPERATING EXPENSES | 2022 | 2023 | 2024 | YTD 2025 |
|---|---|---|---|---|
| GAAP S&M expense as a percentage of revenue | 22.8% | 17.3% | 13.9% | 14.8% |
| Stock-based compensation expense as a percentage of revenue | (1.8%) | (1.0%) | (1.0%) | (1.3%) |
| Severance payments for workforce reduction as a percentage of revenue | — % | (0.5%) | — % | — % |
| **Non-GAAP S&M expense as a percentage of revenue** | **20.9%** | **15.8%** | **12.9%** | **13.4%** |

# GAAP to Non-GAAP *Reconciliation*

## *R&D*

| OPERATING EXPENSES | 2022 | 2023 | 2024 | YTD 2025 |
|---|---|---|---|---|
| GAAP R&D expense as a percentage of revenue | 23.5% | 24.4% | 20.2% | 20.6% |
| Stock-based compensation expense as a percentage of revenue | (3.4%) | (3.4%) | (3.2%) | (3.4%) |
| Severance payments for workforce reduction as a percentage of revenue | — % | (0.4%) | — % | — % |
| **Non-GAAP R&D expense as a percentage of revenue** | **20.2%** | **20.6%** | **17.0%** | **17.1%** |

# GAAP to Non-GAAP *Reconciliation*

## G&A

| OPERATING EXPENSES | 2022 | 2023 | 2024 | YTD 2025 |
|---|---|---|---|---|
| GAAP G&A expense as a percentage of revenue | 21.4% | 15.1% | 10.8% | 10.4% |
| Stock-based compensation expense as a percentage of revenue | (2.9%) | (3.5%) | (2.8%) | (2.6%) |
| CEO separation costs payment as a percentage of revenue | — % | (1.9%) | — % | — % |
| Gain on lease modification as a percentage of revenue | — % | 0.7% | — % | — % |
| Severance payments for workforce reduction as a percentage of revenue | — % | (0.3%) | — % | — % |
| Impairment, net as a percentage of revenue | (4.7%) | — % | — % | — % |
| **Non-GAAP G&A expense as a percentage of revenue** | **13.8%** | **10.1%** | **8.0%** | **7.8%** |

# GAAP to Non-GAAP *Reconciliation*

## *D&A*

| OPERATING EXPENSES | 2022 | 2023 | 2024 | YTD 2025 |
|---|---|---|---|---|
| GAAP D&A expense as a percentage of revenue | 7.0% | 4.7% | 2.5% | 2.5% |
| Amortization of stock-based compensation capitalized in software development costs as a percentage of revenue | (0.5%) | (0.4%) | (0.2%) | (0.1%) |
| Amortization of purchased intangibles as a percentage of revenue | (0.9%) | (0.4%) | (0.3%) | (1.1%) |
| **Non-GAAP D&A expense as a percentage of revenue** | **5.6%** | **3.9%** | **2.0%** | **1.3%** |

# Operating Cash Flow Per Share *Reconciliation*

| OPERATING CASH FLOW PER SHARE | 2022 | 2023 | 2024 | YTD 2025 |
|---|---|---|---|---|
| GAAP net cash provided by operating activities | $25.4M | $60.3M | $188.2M | $177.1M |
| Diluted Weighted Average Shares Outstanding | 35.0M | 36.4M | 36.8M | 36.4M |
| **Operating cash flow per share** | **$0.72** | **$1.66** | **$5.12** | **$4.87** |

Exhibit B

## December 2025 Tenant Insurance Tracking

**Tenants:** All

**Tenant Status:** Future and Current

**Tenant Type:** All

**Entities:** Active Properties

| Property | Unit | Tenant | Status | Insurance Expiration | Insurance Policy Number | Insurance Provider | Move-in | Lease To | Rent | Lease From |
|---|---|---|---|---|---|---|---|---|---|---|
| Sunrise Apartments - 777 6th Ave San Diego, CA 92101 | c | Hamilton, Amanda | Current | 12/09/2026 | 684736262 | Liberty Mutual | 12/21/2025 | 12/20/2026 | 2,495.00 | 12/21/2025 |
| 576 Grace Way - 576 Grace Way Santa Barbara, CA 93101 | 2 | Peters, Sam | Current | 12/09/2026 | 2345346345690 | State Farm | 12/15/2025 | 12/14/2026 | 1,000.00 | 12/15/2025 |
| 2696 T.Authority - 2696 Via Costina San Diego, CA 92173 | 2696 T.Authority | Myers, Sally | Current | 12/09/2026 | 2345723471 | Travelers | 12/15/2025 | 12/14/2026 | 2,400.00 | 12/15/2025 |
| Danjur Luxury Towers - 1669 Danjur Street San Diego, CA 92129 | 1006 | Evans, Brad | Current | 12/06/2026 | 34235066322 | Geico | 12/09/2025 | 12/31/2026 | 2,400.00 | 12/09/2025 |
| 104 Micheltorena - 104 Micheltorena Dr. Santa Barbara, CA 93101 | 104 Micheltorena | Smith, Jessica | Current | 12/01/2026 | 1234506932 | AAA | 12/03/2025 | 12/31/2026 | 1,500.00 | 12/03/2025 |
| Levi's Stadium - 4900 Marie P DeBartolo Way Santa Clara, CA 95054 | Sec 129 | Willis, Patrick | Current | 12/17/2025 | 555322q2345 | Geico | 09/01/2019 | 08/13/2026 | 800.00 | 09/01/2019 |
| Danjur Luxury Towers - 1669 Danjur Street San Diego, CA 92129 | 206 | Ross, Bob | Current | 12/05/2025 | er6w56734777 | USAA | 08/01/2019 | 07/31/2021 | 1,900.00 | 08/01/2019 |
| Danjur Luxury Towers - 1669 Danjur Street San Diego, CA 92129 | 105 | Castler, Cass | Current | 12/01/2025 | 345346e4574578 | Lemonade | 07/01/2019 | 01/31/2020 | 1,850.00 | 02/01/2019 |
| 453 Niagara - 453 Niagara St. Santa Barbara, CA 93101 | 453 Niagara | Hicks, Gregory | Current | 12/20/2025 | 552wry7w3r45t7 | AAA | 05/01/2014 | 04/09/2027 | 3,000.00 | 05/01/2014 |
| Danjur Luxury Towers - 1669 Danjur Street San Diego, CA 92129 | 1108 | Ramsey, Lauren | Current | 12/30/2025 | a435234677 | Assurant | 07/01/2010 | 06/04/2026 | 3,400.00 | 07/01/2010 |
| Figi Apartments - 4342 W San Ysidro Blvd San Diego, CA 92173 | 4 | Jersey, Albert | Current | 12/12/2025 | 523123451236 | AAA | 04/01/2009 | 08/13/2026 | 1,250.00 | 04/01/2009 |

**Total**

Exhibit C

Introducing Real Estate Performance Management. **Learn More.**

appfolio

Products Why AppFolio Resources Pricing Book a Free Demo


rms of Service

pFolio Property Manager Core

)verview
. Scope of services
. Modification of These Terms of ervice
. Customer Support
. Training
. Your Rights and Restrictions
. Term and Termination
. Fees
. Representations and Warranties; isclaimer
. Confidential Information and usiness Data
0. Indemnification
1. Limitation on Liability
2. Data Protection
3. Ownership Disputes
4. Customer Interactions
5. Third Party Products and ervices
6. General Provisions

pFolio Property Manager Plus

pFolio Property Manager Max

pFolio Property Manager Add-On Services

pFolio Investment Manager


# AppFolio Property Manager Core

Last updated: August 5, 2025

Welcome to AppFolio Property Manager Core! Please carefully review these AppFolio Property Manager Core Terms of Service (these "Terms of Service"), as they contain important information about your legal rights, remedies and obligations. By subscribing to or using any of our Services (as defined below), you are entering into a legally binding agreement with AppFolio, Inc. (also referred to as "AppFolio," "we," and "our") that gover your access to and use of the Services.

The agreement consists of (i) your order form and (ii) these Terms of Service, which incorporate by reference (a) the Add-On Service Terms for any Service to which you subscribe or use, including the AppFolio Value+ Terms, the AppFolio Tenant Screening Terms, the AppFolio Payments Terms, the AppFolio Sites Terms, the AppFolio Beta Terms and (b) any other terms or policies applicable to your use of the Services that we make available, such as through an online signup flow. Any terms contained in your order form will supersede these Terms of Service.

In addition, our Privacy Notice contains information on how we collect, use and share your personal informati for our own purposes. The Privacy Notice is not a part of these Terms of Service and may be changed from ti to time, but by agreeing to these Terms of Service, you acknowledge and consent to the collection, use, shar and disclosure of your personal information and data as described in our Privacy Notice, as may be modified from time to time.

## 1. Scope of services

We offer a hosted suite of property management software services, which include our property management software solution, AppFolio Property Manager Core, and Add-On services to which you may subscribe or use addition to your base subscription (collectively the "Services" and each a "Service").

Some Services are offered on a subscription basis, while others are made available per-use. To subscribe to c use a Service, you must sign an order form or complete the online sign-up flow, which identifies the Service, additional terms, and the fees payable for such Service. You may access and use the Service to manage and account for the real property units (collectively, the "Units" and each a "Unit"). If the Service is billed on a per unit basis, we will assess your Unit count at regular intervals and invoice you appropriately.

We reserve the right to modify the Services (or any part thereof) from time to time, and we are not liable to yo or to any third party for any modification of the Services.

**1.1 Intended Use**

The Services are designed and intended to be used for property management purposes in the United States. Your use of the Services for any other purpose or in any other manner is at your own risk and may be grounds for termination.

**1.2 No Legal Advice**

The Services contain features and tools designed to assist you in the operation of your business and are capable of being used to comply with certain of your regulatory or other legal obligations. Notwithstanding th foregoing, we do not make any representations or warranties that your use of the Services will satisfy or ensu compliance with any legal obligations or laws, rules, or regulations. AppFolio does not provide legal advice ar is not engaged in the practice of law. We encourage you to consult with your legal counsel before utilizing an of the Services that may have legal ramifications.

**1.3 Expanding the Services**

You may subscribe to or use additional Services and add additional databases. These additions may be subje to eligibility and your execution of an order form or completion of an additional online sign-up flow. All new Services are subject to these Terms of Service.

**1.4 Migration of Data**

Promptly following your initial subscription to the Services, we will coordinate and work with you to migrate certain of your data into the Services (referred to as "Onboarding"). You will be responsible for providing data a format deemed acceptable to us and will provide materials and reasonable assistance for the migration of your data. You represent and warrant that you are the rightful owner of your data and have the requisite authority to perform the migration of such data. You will retain all right, title and interest in and to your data.

Together, we will mutually agree upon a date by which Onboarding will be completed and your access to the Services will go live (the "Go-Live Date"). If it becomes necessary to move back your Go-Live Date, we will mutually agree on a new date. But if the Go-Live Date is moved more than once due to your failure to provide us with the requested data, information, or assistance required to complete such onboarding, we reserve the right to charge you an additional Onboarding Fee (as defined below). You must complete migration of your da before receiving access to the Services.

In some instances, changes to your business may require setting up a new database and/or migrating the da within the existing database; for example, a change of your business name, tax identification number, or business structure. If Such a "Re-Migration" is necessary we will charge an additional one-time non-refundab Onboarding Fee for setting up a new database and/or migrating the data within the existing database. We wi help determine the optimal plan for Re-Migration based upon the individual situation. Additional Onboarding Fees are non-refundable and due and payable by you on the date of invoice.

**1.5 Set-Up and Configuration**

You are solely responsible for determining the appropriate set-up and configuration of the Services. In the event you request our assistance in the set-up or configuration of the Services, without in any way limiting Section 8.2, we make no representations or warranties with respect to any changes we may make or work we may perform on your behalf and at your request.

# 2. Modification of These Terms of Service

We work constantly to improve our Services with updates, new features, and new services. And we may need change these Terms of Service from time to time to accurately reflect our Services and practices. If we do, those revised Terms of Service will supersede prior versions. Unless we say otherwise, changes will be effecti upon the "Last Updated" date located at the top of this page. We agree that changes cannot be retroactive. W will provide you advance notice of any material changes to these Terms of Service. For any other changes, we will publish the revised Terms of Service and update the "Last Updated" date above. We hope that you will continue to use our Services, but if any change has a negative material impact on your business and you obje to such changes, you may terminate your subscription to the Services without penalty and in accordance wit the terms herein. Your continued use of the Services after we modify these Terms of Service constitutes your acceptance of any revisions.

# 3. Customer Support

We will use commercially reasonable efforts to provide complimentary technical support services to you and your authorized users of the Services. Our standard support is available Monday through Friday from 8:00 a.ı - 8:00 p.m. Eastern Time, excluding major holidays, which include Memorial Day, Independence Day, Labor D Thanksgiving, Christmas, and New Year's Day.

# 4. Training

We will make training materials and sessions available to you and your authorized users. These include tutorials, which are accessible via the Help Articles and Training Sessions sections of our website at no additional charge. If you purchase custom training, the hours must be used within 90-days of contract signin or 90-days of your Go-Live date, whichever comes second. Custom training fees are considered Service Fee and are non-refundable.

# 5. Your Rights and Restrictions

**5.1 Authorization to Use the Services**

Subject to (i) your timely payment of all fees set forth in the order form or online sign-up flow and (ii) your compliance with these Terms of Service, we authorize you to use (and permit your authorized users to use) th Services to which you have subscribed.

**5.2 Authorized Users**

You (i) are responsible for your authorized users' compliance with these Terms of Service, and (ii) will use commercially reasonable efforts to prevent unauthorized access to or use of the Services. If the authorized status of a user changes, it is your responsibility to promptly remove such user's access to the Services. Thir parties are not permitted to access or use the Services or any application programming interface we may ma available to you without our prior consent. Even if we provide prior consent for a third party to access or use Services, we disclaim all liability for any actions taken by that third party with respect to the Services, and yo assume all risk for any actions taken by that third party. We reserve the right to disable or delete access to th Services and any application programming interface for any of your authorized users to enforce these Terms Service or otherwise protect our interests.

**5.3 Your Responsibilities; Use of the Services In Compliance With Laws**

The Services contain various features, tools and workflows that assist you in the conduct of your business. W do not make any representations or warranties that your use of the Service will satisfy or ensure compliance with any legal obligations or applicable laws, rules, or regulations. For example, you may be able to use the Services to, among other things, text, email, and accept and make payments. Such activities can be highly regulated, and while we assist you in carrying out such activities, you are solely responsible for ensuring compliance with all applicable laws and regulations including, without limitation, the Fair Credit Reporting Ac Equal Credit Opportunity Act, the Fair Housing Act, Title VII of the Civil Rights Act of 1964, the Telephone Consumer Protection Act of 1991, and utility billing practices. You are responsible for all activities that occur under your account or by your authorized users. Without limiting the foregoing, you will (i) have sole responsibility for the accuracy, quality, integrity, legality, reliability, and appropriateness of all data that you submit to the Services; (ii) use commercially reasonable efforts to prevent unauthorized control or tampering any other unauthorized access to, or use of, the Services and notify us immediately of any unauthorized use security breach; (iii) comply with all applicable local, state, federal, and foreign laws (including laws regardin privacy and protection of personal or consumer information) in using the Services; and (iv) obtain and mainta

all computer hardware, software and communications equipment needed to access the Services in connectic with your use of the Services.

**5.4 Your Restrictions**

You may not, and you will ensure your authorized users do not, (i) disassemble, reverse engineer, decompile otherwise attempt to decipher any code in connection with the Services, or modify, adapt, create derivative works based upon, or translate the Services; (ii) license, sublicense, sell, rent, assign, distribute, time share transfer, lease, loan, resell for profit, distribute, or otherwise commercially exploit, grant rights in or make the Services or any content offered therein available to any third party; (iii) use the Services except as expressly authorized under these Terms of Service or in violation of any applicable laws; (iv) engage in any illegal or deceptive trade practices with respect to the Services; (v) circumvent or disable any security or other technic features or measures of the Services or any other aspect of the software or, in any manner, attempt to gain unauthorized access to the Services or its related computer systems or networks; (vi) use the Services to transmit infringing, obscene, threatening, libelous, or otherwise unlawful, unsafe, malicious, abusive or tortio material, or to store or transmit material in violation of third-party privacy rights; (vii) use the Services to stor or transmit any viruses, worms, time bombs, Trojan horses and other harmful or malicious code, files, scripts, agents or programs or to send spam or otherwise duplicative or unsolicited messages in violation of applicab laws; (viii) interfere with or disrupt the integrity or performance of the Services or third-party data contained therein; (ix) use any robot, spider, or other automated device, process or means to access, retrieve, scrape o index any portion of the Services; (x) reformat or frame any portion of the Services; or (xi) make available or otherwise provide all or any portion of the Services, our Confidential Information (as defined below), or any application programming interface we make available to you to any of our direct or indirect competitors.

Although we have no obligation to monitor your use of the Services, we may do so at our discretion and may prohibit any use of the Services we believe may be in violation of these Terms of Service or applicable laws a regulations.

**5.5 Reservation of Rights**

No other rights are granted except as expressly stated in these Terms of Service, and nothing herein conveys any rights or ownership or license in, or to, the Services or any underlying software or intellectual property. W own all rights, title and interest, including all intellectual property rights, in and to the Services and the underlying software, and any and all updates, upgrades, modifications, enhancements, improvements or derivative works thereof.

# 6. Term and Termination

**6.1 Term**

If a Service is subject to a term, the term will be set forth on the order form or in the online sign-up flow. Unle either party provides written notice of non-renewal at least thirty (30) days prior to the expiration of the curre term of a Service, the Service will automatically renew. Your base Service subscription will automatically rene for the same period as your initial term; and add-on services will automatically renew to become coterminous with your base subscription.

At least sixty (60) days prior to the expiration of your base Service Subscription, we will provide you with an updated order form reflecting the Services, rates, unit counts, and terms applicable to your next term. Any active addenda to your order form will remain incorporated and unchanged, unless replaced by a new addendum.

WRITTEN NOTICE OF NON-RENEWAL MUST BE SUBMITTED:

via email to: billing@appfolio.com

or via USPS or courier to: AppFolio, Inc.

70 Castilian Drive Santa Barbara, CA 93117

Case: 26-769, 04/07/2026, DktEntry: 11.4, Page 218 of 299

Attn.: Billing Department

**6.2 Termination**

Either party may terminate any subscription to Services (i) if the other party breaches any of its obligations under these Terms of Service and such breach is not cured within thirty (30) days of receipt of notice from th non-breaching party, or (ii) if the other party becomes insolvent or bankrupt, liquidated or is dissolved, or ceases substantially all of its business. Notwithstanding the foregoing, we may immediately terminate your subscription to the Services if: (a) you materially breach of these Terms of Service, as determined by us in ou sole and absolute discretion; (b) we reasonably believe that you are associated with conduct that is illegal, fraudulent, or that could otherwise cause a real risk of harm to us or others (whether financial, legal, busines or reputational harm); or (c) upon the request of any of our financial service providers. Upon termination of yo subscription, you will immediately discontinue all use of the Services, cease to represent that you are a user the Services, and destroy all our Confidential Information (as defined in Section 9 below) in your possession.

**6.3 Handling of Your Data in the Event of Termination**

You agree that following expiration or termination of any of your subscriptions to the Services, we may immediately deactivate the affected Services and that, following a reasonable period, we may delete your account and data. In the event you terminate your subscriptions, or allow them to expire, you are expected to retrieve your data prior to the termination or expiration. However, in the event that the Services are terminate by us, we will grant you temporary, limited access to the Services, not to exceed thirty (30) days, for the sole purpose of permitting you to retrieve your proprietary data, provided that you have paid in full all undisputed amounts owed to us. You further agree that we will not be liable to you or to any third party for any terminatic of your access to the Services or deletion of your data, provided that we are in compliance with the terms of this Section 6.3.

**6.4. Termination for Convenience; Early Termination Fee**

You have and may invoke an option terminate your subscription to the Services for convenience at any time b providing thirty (30) days' prior written notice and paying to us (a) any outstanding fees and (b) an early termination fee equal to fifty percent (50%) of the Service Fees (as defined below) payable for the remaining period of your subscription, calculated on a pro rata basis (the "Early Termination Fee"). You hereby expressly acknowledge and agree that we shall have the right to charge the Early Termination Fee to the payment meth associated with your AppFolio account. You will not be entitled to a refund of any pre-paid amounts under an circumstances.

# 7. Fees

**7.1 Service Fees**

You will pay certain non-refundable fees for the Services in the amount set forth on the order form or in the online sign-up flow (the "Service Fees") and according to the billing frequency stated therein. Service Fees a due and payable on the date of invoice and are non-refundable. Service Fees may be based on usage; the minimum amounts set forth in your order form; or the minimums for each Service. Unless set forth on your or form, we may increase the minimum amounts for a Service from time to time by providing you with no less th thirty (30) days advance notice.

For Services offered on a subscription basis, the rate of the Service Fees is fixed for the term of the subscription and may only be increased at renewal. For Services offered on a per-use basis, we may increase Service Fees from time to time by providing you with no less than thirty (30) days advance notice.

**7.2 Onboarding Fees**

You will pay certain non-refundable fees for onboarding and data migration in the amount set forth on the orc form,online sign-up flow, or as otherwise set forth in Section 1.4 (the "Onboarding Fees"). The Onboarding Fe are due and payable by you on the date of invoice. Onboarding Fees are non-refundable unless we fail to

complete the onboarding for reasons other than your failure to provide us with the requested data, informatic or assistance required to complete such onboarding.

**7.3 Additional Fees**

You may incur certain other non-refundable fees or charges based on your use of the Services in addition to those fees set forth on the order form or in the online sign-up flow (the "Additional Fees"). We will provide you with notice of any Additional Fees before they are incurred.

**7.4 Late Payments**

You acknowledge that your failure to pay any fees when due may result in suspension or termination of your subscription to the Service. If you fail to pay any of the fees or charges due hereunder, AppFolio reserves the right to, among other things, engage an attorney or a collections agency to collect the delinquent fees and charges. You agree to pay all fees and costs incurred by AppFolio in connection with the collection of such delinquent amounts, including without limitation, any and all court and related costs, attorneys' and/or collections agencies' fees plus interest in an amount equal to the lesser of 1.0% per month or the maximum rate permitted by applicable law.

**7.5 Taxes**

You are responsible for all sales tax, use tax, value added taxes, withholding taxes and any other similar taxe: and charges of any kind imposed by federal, state or local governmental entities on the transactions contemplated by these Terms of Service. When we have the legal obligation to pay or collect taxes for which you are responsible pursuant to this Section, the appropriate amount will be invoiced to and paid by you unle you provide us with a valid tax exemption certificate authorized by the appropriate taxing authority.

# 8. Representations and Warranties; Disclaimer

**8.1 Representations and Warranties**

You represent and warrant that (i) you have all necessary authority to enter into and perform your obligations under these Terms of Service without the consent of any third party or breach of any contract or agreement with any third party; and (ii) you will use the Services only for lawful purposes in accordance with these Term: of Service.

**8.2 Disclaimer of Warranties**

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, WE MAKE NO REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, IN LAW OR FROM A COURSE OF DEALII OR USE OF TRADE, AS TO ANY MATTER, INCLUDING THOSE OF MERCHANTABILITY, SATISFACTORY QUALITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. WE DO NOT WARRAN THAT THE SOFTWARE OR THE SERVICES WILL MEET ALL OF YOUR REQUIREMENTS OR THAT THE USE THE SOFTWARE OR THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE. THE SOFTWARE AND SERVICES ARE PROVIDED TO YOU ON AN "AS IS" BASIS AND YOUR USE OF SOFTWARE AND SERVICES I AT YOUR OWN RISK. WE HEREBY EXPRESSLY DISCLAIM ANY REPRESENTATIONS OR WARRANTIES THA YOUR USE OF THE SERVICES WILL SATISFY OR ENSURE COMPLIANCE WITH ANY LEGAL OBLIGATIONS OR LAWS, RULES OR REGULATIONS. THIS DISCLAIMER APPLIES TO BUT IS NOT LIMITED TO ANY FEDERAL OR STATE STATUTES OR REGULATIONS THAT MAY BE APPLICABLE TO YOU. YOU ARE SOLELY RESPONSIBLE FOR ENSURING THAT YOUR USE OF THE SERVICES IS IN ACCORDANCE WITH APPLICABI LAW.

IF YOU ARE DISSATISFIED WITH THE SERVICES OR THESE TERMS OF SERVICE, YOUR SOLE AND EXCLUSIVE REMEDY IS TO STOP USING THE SERVICES. NOTWITHSTANDING THE FORGOING, NOTHING THIS SECTION (SECTION 8.2) SHALL BE CONSTRUED TO LIMIT OR DEPRIVE EITHER PARTY OF A REMED THAT IS OTHERWISE EXPRESSLY PROVIDED FOR UNDER THESE TERMS OF SERVICE.

THE PARTIES EXPRESSLY ACKNOWLEDGE THAT THE DISCLAIMER OF WARRANTY CONSTITUTES AN

ESSENTIAL PART OF THE AGREEMENT BETWEEN THE PARTIES CONTAINED IN THESE TERMS OF SERVICE.

# 9. Confidential Information and Business Data

**9.1 Confidential Information**

Neither party shall disclose to any third party any information or materials provided by the other party hereunder and reasonably understood to be confidential ("Confidential Information") without the other party's prior written consent, except as otherwise expressly permitted under these Terms of Service; provided, however, AppFolio may use and disclose your Confidential Information (in accordance with our Privacy Notice as necessary to provide the Services. The foregoing restrictions do not apply to (i) any information that is in t public domain or already in the receiving party's possession, (ii) was known to the receiving party prior to the date of disclosure, (iii) becomes known to the receiving party thereafter from a third party having an apparen bona fide right to disclose the information, or (iv) Confidential Information that the receiving party is obligate to produce pursuant to a court order or a valid administrative subpoena, providing receiving party provides disclosing party of timely notice of such court order or subpoena (unless receiving party is legally precluded from providing such notice).

You agree to ensure that your authorized users keep all passwords and other access information to the Services in strict confidence.

Each party agrees that its violation of this Section 9.1 may cause irreparable injury to the other party, entitling the other party to seek injunctive relief in addition to all legal remedies.

**9.2 Your Business Data**

While it may not constitute personal information (use of personal information is addressed in our Privacy Notice), if you use the Services, we may access and use data you provide us related to your business and obtain other information related to your business, such as your bank account balance and transaction history ("Business Data") to provide, improve, develop, and market the Services. Some examples include providing customer service, data analytics, and sending you advertising materials. We do not share your Business Data with anyone except as necessary to provide our Services. Some examples include sharing Business Data with third-party service providers, legally required disclosures to courts or law enforcement, and sharing Business Data with our wholly owned subsidiaries. We aggregate and anonymize your Business Data to create industry reports, which may be made available or provided to the public. We do not and will not sell your Business Dat

This Section 9 will survive termination or expiration of your subscription to the Services.

# 10. Indemnification

**10.1 Our Indemnification**

We agree to defend, indemnify, and hold you harmless from and against all claims brought or threatened against you by a third party alleging that a provision of the Services as permitted hereunder infringes or misappropriates a third party copyright, trade secret, trademark or patent ("Infringement Claim"). If your use the Services has become, or in our opinion is likely to become, the subject of any Infringement Claim, we may at our option and expense: (i) procure for you the right to continue using the Services as set forth herein; (ii) modify the Services to make them non-infringing; or (iii) if the foregoing options are not reasonably practicab terminate your subscription to the Services and refund you any unused prepaid Service Fees. This Section 10 states your exclusive remedy for any claim by a third party alleging that the use of the Services as permitted hereunder infringes or misappropriates a third party copyright, trade secret, trademark or patent. The indemnification obligations in this Section will survive termination or expiration of your subscription to the Services.

**10.2 Limitations**

We have no liability or obligation with respect to any costs or damages claimed under Section 10.1 if the Infringement Claim arises out of or is in any manner attributable to (i) any modification of any Services by you (or any of your authorized users), or (ii) use of Services in combination with services and products not provid by AppFolio if such infringement would have been avoided without such modification or combination, or (iii) c compliance with your designs or instructions (each an "Excluded Claim").

**10.3 Your Indemnification**

You agree to defend, indemnify, and hold us and all our affiliates, employees, officers, directors, contractors, agents, licensors, successors and assigns (collectively, the "AppFolio Parties") harmless from any and all clair judgments, awards, demands, suits, proceedings, investigations, damages, costs, expenses, losses, and any other liabilities (including reasonable attorneys' fees, court costs and expenses) (collectively, "Costs") arising out of or relating to (i) your use of the Services in violation of these Terms of Service, (ii) an Excluded Claim, ( any actual or alleged breach by you of any representation, warranty, covenant or obligation under these Term of Service, or (iv) your gross negligence or willful misconduct. Your indemnification obligations under this Section 10.3 will survive any termination or expiration of your subscription to the Services.

**10.4 Conditions of Indemnification**

The indemnification obligations under this Section 10 above are conditioned upon (i) the indemnified party notifying the indemnifying party promptly in writing upon knowledge of any claim for which it may be entitled indemnification hereunder; (ii) to the extent applicable, the indemnified party ceasing use of the claimed infringing Services upon receipt of notice of an Infringement Claim; (iii) the indemnified party permitting indemnifying party to have the sole right to control the defense and settlement of any such claim (provided tl the indemnifying party may not settle any claim without the indemnified party's consent unless the settlemer unconditionally releases the indemnified party from all liability); (iv) the indemnified party providing reasonab assistance to the indemnifying party, at the indemnifying party's expense, in the defense of such claim; (v) th indemnified party not entering into any settlement agreement or otherwise settling any such claim without indemnifying party's express prior written consent or request (except as set forth in (iii) above); and (vi) the indemnified party complying with any settlement or court order made in connection with the claim (e.g., relat to the future use of any infringing materials). For clarity, the indemnified party may participate in the defense settlement of a claim with counsel of its own choice and at its own expense.

# 11. Limitation on Liability

EXCEPT IN CONNECTION WITH (I) EITHER PARTY'S INDEMNIFICATION OBLIGATIONS PURSUANT TO THIS AGREEMENT, (II) YOUR PAYMENT OBLIGATIONS PURSUANT TO SECTION 7 (FEES), (III) BREACH OF SECTION 5.3 (YOUR RESPONSIBILITIES), (IV) BREACH OF SECTION 5.4 (YOUR RESTRICTIONS), (V) BREACH OF SECTION 12 (DATA PROTECTION), OR (VI) AS OTHERWISE PROVIDED FOR IN THE TERMS OF ANY ADD-ON SERVICE TO WHICH YOU SUBSCRIBE OR USE, EACH OF OUR LIABILITY UNDER THESE TERMS OF SERVICE WILL BE LIMITED AS FOLLOWS:

TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY'S TOTAL LIABILITY ARISING OUT OF OR IN CONNECTION WITH THESE TERMS OF SERVICE IS LIMITED TO THE SUM OF THE AMOUNTS PAID BY YOU FOR THE SERVICES DURING THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE DATE THE CAUS OF ACTION AROSE.

TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER PARTY WILL BE RESPONSIBLE FOR LOST PROFITS, REVENUES, DATA, FINANCIAL LOSSES,OR INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY PUNITIVE OR INCIDENTAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE SERVICES OR THESE TERMS OF SERVICE. IN ALL CASES NEITHER PARTY WILL BE LIABLE FOR ANY LOSS OR DAMAGI THAT IS NOT REASONABLY FORESEEABLE.

BECAUSE SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATION MAY NOT APPLY TO YOU, IN WHIC

CASE OUR LIABILITY SHALL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY LAW.

## 12. Data Protection

**12.1 Your Obligations**

You will comply with all applicable privacy, data protection, anti-spam and other laws, rules, regulations and guidelines relating to protection, collection, use and distribution of Personal Information (as defined below). I required by applicable data protection legislation or other law or regulation, you will inform third parties that you are providing their Personal Information to us for processing and will ensure that any required third partie have given their consent to such disclosure and processing. "Personal Information" means any information th identifies, relates to, describes, or can be reasonably associated with or traced to, directly or indirectly, an individual or household, including an individual's name, address, telephone number, e-mail address, credit ca information, social security number or other similar specific factual information, regardless of the media on which such information is stored (e.g., on paper or electronically).

**12.2 Service Provider Certification**

This Section 12.2 applies only where, and to the extent that, AppFolio processes Personal Information that is subject to the California Consumer Privacy Act ("CCPA") on your behalf as a service provider (as defined in th CCPA) in the course of providing the Services. AppFolio shall not (i) sell (as defined in the CCPA) any Person Information; (ii) retain, use, or disclose any Personal Information for any purpose other than for the specific purpose of performing the Services, including retaining, using, or disclosing any Personal Information for a commercial purpose (as defined in the CCPA) other than for such specific purpose; or (iii) retain, use, or disclose any Personal Information outside of the direct business relationship between AppFolio and you. AppFolio certifies that it understands and will comply with the restrictions set out in this Section 12.2.

## 13. Ownership Disputes

Ownership of a database associated with the Services is sometimes disputed between one or more parties. While we will have no obligation to do so, we reserve the right, at any time and in our sole discretion, with or without notice to you, to determine rightful database ownership and to transfer a database to the rightful owner. If we can't reasonably determine the rightful owner, we reserve the right to suspend access to a database until the disputing parties reach a resolution. We also may request joint instructions or certain documentation from the disputing parties, such as a government-issued photo ID, a credit card invoice or a business license, to help determine the rightful owner.

## 14. Customer Interactions

**14.1 Customer Research**

We frequently engage with our customers, and may engage with our customers' customers or other third parties related to our customers, to understand how they interact with our Services and how to better develo our Services to meet their collective and ever-evolving needs. While transparency and candor are key to that process, you acknowledge and agree that you will not improperly use or disclose to us any confidential information or trade secrets of any third parties, and will not breach any obligation of confidentiality that you may have to any third party. You further acknowledge and agree that no jointly owned intellectual property sh be created as a consequence of our customer or third party engagement process or practices, and that AppFolio owns all right, title and interest in and to its intellectual property.

**14.2 Ownership of Feedback**

You and your authorized users may from time to time provide suggestions, comments, ideas or other feedbac ("Feedback") to us with respect to the Services. You agree that we are free to use, disclose, reproduce, licens or otherwise distribute and exploit the Feedback, entirely without obligation or restriction of any kind on account of intellectual property rights or otherwise.

**14.3 Services to Your Customers**

You acknowledge and agree that we may make certain services available directly to your tenants, homeowne or other customers; and may communicate with them regarding these services. These services, such as our Online Portal, payments offerings, and renters insurance,may be provided by us, through our licensed subsidiaries, and/or partners. Furthermore, any information that we make available to you about renters insurance is for informational purposes only and is not a solicitation or offer. You acknowledge and agree tha renters insurance is offered by AppFolio Insurance Services, Inc. ("AIS"), a licensed insurance producer, and n through AppFolio, Inc. Any questions regarding and requests to purchase renters insurance should be directe only to AIS.

# 15. Third Party Products and Services

**15.1 Third Party Products and Services**

The Services and our website may contain links to or integrations with products, services, and websites provided by third parties, which may include our affiliates or subsidiaries. You may choose to use such third party products or services in connection with the Services, including Third Party Applications (see Section 15 (AppFolio Stack Marketplace)), however, your receipt or use of any third party products, services or Third Par Applications, and the third parties' use or access to any of your data, is subject to a separate agreement between you and the third party provider. Once you enable or use third party products, services, or Third Par Applications in connection with the Services, you consent to us allowing that third party provider to access o use your data as required for the interoperation of their products and services with the Services. Such access and use by third party providers may include transmitting, transferring, deleting, or modifying your data, or storing your data on systems belonging to that third party provider and their vendors. You acknowledge and agree that this access and use of your data by a third party provider is subject to the applicable agreement between you and that third party provider. AppFolio makes no guarantee that any third party products, servic or Third Party Applications will work properly with the Services or that third party products, services, or Third Party Applications will continue to work with the Services as they change over time.

**15.2 AppFolio Stack Marketplace**

We provide a variety of integrations with third party products and services and the Services through our AppFolio Stack Marketplace ("Third Party Applications"). Third Party Applications are not AppFolio Services and remain subject to their own applicable third party providers' terms. We may enable interoperation of the Services with Third Party Applications as set forth in Section 15.1 above (Third Party Products and Services). We may, at any time, remove any Third Party Applications from the AppFolio Stack Marketplace and the third party providers may also update, modify, or remove their own applications at any time.

**15.3 Disclaimer of Liability**

AppFolio has no liability or responsibility whatsoever for any third party provider's websites, products, service or Third Party Applications, including their accuracy, reliability, availability, security, data handling, data processing, completeness, usefulness, or quality, even if AppFolio has reviewed, certified, or approved the product, service, or Third Party Application for use in connection with the Services. Use of third party websit products, services, or Third Party Applications is at your sole discretion and risk and you are solely responsib for your decision to permit any third party provider to use or access your data. The third party provider is sole responsible for ensuring that any information submitted through their websites, products, services, or Third Party Applications to the Services is accurate, complete, and correct. AppFolio is not responsible for the standards or business practices of any third party provider and WE DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR ANY THIRD PARTY WEBSITES, PRODUCTS, SERVICES, AND THIRD PARTY

APPLICATIONS (WHETHER SUPPORT, AVAILABILITY, SECURITY OR OTHERWISE) OR FOR THE ACTS OR OMISSIONS OF ANY THIRD PARTY PROVIDERS OR VENDORS.

# 16. General Provisions

**16.1 Independent Parties**

No joint venture, partnership, agency or employment relationship exists between you and AppFolio. You are solely responsible for managing your employees and for any and all compensation, taxes, benefits and liabilit to your employees and any of your other representatives or service providers.

**16.2 Assignment**

You will not assign or transfer the Services or any of your rights and/or obligations under these Terms of Service without our prior written consent. We may without restriction assign or transfer our rights and/or obligation hereunder, at our sole discretion. Subject to the foregoing, these Terms of Service will bind to the parties' respective successors and assigns.

**16.3 Force Majeure**

No failure, delay or default in performance of any obligation of a party will constitute an event of default or breach of these Terms of Service to the extent that such failure to perform, delay or default arises out of a cause that is beyond the control and without negligence of such party, including (but not limited to) natural disasters (e.g. lightning, earthquakes, hurricanes, floods); wars, riots, terrorist activities, and civil commotion a local exchange carrier's activities, and other acts of third parties; explosions and fires; embargoes, strikes, and labor disputes; governmental decrees; failures of telecommunications providers or internet service providers; and failures of third party suppliers, service providers or vendors. The party affected by such caus shall take all reasonable actions to minimize the consequences of any such cause.

**16.4 Applicable Law**

These Terms of Service and any dispute arising out of or relating to the Services and/or these Terms of Servi will be interpreted in accordance with the laws of the State of California, without regard to conflict-of-law provisions. All disputes arising out of or related to these Terms of Service shall be subject to the exclusive jurisdiction and venue of the California state courts located in Santa Barbara, California and federal courts o the Central District of California (unless we both agree to some other location). We each hereby expressly consent to the personal and exclusive jurisdiction of such courts.

**16.5 Notices**

You agree that we will provide notices, statements and other messages to you in the following ways: (i) withir the Service, or (ii) to the contact information you last provided us (e.g., e-mail, mobile number, physical address, etc.). You agree to keep your contact information up to date.

**16.6 No Waiver; Cumulative Remedies**

Either party's failure to enforce any right or provision under these Terms of Service will not constitute a waive of that right or provision. Except as expressly set forth in these Terms of Service, the exercise by either party any of its remedies under these Terms of Service are in addition to (and not exclusive of) any other remedies permitted at law or in equity.

**16.7 Severability**

If any provision of these Terms of Service is deemed invalid, then that provision will be limited or eliminated b the court to the minimum extent necessary, and the remaining provisions of these Terms of Service will remai in full force and effect.

**16.8 Entire Agreement**

The sole and entire agreement between you and us consists of (i) your order form and (ii) these Terms of Service, which incorporate by reference (a) the Add-On Service Terms for any Service to which you subscrib or use, including the AppFolio Value+ Terms, the AppFolio Tenant Screening Terms, the AppFolio Payments Terms, the AppFolio Sites Terms, the AppFolio Beta Terms and (b) any other terms or policies applicable to yo use of the Services that we make available, such as through an online signup flow. This agreement supersede all prior and contemporaneous oral or written understandings or agreements with AppFolio with respect to th Services. You acknowledge and agree that your agreement is not contingent upon the delivery of any future functionality or features not specified herein or in an order form or in the online sign-up flow, as applicable, o dependent upon any oral or written, public or private comments made by us with respect to future functionali or features for the Services.

**16.9 Export**

You understand and acknowledge that the Services may be subject to United States export control laws and regulations. You and your authorized users agree that: (i) you will comply with all applicable United States export control laws and regulations; (ii) you are not located within, or a resident of, any country or territory fo which the United States maintains export control laws and regulations, and trade and economic sanctions or embargoes; (iii) you will not use the Services from or in any territory that is subject to export and import laws and regulations, and trade and economic sanctions (currently including, but not limited to, Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, the Luhansk People's Republic region of Ukraine, and the Donets People's Republic of Ukraine); (iv) you are not a person on the List of Specially Designated Nationals and Blocked Persons, or any other list of sanctioned persons administered by the Office of Foreign Assets Contro or any other governmental entity; and (v) you will not use the Services for any purpose prohibited by applicab export control laws and regulations.

**16.10 Copyright Policy**

AppFolio respects the intellectual property rights of others, and asks that everyone utilizing the Services do t same. Anyone who believes that their work has been reproduced on the Services in a way that constitutes copyright infringement may notify us here.

**duct**

OPERTY MANAGEMENT

erview

rkflow Automation

sident Experience

counting & Reporting

rketing & Leasing

intenance

mmunication & Service

egrations & Partnerships

RE FROM APPFOLIO

estment Management

alm-X AI

hat's New

**Solutions**

Single-Family

Multifamily

Student Housing

Affordable Housing

Community Associations

Commercial

Investment Management

**Pricing**

Property Management

Investment Management

Book a Free Demo

Contact Us

**r Company**

o We Are

reers

ersity & Inclusion

estor Relations ↗

**Resources**

Blog

Events

Newsroom

Contact Us

**Why AppFolio**

Performance Method

Customer Experience

Customer Stories

Customer Trust

**Login**

Property Manager Login

Investment Manager Login

Resident Portal Login

Owner Portal Login

Vendor Portal Login

Investor Portal Login

025 AppFolio, Inc Privacy Notice ↗ Do Not Sell or Share My Personal Information ↗

Exhibit D

On Tue, Dec 9, 2025 at 8:05 PM Mike T. Brown <mtb@joinbeagle.com> wrote:

Hi AJ,

I wanted to quickly and personally address AppFolio's recent email about Beagle.

Our entire model is **built on positively disrupting the status quo** in a way that's better for property managers - more protection, more control, and more revenue. We are **committed to accurate representation, strict data protection, and responsible access.**

While AppFolio's message listed things a user *could* technically do in your account, we have **never** used access for anything outside of administering your compliance and protection program as instructed by you.

Here's what really matters:

1. **Our access was standard vendor access.**
   - The permissions we used (user logins to view data and help administer your program) are very common for vendors supporting AppFolio customers.
   - We only accessed what you explicitly allowed us to, to run compliance and protection programs on your behalf. See our Appfolio Data Access Statement here

2. **AppFolio is protecting its own product, not pointing out a problem with your setup.**
   - AppFolio has its own resident insurance product (Folioguard/SmartEnsure) with fixed limits and economics they control as a broker to a 3rd party carrier.
   - **Beagle is different:** you're working directly with the carrier, in partnership, with **better economics, more flexible protection options, and higher upside for your portfolio.**

3. **The "fix" is simple and already in motion.**
   - We can **continue to run your Beagle program using scheduled reports** from AppFolio instead of direct logins if you prefer. Appfolio has explicitly indicated in their email that these are ok.
   - In many cases, those reports are already set up - we just need to confirm they stay active.

**To make sure there's no lapse in your protections or revenue, your account manager (cc'd) will be reaching out to you directly via phone call and email to review your AppFolio setup and confirm the updated process.**

**Lastly, we'd love to send you a gift of appreciation for any confusion or concern this may have caused.**
Your account manager will arrange this when they reach out.

Thank you for your continued partnership,

--

logo
button

**Mike T. Brown**
Chief Executive Officer
(832) 489-3247
mtb@joinbeagle.com
joinbeagle.com
Salt Lake City | Atlanta

Brian Procel (Cal. Bar No. 218657)
Brian@Procel-Law.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@Procel-Law.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for Defendant*
*AppFolio, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,

Plaintiffs,

v.

APPFOLIO, INC., a California corporation,

Defendants.

Case No. 2:25-cv-12248-JFW-SSC

**DECLARATION OF NATE DELAGE IN SUPPORT OF APPFOLIO, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR AN EX PARTE TEMPORARY RESTRAINING ORDER; EXHIBIT A**

# DECLARATION OF NATE DELAGE

I, Nathaniel Delage, declare:

1. I make this declaration in support of AppFolio, Inc.'s ("AppFolio's") Opposition To Plaintiffs' Motion For An Ex Parte Temporary Restraining Order, based on personal knowledge. If called as a witness, I could and would testify competently hereto.

2. My job title is Director, Software Engineering, for AppFolio. I have been employed by AppFolio for approximately seven years and eleven months.

3. On December 9, 2025, AppFolio announced that it would shut down Plaintiffs' ("Beagle's") user accounts in AppFolio's customers' databases. I investigated Beagle's activity in AppFolio since that announcement. As detailed below, Beagle has changed the identifiers on approximately 60 of its user accounts to try to prevent AppFolio from finding and disabling Beagle's access.

## AppFolio's Database Security and Records

4. AppFolio offers a software platform for property managers called AppFolio Property Manager. When a property manager subscribes to AppFolio Property Manager, they receive a database that serves, among other things, as the system of record for their business.

5. The data and capabilities within a property manager's database are extremely sensitive. These include personally identifiable information about the property manager's residents, access to the property manager's bank accounts, and more. To keep that information secure, AppFolio maintains strict data isolation: each customer's data is stored in a unique database.

6. Within their database, property managers can create user accounts to give their employees access. For example, if a property manager has a staff-member who monitors rent payments through AppFolio, the property manager can create an account for that staff member to access the database and perform that function. Only the property manager (including its employees) is intended to have user-access to the property manager's database. The Terms of Service, in fact, prohibit the property manager from providing user-access to third parties without AppFolio's permission.[1] (See Saxena Decl. Exh. C.)

7. For security and auditing purposes, user accounts are assigned a permanent, unique identifier (User ID).

**Initial Investigation into Beagle Access**

8. Following customer reports that Beagle was asking AppFolio users to create user accounts for its employees, we began to investigate Beagle's access to and activities in our customer's databases. This investigation included queries of the user information contained within the property managers' database and the user actions stored within the data logs.

9. We began by scanning property manager databases for user accounts with email addresses containing keywords like "beagle." This search returned users with email addresses such as reports@beagleforpm.com. Once we identified these user accounts, we conducted further analysis to identify additional Beagle user accounts based on the pattern of actions the user account takes within a customer's database.

[1] Section 5.2 of the Terms of Service (Authorized Users) states: "Third parties are not permitted to access or use the Services or any application programming interface we may make available to you without our prior consent."

10. Through this analysis, we identified Beagle user accounts in over one hundred of our customers' databases. All of those accounts are in violation of AppFolio's Terms of Service.

**AppFolio's Response and Agreement to Wait**

11. On December 9, 2025, AppFolio informed only its customers who use Beagle that, consistent with our Terms of Service, we would disable our customers' Beagle user accounts on December 16, 2025. On December 15, 2025, AppFolio agreed not to disable those accounts until December 23, 2025.

**Beagle's Efforts to Hide its User Access**

12. On December 16, 2025, the day after AppFolio agreed to delay disabling customers' Beagle user accounts, we noticed a previously identified Beagle user account was missing from a customer's user list.

13. We queried the customer's AppFolio database. This revealed that the account had not, in fact, been removed. It still existed in the database, only the email address had been changed from reports@beagleforpm.com to support@portfoliopm.cc. In other words, ***the Beagleforpm.com email domain—the way AppFolio can most easily identify Beagle accounts in order to close them—had been changed.***

14. Typically, changes to the email address associated with a user account are made by the user themselves. To confirm that was the case here – that Beagle had changed the email address – we reviewed the User Account Audit Logs and Server Access Logs. These showed, conclusively, that Beagle (not the customer) had changed the email address to support@portfoliopm.cc.

15. Following this discovery, we queried all customer databases for previously identified Beagle User IDs. This search identified ***sixty Beagle user accounts with new email addresses, using eight different domain names.***[2] These domain names are largely generic and are, on their own, untraceable to Beagle. The domains are:

- pmportfolio.cc
- portfolioanalysis.cc
- portfolioreview.cc
- portfoliopm.cc
- fortwaynegroup.cc
- scheduledreports.info
- residentliability.com
- gmail.com

16. Each of these sixty user accounts changed their email address on or after December 9, 2025, the day AppFolio announced that it would soon disable Beagle accounts. And fifty-seven of the user accounts changed their email address on or after December 15, 2025, the day AppFolio agreed to delay their disablement. In other words, ***during the period in which AppFolio agreed to delay closing Beagle's accounts, Beagle tried to hide itself in AppFolio's system.***

[2] We have completed time-consuming forensic reviews on nineteen of these user accounts and have confirmed that for all nineteen, the Beagle user (not the property manager) changed the email address. I am confident the remaining forty-one will show the same.

17. We also conducted a domain registration analysis, which showed that seven of the eight new domain names were created on or after AppFolio agreed to delay disablement (gmail.com being the exception). The only conclusion I can draw from this is that Beagle created and used generic domain names for the specific purpose of concealing their presence and activity within our customers' databases.

18. If the customers' user accounts did not have a permanent User ID, and had we not already associated those User IDs with Beagle, we would not have been able to connect these generic email addresses to Beagle. Once Beagle becomes aware of this capability, I am concerned that they will find new ways to hide their accounts and activity within our customers' databases.

**Security Risks**

19. The changes to the email addresses also highlight one of the inherent risks in the manner Beagle accesses our customers' databases. As mentioned above, the database is designed so the customer can assign an individual user account to each of its individual employees. Those employees then have their own account, with their own password, and all of their individual actions are logged in the system. And when the employee leaves, the customer can simply delete the user accounts – permanently removing the former employee's access. The same is not true of Beagle's access.

20. Because the customer creates only one user account for Beagle, every Beagle employee accessing the customers' database shares that one user account. This presents multiple security risks.

21. First, by sharing one user account, actions taken by Beagle employees in the database are not traceable to any individual employee. This allows any bad-actor employee to act with anonymity, knowing their actions can only be tied to the shared user account – not them specifically.

22. Second, because Beagle employees share the one user account, they must also share the user account's password. This violates a base principle of cyber security and creates significant opportunity for compromised access to the database. For example, if a Beagle employee knows the shared password, and leaves the company, they could still use the shared user account to access the customer's database. And because the user account is not tied to the individual, it would not be immediately clear that anyone had improper access.

23. In either case, the bad actor could undertake any number of harmful actions, such as stealing resident's Personally Identifiable Information or accessing the customers' bank accounts, all while remaining anonymous in the system. This risk is increased by the elevated permissions Beagle persuades customers to give it (which include write access to customer accounting records).

24. This security risk is one of the many reasons our Terms of Service do not permit third parties to have user access to our customer accounts: it breaks the security structures we work so hard to create. We, instead, offer other ***secure*** methods for our customers to share their data and integrate with third parties of their choice.

**<u>Beagle's Standard Use of AppFolio's System</u>**

25. One of the features of AppFolio Property Manager is that a property manager can use the platform to charge its residents for rent or additional

services. When Beagle obtains log-in credentials for a property manager's AppFolio database, Beagle sometimes uses AppFolio's functionality to issue residents charges for Beagle's products. Attached as Exhibit A is a true and correct copy of an activity log showing the use of AppFolio to issue charges to a property manager's resident for Beagle's products. This activity log is recorded contemporaneously and maintained in the regular course of business.[3]

///

[3] I am a duly authorized custodian of records for AppFolio. I have authority to testify as to the authenticity of Exhibit A.

26. When AppFolio disables a customer's Beagle user account, property managers will still be able to use AppFolio to charge residents for Beagle products. And if in the future Beagle recruits property managers who use AppFolio, those shared customers will still be able to use AppFolio to charge for Beagle's services. After Beagle's accounts on AppFolio's platform are closed, the only difference regarding payment will be that Beagle itself will not be able to log in to the property manager's AppFolio account and set up the billing.

I declare under penalty of perjury according to the laws of the State of California and the United States of America that the foregoing is true and correct and that this declaration was signed by me on December 26, 2025 in San Diego, California.

______________________________

Nathaniel Delage

services. When Beagle obtains log-in credentials for a property manager's AppFolio database, Beagle sometimes uses AppFolio's functionality to issue residents charges for Beagle's products. Attached as Exhibit A is a true and correct copy of an activity log showing the use of AppFolio to issue charges to a property manager's resident for Beagle's products. This activity log is recorded contemporaneously and maintained in the regular course of business.[3]

26. When AppFolio disables a customer's Beagle user account, property managers will still be able to use AppFolio to charge residents for Beagle products. And if in the future Beagle recruits property managers who use AppFolio, those shared customers will still be able to use AppFolio to charge for Beagle's services. After Beagle's accounts on AppFolio's platform are closed, the only difference regarding payment will be that Beagle itself will not be able to log in to the property manager's AppFolio account and set up the billing.

I declare under penalty of perjury according to the laws of the State of California and the United States of America that the foregoing is true and correct and that this declaration was signed by me on December 29, 2025 in San Diego, California.

Nathaniel Delage

[3] I am a duly authorized custodian of records for AppFolio. I have authority to testify as to the authenticity of Exhibit A.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Beagle Labs, Inc., et al., Plaintiff(s), v. AppFolio, Inc., Defendant(s). | Case No. **CV 25-12248-JFW(SSCx)** **STANDING ORDER** |

**READ THIS ORDER CAREFULLY. IT CONTROLS THE CASE AND DIFFERS IN SOME RESPECTS FROM THE LOCAL RULES.**

This action has been assigned to the calendar of Judge John F. Walter. Both the Court and counsel[1] bear responsibility for the progress of litigation in Federal Court. To secure the just, speedy, and inexpensive determination of every action, all counsel are ordered to familiarize themselves with the Federal Rules of Civil Procedure, the Local Rules of the Central District of

[1]Any reference in the Court's Standing Order (or any other court order) to "counsel" or "attorney" applies to parties appearing pro se unless the context requires otherwise.

California, the General Orders of the Central District and the Judge's Procedures and Schedules found on the website for the United States District Court for the Central District of California (www.cacd.uscourts.gov).

**1. <u>Service of the Complaint</u>:**

The plaintiff shall promptly serve the Complaint in accordance with Fed.R.Civ.P. 4 and shall file the proof(s) of service pursuant to the Local Rules. **The plaintiff is hereby notified that failure to serve the Complaint as required by Fed.R.Civ.P. 4(m) will result in the dismissal of the Complaint against the unserved defendant(s).**

**2. <u>Presence of Lead Counsel</u>:**

Lead trial counsel shall attend all proceedings before this Court and all Local Rule 7-3, scheduling, status, and settlement conferences. Only <u>ONE</u> attorney for a party may be designated as lead trial counsel unless otherwise permitted by the Court.

**3. <u>Electronic Filing and Courtesy Copies</u>:**

(a) Within ten days of a party's initial appearance, lead trial counsel shall file a declaration entitled, "Declaration of Lead Trial Counsel" which shall: (1) notify the Court that counsel has registered as an "CM/ECF User;" (2) include lead counsel's "E-Mail Address of Record;" and (3) confirm that lead counsel has read the Court's Standing Order and the Local Rules.

(b) All documents that are required to be filed in an electronic format pursuant to the Local Rules shall be filed electronically no later than 4:00 p.m. on the date due unless

otherwise ordered by the Court. Any documents filed electronically after 4:00 p.m. on the date due will be considered late and may be stricken by the Court. All documents filed electronically shall be filed in accordance with the Local Rule 5-4. Each PDF file shall contain no more than one document or exhibit, *see* Local Rule 5-4.3.1, and each document or exhibit shall be meaningfully described on the docket such that the document or exhibit can be easily identified. For example, if a declaration in support of a motion appears as Docket No. 30, exhibit 1 to the declaration should be filed as Docket No. 30-1 with a description of the exhibit that includes the title of the exhibit and the exhibit number (*e.g.*, Exhibit 1: Letter from John Doe to Jane Doe dated January 1, 2021). Exhibit 2 to the declaration should be filed as Docket No. 30-2 with a description of the exhibit which includes the title of the exhibit and exhibit number (Exhibit 2: Letter from Jane Doe to John Doe dated January 2, 2021), and so on. Any documents that counsel attempt to file electronically that are improperly filed will not be accepted by the Court.

(c) Counsel are ORDERED to deliver **2 copies** of all documents filed electronically in this action to Chambers. For each document filed electronically, one copy shall be marked "CHAMBERS COPY" and the other copy shall be marked "COURTESY COPY." The "CHAMBERS COPY" and "COURTESY COPY" are collectively referred to herein as "Courtesy Copies." The Courtesy Copies of each electronically filed document must include on each page the running header created by the ECF

system. In addition, on the first page of each Courtesy Copy, in the space between lines 1 - 7 to the right of the center, counsel shall include the date the document was e-filed and the document number. The Courtesy Copies shall be single-sided and shall not be blue-backed. All documents must be stapled only in the top left-hand corner, the electronic proof of service must be attached as the last page of each document, and the exhibits attached to any document must be tabbed. Counsel shall not staple the "COURTESY COPY" and "CHAMBERS COPY" together. The "COURTESY COPY" and "CHAMBERS COPY" of all documents must be three-hole punched at the left margin with oversized 13/32" hole size, not the standard 9/32" hole size. If the courtesy copy exceeds twenty-five pages, the courtesy copy shall be placed in a slant D-ring binder with each item of evidence separated by a tab divider on the right side. All documents contained in the binder must be three hole punched with the oversized 13/32" hole size, not the standard 9/32" hole size. The binder shall include a Table of Contents and the spine of the binder shall be labeled with its contents.

The Courtesy Copies shall be delivered to Chambers no later than 10:00 a.m. on the next business day after the document was electronically filed.

(d) For any document that is not required to be filed electronically, counsel are ORDERED to deliver 1 conformed copy of the document, which shall be marked "COURTESY COPY," to Chambers **at the time of filing.** For any document or exhibit that is not required to be filed electronically,

counsel shall retain a copy of that document or exhibit until all appeals have been exhausted.

(e) If the Court has granted an application to file documents under seal, the Court's Courtesy Copies shall include a complete version of the documents including any sealed documents. Each document that has been filed under seal shall include a notation identifying that the document has been filed under seal, and shall be highlighted to show the portion of the document that has been redacted. For example, if the Court orders Ex. A to a Declaration filed under seal, the Court's Courtesy Copies of the Declaration should include Ex. A as an attachment with a notation that it has been filed under seal pursuant to the Court's order and any redactions shall be highlighted.

(f) In the unlikely event counsel finds it necessary to file a Notice of Errata: (1) the Notice of Errata shall specifically identify each error by page and line number and set forth the correction; and (2) a corrected version of the document in its entirety shall be attached to the Notice of Errata.

(g) When a proposed order or other proposed document accompanies an electronic filing, the proposed order or other proposed document shall be in PDF format and included, as an attachment, with the main electronically filed document (*e.g.*, stipulations, applications, motions). Proposed orders or other proposed documents (such as a proposed judgment) that are not lodged with a main document shall be electronically lodged as an attachment to a Notice of

Lodging; if the proposed document is being submitted in response to a court order, the filer shall link the Notice of Lodging to that court order.

After a document requiring a judge's signature has been lodged, a WordPerfect or Microsoft Word copy of the proposed document, along with a PDF copy of the electronically filed main document, MUST be emailed to the chambers email address, EITHER by using the "Proposed Orders" link within the CM/ECF System OR by sending a separate email with the subject line in the following format: Court's divisional office, year, case type, case number, document control number assigned to the main document at the time of filing, judge's initials, and filer (party) type and name (*e.g.*, for Los Angeles: LA08CV00123-6-ABC-Defendant). **Do not submit the proposed order twice.** Failure to comply with this requirement may result in the denial or striking of the request or the Court may withhold ruling on the request until the Court receives the required documents.

**4. Discovery:**

(a) All discovery matters have been referred to a United States Magistrate Judge. (The Magistrate Judge's initials follow the Judge's initials next to the case number.) All discovery documents must include the words "DISCOVERY MATTER" in the caption to ensure proper routing. Counsel are directed to contact the Magistrate Judge's Courtroom Deputy to schedule matters for hearing.

All decisions of the Magistrate Judge shall be final, subject to modification by the District Court only where it

is shown that the Magistrate Judge's Order is clearly erroneous or contrary to law. Any party may file and serve a motion for review and reconsideration before this Court. The moving party must file and serve the motion within fourteen calendar days of service of a written ruling or within fourteen calendar days of an oral ruling that the Magistrate Judge states will not be followed by a written ruling. The motion must specify which portions of the ruling are clearly erroneous or contrary to law and support the contention with a memorandum of points and authorities. Counsel shall deliver a courtesy copy of the moving papers and responses to the Magistrate Judge.

(b) Counsel shall begin to actively conduct discovery before the Fed.R.Civ.P. 26(f) conference because at the Scheduling Conference the Court will impose tight deadlines to complete discovery. If the action is a putative class action, the parties shall begin to conduct discovery immediately, so that the Motion for Class Certification can be timely filed.

**5. <u>Motions</u>:**

**(a) Time for Filing and Hearing Motions:**

Motions shall be filed in accordance with the Local Rules. This Court hears motions on **Mondays commencing at 1:30 p.m.** Once a party has noticed a motion for hearing on a particular date, the hearing shall not be continued without leave of Court. No supplemental briefs shall be filed without leave of Court. Courtesy Copies shall be provided to the Court in accordance with Section 3 of this Order. No

motion shall be noticed for hearing more than 35 calendar days after service of the motion unless otherwise ordered by the Court. Documents not filed in compliance with the Court's requirements will be stricken and will not be considered by the Court.

**(b) Local Rule 7-3:**

Among other things, Local Rule 7-3 requires counsel to engage in a pre-filing conference to discuss thoroughly the substance of the contemplated motion and any potential resolution. Counsel should discuss the issues with sufficient detail so that if a motion is still necessary, the briefing may be directed to those substantive issues requiring resolution by the Court.

Many motions to dismiss or to strike could be avoided if the parties confer in good faith especially for perceived defects in a Complaint, Answer, or Counterclaim that could be corrected by amendment. *See, e.g., Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)(where a motion to dismiss is granted, a district court should provide leave to amend unless it is clear that the Complaint could not be saved by any amendment). The Ninth Circuit requires that this policy favoring amendment be applied with "extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).

These principles require counsel for the plaintiff to carefully evaluate the defendant's contentions as to the deficiencies in the Complaint, and in most instances, counsel should agree to any amendment that would cure a curable

defect. Counsel should, at the very least, resolve minor procedural or other non-substantive matters during the conference.

All 7-3 conferences shall be conducted **in person** by lead counsel. If lead counsel are not both located within the Central District of California, the conference may take place via video (letters and e-mail do not constitute a proper 7-3 conference). The pro se status of one or more parties does not excuse compliance with Local Rule 7-3.

Notwithstanding the exemption for preliminary injunction motions in Local Rule 7-3, counsel contemplating filing a preliminary injunction motion shall comply with Local Rule 7-3 and meet and confer **in person** at least five days prior to the filing of such a motion.

Not more than two calendar days after the 7-3 conference for any contemplated motion (and at least five calendar days prior to filing the contemplated motion), counsel shall file a joint statement indicating the date of, duration of, and method of communication used during the conference and the participants in the conference. In addition, the joint statement shall detail the issues discussed and resolved during the conference and the issues remaining. Failure to strictly comply with the Court's requirements or Local Rule 7-3 will result in the striking and/or the denial of the motion.

**(c) Length and Format of Motion Papers:**

**Memoranda of Points and Authorities in support of or in opposition to motions shall not exceed 25 pages. Replies**

**shall not exceed 12 pages.** Only in rare instances and for good cause shown will the Court grant an application to extend these page limitations.

**Typeface shall comply with the Local Rules. NOTE: If Times Roman is used, the font size must be no less than 14; if Courier is used, the font size must be no less than 12.** Footnotes shall be in the same typeface and font size as the text and shall be used sparingly.

Documents which do not conform to the Local Rules and this Order will not be considered.

**(d) Citations to Case Law:**

Citations to case law **must** identify not only the case being cited, but the specific page referenced. In the event it is necessary to cite to Westlaw or Lexis, the Court prefers that counsel cite to Westlaw. Hyperlinks for case citations must be included.

**(e) Citations to Other Sources:**

Statutory references should identify, with specificity, which sections and subsections are being referenced (*e.g.*, Jurisdiction over this claim for relief may appropriately be found in 47 U.S.C. § 33, which grants the district courts jurisdiction over all offenses of the Submarine Cable Act, whether the infraction occurred within the territorial waters of the United States or on board a vessel of the United States outside said waters). Statutory references which do not specifically indicate the appropriate section and subsection (*e.g.*, Plaintiffs allege conduct in violation of

the Federal Electronic Communication Privacy Act, 18 U.S.C. § 2511, *et seq.*) are to be **avoided.** Citations to treatises, manuals, and other materials should similarly include the volume and the section referenced.

**(f) Proposed Statement of Decision**

Not more than two days after the deadline for filing the Reply, each party shall lodge a Proposed Statement of Decision, which shall contain a statement of the relevant facts and applicable law with citations to case law and the record. The Proposed Statement of Decision shall not exceed fifteen pages and shall be in a form that would be appropriate for the Court to enter as its final order on the motion. The Proposed Statement of Decision shall be submitted to the Court in accordance with the Local Rules and shall be e-mailed in WordPerfect or Word format to the Chambers' e-mail address (JFW_Chambers@cacd.uscourts.gov) at the time of filing. Failure to lodge the Proposed Statement of Decision will result in the denial or granting of the motion.

**(g) Opposing Papers**

Within the deadline prescribed by the Local Rules, a party opposing a motion shall file: (1) an Opposition; or (2) a Notice of Non-Opposition. If a party files a Notice of Non-Opposition to a motion under Federal Rule of Civil Procedure 12(b), (e), or (f), that party shall state whether it intends to file an amended complaint in accordance with Federal Rule of Civil Procedure 15(a)(1).

**Failure to timely respond to any motion shall be deemed by the Court as consent to the granting of the motion. *See* Local Rules.**

**(h) Amended Pleadings**

Whenever a plaintiff files an amended pleading, a redlined version of the amended pleading shall be filed and delivered to Chambers indicating all additions and deletions to the prior version of that pleading.

In addition to the requirements of the Local Rules, all motions to amend the pleadings shall: (1) state the effect of the amendment; and (2) state the page, line number(s), and wording of any proposed change or addition of material.

In the event the Court grants a motion to dismiss without prejudice to filing an amended complaint, the plaintiff shall file an amended complaint within the time period specified by the Court. If no time period is specified by the Court, the plaintiff shall file an amended complaint within fourteen calendar days of the date of the order granting the plaintiff leave to file an amended complaint. Failure to file an amended complaint within the time allotted will result in the dismissal of the action with prejudice.

**(i) Motions for Class Certification**

Motions for Class Certification shall be filed within 120 days after service of a pleading purporting to commence a class action (or if applicable 120 days after service of the Notice of Removal), unless otherwise ordered by the Court. Failure to timely file a Motion for Class Certification will

result in the striking of the class allegations from the operative pleading.

**6. <u>Ex Parte Applications</u>:**

Ex parte applications are solely for extraordinary relief. *See Mission Power Eng'g Co. v. Continental Cas. Co.*, 883 F. Supp. 488 (C.D. Cal. 1995). Applications that fail to conform with the Local Rules, including a statement of opposing counsel's position, will not be considered. In addition to electronic service, the moving party shall immediately serve the opposing party by e-mail or hand service and shall notify the opposing party that any opposition must be filed not later than twenty-four hours after the filing of the ex parte application. If counsel does not intend to oppose the ex parte application, counsel shall immediately inform the Courtroom Deputy by e-mail and immediately file a Notice of Non-Opposition. The Court considers ex parte applications on the papers and usually does not set the matters for hearing. Courtesy Copies of all moving and opposition (or non-opposition) papers shall be provided to the Court in accordance with Section 3 of this Order. The Courtroom Deputy will notify counsel of the Court's ruling or a hearing date and time, if the Court determines a hearing is necessary.

**7. <u>Applications or Stipulations to Extend the Time to File any Required Document or to Continue Any Date</u>:**

No application or stipulation to extend the time to file any required document or to continue any date is effective unless and until the Court approves it. Any application or

stipulation to extend the time to file any required document or to continue any date must set forth the following:

(a) the existing due date or hearing date, as well as all dates set by the Court, including the discovery cut-off date, the Pre-Trial Conference date, and the Trial date;

(b) the new dates proposed by the parties;

(c) specific, concrete reasons supporting good cause for granting the extension; and

(d) whether there have been prior requests for extensions by any party, and whether those requests were granted or denied by the Court.

The application or stipulation must be accompanied by a separate proposed order. The proposed order shall include the existing due date(s) or hearing date(s) as well as the new proposed date(s).

Failure to comply with the provisions of this section may result in the denial of the application or stipulation.

**8. <u>Temporary Restraining Orders and Injunctions</u>:**

**(a) Documentation Required:**

Parties seeking emergency or provisional relief shall comply with Fed.R.Civ.P.65 and the Local Rules. An ex parte application for a temporary restraining order must be accompanied by: (1) a copy of the complaint; (2) a separate memorandum of points and authorities in support of the application; (3) the proposed temporary restraining order and a proposed order to show cause why a preliminary injunction should not issue; and (4) such other documents in support of the application that the party wishes the Court to consider.

Courtesy Copies of these documents shall be immediately delivered to Chambers.

**(b) Notice of Ex Parte Applications:**

Unless relieved by order of the Court for good cause shown, on or before the day counsel files an ex parte application for a temporary restraining order, counsel must personally serve notice and all documents in support of the ex parte application and a copy of the Court's Standing Order on opposing counsel or party. Counsel shall also notify the opposing party that any opposition must be filed no later than twenty-four hours after the service of the ex parte application. Counsel shall immediately file a Proof of Service.

If counsel does not intend to oppose the ex parte application, counsel shall immediately inform the Courtroom Deputy by e-mail and immediately file a Notice of Non-Opposition. The Court considers ex parte applications on the papers and usually does not set the matter for hearing. Courtesy Copies of all moving, opposition, or non-opposition papers shall be provided to the Court in accordance with Section 3 of this Order. The Courtroom Deputy will notify counsel of the Court's ruling or a hearing date and time, if the Court determines a hearing is necessary.

**9. Proposed Protective Orders and Filings Under Seal:**

Protective orders pertaining to discovery must be submitted to the assigned Magistrate Judge. Proposed protective orders should not purport to allow, without further order of Court, the filing under seal of pleadings or

documents filed in connection with a hearing or trial before the Court. The existence of a protective order does not alone justify the filing of pleadings or other documents under seal, in whole or in part.

An application to file documents under seal must meet the requirements of the Local Rules and shall be limited to three documents by a party, unless otherwise ordered by the Court. The application to file documents under seal should not be filed under seal. There is a strong presumption of the public's right of access to judicial proceedings and records in civil cases. In order to overcome the presumption in favor of access, the movant must demonstrate compelling reasons (as opposed to good cause) for the sealing if the sealing is requested in connection with a dispositive motion or trial, and the relief sought shall be narrowly tailored to serve the specific interest sought to be protected. *Pintos v. Pacific Creditors Ass'n,* 605 F.3d 665 (9th Cir. 2010), *Kamakana v. City and County of* Honolulu, 447 F.3d 1172 (9th Cir. 2006), *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003).

For each document or other type of information sought to be filed under seal, the party seeking protection must articulate compelling reasons supported by specific facts or legal justification that the document or type of information should be protected. The facts supporting the application to file documents under seal must be provided by a declaration. The declaration shall attach an unredacted copy of each document to be filed under seal. The parties are ordered to

highlight the portion of the document containing counsel's proposed redactions. Documents that are not confidential or privileged in their entirety will not be filed under seal if the confidential portions can be redacted and filed separately. The declarations in support of the application to file documents under seal shall include an explanation of why redaction is not feasible.

If the parties anticipate requesting the Court to file more than three documents under seal in connection with any motion, they shall identify all such documents that will be required to support and oppose the motion during the Local Rule 7-3 conference. The parties shall then meet and confer in order to determine if the documents satisfy the "compelling need" standard for "sealing" each document. Thereafter, the parties shall file a joint application and lodge a proposed order to file under seal all such documents with the required showing as to each document. The joint application shall be filed promptly so that the Court may rule on the application before the filing date for the motion. The parties shall not file any pleadings containing documents they have requested the Court to file under seal until the Court acts on the application to file under seal.

If a party wishes to file a document that has been designated confidential by another party, the submitting party must give any designating party five calendar days notice of intent to file. If the designating party objects, it should notify the submitting party and file an application to file documents under seal within two court days.

If an application to file documents under seal is denied in part or in full, the lodged documents will not be filed. The Courtroom Deputy will notify the submitting party, and hold the lodged documents for three court days to allow the submitting party to retrieve the documents. If the documents are not retrieved, the Courtroom Deputy will dispose of the documents.

If the Court grants an application to file documents under seal, the parties shall file within two days of the Court's Order a complete version of the documents under seal and a redacted version for public viewing (omitting only such portions as the Court has ordered to be filed under seal). The Court's Courtesy Copies of all documents filed under seal shall include a complete version of the documents with a notation identifying that the document has been filed under seal and shall be highlighted to show the portion of the document that has been redacted. Should counsel fail to file the under seal version and redacted version of the documents, the Court will strike any motion that relies on or relates to those documents and/or file those documents in the public record.

**10. <u>Cases Removed From State Court</u>:**

Within five days of removal, all documents filed in state court, including documents attached to the Complaint, Answer(s), and Motion(s), must be re-filed in this Court as a separate supplement to the Notice of Removal. The Courtesy Copies of the supplement shall be prepared in accordance with Section 3 of this Order. If the defendant has not yet

answered or moved, the Answer or responsive pleading filed in this Court must comply with the Federal Rules of Civil Procedure and the Local Rules of the Central District. If before the case was removed a motion was pending in state court, it must be re-noticed in accordance with the Local Rules.

**11. <u>Actions Transferred From Another District</u>**

Counsel shall file, within ten days of transfer, a Joint Report summarizing the status of the action which shall include a description of all motions filed in the action and the transferor court's ruling on the motions. In addition, counsel shall deliver (but not file) one courtesy copy to Chambers of each document on the docket of the transferor court. On the first page of each courtesy copy, in the space between lines 1 - 7, to the right of the center, counsel shall include the date the document was filed and the document number. The courtesy copies shall be placed in a slant D-ring binder in chronological order with each document separated by a tab divider on the right side. All documents contained in the binder must be three hole punched with the oversized 13/32" hole size, not the standard 9/32" hole size. The binder shall include a Table of Contents and the spine of each binder shall be labeled with its contents. The courtesy copies shall be delivered to Chambers within ten days of the transfer.

/ / /

/ / /

/ / /

**12. Status of Fictitiously Named Defendants:**

This Court adheres to the following procedures when a matter is removed to this Court on diversity grounds with fictitiously named defendants referred to in the Complaint:

(a) Plaintiff shall ascertain the identity of and serve any fictitiously named defendants within 90 days of the date that the Complaint was filed in State Court.

(b) If plaintiff believes (by reason of the necessity for discovery or otherwise) that fictitiously named defendants cannot be fully identified within the 90-day period, an ex parte application requesting permission to extend the period to effectuate service may be filed with the Court. Such application shall state the reasons therefore, and will be granted only upon a showing of good cause. The ex parte application shall be served upon all appearing parties, and shall state that appearing parties may respond within seven calendar days of the filing of the ex parte application.

(c) If plaintiff desires to substitute a named defendant for one of the fictitiously named defendants, plaintiff shall first seek the consent of counsel for all defendants (and counsel for the fictitiously named party, if that party has separate counsel). If consent is withheld or denied, plaintiff shall file an ex parte application requesting such amendment, with notice to all appearing parties. Each party shall have seven calendar days to respond. The ex parte application and any response should comment not only on the substitution of the named party for a fictitiously named defendant, but on the question of whether the matter should

thereafter be remanded to the Superior Court if diversity of citizenship is destroyed by the addition of the new substituted party.

**13. Bankruptcy Appeals:**

Counsel shall comply with the Notice Regarding Appeal From Bankruptcy Court issued at the time the appeal is filed in the District Court. Counsel are ordered to notify the Court in a joint report if the Certificate of Readiness has not been prepared by the Clerk of the Bankruptcy Court and submitted to the Clerk of the District Court within 90 days of the date of this Order.

The matter is considered submitted upon the filing of the final brief. No oral argument is held unless ordered by the Court.

**14. Communications with Chambers:**

Counsel shall not attempt to contact the Court or its Chambers staff by telephone or by any other ex parte means, although counsel may contact the Courtroom Deputy at JFW_Chambers@cacd.uscourts.gov with appropriate inquiries after reviewing the Federal Rules of Civil Procedure, the Local Rules, and this Court's Orders. To facilitate communication with the Courtroom Deputy, counsel should list their e-mail addresses and their telephone numbers on all papers.

**15. Notice of This Order:**

Counsel for plaintiff shall immediately serve this Order on all parties, including any new parties to the action. If

this case came to the Court by removal, defendant shall serve this Order on all other parties.

**__Caveat__: If counsel fail to cooperate in the preparation of the required Joint Rule 26 Report or fail to file the required Joint Rule 26 Report, or if counsel fail to appear at the Scheduling Conference, the Pre-Trial Conference and/or any other proceeding scheduled by the Court, and such failure is not otherwise satisfactorily explained to the Court: (a) the cause shall stand dismissed for failure to prosecute, if such failure occurs on the part of the plaintiff; (b) default judgment shall be entered, if such failure occurs on the part of the defendant; or (c) the Court may take such action as it deems appropriate.**

IT IS SO ORDERED.

DATED: December 29, 2025

JOHN F. WALTER
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to:

District Judge **John F. Walter**
Magistrate Judge **Stephanie S. Christensen**

The case number on all documents filed with the Court should read as follows:

**2:25−cv−12248−JFW (SSCx)**

District judges in the Central District of California refer all discovery-related motions to the assigned magistrate judge pursuant to General Order No. 05-07. Discovery-related motions should be noticed for hearing before the assigned magistrate judge. Please refer to the assigned judges' Procedures and Schedules, available on the Court's website at www.cacd.uscourts.gov/judges-requirements, for additional information.

Clerk, U.S. District Court

December 29, 2025
Date

By /s/ *Estrella Liberato*
Deputy Clerk

## ATTENTION

*The party that filed the case-initiating document in this case (for example, the complaint or the notice of removal) must serve a copy of this Notice on all parties served with the case-initiating document. In addition, if the case-initiating document in this case was electronically filed, the party that filed it must, upon receipt of this Notice, promptly deliver mandatory chambers copies of all previously filed documents to the newly assigned-district judge. See L.R. 5-4.5. A copy of this Notice should be attached to the first page of the mandatory chambers copy of the case-initiating document.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEAGLE LABS, INC., et al.,<br>Plaintiffs,<br>v.<br>APPFOLIO, INC.,<br>Defendant. | Case No. 25-cv-10670-AMO<br><br>**ORDER TRANSFERRING CASE & MAINTAINING STATUS QUO** |

On December 15, 2025, Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc. (collectively, "Plaintiffs" or "Beagle") commenced this action against Defendant AppFolio, Inc., asserting claims for tortious interference with contractual relations, tortious interference with prospective economic relations, false advertising, unfair competition, monopolization, defamation and trade libel, unjust enrichment, and declaratory judgment. Complaint (Dkt. No. 1). The same day, Beagle filed an ex parte motion for a temporary restraining order, and the Court held a status conference with the parties. Dkt. Nos. 4, 15. At the status conference, the Court directed the parties to submit briefing on why the case should not be transferred, pursuant to 28 U.S.C. § 1404(a), to the United States District Court for the Central District of California.[1] Now before the Court is the parties' briefing on that issue. For the reasons set forth below, this case is **TRANSFERRED** to the United States District Court for the Central District of California.

Title 28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division

[1] At the status conference, Defendant agreed to maintain status quo through December 22, 2025.

United States District Court
Northern District of California

where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Transfer pursuant to Section 1404(a) lies within the discretion of the district court and depends on the facts of each particular case. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000). The Court must first determine whether the case could have been brought in the district where transfer is sought, i.e., where venue is proper, before assessing the convenience of parties and witnesses and the interest of justice. *See State of Cal. v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1059 (N.D. Cal. 2018). In deciding whether transfer is warranted, the Court must consider both public factors, which go to the interests of justice, and private factors, which go to the convenience of the parties and witnesses. *See Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). Such factors may include: (1) the location where the relevant agreements were negotiated and executed; (2) the state that is most familiar with the governing law; (3) the plaintiff's choice of forum; (4) the parties' respective contacts with the forum; (5) the contacts relating to the plaintiff's cause of action in the chosen forum; (6) the differences in the costs of litigation in the two forums; (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses; (8) the ease of access to sources of proof; (9) the presence of a forum selection clause; and (10) the relevant public policy of the forum state, if any. *Jones*, 211 F.3d at 498-99. Courts may also consider "the administrative difficulties flowing from court congestion." *Decker Coal Co.*, 805 F.2d at 843 (internal quotations and citations omitted).

Turning to the preliminary issue of whether this action could have been brought in the United States District Court for Central District of California, Defendant has its principal place of business in Goleta, California. Complaint ("Compl.") (Dkt. No. 1) ¶ 17. Goleta is located in Santa Barbara County, which lies within the Central District. Declaration of Sean Saxena ("Saxena Decl.") (Dkt. No. 21-1) ¶ 3. This action, therefore, could have been properly filed there. *See* 28 U.S.C. 1391(b)(1) ("A civil action may be brought in a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located[.]").

Moving next to the convenience of the parties and witnesses, Beagle's choice of forum, the parties' respective contacts with the forum, the contacts relating to the plaintiff's cause of action in

United States District Court
Northern District of California

the chosen forum, and the burden on party and non-party witnesses all favor transfer. With respect to its decision to file in this district, Beagle asserts that its choice of forum deserves great deference, because "Beagle Technologies, Inc., was based in the Bay Area for much of the relevant time Period[,]" and "[t]he Beagle Entities' parent is based in San Francisco and has deep ties to the Bay Area." Pls.' Br. (Dkt. No. 22) at 4. The allegations in the operative complaint are to the contrary: "Plaintiff Beagle Labs, Inc. is a Delaware corporation with principal places of business in Chicago and Dallas." Compl. ¶ 12. "Plaintiff Beagle Technologies, Inc. is a Delaware corporation." *Id.* ¶ 13. "Plaintiff Big Beagle, Inc. is a Delaware corporation with a principal place of business in South Salt Lake." *Id.* ¶ 14. "Plaintiff Rental Property Managers Association LLC is an Alabama limited liability company in Alabama." *Id.* ¶ 15. "Plaintiff YRIG Risk Retention Group, Inc. is an Alabama corporation with a principal place of business in Alabama." *Id.* ¶ 16. Where, as here, "a plaintiff brings its charges in a venue that is not its home forum . . . that choice of forum is entitled to less deference." *In re Link_A_Media Devices Corp.*, 662 F.3d 1221, 1223 (Fed. Cir. 2011) (citations omitted); *see also Thomas v. Twentieth Century Fox Film Corp.*, No. 21-CV-02720-LB, 2021 WL 2434032, at *3 (N.D. Cal. June 15, 2021) ("If the operative facts have not occurred within the forum and the forum has no interest in the parties or subject matter, the plaintiff's choice is entitled only minimal consideration.") (internal quotations and citation omitted). Accordingly, Beagle's choice of forum is entitled to little weight. This factor thus weighs in favor of transfer.

As to the parties' respective contacts with the forum and the contacts relating to Beagle's causes of action in the chosen forum, Beagle alleges that "[m]aterial negotiations, communications, and misrepresentations were carried out and received by persons located in this District[,]" that "AppFolio's implementation of the complained-of conduct, customer effects, and injury was also felt by Plaintiffs in this District[,]" and that "Beagle has many customers in the San Francisco Bay Area, including its largest customer, who is an AppFolio user and whose access to Beagle would be cut off by AppFolio's intended blocking." Compl ¶ 21. It also asserts that "AppFolio directed its tortious interference and unfair competition to citizens of this venue—including Beagle's largest customer and thousands of other customers[,]" that "AppFolio's

conduct directed at the group impacts the parent and those effects are felt [in the SF Bay Area,]" that "Beagle has several active listings for job postings for San Francisco[,]" and that "AppFolio explicitly indicates the 'Bay Area' as one of five 'Hubs' where 'current and future team members can collaborate, connect, and make a lasting impact." Pls.' Br. at 3-5.

However, AppFolio's Senior Director of Insurance, Sean Saxena, declares that its "executive team is based in its Santa Barbara County headquarters, which houses the highest concentration of AppFolio employees[,]" and "[a]s a result, nearly all of AppFolio's employees with personal knowledge of the conduct, business strategies, statements, and policies alleged in Plaintiffs' complaint and application for a temporary restraining order are based in the Santa Barbara County headquarters." Saxena Decl. ¶¶ 4, 5. Saxena further declares that [a]ny broadly disseminated, customer-facing statements made by AppFolio regarding Plaintiffs would have been issued from the Santa Barbara County headquarters[,]" that "[a]ny statements by AppFolio that Plaintiffs allege were defamation or threats would have been issued from Santa Barbara County headquarters[,]" and that "none of the statements about which Beagle complains were made in the Northern District, and none of the relevant business decisions or policies were made in the Northern District." *Id.* ¶ 6. These sworn facts establish that, at least for the parties and party affiliated witnesses, the Central District of California is the more convenient forum. *See Park v. Dole Fresh Vegetables, Inc.*, 964 F. Supp. 2d 1088, 1095 (N.D. Cal. 2013) (explaining that "litigation costs are reduced when venue is located near the most witnesses expected to testify").

Turning to the convenience of non-party witnesses, the Court likewise finds the Central District to be the more convenient forum. Although "[t]he convenience of witnesses is said to be the most important factor in passing on a transfer motion[,]" *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 497, 501 (C.D. Cal. 1981) (citation omitted), "[t]he convenience of non-party witnesses is a more important factor than the convenience of party witnesses." *Metz v. U.S. Life Ins. Co. in City of New York*, 674 F. Supp. 2d 1141, 1147 (C.D. Cal. 2009) (citation omitted). While AppFolio does not specifically identify any non-party witnesses, the Court nonetheless finds that the Central District is a more convenient forum. AppFolio has sued Beagle in state court in Santa Barbara. Def.'s Br. (Dkt. No. 21) at 2. Even when crediting

United States District Court
Northern District of California

Beagle's contention that "the nature of the matters is distinct," allowing two separate suits to proceed in two different parts of the state imposes a substantial burden on non-party witnesses,[2] including the Beagle customers that reside in this district, such that litigating in the same locale, i.e., the Central District, is more convenient, irrespective of whether one action proceeds in state court and the other moves forward in federal court.[3] *See Bhd. of Maint. of Way Employes Div./IBT v. Union Pac. R.R. Co.*, 485 F. Supp. 3d 1048, 1062 (D. Neb. 2020) (finding that convenience to witnesses slightly favored transfer because "[t]o the extent any witnesses [we]re involved, those same witnesses w[ould] presumably also be involved in the currently pending D.C. case, and litigating at least two cases in conjunction with one another will reduce the hassle for witnesses."). That Beagle's parent corporation is located in this district does not compel a different conclusion. Beagle's parent corporation is more akin to a "party witness[s] or witness[] employed by a party," that "can be compelled by the parties to testify regardless of where the litigation will occur." *Hendricks v. StarKist Co.*, No. 13-CV-729 YGR, 2014 WL 1245880, at *3 (N.D. Cal. Mar. 25, 2014). Accordingly, the convenience to non-party witnesses, as well as the parties and party affiliated witnesses, favor transfer.

///

///

///

///

///

///

---

[2] It also imposes burdens on the parties and party affiliated witnesses, further supporting transfer. *See Buzzballz, LLC v. MPL Brands NV, Inc.*, 741 F. Supp. 3d 889, 897 (D. Nev. 2024) (finding the "costs of bringing two parties to a district in which no one is truly at home: double the car rentals, hotels, and plane tickets" supported transfer).

[3] The Court thus does not reach the question of whether the pendency of the state court litigation also supports transfer under the first-to-file doctrine. With respect to AppFolio's argument that "Central District residents have a stronger interest in claims against Central-District-based AppFolio than residents here have in claims brought by out-of-state entities," Def.'s Br. at 6, the Court finds it unpersuasive. The only case AppFolio cites in support – *Walters v. Famous Transports, Inc.*, 488 F. Supp. 3d 930 (N.D. Cal. 2020) – involved competing states' interest rather than those of competing districts.

Transfer also serves the interests of justice. As AppFolio points out, "[d]ockets in the Northern District of California are considerably more congested than in the Central District[.]" Def.'s Br. at 6. Data published as of June 30, 2025 confirms this:

| | Northern District of CA | Central District of CA |
|---|---|---|
| Pending cases per judgeship | 1,034 | 520 |
| Median time filing to disposition (civil) | 20.5 months | 3.9 months |
| Median time filing to trial (civil) | 37.6 months | 26.5 months |
| Number of civil cases over 3 years old | 2,346 | 817 |

*See* June 30, 2025 Fed. Ct. Mgmt. Statistics, Comparison of Districts Within the Ninth Circuit, https://www.uscourts.gov/sites/default/files/document/fcms_na_distcomparison0630.2025.pdf, at 9.). Additionally, AppFolio highlights that "[c]aseloads are up 43% over the prior year in the Northern District, compared to an increase of just 6% in the Central District." *Id.* The relative congestion of the two districts thus favors transfer. *Cf. Sunbeam Prods., Inc. v. Homedics, Inc.*, 587 F. Supp. 2d 1055, 1058 (W.D. Wis. 2008) (denying transfer where proposed transferee court had a longer median time from filing to trial, making for a delay, which "would substantially diminish the value of plaintiff's patent and be highly prejudicial to its rights[.]").

Transfer also protects against forum shopping. Beagle contends it is "not fleeing unfavorable precedent nor chasing favorable law." Pls.' Br. at 5. The Court disagrees. In its motion for a temporary restraining order, Beagle cites, in addition to a Ninth Circuit decision, an unpublished order from this Court in connection with the proposition that "[t]he Ninth Circuit has made clear that data blocking and targeting a competitor in precisely the way AppFolio plans to do is unlawful." Dkt. No. 4 at 2. Given Beagle's heavy reliance on this Court's order its motion, it appears that Beagle strategically filed in this district, which bears a minimal connection to this controversy as discussed above, hoping that a Northern District court would be more likely than a court in the Central District to follow an in-district unpublished order. Thus, while "[n]o single factor is dispositive" in the transfer analysis, *Park*, 964 F. Supp. 2d at 1093 (internal quotations and citation omitted), the apparent forum shopping by Beagle strongly favors transfer.

United States District Court
Northern District of California

Because the overall balance of applicable factors supports continuing this litigation in the United States District Court for the Central District of California, this action is **TRANSFERRED** to that district. Defendant **SHALL** continue to maintain status quo pending further order of the transferee court. To the extent Beagle contends that Defendant has failed to maintain status quo through December 22, 2025, as it agreed on the record during the status conference held December 15, 2025, it may raise that issue to the transferee court.

**IT IS SO ORDERED.**

Dated: December 19, 2025

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

**GREENBERG TRAURIG, LLP**
Michael Burshteyn (SBN 295320)
Marcelo Barros (SBN 339069)
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone: 415.655.1300
Michael.Burshteyn@gtlaw.com
Marcelo.Barros@gtlaw.com

Jake Evans (*pro hac vice*)
Jordana R. Sternberg (*pro hac vice* forthcoming)
Terminus 200, 3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
Telephone: 678.553.2100
Jake.Evans@gtlaw.com
Jordana.Sternberg@gtlaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,<br><br>Plaintiffs,<br><br>v.<br><br>APPFOLIO, INC., a California corporation,<br><br>Defendant. | CASE NO. **25-cv-106 0-AMO**<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER ENUE** |

Plaintiffs[1] submit this brief on venue issues pursuant to Court Order, Dkt. 15.

Plaintiffs also alert the Court that AppFolio has made the status quo worse despite its consent not to alter the status quo this past Monday. Beagle submits evidence that AppFolio has continued to show its in-app banner to users (as recently as yesterday) stating that Beagle has been deplatformed: "we're removing [Beagle] access on December 16, 2025."[2] AppFolio has issued no statements correcting its prior mass email blasts. Beagle's customers now believe Beagle has already been banned days ago and are canceling contracts. The status quo was before December 9, 2025, when AppFolio began threatening to deplatform Beagle. Even without the ban this week, the continued threat is causing irreparable harm. Suggesting that Beagle was already banned days ago is **orse** than the situation was on Monday. Beagle customers do not believe Beagle that there has been no ban. This has already caused Beagle more than $500,000 in lost annual recurring revenue and over 6,000 lost "doors," the metric Beagle uses to measure customer scale. (Brown Decl. ¶ 11.) Just this morning, a newsletter was published about the dispute to tens of thousands of property managers. In response to a request for a comment yesterday, AppFolio simply forwarded its prior mass message, once again leaving in the language that Beagle would have already been banned earlier this week on December 16, 2025.[3] Plaintiffs also inform the Court that, in the state court proceeding in Santa Barbara, Judge Geck denied AppFolio's second application for a TRO on Wednesday morning, December 17, 2025.[4]

## I THE NORTHERN DISTRICT OF CALIFORNIA IS AN APPROPRIATE ENUE

Plaintiffs address both 28 U.S.C. §§ 1404 and 1391 preemptively.[5] AppFolio faces a high bar on venue. Courts do not disturb a Plaintiff's chosen forum lightly, especially when, as here, Plaintiffs and the

---

[1] Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc. ("Beagle" or "Beagle Entities").
[2] (Declaration of Michael Brown ("Brown Decl."), ¶¶ 6-8, Ex. B).
[3] https://peter.beehiiv.com/p/peter-lohmann-s-newsletter-issue-170
[4] During the hearing, AppFolio's counsel emphasized and represented to the Santa Barbara State Court that the federal TRO before this Court was distinct from the state court action. (Barros Decl. ¶ 2.)
[5] To the extent AppFolio raises Rule 12(b)(3), it waives Rule 12(b)(2)-(5) by operation of Rule 12(h)(1).

parent company have a strong presence in the Bay Area. The Supreme Court held in *Piper Aircraft o v eyno* that there is "ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum." 454 U.S. 235, 255 (1981). AppFolio must make a "strong showing of inconvenience to warrant upsetting [] plaintiff's choice of forum." *ec er oal o v o on ealth dison o* , 805 F.2d 834, 843 (9th Cir. 1986). Not only must the balance of convenience "clearly favor[] transfer," "[i]t is not enough for the defendant to merely show that it prefers another forum . . . merely [] shift[ing] the inconvenience from one party to another." *a v oyota Motor orp* , 65 F. Supp. 3d 772, 776 (N.D. Cal. 2014).[6] AppFolio cannot make such a showing, particularly in light of its own presence in this district.

**A enue is Appropriate in this Forum Under Section 1 1**

First, venue is proper under Section 1391(b)(1) and (d) because AppFolio is deemed to reside in this district as subject to personal jurisdiction with respect to this civil action. AppFolio's purposeful and targeted conduct here, including its directed targeting of Beagle, foreseeably subject it to suit. Under *alder*, the "effects" of AppFolio's decision were felt here. *ee e* , *Aslie v A Bd of rthopaedic ur ery*, No. 2:24-cv-01181 AC, 2024 U.S. Dist. LE IS 137398, at *9 (E.D. Cal. Aug. 1, 2024).[7]

Second, venue is also proper under Section 1391(b)(2) because a substantial portion of events and omissions giving rise to this action happened here. AppFolio directed its tortious interference and unfair competition to citizens of this venue—including Beagle's largest customer and thousands of other customers. ( *ee e* , Dkt. 4-4, Ex. B to Brown Decl. ISO TRO.) Beagle's parent company is based in the SF Bay Area. AppFolio's conduct directed at the group impacts the parent and those effects are felt here. The Complaint sufficiently alleges this (Dkt. 1 ¶ 21) and the Court can review facts outside the pleadings

[6] (citing *o odity utures radin o n v ava e*, 611 F.2d 270, 279 (9th Cir. 1979) and *an usen v Barrac* , 376 U.S. 612, 645-46 (1964).
[7] *ee also Panavision nt l td P ship v oeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998) ("[i]n tort cases, jurisdiction may attach if the defendant's conduct is aimed at or has an effect in the forum state").

for this analysis. *ee e* , *oe v A* , 552 F.3d 1077, 1081 (9th Cir. 2009) ("facts outside the pleadings may be considered"); (Dkt. 4-8 at 4, Ex. TO Decl. D'Angelo ISO TRO). Beagle has several active listings for job postings for San Francisco.[8] AppFolio's argument that there is a single proper venue is incorrect. But "There may be multiple proper venues," so the existence of another one does not merit transfer.[9]

**B Section 1 0 a Transfer is Not arranted** [10]

"A motion for transfer under section 1404(a) requires the court to weigh multiple factors[.]" *ones v ranchisin nc* , 211 F.3d 495, 498-99 (9th Cir. 2000). Beagle addresses the salient ones here:

**Plaintiff's Forum Choice** A plaintiff's choice of forum is awarded deference. Plaintiffs chose to sue in this District. Beagle Technologies, Inc., was based in the Bay Area for much of the relevant time period. The Beagle Entities' parent is based in San Francisco and has deep ties to the Bay Area, including its founders and executives who are key witnesses in this case. Beagle's biggest customer is here in the Bay Area as are thousands of Beagle "Doors." Because Plaintiffs are at home in this forum, and operative facts took place here, their choice of forum deserves great deference.

AppFolio's forum shopping argument is meritless. (Dkt. 14.) A hallmark of forum shopping is "the practice of choosing the most favorable jurisdiction or court in which a claim might be heard." *ity of olly ood irefi hters Pension ys v ells ar o o* , No. 23-cv-02445-JST, 2024 U.S. Dist. LE IS 100198, at *21 (N.D. Cal. June 5, 2024) (internal citation and brackets omitted). Here, governing

---

[8] https://www.joinbeagle.com/careers (accessed December 19, 2025).

[9] *ee n re i it one* , 551 F.3d 572, 575 (7th Cir. 2008).

[10] To the extent AppFolio raises a first-to-file rule doctrine, it categorically does not apply. The Santa Barbara litigation is distinct from the NDCA litigation, as evidenced by AppFolio's counsel's own admissions in arguing the dueling TROs are distinct. (Barros Decl. ¶ 2.)

law will be the same in either forum; Plaintiffs are not fleeing unfavorable precedent nor chasing favorable law. The Northern District is the controversy's center of gravity.[11]

**Convenience of the parties** It would be convenient for both parties to litigate here. Any assertions by AppFolio to the contrary are belied by AppFolio's own presence in the Bay Area. AppFolio explicitly indicates the "Bay Area" as one of five "Hubs" where "current and future team members can collaborate, connect, and make a lasting impact." AppFolio is actively hiring here.[12]




| | |
|---|---|
| Director, Corporate Finance | 5 Locations |
| Mobile Software Engineer II | 7 Locations |
| Real-Time Data Engineer II | 8 Locations |
| Software Engineer II - Accounting | 8 Locations |
| Software Engineer II - Investment Manager | 8 Locations |
| Sr. Campaign Manager | 8 Locations |
| Sr. Deal Desk Manager | 3 Locations |
| Sr. Internal Audit Manager | 4 Locations |
| Sr. Machine Learning Engineer - Realm-X | 9 Locations |
| Sr. Product Manager | 8 Locations |
| Sr. Site Reliability Engineer - Observability | 9 Locations |
| Sr. Site Reliability Engineer - Observability | 9 Locations |
| Sr. Software Engineer - Data Query | 8 Locations |
| Sr. Software Engineer - Mixed Portfolio Foundation | 9 Locations |
| Sr. Software Engineer - Platform/CI | 8 Locations |

**itness convenience** Though "[t]he convenience of the witnesses, particularly non-party witnesses, is often the most important factor," *ross an v ohnson ohnson*,[13] AppFolio bears the burden to "name the witnesses, state their location, and explain their testimony and its relevance." *endric s v tar ist o* , 2014 WL 1245880, at *3 (N.D. Cal. Mar. 25, 2014).[14] In any event, the parent company and its founders are located in the Bay Area, as are many other key witnesses—including those at Beagle's largest customer. Beagle has more than 3,000 active product enrollments in Northern California that use AppFolio. The NDCA is more convenient for these witnesses and the collection of evidence concerning customer relationships and harm. (Brown Decl. ¶¶ 2-4.)[15]

**Feasibility of consolidation of other claims** Beagle will not remove the Santa Barbara case, so

---

[11] *oy v er echs nc* , No. 2:24-cv-00306-RLP, 2025 U.S. Dist. LE IS 57887, at *9 (E.D. Wash. Mar. 27, 2025) (forum shopping where the "state court previously considered the issues presented by this [federal] suit and gave . . . an unfavorable ruling").
[12] https://www.appfolio.com/company/careers Locations (last accessed December 19, 2025).
[13] No. 14-CV-03557-VC, 2015 LE IS 48356, at *1 (N.D. Cal. Apr. 13, 2015) (citation omitted).
[14] (quoting *ostco holesale v i erty Mut ns o* , 472 F. Supp. 2d 1183, 1193 (S.D. Cal. 2007)).
[15] It is AppFolio's burden to identify any third-parties, not the Beagle Entities.

there will be no Central District of California case arising out of it. This factor is immaterial because the two proceedings are not parallel. Resolution of one action does not resolve the other. While the Santa Barbara litigation revolves around AppFolio's claims that some Beagle sales representatives allegedly acted without authorization, this NDCA action alleges AppFolio engaged in anticompetitive conduct to threaten to de-platform Beagle. Though the Santa Barbara filing may be a strategic prong of AppFolio's anticompetitive strategy, the nature of the matters is distinct. During the Santa Barbara TRO hearing this week, AppFolio's counsel emphasized the distinctive nature of the cases. AppFolio cannot credibly claim that litigating here imposes undue hardship compared to the Central District, particularly given AppFolio's scale, resources, and extensive dealings with customers in this District. At most, the two districts are in equipoise, resulting in the preservation of Plaintiff's choice.

**II A Temporary Restraining Order is Appropriate and ill Travel ith the Case**

Because AppFolio has made the status quo worse by making Beagle customers think Beagle has already been banned, a TRO is merited to avoid further irreparable harm.[16] If the Court concludes that transfer is appropriate, Plaintiffs respectfully request that the Court enter a TRO to preserve the status quo and require corrective steps during the interim period while the transferee court calendars a preliminary injunction hearing. A TRO would travel. "When an action is transferred, it remains in the posture it was in and all further proceedings . . . . This leaves in place whatever already has been done in the transferor court." *ee e , in h v olf*, 2020 WL 8083631, at *13 (D. Ariz. Dec. 16, 2020).[17]

Because this is the appropriate forum, Plaintiffs respectfully request the Court deny AppFolio's attempts to buy time to cause irreparable harm to Beagle and maintain the action here or, in the alternative, issue a TRO subject to the receiving Court's opportunity to consider the issues.

---

[16] ( *ee* Brown Decl. ¶¶ 5-14.) In a similar situation in District of Maryland in the last few months, Honorable Judge Maddox has heard two TRO hearings and set a multi-day preliminary injunction hearing while considering a venue transfer motion. Case No. 1:25-cv-03246-MJM (D. Md. Sept. 30, 2025).

[17] Plaintiffs are prepared to submit an amended proposed order should that be helpful to the Court.

DATED: December 19, 2025

Respectfully submitted,

By */s/ Michael Burshteyn*

**GREENBERG TRAURIG, LLP**
Michael Burshteyn (SBN 295320)
Marcelo Barros (SBN 339069)
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone: 415.655.1300
Michael.Burshteyn@gtlaw.com
Marcelo.Barros@gtlaw.com

Jake Evans (*pro hac vice* forthcoming)
Jordana R. Sternberg (*pro hac vice* forthcoming)
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
Telephone: 678.553.2100
Jake.Evans@gtlaw.com

**GREENBERG TRAURIG, LLP**
Michael Burshteyn (SBN 295320)
Marcelo Barros (SBN 339069)
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone: 415.655.1300
Michael.Burshteyn@gtlaw.com
Marcelo.Barros@gtlaw.com

Jake Evans (*pro hac vice*)
Jordana R. Sternberg (*pro hac vice* forthcoming)
Terminus 200, 3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
Telephone: 678.553.2100
Jake.Evans@gtlaw.com
Jordana.Sternberg@gtlaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,

Plaintiffs,

v.

APPFOLIO, INC., a California corporation,

Defendant.

CASE NO. **25-cv-106 0-AMO**

**DECLARATION OF MICHAEL BRO N IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO TRANSFER ENUE**

**DECLARATION OF MICHAEL BRO N**

I, Michael Brown, declare as follows:

1. I am the CEO of Big Beagle, Inc. (together with other Plaintiff entities, "Beagle" or "Plaintiffs"). I have personal knowledge of the facts surrounding the present action and Beagle's business, and all facts stated herein, unless otherwise stated on information and belief. If called upon to testify, I could and would competently do so under oath as to the truth of the matters stated herein.

**A Northern California is the Right Place for this Court Case**

2. Corgi Insurance Services, Inc. ("Corgi") is the parent company parent corporation of Beagle Labs, Inc., Big Beagle, Inc., and Beagle Technologies, Inc. Corgi is based in San Francisco.

3. The founders of Corgi are critical witnesses with firsthand knowledge of important facts, including product development, customer relationships, the business model of the Beagle brand companies, and the commercial and business relationship between Corgi, and the Beagle brand companies, and AppFolio.

4. Beagle's biggest customer is in the San Francisco Bay Area and uses AppFolio. They would be an important witness in this case. Beagle has more customers in Northern California than in Southern California. Beagle has over 3,000 active product enrollments in Northern California that use AppFolio. Beagle was based in San Francisco for much of the relevant time period, but has recently relocated to Utah. Attached as **Exhibit A** is a copy of Beagle's careers webpage, which lists job postings with San Francisco locations. The link is available here: https://www.joinbeagle.com/careers. Beagle does still hire in San Francisco.

**B AppFolio is Ma ing the Status uo orse Despite Their Agreement to Preserve It**

5. It is my understanding that AppFolio represented to this Court that they would maintain the status quo until at least December 22, 2022.

6. AppFolio did not block Beagle's domain yet, as far as we can tell, however, the mass messaging about their intent to do so via email and through banners in their app is causing havoc to our business. We received at least one message this week that AppFolio is still showing the banner saying that Beagle will be blocked to customers. On Thursday, December 18, 2025, for instance, a customer said "Hey Beagle team, We saw you lost access 2 days ago to our AppFolio . . ." Attached as **Exhibit B** is a copy of

this message and a screenshot of the banner that the customer took today and sent to us, as well as another message we received this morning stating "we have opted not to continue with beagle. This comes from the emails we have received from AppFolio[.]".

7. It appears the banner has not changed at all. It still says that AppFolio will ban Beagle on December 16, 2022, this past Tuesday, the original date AppFolio threatened to ban Beagle. This means that our customers think Beagle has already been banned earlier this week—they have no idea that AppFolio agreed not to change the status quo.

8. Just this morning, on December 19, 2025, a newsletter went out to tens of thousands of property managers about the dispute. In that newsletter, it stated that AppFolio responded to a request for comment by forwarding its prior mass email that, just like the banner that is still up, says Beagle was banned on December 16, 2025, earlier this week. Attached as **Exhibit C** is a copy of the letter AppFolio forwarded. Attached as **Exhibit D** is the newsletter at issue. The newsletter is available at this link: https://peter.beehiiv.com/p/peter-lohmann-s-newsletter-issue-170.

9. The status quo of this dispute was before December 9, 2025, or the date when we believe this banner went up and AppFolio began messaging to the market en masse that it would deplatform Beagle.

10. Because AppFolio has not issued any corrective statements and continues to represent that it will ban Beagle—indeed that it already did as of December 16, 2025, according to this banner, the status quo is not preserved. AppFolio's threat to ban Beagle was never part of the status quo.

11. Between Big Beagle, Inc. and Beagle Labs, Inc., Beagle has already lost over $500,000 in annual recurring revenue based on this. This revenue accounts for over 6,000 "doors," which is a metric we use to identify the amount of rental doors that are signed up with Beagle.

12. Unless AppFolio retracts or corrects its prior statement, the status quo that existed before AppFolio threatened to deplatform Beagle cannot be preserved. The fact that AppFolio kept the banner up that said Beagle would be deplatformed this past Tuesday, December 16, 2025 is actually **orse** than even the situation before Tuesday, December 16, 2025. Before December 16, 2025, our customers saw AppFolio's messaging, but the date had not occurred. So there was at least something in the future we could try to correct the record about and explain to customers that AppFolio's statements about Beagle were false. Now, the messaging from AppFolio makes customers think we have already been banned days

ago. I believe in effect AppFolio's failure to correct or retract its prior statements has made the status quo much worse for Beagle.

13. We also have discovered that AppFolio sent another message on December 15, 2025, on Monday, at 9:11am PT, telling customers that it would deplatform Beagle on December 16, 2025. Although this was sent before the commitment AppFolio made to preserve the status quo later in the day on December 16 at the Court's status conference, the message primed customers to think Beagle would be banned the next day. Attached as **Exhibit E** is a copy of this message.

14. As far as we know, there has been no alteration to this messaging, and now our customers have every reason to believe Beagle has already been banned, based on AppFolio's messaging. Even when we attempt to communicate with our customers, they are faced with competing messaging from AppFolio. In another message we received on December 18, 2025, a customer said "Appfolio said that Beagle is not an approved vendor and that we should not be partnering due to not meeting compliance requirements." Attached as **Exhibit F** is a copy of this message.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct. This declaration was executed on this 19th day of December 2025 in Salt Lake City, Utah.



Michael Brown

# EXHIBIT A

beagle

Home | Waiver Programs | Resident Kit | AI Tools | Company | Login | Book a Demo

Careers

# Reshape the Future of Property Tech

We're on a mission to revolutionize property management tech. Join us in making a real difference here in San Francisco.

View Roles






# Join Us

Help Beagle shape the future of property management tech.

All Roles | Engineering | Product | Sales

| | | | |
|---|---|---|---|
| Senior Software Engineer | $100k - $180k | San Francisco | Apply |

| | | | |
|---|---|---|---|
| Account Executive | $100k - $120k | San Francisco | Apply |
| GoLang Full-Stack Developer | $120k - $200k | San Francisco | Apply |
| Founding Product Manager | $100k - $180k | San Francisco | Apply |



beagle

Autopilot for Renters Insurance Compliance

473 Pine St Floor 5
San Francisco, CA 94104

support@beagleforpm.com

**Product**

Features

Resident Kit

Waiver Programs

FAQ

**Company**

Careers

**Resources**

Blog

Book a Demo

Beagle vs. Second Nature

Support

Nothing on this website is intended to act as a solicitation or offer for the purchase or sale of insurance in any state where it is forbidden.

These benefits to Association members should not be construed as an offer to provide insurance or construed as an insurance product in any state where where it would be prohibited by law.

Member benefits are not available to residents; they can only be accessed by landlord Association members.

© 2025 Beagle. All rights reserved.

Privacy Policy

Terms of Service

# EXHIBIT B


[redacted]
Finish update
200 Cruises Carni...
New Cash Buyer
Note pad
Sail From
https://realestatew...
QuickBooks
Cash Offer For Yo...
Legacy My Accou...
SalesForce
All Bookmarks
Attention Required: Beagle Access to Your Account
We recently identified that Beagle has been accessing AppFolio accounts in a way that violates our Terms of Service and creates risk for your business. To keep your account safe, we're removing their access on December 16, 2025.
You can continue working with Beagle using approved options such as scheduled reports. For more information, please reference our full communication or contact Support if you need assistance.
fine... don't show this message again
Properties
People
Accounting
Maintenance
Reporting
Communication
What's New 33
[redacted]
Minimize
[redacted]
appfolio.com/accounting/financial_diagnostics
Assigned Tasks
Manage Realm-X Flows
Assigned To
Workflow
Property
[redacted]
Search...
Search...
Groups
Search...
Sort By
Date Created
Email All Tenants In Unit (2)
Mark as ...
Displaying Task Group: 1-1 of 1
Move Ins
FEEDBACK
Move Outs
Property
New Property
People
Move In Tenant
Tenant Receipt
Homeowner Receipt
Enter Bill
New Owner
New Vendor
Rent Increase
Reports
Delinquency
Tenant Ledger
Income Statement
Unit Vacancy Detail
Rent Roll
Cash Flow
Lease Expiration Detail By Month
Support


Screenshot 2025-12-18 at 9.05.30 AM.png
665 KB

**Walt Boxwell**
to me

View Walt's Profile 9:39 AM (0 minutes ago)

Log email to HubSpot

---------- Forwarded message ---------
From: [redacted]
Date: Thu, Dec 18, 2025 at 9:37AM
Subject: Re: Attention Required: Beagle Access to Your Account
To: [redacted] Walt Boxwell <walt@beagleforpm.com>, drew@beagleforpm.com <drew@beagleforpm.com>, Enzo Passariello <enzo@beagleforpm.com>, Jacob Lizarraga <jacob@beagleforpm.com>, [redacted]

Hey Beagle team,

We saw you lost access 2 days ago to our AppFolio and it seems Beagle has started a lawsuit against AppFolio. See email below. Does this impact operations and what are next steps, can we meet on this ASAP or do we need to start looking at offboarding options?

We'd like to keep working with you, even though it's been turbulent, we see the vision and done for you/flexible insurance compliance and enforcement is a great value. I don't particularly like the way AppFolio is a closed system. So let's work to figure this out. We are tech first in the way we do things, so we can help implement a plan.

Anyone available for a call this afternoon?

Thank you,

[redacted]

---------- Forwarded message ---------
From: [redacted]
Date: Fri, Dec 19, 2025, 6:24 AM
Subject: Re: Beagle invoice for [redacted] Oct 1, 2025 - Oct 31, 2025
To: Beagle Billing <billing@beagleforpm.com>

I will honor this invoice - However, after a discussion with my legal team and team, we have opted not to continue with beagle. This comes from the emails we have received from AppFolio and at this time we are not comfortable being in a position that just does not align with our goals and objectives. We are formally terminating our agreement with you - Effective immediately - as we start the new year. This serves as my notice to you and your company.

[redacted]

# EXHIBIT C

https://docs.google.com/document/d/...

AppFolio Letter Regarding Beagle
File Edit View Tools Help

Request edit access

**Provided to Peter Lohmann Media on 12/18/25:**

**Matthew Kaddatz**
Sr. Director,Subject Line: Attention Required: Beagle Access to Your Account

Hi [customer name],

We have received reports from several customers that Beagle – an insurance and resident services company – recently made false claims about AppFolio, representing themselves as an AppFolio partner in an attempt to win business and gain noncompliant access to customer accounts. Beagle is not an AppFolio integration partner and we have no plans to partner with them in the future.

Third-party providers are an important part of our industry and we support multiple safe methods for you to work with them, including AppFolio Stack, Database API, and scheduled reports. All of our integration partners go through a rigorous vetting process to ensure they meet our standards and share in our commitment to provide a high-quality experience to you and your customers.

We value your ability to choose providers, but *the method* by which Beagle has chosen to operate their business places you at risk. By creating user accounts in your database, Beagle has the ability to:

- access the personally identifiable information of your residents
- issue payments through the AppFolio payments platform
- view and take action across your entire account database

In addition to the serious security risks this noncompliant access poses for you, your residents, and your customers, it also constitutes a breach of AppFolio's terms of service, which are in place both to protect your account and to safeguard AppFolio's intellectual property.

To keep our ecosystem safe, we cannot allow Beagle's noncompliant access. We have notified Beagle we are removing their access and outlined a path to provide you continued service that is compliant with our terms of service and does not create security risk. **To facilitate any transition for your business, we will allow them maintain access to your database (should you so choose) for 5 business days, until December 16, 2025, before removing those users.**

As your trusted technology partner, we work to protect the integrity of your data and provide integrated experiences that enable you to have stable, seamless user experiences. If we can provide any additional support, please contact our Customer Care team by clicking on Support from your AppFolio database and a dedicated representative would be happy to follow up.

# EXHIBIT D

https://peter.beehiiv.com/p/peter-lohmann-s-newsletter-issue-170

Peter Lohmann's Newsletter

Login Subscribe

Peter Lohmann's Newsletter > Posts > Peter Lohmann's Newsletter - Issue #170

# Peter Lohmann's Newsletter - Issue #170

AppFolio and Beagle trade lawsuits. Jay Parsons reacts to WSJ coverage of rent control.



Peter Lohmann
December 19, 2025

Peter Lohmann's Newsletter

*A no-fluff weekly publication for the property management industry.*

https://peter.beehiiv.com/p/peter-lohmann-s-newsletter-issue-170

This section is sponsored by ***Rentvine***. Rentvine is the all-in-one platform for property managers who want clean accounting, connected workflows, and zero feature paywalls. This winter, get **3 months free + Apple AirPods** if you manage 150+ units and enroll in our screening services (terms apply). Don't miss the Winter Sale! ***Contact us today.***

## Industry News & Events

- **Beagle** (they provide renter's insurance compliance automation) sued **AppFolio** on Tuesday, claiming they acted anticompetitively in ***blocking Beagle's access*** to their platform. This comes in response to AppFolio's ***legal action*** against them and letter to their mutual customers last week. In the letter, AppFolio accused Beagle of making false claims about them and putting resident data at risk. In response to my requests for comment, AppFolio forwarded a copy of their ***letter to customers*** and Beagle provided ***this statement***.
- Some interesting data on **late rent** in a ***new survey*** conducted by RentRedi and BiggerPockets.
- Love this **rent control rant** ***by Jay Parsons***, using a new WSJ analysis of Minneapolis & St. Paul.
- The deadline to ***get tickets*** for **NARPM's 2026 Capitol Summit** is approaching fast.
- A few industry leaders & OGs have partnered up to launch **Property Management University**, a new ***education-focused platform***.

# EXHIBIT E

**From:** AppFolio <updates@hello.appfolio.com>
**Date:** December 15, 2025 at 9:11:53AM PST
**To:** [redacted]
**Subject: Attention Required: Reminder of Beagle Access to Your Account**
**Reply-To:** updates@hello.appfolio.com

Hi [redacted]

We are following up on an email we sent last week regarding the company Beagle - an insurance and resident services company – and their access to your account.

Beagle's noncompliant access introduces security risks for you, your residents and your customers. By creating user accounts in your database, Beagle has the ability to access personally identifiable information of your residents, issue payments through the AppFolio payments platform and take action across your entire account database.

**This is a reminder that in order to keep our ecosystem safe, we're removing their access to your account tomorrow, December 16, 2025.** Third-party providers are an important part of how you operate your business, and we're here to support that with several safe options, including scheduled reports.

If we can provide any additional support to you, please contact our Customer Care team by clicking on Support from your AppFolio database and a dedicated representative would be happy to follow up.

Sincerely,
AppFolio

# EXHIBIT F

[redacted]

---------- Forwarded message ---------
From: [redacted]
Date: Thu, Dec 18, 2025 at 8:47 AM
Subject: Re: Flyers - Beagle Marketing Material
To: Nithin <nithin@beagleforpm.com>
Cc: Bruno Arias <bruno@beagleforpm.com>, [redacted]

Good morning,

Both [redacted] and Appfolio said that Beagle is not an approved vendor and that we should not be partnering due to not meeting compliance requirements.

Thanks,

[redacted]

---

**From:** Nithin <nithin@beagleforpm.com>
**Sent:** Wednesday, December 17, 2025 5:01 PM
**To:** [redacted]
**Cc:** Bruno Arias <bruno@beagleforpm.com>; [redacted]
**Subject:** Re: Flyers - Beagle Marketing Material

Hey [redacted],

Has AppFolio notified you that Beagle is allowed soft-integration into AppFolio?

If not, what has AppFolio explicitly told you in regards to our integration in AppFolio that's causing you to question the legality of our partnership?

On Wed, Dec 17, 2025 at 3:56 PM [redacted] wrote:

> Bruno,
>
> I need to cancel my partnership with Beagle. Beagle is not an approved vendor with [redacted] and Appfolio. Can you please confirm the cancellation of our partnership? When Beagle is approved, we can revisit working together. Your assistance is greatly appreciated.
>
> Best,

[redacted]

[redacted]

**From:** Bruno Arias <bruno@beagleforpm.com>
**Sent:** Friday, December 12, 2025 4:47 PM
**To:** [redacted]
**Subject:** Re: Flyers - Beagle Marketing Material

Hi [redacted],

Regarding Appfolio permissions, I wasn't able to see specifically what Beagle's current permissions are.

However, you can check and adjust them via the following link:

[https://knowledge.appfolio.com/en/articles/6981263-manage-user-roles-and-permissions#h_c94fbae125].

I have attached a guide that details the necessary permissions we require for our partnership operations. All information that is not crucial to our work is excluded from this list, ensuring your peace of mind.

I want to assure you that even if we had broader permissions, we are committed to the security and integrity of our partnership, and all non-essential activities in your Appfolio account are off limits to us.

Please let me know if you have any questions.

--
Bruno A.
Account Manager
bruno@beagleforpm.com
(415) 985 1877

On Fri, Dec 12, 2025 at 1:19 PM Bruno Arias <bruno@beagleforpm.com> wrote:

Hi [redacted] as promised in our call earlier today, here is the flyers that show what's included in your program.

For the Information regarding the Permissions in Appfolio I will be creating that today so that you can have more clarity on what we're able to do, we want to be fully transparent and give you as much confidence as possible in working alongside us as your partners.

Please let me know if you have any questions or concerns, I'm more than happy to help!

--
**Bruno A.**
Account Manager
bruno@beagleforpm.com
(415) 985 1877

--
**Bruno A.**
Account Manager
bruno@beagleforpm.com
(415) 985 1877

--
**Bruno A.**
Account Manager
bruno@beagleforpm.com
(415) 985 1877