# No. 26-769

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

►►◄◄

BEAGLE LABS, INC., BEAGLE TECHNOLOGIES, INC., BIG BEAGLE, INC., RENTAL PROPERTY MANAGERS ASSOCIATION LLC, AND YRIG RISK RETENTION GROUP, INC.,

*Plaintiffs-Appellants*,

V.

APPFOLIO, INC.,

*Defendant-Appellee*.

_____

*On Appeal From The United States District Court
For The Central District Of California
Case No. 2:25-cv-12248-JFW-SSC
The Honorable John F. Walter*

_____

**ANSWERING BRIEF OF DEFENDANT-APPELLEE
APPFOLIO, INC.**

Brian A. Procel
Jeremiah M. Levine
Marty H. Pritikin
PROCEL LEVINE LLP
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
(424) 788-4538

*Attorneys for Defendant-Appellee AppFolio, Inc.*

June 5, 2026

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee AppFolio, Inc. states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated: June 5, 2026

/s/ Jeremiah M. Levine
Jeremiah M. Levine

i

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ........................................................................ IV

INTRODUCTION ................................................................................... 1

STATEMENT OF JURISDICTION ........................................................ 3

STATEMENT OF THE CASE ............................................................... 5

I. BEAGLE ACCESSES APPFOLIO'S PLATFORM WITHOUT AUTHORIZATION .......................................................................... 5

    A. AppFolio Offers A Property Manager Platform And Prohibits Unauthorized Access To That Platform ........................... 5

    B. Beagle Accesses The Property Manager Platform With Borrowed, Unauthorized Credentials ................................ 7

    C. AppFolio Enforces Its Terms of Service ........................... 8

    D. Beagle's CEO Confirms Beagle Can Continue Running Its Program Using Scheduled Reports .................................. 9

II. BEAGLE SUES APPFOLIO ........................................................... 9

    A. Beagle Seeks A TRO ...................................................... 9

    B. The Court Denies Beagle's Motion ................................. 11

    C. The Court Denies Beagle's Request For Reconsideration ..... 12

SUMMARY OF THE ARGUMENT ...................................................... 12

ARGUMENT ....................................................................................... 15

I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CONCLUDING THAT BEAGLE FAILED TO SHOW LIKELY IRREPARABLE HARM ................................................................. 15

    A. The District Court Did Not Clearly Err In Finding That Beagle Could Obtain The Data It Claimed To Need ................ 16

    B. Beagle's Alternative Theories Were Forfeited And Unsupported ...... 19

    C. Beagle Did Not Establish Irreparable Harm Based On The Purported Injury To Its Reputation .................................. 23

II. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION BY DECIDING THE APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF ON THE PAPERS ..................................................24

    A. The Dispositive Factual Question Was Resolved by the Written Record ..................................................................................25

    B. Beagle's Cases Do Not Require A Hearing Here ..............................26

    C. The Procedural Posture Beagle Now Criticizes Was Of Its Own Making ....................................................................................27

III. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION BY DENYING RECONSIDERATION ..........................................................28

IV. BEAGLE IDENTIFIES NO BASIS FOR THIS COURT TO ENTER A STAY ...............................................................................................32

CONCLUSION ..................................................................................................32

STATEMENT OF RELATED CASES ...............................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*389 Orange Street Partners v. Arnold*,
179 F.3d 656 (9th Cir. 1999) ...................................................................28

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...............................................................15

*Babaria v. Blinken*,
87 F.4th 963 (9th Cir. 2023) .....................................................................3

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ..................................................................20

*Center for Food Safety v. Vilsack*,
636 F.3d 1166 (9th Cir. 2011) ...............................................................16

*Charlton v. Estate of Charlton*,
841 F.2d 988 (9th Cir. 1988) ..................................................................26

*Environmental Defense Fund, Inc. v. Andrus*,
625 F.2d 861 (9th Cir. 1980) ....................................................................4

*Greenwood v. FAA*,
28 F.3d 971 (9th Cir. 1994) ....................................................................32

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ............................................................22, 23

*International Molders' & Allied Workers' Local Union No. 164 v. Nelson*,
799 F.2d 547 (9th Cir. 1986) ........................................................24, 25, 26

*Kirshner v. Uniden Corp. of America*,
842 F.2d 1074 (9th Cir. 1988) ...............................................................21

*Kona Enterprises, Inc. v. Estate of Bishop*,
229 F.3d 877 (9th Cir. 2000) .............................................................28, 30

*Los Angeles Memorial Coliseum Commission v. National Football League*,
634 F.2d 1197 (9th Cir. 1980) ...............................................................24

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) ..................................................................30

iv

*Perfect 10, Inc. v. Google, Inc.*,
  653 F.3d 976 (9th Cir. 2011) ..................................................................23

*Religious Technology Center v. Scott*,
  869 F.2d 1306 (9th Cir. 1989) ............................................................4, 16

*Sampson v. Murray*,
  415 U.S. 61 (1974) ................................................................................21

*School District No. 1J v. ACandS, Inc.*,
  5 F.3d 1255 (9th Cir. 1993) ...................................................................31

*Smith v. Marsh*,
  194 F.3d 1045 (9th Cir. 1999) ...............................................................18

*Thomas v. County of Los Angeles*,
  978 F.2d 504 (9th Cir. 1992) .................................................................26

*United States v. Mark*,
  795 F.3d 1102 (9th Cir. 2015) ..........................................................28, 31

*University of Texas v. Camenisch*,
  451 U.S. 390 (1981) ...........................................................................3, 27

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008) ...........................................................15, 16, 23, 32

*Zamani v. Carnes*,
  491 F.3d 990 (9th Cir. 2007) .................................................................19

## Statutes

28 U.S.C. § 1292(a)(1) ................................................................................3

Fed. R. Civ. P. 59(e) ...............................................................3, 14, 28, 30

Fed. R. Evid. 801(d)(2)(D) ...................................................................17, 18

## Other Authorities

7 Moore's Federal Practice ¶ 65.04[3] ....................................................24

## **<u>INTRODUCTION</u>**

AppFolio operates a software platform that property managers use to run their businesses. AppFolio's Terms of Service have long prohibited third parties from accessing its platform without its consent. Beagle systematically violated that prohibition by borrowing AppFolio credentials from property managers to access and use AppFolio's entire platform. Beagle used these borrowed credentials to reach residents' personally identifiable information and issue residents charges for its services through AppFolio's payments system.

In December 2025, AppFolio told Beagle that it would enforce its Terms of Service and delete the unauthorized credentials that Beagle had been using to access AppFolio's platform. But AppFolio did not prevent property managers from working with Beagle. Instead, AppFolio identified two authorized methods through which property managers could use their AppFolio database to share their data with Beagle: Scheduled Reports and Database API.

That same day, Beagle's CEO emailed a customer to confirm that Beagle could use Scheduled Reports to continue providing service, saying:

> *The fix is simple and already in motion. We can continue to run your Beagle program using scheduled reports from AppFolio instead of direct logins.* 3-ER-519.

The TRO proceedings later confirmed the CEO's assessment that Beagle could use Scheduled Reports to continue providing service to its customers. Beagle's

1

motion identified four categories of data Beagle needed to avoid irreparable harm. AppFolio's opposition showed that each category of data was available in a Scheduled Report. The district court thus found that the motion's identification of the categories of data that Beagle needed to avoid harm, the sample Scheduled Report, and the CEO's assessment that Scheduled Reports provided Beagle with a simple "fix" showed that customers could use Scheduled Reports to provide Beagle with the information it needed. The court accordingly determined that Beagle had not carried its burden of establishing irreparable harm.

The district court's factual finding was well supported, and its no-irreparable-harm conclusion based on that finding was well within its discretion. Indeed, on appeal, Beagle does not dispute the district court's finding that the record showed that Scheduled Reports would provide the data that its motion for a TRO claimed was essential to avoid irreparable harm. Instead, Beagle points to a different, broader claim of harm it first hinted at in reply and then pressed in a reconsideration motion—that it needed not just "read" access (the ability to access customer data), but also "write" access (the ability to take actions on AppFolio's platform). Beagle argues that the district court abused its discretion by treating that theory as forfeited and resolving these issues without an evidentiary hearing.

But Beagle's motion for a restraining order was its opportunity to make a showing of irreparable harm. And proceedings on claims for preliminary relief

2

routinely proceed on written submissions. A party cannot withhold an argument and evidence of harm and then claim entitlement to a hearing to supply it. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). That is precisely what Beagle has done here.

Nor, similarly, can Beagle show that the district court abused its discretion in denying its motion for reconsideration. The court correctly described Beagle's changing claims of harm as a "moving target" and acted within its discretion by denying the reconsideration motion because the evidence Beagle submitted had been available to it previously and its new theory was forfeited. Rule 59(e) does not permit a disappointed movant to supply, after losing, a technical analysis that it could have supplied with its initial motion for relief.

The district court's orders should be affirmed.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). Orders ruling on a temporary restraining order are typically not appealable. *Babaria v. Blinken*, 87 F.4th 963, 975–76 (9th Cir. 2023). That rule is "largely for prudential rather than jurisdictional reasons," including the short duration of a TRO and the possibility that one will issue without the adversary receiving notice or an opportunity to respond, leaving the court of appeals with an incomplete record to review. *Id*. But when the denial of a TRO is tantamount to the denial of a preliminary injunction, appellate

3

review is available. *Religious Tech. Ctr. v. Scott*, 869 F.2d 1306, 1308–09 (9th Cir. 1989) (citing *Env't Def. Fund, Inc. v. Andrus*, 625 F.2d 861, 862 (9th Cir. 1980)).

Two circumstances make the denial of a TRO tantamount to the denial of a preliminary injunction: notice and full adversary engagement on the application, and a practical effect foreclosing further interlocutory relief. Both are present here. Beagle's motion for a TRO was supported by declarations and supporting exhibits. 4-ER-611–631; 4-ER-632–709. Shortly after the motion was filed, Beagle obtained an order from the district court maintaining the status quo by directing AppFolio not to disable the accounts that property managers have created for Beagle on AppFolio's platform until further order of the court. 1-ER-008. AppFolio then filed a full opposition to Beagle's motion supported by three declarations. 3-ER-294–324. Beagle's reply was supported by two additional declarations. 2-ER-266–275. The district court thus adjudicated Beagle's request for preliminary injunctive relief on a complete adversary record. 1-ER-005–010. And the court denied relief on the merits, holding that "Beagle has failed to demonstrate a likelihood that it will suffer irreparable harm" because the categories of data that Beagle identified as necessary to its ability to continue serving its customers were "available through alternative authorized means." 1-ER-009. While the district court did not formally convert the TRO motion to a preliminary injunction motion, the standstill order, the full

4

adversarial briefing, and the merits-based denial of relief mean that the court's order practically foreclosed further interlocutory relief.

Beagle filed a timely notice of appeal on February 6, 2026, 4-ER-742–748, and a timely amended notice on March 31, 2026, 4-ER-735–737.

**STATEMENT OF THE CASE**

**I. BEAGLE ACCESSES APPFOLIO'S PLATFORM WITHOUT AUTHORIZATION**

    **A. AppFolio Offers A Property Manager Platform And Prohibits Unauthorized Access To That Platform**

AppFolio provides property management software to residential property managers throughout the United States. 1-ER-005. Property managers pay a monthly fee to access the AppFolio Property Manager platform. *Id*. The platform is not available to non-customers. *Id*.

A property manager who subscribes to AppFolio Property Manager receives a database that provides a wide range of functions, including accounting, payments, tenant screening, maintenance, and insurance-related services. *Id*. A subscriber can create multiple user accounts so that its employees can access the database to perform different functions. *Id*.

AppFolio's Terms of Service have prohibited unauthorized third-party access to its platform since 2019. Saxena Decl. (Dec. 29, 2025) ¶ 21, 3-ER-406. Section 5.2 of those Terms states: "Third parties are not permitted to access or use the Services or any application programming interface we may make available to you without

5

[AppFolio's] prior consent." 1-ER-006; 3-ER-507. Section 5.2 further reserves AppFolio's right to "disable or delete access to the Services and any application programming interface for any of your authorized users to enforce these Terms of Service or otherwise protect our interests." *Id.*

AppFolio customers can provide their data to third parties in four different ways. First, Scheduled Reports allow a property manager to automate the export of nearly any data in its database and deliver it to a third-party on a recurring schedule. 1-ER-006. Second, the AppFolio Stack Marketplace offers vetted integrations following a formal application and review process. *Id*. Third, Database API (i.e., application programming interface) enables software-to-software communication with customer databases. *Id*. Finally, customers can share data directly outside the AppFolio platform. *Id*. Each method gives customers full control over their data without circumventing AppFolio's security infrastructure.

Property managers regularly use these authorized methods to share their data with third parties, including third parties that offer services competing with AppFolio's own. 1-ER-006. One such competing provider is Second Nature, which Beagle contends uses "the exact same method of authorized access" it does. Brown Decl. (Dec. 15, 2025) ¶ 8, 4-ER-637. The district court rejected the comparison: Second Nature accesses the platform "with AppFolio's permission in accordance

6

with AppFolio's Terms of Service (and after a vetting process), whereas Beagle has never asked AppFolio for permission." 1-ER-007–008.

### B. Beagle Accesses The Property Manager Platform With Borrowed, Unauthorized Credentials

Beagle provides insurance-compliance services to property managers, including tenant liability waiver programs and renters' insurance verification. 1-ER-007. To provide those services, Beagle uses data that AppFolio maintains for its customers on the Property Manager platform.

But Beagle did not use any of the AppFolio authorized methods to access that data. Instead, Beagle had its customers create user accounts using Beagle's email domains and then logged into those accounts as if its personnel were the customers' own employees. 1-ER-006–007; Saxena Decl. (Dec. 29, 2025) ¶¶ 24, 29, 3-ER-406, 3-ER-408; Delage Decl. (Dec. 29, 2025) ¶ 6, 3-ER-522. These user accounts gave Beagle credential-based platform access that violated Section 5.2 of AppFolio's Terms. Beagle did not seek AppFolio's consent to access the platform in this way. Beagle also never requested consent to access AppFolio's platform more generally. 1-ER-007; Saxena Decl. (Dec. 29, 2025) ¶ 29, 3-ER-408.

The accounts Beagle created carried the full capabilities of a customer's internal user. Depending on the permissions a property manager granted, Beagle's accounts could access residents' personally identifiable information, issue payments through AppFolio's payment platform, alter bank account information, and take

7

action across the customer's entire database. 1-ER-007. Beagle exercised some of those capabilities in practice. Nate Delage, AppFolio's Director of Software Engineering, declared that Beagle "sometimes uses AppFolio's functionality to issue residents charges for Beagle's products" and that its accounts carried "write access to customer accounting records." Delage Decl. (Dec. 29, 2025) ¶¶ 23, 25, 3-ER-526–527. Beagle's own CEO did not dispute the point. He acknowledged in writing that AppFolio's notice "listed things a user could technically do in your account." 3-ER-519.

### C.     AppFolio Enforces Its Terms of Service

On December 9, 2025, AppFolio notified its customers that Beagle's access through customer-created user accounts constituted a "breach of AppFolio's terms of service" creating "serious security risks" for customer data. 1-ER-008. The notice identified authorized alternatives through which customers could continue sharing their data with Beagle after access was disabled. *Id.*; Brown TRO Decl. Ex. C, 4-ER-673–676. AppFolio gave customers and Beagle five business days' notice before any accounts would be disabled. 1-ER-008.

That same day, AppFolio separately emailed Beagle offering to answer "questions about compliant access paths" and provide "clarification on transition steps." Saxena Decl. (Mar. 2, 2026) ¶ 4, 2-ER-084. Beagle never responded. *Id.*

8

### D. Beagle's CEO Confirms Beagle Can Continue Running Its Program Using Scheduled Reports

Also on that same day, Mike Brown, CEO of Big Beagle, Inc., emailed a customer to offer reassurance that Beagle could continue providing service. He wrote that the "fix is simple and already in motion. We can continue to run your Beagle program using scheduled reports from AppFolio instead of direct logins." 3-ER-519. Brown added that "in many cases, those reports are already set up." *Id.*

## II. BEAGLE SUES APPFOLIO

A week later, Beagle filed suit against AppFolio in the Northern District of California. Its complaint alleged various business torts, violations of the antitrust laws, and claims of defamation and libel. 4-ER-714–734.

### A. Beagle Seeks A TRO

Beagle moved the same day for an *ex parte* TRO. Beagle asked the court to enjoin AppFolio from disabling Beagle's customer-created user accounts on the Property Manager Platform or from otherwise interfering with Beagle's access to data on that platform until a motion for a preliminary injunction could be adjudicated. Beagle's TRO motion identified four categories of data that it needed to continue providing service to its customers: "tenant rosters, unit identifiers, lease and billing information, and insurance compliance." 1-ER-009.

At a status conference held the same day that the motion for a TRO was filed, AppFolio agreed not to suspend Beagle's access for a week. Before the week was

9

over, the Northern District of California transferred the case to the Central District of California and ordered AppFolio to maintain the status quo pending further order from the Central District. 3-ER-559.

AppFolio filed its opposition about a week after the Northern District transferred the case and entered the standstill order. The opposition demonstrated that Scheduled Reports could provide every item on Beagle's list of the information that it needed to continue serving its customers. AppFolio supported its opposition with declarations and a sample Scheduled Report confirming that Beagle's customers could provide each of the four categories of information Beagle claimed it needed. 3-ER-502–503. AppFolio's evidence showed that Scheduled Reports allow a property manager to automate the export of nearly any data in its database and deliver it to a third-party provider on a recurring schedule. 1-ER-006. A customer can configure a Scheduled Report in approximately five minutes. *Id.* AppFolio also relied on Beagle's CEO's own assessment that the fix to AppFolio's decision to cut off Beagle's method of access to its platform was "simple." 3-ER-299; 3-ER-502–503; 3-ER-519.

Although AppFolio's opposition showed that property managers could use Scheduled Reports to provide Beagle with the information it needed to serve them, AppFolio also identified additional methods customers could use to provide authorized access to their data to third parties like Beagle. For example, Database

10

API enables communication between software programs and gives customers a mechanism for structured data exchange with any third-party provider of their choosing. 1-ER-006.

Beagle's reply argued that its CEO's message to a customer stating that Scheduled Reports were a quick fix that would provide it with all the data it needed to continue providing service was "damage control," not a concession, and that in fact the Scheduled Reports were insufficient. 2-ER-272; Brown Reply Decl. (Dec. 31, 2025) ¶ 5, 2-ER-278. The reply also introduced new theories of irreparable harm: that it also needed unspecified information about insurance and access to the AppFolio platform to "add or remove charges." 1-ER-003.

## B. The Court Denies Beagle's Motion

The district court denied the TRO in early January 2026, holding that Beagle had not satisfied its burden of showing that it would suffer irreparable harm absent an injunction. The court found that the data Beagle claimed to need was "available through alternative authorized means, such as through the use of Scheduled Reports." 1-ER-009–010. The court noted that Beagle argued in reply that Scheduled Reports were an inadequate substitute because the process to set up Scheduled Reports would be "onerous" for its customers, but found that Beagle "failed to demonstrate that the setting up of Scheduled Reports is particularly onerous." 1-ER-009–010. The court further noted that Beagle's reply argued (contrary to its CEO's

11

admission) that Scheduled Reports did not provide it with all of the information that it required, but the court rejected that claim because it was presented for the first time in reply. 1-ER-010.

### C. The Court Denies Beagle's Request For Reconsideration

Beagle moved for reconsideration, now introducing a third, broader theory of irreparable harm. Beagle claimed that it required the ability to perform "write operations" within AppFolio's systems, including to "remediate compliance issues, validate or correct records, execute workflows, or perform other active functions required by Plaintiffs' customer contracts." 1-ER-002–003.

The district court denied the reconsideration motion. 1-ER-002–004. Noting that Beagle's claim of irreparable harm had been "a moving target," 1-ER-003, the court rejected the contention that this new theory of irreparable injury was grounds for reconsideration because the information that Beagle needed from its customers "was well-known to Beagle at the time it filed its Motion for TRO, and could have been presented to the Court before it issued its decision." 1-ER-004.

### SUMMARY OF THE ARGUMENT

I. This appeal turns on a straightforward factual finding. Beagle sought emergency injunctive relief on the theory that AppFolio was about to cut it off from four categories of customer data that it said were necessary to operate its service. The district court rejected that premise after AppFolio demonstrated that customers

12

could provide the same data through authorized Scheduled Reports. That finding is well supported by the record. Because the data Beagle said that it needed remained available to Beagle through Scheduled Reports, the district court correctly concluded that Beagle had failed to show that it was likely to suffer irreparable harm.

Beagle's central argument on appeal turns on theories that were never properly raised below, and that would fail to demonstrate irreparable harm regardless. After AppFolio showed that Scheduled Reports provided the categories of data Beagle claimed to need, Beagle argued in reply that it also needed additional insurance information and the ability to make certain charges. The district court acted well within its discretion in declining to credit a new theory raised when AppFolio had no opportunity to respond. And in any event, the record showed that Beagle's claim of harm depended on speculation about unspecified data fields and the possibility that AppFolio might deny access to other authorized paths, such as the Database API. That speculation did not establish irreparable harm.

Beagle's separate theory that the district court erred by failing to consider its claim of reputational harm likewise fails. Beagle sought an order preventing AppFolio from disabling the customer-created user accounts Beagle had been using to access the platform. 4-ER-630. That relief would not have retracted or corrected the customer communications Beagle claims damaged its reputation. That purported harm also could have been addressed through damages in any event.

13

II. Beagle's claims of procedural error also lack merit. The district court did not err by deciding its motion on the papers. A hearing is not required merely because the parties have submitted competing declarations. The district court had before it Beagle's four-category data claim, AppFolio's sample report establishing that Scheduled Reports could include each category of data, and Beagle's CEO's own written statement that Scheduled Reports would provide the information it needed. A subsequent declaration by the CEO did not give rise to the sort of factual dispute that would require a hearing.

III. The district court likewise acted within its discretion in denying the reconsideration motion. A Rule 59(e) motion may not be used to present evidence that could reasonably have been offered before the original order. But the information underlying Beagle's reconsideration motion was, as the district court found, "well-known to Beagle at the time it filed its Motion for TRO, and could have been presented to the Court before it issued its decision." 1-ER-004. A litigant cannot show grounds for reconsideration by submitting an analysis it could and should have submitted earlier.

IV. Finally, even if the district court erred—and it did not—the remedy would not be for this Court to enter an injunction against AppFolio, as Beagle now requests. Rather, the appropriate remedy would be to remand the case to the district court so

14

that it could determine whether Beagle has satisfied all the requirements for injunctive relief.

**ARGUMENT**

The district court's denial of preliminary relief rests on straightforward grounds: the record showed that Beagle's customers could use Scheduled Reports to provide it with the four categories of data it claimed to need to continue providing service. As the district court concluded, that factual finding meant that Beagle failed to establish that it was likely to suffer irreparable harm.

## I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CONCLUDING THAT BEAGLE FAILED TO SHOW LIKELY IRREPARABLE HARM

To obtain a preliminary injunction, a movant must establish that (1) it is likely to succeed on the merits of its claim; (2) it is likely to suffer irreparable harm absent the preliminary injunction; (3) the balance of equities tips in its favor; and (4) a preliminary injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). When evaluating the *Winter* factors, this Court uses a "sliding scale approach." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). But the sliding-scale approach does not eliminate the irreparable injury requirement: serious questions on the merits can support an injunction only if the plaintiff also shows a likelihood of irreparable injury. *Id*. at 1135. When a movant fails to show likely irreparable injury, a court may deny relief

15

without addressing the remaining *Winter* factors. *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1173 (9th Cir. 2011).

That is what happened here. The district court denied Beagle's motion after finding that Beagle could obtain the data it claimed to need through Scheduled Reports. That factual finding is reviewed for clear error, and the denial of a preliminary injunction is reviewed for abuse of discretion. *Religious Tech. Ctr. v. Scott*, 869 F.2d 1306, 1309 (9th Cir. 1989). On this record, the district court's decision is well within its discretion.

### A. The District Court Did Not Clearly Err In Finding That Beagle Could Obtain The Data It Claimed To Need

Beagle's TRO motion identified four categories of data it said were operationally necessary: tenant rosters, unit identifiers, lease and billing information, and insurance compliance. 1-ER-009. Its irreparable-harm theory rested on the premise that if AppFolio disabled Beagle's unauthorized user credentials, Beagle would lose access to that data and be unable to continue providing service. D'Angelo Decl. (Dec. 15, 2025) ¶ 4, 4-ER-685; 1-ER-009.

AppFolio's opposition showed otherwise. AppFolio submitted a sample Scheduled Report containing each category of data Beagle had identified as essential. 3-ER-502–503. AppFolio also showed that a customer could set up a Scheduled Report in approximately five minutes. 1-ER-006. The record also included an email from Mike Brown, CEO of Big Beagle, Inc., to a customer

16

explaining at the inception of this suit that the "fix is simple and already in motion. We can continue to run your Beagle program using scheduled reports from AppFolio instead of direct logins. . . . In many cases, those reports are already set up." 3-ER-519.

Based on this evidence, the district court found that the data Beagle identified as essential remained "available through alternative authorized means, such as through the use of Scheduled Reports." 1-ER-009. Given the sample report and Brown's contemporaneous email admission that Scheduled Reports would provide Beagle the access that it needed, the district court's finding was well supported— and certainly not clearly erroneous, as would be required for reversal.

Beagle's suggestion that the district court erred by crediting Brown's statement, Opening Br. 19, lacks merit. Brown wrote the email as CEO of the operational entity running the Beagle service. It is accordingly a party admission on which the court was entitled to rely. Fed. R. Evid. 801(d)(2)(D). Brown's later declaration attempting to recast the email as damage control does not undermine the court's finding or even contradict Brown's email. *Contra* Opening Br. 18. The declaration asserts that Scheduled Reports are "not workable" because they shift labor to property managers and thus undermine Beagle's "value proposition." 2-ER-278. But value is a different question than technical feasibility, which is the

17

question Beagle's motion raised and Brown's email answered ("The fix is simple and already in motion").

Beagle also suggests that Brown lacked the technical expertise to assess Scheduled Reports as an alternative. *See* Opening Br. 18–19. But the record forecloses that suggestion. Brown's observation that "in many cases, those reports are already set up," 3-ER-519, reflects operational familiarity with the tool. And Rule 801(d)(2)(D) requires only that the statement concern matters within the scope of the declarant's employment, not that the declarant hold an engineering degree.

Beagle further contends that Brown spoke only for Big Beagle, and not for the other plaintiff entities. Opening Br. 52–53. That argument was not raised in the TRO proceedings and is therefore forfeited. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). Moreover, the email itself refutes the point. Brown did not describe a transition limited to Big Beagle. He wrote: "We can continue to run your Beagle program using scheduled reports from AppFolio instead of direct logins." 3-ER-519. "We" refers to the enterprise that marketed and delivered the integrated Beagle service and jointly sought emergency relief in this case.

Finally, and in any event, the district court's finding that the Scheduled Reports provided the necessary data would remain well-supported even if Brown's admission were for some reason disregarded. The court's finding rested also on the sample report in the record, and not simply on Brown's statement. 1-ER-009. Beagle

18

provides no basis for this Court to conclude that evidence was insufficient to support the court's finding.

### B. Beagle's Alternative Theories Were Forfeited And Unsupported

Unable to rebut AppFolio's evidence that Scheduled Reports would provide it with the data it needed, Beagle shifted theories over the course of the proceedings. The district court accurately described Beagle's claims of harm as a "moving target." 1-ER-003. Beagle now contends that this finding cannot be reconciled with the record. Opening Br. 47.

As explained above (*see supra* pp. 16–19), Beagle's TRO motion claimed irreparable harm because it allegedly could not obtain four categories of data. Once AppFolio showed that each category was available through Scheduled Reports, Beagle asserted in reply that it also needed unspecified insurance-policy fields and the ability to add or remove charges. 1-ER-003. Its reconsideration motion then argued that it needed write access to the AppFolio platform.

The district court acted within its discretion in declining to credit those shifting theories of irreparable harm. As the court found, the information underlying each newly asserted claim of harm had been "well-known to Beagle at the time it filed its Motion for TRO." 1-ER-003. Beagle thus had no viable reason to refrain from asserting and supporting these theories in its opening motion. A court need not consider arguments raised for the first time in reply. *Zamani v. Carnes*, 491 F.3d

19

990, 997 (9th Cir. 2007). Beagle chose to frame its claim of irreparable harm as a claim that it would be blocked from obtaining essential data, and the district court properly held it to that framing. That alone is a sufficient basis for this Court to affirm.

Beagle's remaining arguments would fail to undermine the district court's findings in any event.

**Insurance Policy Data**. The district court noted that Beagle's claim about insurance fields "fail[ed] to identify what data fields [were] missing," leaving the court unable to assess materiality. 1-ER-010. The court also found that, regardless, the Database API provided an additional authorized path for the insurance-policy data Beagle raised in its reply. *Id*. Beagle contends that AppFolio might deny it access to the Database API. Opening Br. 43–44. But that contention was speculative when Beagle raised it below, and the district court rejected it on that basis. AppFolio had made "no such statement to its customers"; to the contrary, it had told them it supports "multiple safe methods for you to work with [third party providers], including AppFolio Stack, Database API, and scheduled reports." *Id*. The district court was not required to credit Beagle's mere unsupported assertions that AppFolio might deny it access in the future. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (speculative injury cannot establish irreparable harm).

20

The evidence Beagle now relies on regarding the Database API, Opening Br. 46, was developed weeks after the TRO ruling. Okpokowuruk Decl. (Feb. 11, 2026) ¶ 3, 2-ER-154. Appellate review is, however, confined to the record before the district court at the time of its decision. *Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077 (9th Cir. 1988). And in any event, the statement Beagle points to from AppFolio's Answer concerns Beagle's unauthorized credential-based access, which Section 5.2 of AppFolio's Terms of Service prohibits. 1-ER-007. It does not address whether Beagle could pursue the API path AppFolio's customer notice identified as available.

**Beagle's Value Proposition.** Beagle also attacks the district court's conclusion that Scheduled Reports provided it with the data it sought on the ground that evidence it submitted in reply supposedly shows that the Scheduled Reports invert its "value proposition" by shifting labor to property managers. Opening Br. 39; Brown Reply Decl. (Dec. 31, 2025) ¶ 5, 2-ER-278. But that argument concedes operability. It contends only that Scheduled Reports make Beagle's product less convenient and more costly to deliver. That is a recoverable economic harm, not an irreparable one. *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

**The Write-Access Theory**. Beagle's various efforts to show that it raised a write-access theory of irreparable harm at the threshold are similarly unpersuasive. Beagle first points to a statement by Nate Delage, AppFolio's Director of Software

21

Engineering, that Beagle would "not be able to log in to the property manager's AppFolio account and set up the billing" once its credentials were disabled. Opening Br. 36–37; Delage Decl. (Dec. 29, 2025) ¶ 26, 3-ER-528. But Beagle cannot establish that it preserved a theory of irreparable harm by pointing to a factual statement made by an AppFolio engineer that was never advanced in Beagle's motion. And even if it could, Delage was actually making the opposite point. He was explaining that the disruption from disabling Beagle's access would be limited: the "only difference regarding payment" would be loss of one billing channel Beagle had been using without authorization. *Id*. The declaration confirms that the underlying service could continue without write access. *Id*.

Beagle also tries to show that it claimed harm from lack of write access at the outset by pointing to AppFolio's statement that Beagle was "not just accessing data" but was "issuing charges to residents." Opening Br. 35; 3-ER-300. That statement was made to establish the severity of Beagle's Terms of Service violation that justified AppFolio's actions, not to establish what Beagle operationally requires. This statement does nothing to excuse Beagle's failure to advance or support this theory of irreparable harm in its own motion.

**The hiQ Decision**. In all these respects, Beagle's reliance on *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022), Opening Br. 48–49, is misplaced. The irreparable-harm finding in *hiQ* rested on the plaintiff's showing that it had "no

22

current viable alternative" to the blocked data source and faced the prospect of being driven out of business. *Id*. at 1189. The district court found the opposite here: Beagle had a viable alternative in Scheduled Reports. Beagle's theory of harm also lacks *hiQ's* contractual foundation. *hiQ*'s irreparable-harm finding rested on identified contracts with real third parties whose performance would be disrupted absent injunctive relief. 31 F.4th at 1189. Beagle did not file a customer contract until its reply brief, and the contract it filed makes no reference to AppFolio, write access, or platform integration. 2-ER-280–286. A claimed inability to perform contractual duties the contract does not impose is not irreparable within the meaning of *Winter*.

### C. Beagle Did Not Establish Irreparable Harm Based On The Purported Injury To Its Reputation

Beagle's reputational-harm theory, Opening Br. 49–52, likewise fails. The injunction Beagle sought was directed solely at AppFolio's disabling of its unauthorized access credentials. Yet the reputational injury Beagle now asserts stems from customer communications about security. Irreparable harm must bear a "sufficient causal connection" to the conduct the plaintiff seeks to enjoin. *Perfect 10, Inc. v. Google, Inc*., 653 F.3d 976, 982 (9th Cir. 2011). Because the requested injunction would not have addressed the alleged reputational harm, that theory cannot support preliminary relief.

In any event, the injuries Beagle identifies are lost customers and lost revenue, the classic monetary harms that "[are] not normally considered irreparable." *hiQ*

23

*Labs*, 31 F.4th at 1188 (quoting *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)). Beagle cannot escape that rule by invoking the threat of being driven out of business. That theory depends on the absence of a viable alternative, and the district court found one. *See supra* pp. 16–19.

**II. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION BY DECIDING THE APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF ON THE PAPERS**

Beagle argues that the district court abused its discretion by resolving the TRO motion without live testimony. Opening Br. 53–57. That argument lacks merit. This Court has rejected any presumption favoring evidentiary hearings on preliminary-injunction motions. *Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986). Whether a hearing is necessary depends on "general concepts of fairness, the underlying practice, the nature of the relief requested, and the circumstances of the particular [case]." *Id*. (quoting 7 Moore's Federal Practice ¶ 65.04[3]). Review is for abuse of discretion. *Id.* at 550.

The standard governing the district court's determination is flexible. *Int'l Molders'* affirmed an injunction entered without a hearing even though some facts were disputed because the dispute primarily concerned the application of law to the record. *Id*. at 555. And even where facts are contested, a hearing may be unnecessary when the scope of the factual inquiry would make one impractical. *Id*.

24

The question here is therefore narrow: whether the district court's decision to proceed on the written record fell outside the range of permissible choices. It did not. The dispositive factual question—whether Scheduled Reports provided the data Beagle claimed to need—was resolved by the parties' written submissions, including the sample Scheduled Report and Brown's contemporaneous admission. *See supra* pp. 16–19. The cases Beagle cites do not require a hearing on this record. And Beagle chose the procedures it now criticizes.

## A. The Dispositive Factual Question Was Resolved by the Written Record

The central factual question was whether Beagle would lose access to the data it claimed was operationally necessary. The written record answered that question.

AppFolio submitted a sample Scheduled Report containing each of the four data categories Beagle identified as essential. 3-ER-502–503. Brown's contemporaneous email to a customer confirmed the same point: "The fix is simple and already in motion. We can continue to run your Beagle program using scheduled reports from AppFolio instead of direct logins." 3-ER-519.

Beagle nevertheless contends that the district court could not resolve this technically complex dispute on a written record. Opening Br. 53. But the district court was entitled to decide the question on the documentary record, which included Brown's contemporaneous statement and the sample Scheduled Report. 1-ER-009.

25

And Brown's declaration identified no technical barrier to Scheduled Reports, only that they shift labor to property managers. *See supra* p. 21.

To the extent that Beagle now argues that there is a factual dispute over its need for write access to AppFolio's platform, that issue was not raised in its TRO motion. *See supra* pp. 21–22. The district court could not have abused its discretion in declining to hold an evidentiary hearing to resolve an issue that was not raised. *See* 1-ER-004.

### B.     Beagle's Cases Do Not Require A Hearing Here

The three cases Beagle cites—*Thomas*, *Charlton*, and *Int'l Molders'*—do not support reversal. *See Thomas v. County of Los Angeles*, 978 F.2d 504, 506 (9th Cir. 1992); *Int'l Molders'*, 799 F.2d at 555; *Charlton v. Estate of Charlton*, 841 F.2d 988, 988–89 (9th Cir. 1988).

The factual disputes in those cases were of a different kind. *Thomas* involved "diametrically opposing declarations" describing numerous alleged incidents of police misconduct, and the injunction required findings of a pervasive pattern of constitutional violations. 978 F.2d at 508–09. Those disputes turned on credibility determinations that live testimony could meaningfully resolve. *Charlton* reversed the entry of a permanent injunction because the movant there had not waived a hearing the disputed facts required. 841 F.2d at 989. Beagle's posture is the opposite. It sought *ex parte* relief on the papers and first requested an evidentiary hearing only

26

after the district court had ruled. *See infra* pp. 27–28. Here, by contrast, the key factual question—whether an authorized alternative provided the data Beagle claimed to need—was answered by the documentary record. Finally, *Int'l Molders'* supports the district court's approach. That case rejected any presumption requiring hearings on injunction motions and affirmed a decision made on the papers. 799 F.2d at 555.

### C. The Procedural Posture Beagle Now Criticizes Was Of Its Own Making

Beagle also faults the district court for deciding the TRO motion on a compressed schedule. Opening Br. 54. But that schedule was the result of Beagle's own decisions.

Beagle did not request an evidentiary hearing when it filed the TRO motion. To the contrary, it sought *ex parte* relief and asked the court to decide the request on the papers, with any hearing to follow only if a TRO issued. 4-ER-614, 4-ER-621, 4-ER-630. Even after introducing new factual assertions in reply, Beagle again asked the court to resolve those disputes based on declarations. 2-ER-271–272. Beagle first requested an evidentiary hearing only in its reconsideration motion, after the TRO had been denied. 2-ER-132, 2-ER-138–139. The district court did not abuse its discretion by declining to hold an evidentiary hearing that Beagle never requested. A movant cannot ask a court to decide on the papers and then, after losing, fault the court for doing so. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

27

Nor did Beagle pursue the transition assistance AppFolio offered. AppFolio notified Beagle on December 9, 2025, that it would be deleting Beagle's unauthorized credentials in five days and offered Beagle "additional guidance" and "transition steps" for compliant access paths. Saxena Decl. (Mar. 2, 2026) ¶ 4, 2-ER-084. Beagle let that offer sit and filed an emergency TRO motion without investigating the Database API or engaging the offered transition assistance. Delage Decl. (Mar. 2, 2026) ¶ 5, 2-ER-089–090.

## III. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION BY DENYING RECONSIDERATION

Reconsideration was also properly denied. Rule 59(e) offers an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (citation omitted). "[A] motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Id.* (quoting *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999)). The forfeiture rule is equally clear: "[a] Rule 59(e) motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Id.* This Court reviews the denial of reconsideration for abuse of discretion. *United States v. Mark*, 795 F.3d 1102, 1104 (9th Cir. 2015).

28

The district court acted well within its discretion in concluding that Beagle had not satisfied this demanding standard. Beagle's central reconsideration submission was an engineer's declaration purporting to demonstrate that Scheduled Reports and the Database API could not perform the "write-enabled workflows" Beagle now insists are essential. Opening Br. 59–60; *see* 2-ER-154. But as the district court correctly determined, Beagle failed to advance this write-access theory in its motion for TRO, even though both this theory and the evidence that purportedly supported it would have been available to Beagle at that time. 1-ER-003. As the court explained: "The information, data, and functionality that Beagle requires to service its customer base were well-known to Beagle at the time it filed its Motion for TRO, and could have been presented to the Court before it issued its decision on Beagle's Motion for TRO." 1-ER-004. Beagle knew what it needed to serve its customers when it filed its motion, and could have raised any write-access theory then. It did not. The theory is forfeit.

Because Beagle did not claim to need write capability in its motion, the district court did not reach whether Scheduled Reports and the Database API provide it; it denied reconsideration on the ground that the theory was available all along. *See* 1-ER-003–004. In any event, the record supports the court's determination. Before filing suit, Beagle had used Scheduled Reports to transmit more than 54,000 reports to 346 AppFolio customers. Delage Decl. (Mar. 2, 2026) ¶ 6, 2-ER-090. And on

December 9, 2025, AppFolio identified that and other features that Beagle would be able to use and offered Beagle "additional guidance" on "compliant access paths" and "transition steps." Saxena Decl. (Mar. 2, 2026) ¶ 4, 2-ER-084. While Beagle never responded (*id.*), Beagle's CEO had already assessed those same alternatives in writing. *See* pp. 16–17, *supra* (Argument I) (Brown email, 3-ER-519). Thus, even if Beagle had claimed to need write capability, it was well positioned to determine, and was likely already aware of, its availability at the time it filed the TRO. That Beagle decided, more than a month later (Okpokowuruk Decl. (Feb. 11, 2026) ¶ 3, 2-ER-154), to conduct an engineering analysis in support of a different theory that it had not raised does not excuse its prior failure to advance that argument or make that evidence "newly discovered" within the meaning of Rule 59(e). *Kona Enters.*, 229 F.3d at 890.

This Court rejected the same maneuver in *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873 (9th Cir. 2009). There, the movant sought reconsideration of a preliminary injunction by submitting a post-hearing declaration from its CEO addressing a technical question central to the dispute. *Id.* at 880–81. This Court affirmed the district court's denial of reconsideration, holding that the movant "could have introduced [the CEO's] declaration before the district court made its decision, but did not." *Id.* at 881. Precisely the same is true here. *See also, e.g.*, *School District No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993)

30

("[T]he failure to file documents in an original motion or opposition does not turn the late filed documents into 'newly discovered evidence.'")

*Mark*, on which Beagle relies (Opening Br. 61), illustrates what Beagle's reconsideration motion lacked. In *Mark*, this Court reversed a reconsideration denial because the movant produced newly obtained telephone records that "directly contradicted" the prosecutors' testimony that was the "only affirmative evidence" supporting the district court's original order. 795 F.3d at 1105–06. Three key features supported this Court's holding: (1) the new evidence was genuinely unavailable; (2) that evidence directly contradicted rather than supplemented the earlier record; and (3) it undermined the sole factual basis for the prior ruling. *Id.* Each of these three factors is absent here: (1) Beagle could have conducted and presented the engineer's analysis previously; (2) the evidence does not directly contradict the earlier evidence on which the district court relied, but instead simply attempts to support a different (previously available) theory; and (3) ample evidence supported the district court's finding that the Scheduled Reports provided the data that Beagle's TRO contended it needed. *See supra* pp. 16–19.

Finally, Beagle also asserts in passing that it was entitled to reconsideration based on "documented instances of customer attrition tied directly to AppFolio's January 9, 2026 disparaging communications." Opening Br. 60. How this evidence could have warranted reconsideration is unclear, as Beagle never sought an

31

injunction that would have prevented AppFolio from speaking in this manner in the first place. Regardless, to the extent Beagle had ever asserted a theory of reputational harm, that harm could be addressed by damages, and therefore was not irreparable. *See supra* pp. 23–24.

## IV.  BEAGLE IDENTIFIES NO BASIS FOR THIS COURT TO ENTER A STAY

Beagle asks this Court to "reinstate the status quo maintenance order issued by the Northern District of California pending the outcome of a preliminary injunction hearing." Opening Br. 64. That is a prayer for injunctive relief from this Court, and a movant for injunctive relief must satisfy each of the four factors set out in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Yet Beagle's opening brief does not even attempt to demonstrate that it has satisfied any of the factors aside from showing irreparable harm. An issue not argued specifically and distinctly in an opening brief is forfeited. *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994). Thus, even to the extent that the district court erred in denying Beagle's request for extraordinary relief—and it did not—the proper remedy would be for this Court to remand to the district court to determine whether Beagle is entitled to injunctive relief.

## CONCLUSION

The orders below should be affirmed.

32

Dated:  June 5, 2026          Respectfully submitted,

s/ Jeremiah M. Levine
Brian A. Procel
Jeremiah M. Levine
Marty H. Pritikin
Procel Levine LLP
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
(424) 788-4538

*Attorneys for Defendant-Appellee AppFolio, Inc.*

33

## **STATEMENT OF RELATED CASES**

Pursuant to Ninth Circuit Rule 28-2.6, Defendant-Appellee AppFolio, Inc. is aware of no related cases pending in this Court.

## **CERTIFICATE OF COMPLIANCE**

1.   This brief complies with the type-volume limitation of Circuit Rule 32-1 because it contains 7,365 words, excluding the portions exempted by Fed. R. App. P. 32(f).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Mac (version 16.104) in 14-point Times New Roman.

Dated: June 5, 2026

/s/ Jeremiah M. Levine
Jeremiah M. Levine

35

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25 and Ninth Circuit Rule 25-5, I hereby certify that, on June 5, 2026, I electronically filed the foregoing Brief for Defendant-Appellee with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Court's Appellate Case Management System (ACMS). Participants in the case are registered ACMS users and will be served through ACMS.

Dated: June 5, 2026

/s/ Jeremiah M. Levine
Jeremiah M. Levine

36